# EXHIBIT B

Page 1

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     --------------------------------x

5     DR. PAUL M. CONTI,

6                        Plaintiff,      Case No.

7          - against -                   17-CV-9268

8     JOHN DOE,

9                        Defendant.

10    --------------------------------x

11

12        DEPOSITION OF PAUL S. APPELBAUM, M.D.

13              New York, New York

14           Tuesday, January 21, 2020

15                    9:38 a.m.

16

17

18

19

20

21

22    Reported by:

23    ERICA L. RUGGIERI, RPR

24    JOB NO. 3850032

25

Page 2

1

2                    January 21, 2020

3                    9:38 a.m.

4

5          Deposition of PAUL S.

6     APPELBAUM, M.D., held at the offices

7     of Judd Burstein, P.C., 5 Columbus

8     Circle, Suite 1501, New York, New

9     York, pursuant to Notice, before

10    Erica L. Ruggieri, Registered

11    Professional Reporter and Notary

12    Public of the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

4    Attorneys for Plaintiff

5    Law Offices of Judd Burstein, P.C.

6        5 Columbus Circle, Suite 1501

7        180 Maiden Lane

8        New York, New York 10166

9        212.974.2400

10       BY:   JUDD BURSTEIN, ESQ.

11             jburstein@burlaw.com

12

13   Attorneys for Defendant

14   EMERY CELLI BRINCKERHOFF & ABADY LLP

15       600 Fifth Avenue, 10th Floor

16       New York, New York 10020

17       212.763.5000

18       BY:   KATHERINE R. ROSENFELD, ESQ.

19             krosenfeld@ecbalaw.com

20

21

22

23

24

25

Page 4

1

2          S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND

5     AGREED, by and between the attorneys

6     for the respective parties herein,

7     that filing and sealing be and the

8     same are hereby waived.

9          IT IS FURTHER STIPULATED AND

10    AGREED that all objections, except

11    as to the form of the question,

12    shall be reserved to the time of the

13    trial.

14         IT IS FURTHER STIPULATED AND

15    AGREED that the within deposition may

16    be sworn to and signed before any

17    officer authorized to administer an

18    oath, with the same force and effect

19    as if signed and sworn to before the

20    Court.

21

22

23

24

25

Page 5

```
 1            PAUL S. APPELBAUM, M.D.
 2       P A U L   S.   A P P L E B A U M,
 3       called as a witness, having
 4       affirmed, was examined and testified
 5       as follows:
 6       EXAMINATION BY
 7       MR. BURSTEIN:
 8           Q.   Good morning,
 9       Dr. Appelbaum.
10           A.   Good morning.
11           Q.   I know that you've been
12       deposed before from your report
13       but...
14            MR. BURSTEIN:  Usual stips by
15        the way?
16            MS. ROSENFELD:  Federal court.
17            MR. BURSTEIN:  Right.  You
18        know, basically the rules.  He
19        doesn't have to sign in the
20        presence of a notary.  Even though
21        it's all objections except for --
22        all objections other than form are
23        reserved.  Basically the normal
24        stuff.
25            MS. ROSENFELD:  Right.  And we
```

```
 1            PAUL  S.  APPELBAUM,  M.D.
 2      messages that is the focus of this
 3      litigation, and for the purposes of
 4      this question I'm going to ask you
 5      to assume that there are e-mail
 6      messages of the type that are at
 7      issue in this case?
 8            MS. ROSENFELD:  Objection to
 9       form.
10         Q.   And is there -- are there
11      any peer-review articles discussing
12      issue number one that you are aware
13      of?
14            MS. ROSENFELD:  Objection to
15       form.
16         A.   Not that I'm aware of as I
17      sit here today.
18         Q.   Are there any rules of
19      conduct issued by a psychiatric
20      organization that specifically
21      addresses issue number one?
22            MS. ROSENFELD:  Objection to
23       form.
24         A.   I'm not aware of written
25      rules that specifically address
```

1           PAUL S. APPELBAUM, M.D.

2      responding to text and e-mail

3      messages of this sort.

4           Q.   Okay.  Are you aware of any

5      generally accepted standard within

6      the psychiatric community for

7      addressing the issue raised -- that

8      you opined on in number one?

9           A.   Yes.  I think there are

10     generally accepted standards in

11     psychiatry today.

12          Q.   And what are those

13     standards?

14          A.   Those standards are that a

15     psychiatrist in responding to

16     patient communications, whether they

17     are text, e-mail, phone calls or

18     face-to-face communications needs to

19     attempt to understand them in the

20     context of the treatment and the

21     patient's condition, not necessarily

22     taking them at face value but

23     assessing them with regard to the

24     nonverbal as well as the verbal

25     aspects of the communication, that

1          PAUL S. APPELBAUM, M.D.

2     is what the latent meaning of these

3     communications may well be.  And in

4     responding doing so in a way that's

5     consistent with the overall thrust

6     of the treatment.

7          Q.   Is that generally accepted

8     standard also applicable to

9     psychiatrists who are -- who have

10    terminated treatment where the

11    patient has new therapists, whether

12    it be psychiatrists or

13    psychologists?

14         A.   So I think a psychiatrist

15    has an ongoing obligation not to

16    undermine the previous treatment or

17    otherwise endanger the well being of

18    a former patient, whether or not

19    that patient has linked up with a

20    new treater.

21         Q.   And is it your view that

22    the psychiatrist's duty with respect

23    to the standard of care that you've

24    just identified is the same whether

25    the psychiatrist is treating a

1              PAUL S. APPELBAUM, M.D.

2        current patient as opposed to a

3        psychiatrist who is no longer

4        treating the patient?

5              MS. ROSENFELD:  Objection to

6         the form.

7         A.   Although there are clearly

8        differences with regard to the

9        responsibility of a psychiatrist for

10       a former patient compared with a

11       current patient insofar as the

12       specifics of what I just described

13       are concerned, which is to say not

14       responding in a counter-therapeutic

15       way and keeping in mind the long

16       term welfare of the patient, I don't

17       think there are significant efforts

18       as before and after termination.

19       Q.   Are you aware of any

20       scholarly articles that are peer

21       reviewed addressing the issue of a

22       psychiatrist's obligation to

23       interacting with prior patients?

24       A.   I think there are articles

25       that speak about some aspects of

Page 29

1             PAUL  S.  APPELBAUM,  M.D.
2       those  obligations  but  I'm  not  aware
3       of  any  that  speak  --  well,  let  me
4       back  up  and  say  it  in  a  clearer  way.
5             There  are  certainly  writings
6       that  speak  to  the  general  principle
7       not  undermining  the  previous
8       treatment  and  not  injuring  the
9       patient  deliberately  in  any  way,
10      that  is  having  the  patient's  welfare
11      in  mind  even  when  the  patient
12      becomes  a  former  patient,  and  there
13      are  a  variety  of  specific  ways  in
14      which  that  general  principle  plays
15      out.    I'm  not  aware  of  anybody  who
16      has  written  specifically  about
17      responding  to  text  and  e-mail
18      messages  but  I  think  the  general
19      principle  is  there  and  is  clear.
20           Q.    Are  there  any  peer  review
21      articles  addressing  a  psychiatrist's
22      obligation  post  termination  of  the
23      patient  when  the  --  when  a  patient
24      sends  threatening  e-mails  and  texts?
25           A.    I'm  not  aware  of  such  an

Page 30

1              PAUL S. APPELBAUM, M.D.
2     article.
3          Q.   Are there any generally
4     accepted standards, other than the
5     general one that you just
6     identified, to deal with the
7     specific issue of a patient who is
8     no longer treated by the
9     psychiatrist sending threatening
10    texts and e-mails?
11          MS. ROSENFELD:   Objection to
12     form.
13          A.   I think that I would
14    respond as I did previously, which
15    is to say there are general
16    principles that govern post
17    termination relationships and that
18    that is what would be applied to
19    this circumstance.  I'm not aware of
20    peer review articles that have
21    considered that specifically but I
22    think the general principles have
23    certainly been addressed.
24          Q.   Just to be clear, there's
25    no standards issued by any

1               PAUL S. APPELBAUM, M.D.

2        recognized standards or rules issued

3        by any recognized professional

4        organization such as the APA which

5        address that specific issue?

6              MS. ROSENFELD:  Objection to

7         the form.

8            A.   I'm not aware of specific

9        writings from APA that have

10       addressed that narrow issue as

11       opposed to the broader principles.

12           Q.   Or any -- other than

13       general principles, any generally

14       accepted practice with respect to

15       that specific issue --

16             MS. ROSENFELD:  Objection to

17        the form.

18           Q.   -- of post termination

19       threatening e-mails and texts?

20           A.   So I think the generally

21       accepted practice is to behave in a

22       way that is consistent with those

23       principles I described.

24           Q.   And now drilling down to

25       the individual therapist applying

```
 1            PAUL  S.  APPELBAUM,  M.D.
 2       these  principles,  does  the
 3       application  of  those  principles
 4       involve  the  exercise  of  judgment  by
 5       the  treating  psychiatrist?
 6            A.    I  think  in  part  it  does.
 7            Q.    And  is  it  your  view  that  a
 8       psychiatrist  presented,  for  example,
 9       with  hostile  texts  that  there  is
10       only  one  response  that  would  be
11       professionally  responsible  in  those
12       circumstances?
13            A.    Given  that  there  will  be  a
14       large  number  of  contingencies
15       surrounding  any  particular  case,  I
16       think  those  contingencies  need  to  be
17       taken  into  account.    I'm  not
18       prepared  to  say  there's  just  one
19       right  response.
20            Q.    Are  you  aware  of  any
21       psychiatrist  who  has  been  punished
22       or  sanctioned  by  state  authority  for
23       the  manner  in  which  he  responded  to
24       threats  by  a  patient?
25            A.    No.    But  I  would  not
```

```
 1              PAUL S. APPELBAUM, M.D.
 2       necessarily know if it had happened
 3       because I certainly don't track
 4       every disciplinary action by every
 5       state medical board.
 6          Q.   Are you aware of any -- is
 7       there a -- does the APA, for
 8       example, have a disciplinary
 9       committee?
10          A.   The Ethics Committee -- let
11       me say it differently.  The APA has
12       a disciplinary structure which
13       involves both the district branches,
14       roughly the state societies,
15       although some states like New York
16       have multiple district branches, as
17       well as the national Ethics
18       Committee.
19              In general, disciplinary
20       proceedings are initiated at the
21       state level and then can be appealed
22       to the national level.  There was
23       previously something called the
24       Ethics Appeals Board which I chaired
25       for two years that handled those
```

```
 1              PAUL S. APPELBAUM, M.D.
 2        Are there any peer review articles
 3        of which you are aware which address
 4        issues -- I did a terrible job
 5        again.  I'm sorry.  One more time.
 6              Are you aware of any peer
 7        review articles which address a
 8        physician's right to commence
 9        litigation against a patient?
10              MS. ROSENFELD:  Objection to
11         form.
12           A.   There are articles or books
13        that touch on the question that have
14        redress for nonpayment which
15        consider a range of options which
16        the ultimate one is a lawsuit.  I'm
17        not aware of peer review articles
18        that address any other instances
19        related to lawsuits against former
20        patients.
21           Q.   Okay.  Are you aware of any
22        rules or standards issued by any
23        recognized association, such as the
24        APA, which addressed the issue of a
25        physician's right to commence
```

1            PAUL S. APPELBAUM, M.D.
2       litigation against a client for
3       reasons other than fees?
4            A.   No.  But given that it's
5       such an extraordinary situation I'm
6       also not surprised that there are
7       not standards which generally deal
8       with more common circumstances.
9            Q.   And I take it then that
10      there's also no generally accepted
11      standard within the psychiatric
12      committee -- community addressing
13      the issue of a physician's right to
14      commence litigation against a client
15      for a reason other than nonpayment
16      of fees?
17           MS. ROSENFELD:  Objection to
18        the form.
19           A.   So I would respond as I did
20      before by saying there are, as in
21      much of psychiatric practice,
22      general principles that should be
23      applied.  We discussed briefly what
24      I think those principles are.  But
25      not specific application of those

```
 1              PAUL  S.  APPELBAUM,  M.D.
 2       principles  to  the  issue  that  you  are
 3       asking  about,  namely  commencing  a
 4       lawsuit.
 5            Q.    Are  you  aware  of  any  peer
 6       review  articles,  slightly  different
 7       question,  which  address  the  issue  of
 8       ethical  limitations  on  a
 9       psychiatrist's  right  to  sue  a
10       patient  for  harassing  or  abusive
11       behavior?
12            A.    I'm  not.
13            Q.    And  is  your  answer  the  same
14       with  respect  to  standards,  ethical
15       standards  or  rules  issued  by  a
16       recognized  psychiatric  association?
17             MS.  ROSENFELD:   Objection  to
18        the  form  of  the  question.
19            A.    If  you  are  asking  whether
20       they  specifically  address  suing
21       former  patients,  my  answer  is  no,
22       I'm  not  aware  of  anything  that
23       specifically  addresses  that  unusual
24       issue.
25            Q.    Are  you  aware  of  any  state
```

```
                                        Page 39
 1              PAUL S. APPELBAUM, M.D.
 2        authority or any -- any state
 3        authority issuing a ruling or
 4        discipline because -- from the fact
 5        that a psychiatrist commenced a
 6        proceeding against a patient for a
 7        reason other than nonpayment of
 8        fees?
 9             A.   I am not.
10             Q.   Are you aware of any state
11        medical board or court issuing a
12        ruling concerning limitation --
13        issuing that, sort of the same
14        question, issuing a ruling that a
15        psychiatrist acted improperly in
16        commencing a lawsuit against a
17        patient?
18              MS. ROSENFELD:   Object to the
19         form of the question.
20             A.   No.   But I'm also not aware
21        of any other psychiatrist who has
22        ever sued a former patient other
23        than for nonpayment of fees.
24             Q.   Okay.   Do psychiatrists --
25        are you aware of any court decisions
```

1              PAUL S. APPELBAUM, M.D.

2         Q.    Moving on to number three,

3     "safeguarding Doe's confidence and

4     privacy when he did choose" the

5     initiation -- "to initiate

6     litigation."  I'm going to address

7     that later because there are

8     standards and ethical rules

9     concerning that issue, right?

10        A.    Yes.

11        Q.    But are there any such

12    standards or articles addressing the

13    question of safeguarding confidences

14    and privacy when a psychiatrist sues

15    a patient for reasons other than

16    nonpayment of fees?

17         MS. ROSENFELD:  Objection to

18     the form.

19        A.    Again, I would say that

20    that is so unusual and perhaps

21    unique a situation that I wouldn't

22    expect such things to exist and to

23    my knowledge they don't.

24        Q.    Okay.  Let's move on.  If

25    we go back to paragraph 3 of PA-1.

Page 45

1              PAUL S. APPELBAUM, M.D.

2        was filed on January 5th, 2018.  Do

3        you see that?

4              A.   Yes.

5              Q.   Okay.  But you refer to --

6        that the complaint that was filed on

7        November 27, 2017 -- do you know

8        where you found that date?

9              A.   I do not know where that

10       came from.

11             Q.   Okay.  Are you aware of how

12       the process by which -- well,

13       withdrawn.

14             As you see from PA-3, it's

15       entitled Anonymized Complaint.  Do

16       you see that?

17             A.   Yes.

18             Q.   Are you aware of the

19       process by which this complaint was

20       filed as an Anonymized Complaint?

21             A.   I am not aware of any of

22       the details of the process.

23             Q.   Do you have any knowledge

24       as to whether or not Mr. -- there

25       was a complaint which identified

1              PAUL S. APPELBAUM, M.D.

2        A.    After his evaluation.

3        Q.    How much time?

4        A.    Probably approximately half

5    an hour.

6        Q.    I'll go back to this but do

7    you recall what you discussed with

8    Dr. Cohen?

9        A.    In general terms I asked

10   him for his assessment of the

11   evaluation and to summarize what he

12   had learned and concluded.

13       Q.    And what did he tell you,

14   to your recollection?

15       A.    He told me that he thought

16   Dr. -- as best I recall, that he

17   thought Dr. Conti had exaggerated

18   the threat from the patient, that he

19   was clearly extremely angry at the

20   patient and that he had acted on his

21   anger in the subsequent events,

22   which included the filing of this

23   lawsuit.

24       Q.    Did he explain his reasons

25   for believing that Dr. Conti I think

```
 1              PAUL  S.  APPELBAUM,  M.D.
 2       you said over estimated the threat?
 3            A.   Yes.
 4            Q.   And what reasons did he
 5       give you?
 6            A.   My yes was to the language
 7       of overestimating the threat.
 8              MS.  ROSENFELD:   It was
 9        actually exaggerated.
10              MR.  BURSTEIN:   Exaggerated.
11        Thankfully you have a better memory
12         than I do.
13            A.   So he did not tell me on
14       that phone call in any great detail
15       what the explicit basis was for his
16       belief that Dr. Conti had
17       exaggerated the threat.
18            Q.   Do you recall whether or
19       not you had reviewed the --
20       Dr. Hamilton's psychiatric treatment
21       records of Dr. Conti before March of
22       2019?
23            A.   I don't recall.
24            Q.   Okay.  I'm sorry, I forgot
25       your answer about whether or not you
```

1           PAUL  S.  APPELBAUM,  M.D.

2      major  impressions.

3           MR.  BURSTEIN:   If  I  could  just

4       ask  one  question.

5           MS.  ROSENFELD:   That's  fine.

6       I  didn't  mean  you  needed  to  stop  at

7       this  --

8           Q.   Do  you  recall  what

9      impressions  you  had  about

10      John Doe  upon  reviewing  his

11      patient  file  and  billing  records

12      from  Dr.  Conti  and  his  associated

13      mental  health  professionals?

14           A.   I  had  the  general  sense

15      that  he  was  not  an  easy  patient  to

16      treat.   He  had  been  through  multiple

17      treatments  before.   Clearly  he  had

18      come  in  with  a  history  of  difficult

19      family  relationships  and  sort  of

20      tumultuous  life  events  and  even

21      during  treatment  continued  with  a

22      pattern  of  tumultuous  events.

23           Q.   And  did  you  come  to,  let's

24      say,  any  preliminary  conclusions

25      about  what  an  appropriate  diagnosis

Page 75

1              PAUL S. APPELBAUM, M.D.

2      of    John Doe         would be

3      vis-à-vis his psychological issues?

4          A.   So apart from his Xanax

5      addiction which everybody agrees was

6      present and the fact that he

7      manifested characterological

8      problems of a variety of sorts, I'm

9      not comfortable even today putting a

10     specific label on his diagnosis.  I

11     think it's a sufficiently complex

12     case that without having evaluated

13     him face-to-face, even having read

14     the notes and his deposition and the

15     depositions of people who knew him

16     or who treated him, that I'm not

17     prepared to diagnose him.

18         Q.   Were you aware that in the

19     context of this case a psychiatrist

20     retained by     John Doe's      --

21     by my side examined

22        John Doe         ?

23         A.   Yes.

24         Q.   Did you read that report,

25     his report?

```
 1              PAUL S. APPELBAUM, M.D.
 2       read the counterclaim, the answer
 3       and counterclaim, Exhibit 13, before
 4       you wrote your final -- you
 5       completed your report?
 6            A.   I don't remember.
 7            Q.   You were asked in SA-1 to
 8       render an opinion about the ethical
 9       issues in this case.  Do you recall
10       which ethical issues were identified
11       to you as issues you should review?
12            MS. ROSENFELD:  You can
13        answer, but to the extent it
14        involves disclosing the content of
15        our conversations you can't discuss
16        that.
17            MR. BURSTEIN:  That's not
18        really privileged.  He was retained
19        to express opinions about ethical
20        issues.  I'm entitled to ask what
21        he understood those issues to be.
22            MS. ROSENFELD:  That's fine.
23        He can answer that question to the
24        extent he's not disclosing the
25        content of our conversation.
```

1          PAUL S. APPELBAUM, M.D.

2          A.   I understood those to be

3     whatever issues I could identify, if

4     there were any, related to

5     Dr. Conti's initiation of the

6     lawsuit against the patient.

7          Q.   Do you know whether or not

8     all -- whether or not

9     [John Doe]           has sought damages

10    for what you allege -- for all of

11    what you have opined are ethical

12    violations by Dr. Conti?

13          MS. ROSENFELD:  Objection to

14     the form.

15          A.   I don't know enough about

16    his claim to answer that.

17          Q.   Now, if we go to Section 2

18    of your report, Applicable Standard

19    for Ethical Conduct of a

20    Psychiatrist.  You refer to the APA

21    Principles of Medical Ethics With

22    Annotations Especially Applicable to

23    Psychiatry, correct?

24          A.   Yes.

25          MR. BURSTEIN:  Mark this PA-5.

Page 83

```
 1              PAUL  S.  APPELBAUM,  M.D.
 2              (Exhibit PA-5, American
 3         Psychiatric Association, The
 4         Principles of Medical Ethics With
 5         Annotations Especially Applicable
 6         to Psychiatry, marked for
 7         identification, as of this date.)
 8         Q.    Looking at PA-5, it's a
 9    document entitled American
10    Psychiatric Association, The
11    Principles of Medical Ethics With
12    Annotations Especially Applicable to
13    Psychiatry.
14              Is that the document that you
15    refer to in your report in Section
16    2?
17         A.    Yes.
18         Q.    In says 2013 edition.  Do
19    you know whether or not there's a
20    newer edition of the Principles of
21    Medical Ethics?
22         A.    I'm not aware whether
23    there's a newer edition, although
24    this would have been the edition
25    that was offered up at the time of
```

```
 1              PAUL  S.  APPELBAUM,  M.D.
 2       the  events  involved  in  this  case.
 3            Q.    Have  you  --  did  you  review
 4       any  other  documents  containing
 5       ethical  rules  governing  a
 6       psychiatrist's  conduct  before  --  in
 7       reaching  your  opinion?
 8            A.    No.
 9            Q.    Did  you  review  any
10       statutory  statutes  governing  the
11       issues  --  governing  a  psychiatrist's
12       conduct  with  respect  to  the  issues
13       on  which  you  opined  in  your  report?
14            A.    No.
15             MS.  ROSENFELD:    Objection  to
16        the  form.
17            Q.    Did  you  review  any
18       decisions  of  a  medical  board  or
19       other  or  other  state  administrative
20       body  addressing  the  issues  that  are
21       identified  in  your  report  as  the
22       ones  you  opined  on?
23            A.    No.
24            Q.    Is  there  a  reason  why  you
25       did  not  do  that?
```

                    PAUL S. APPELBAUM, M.D.
1
2          A.    Insofar as I was asked to
3     testify to the ethical issues as I
4     saw them in this case, the guiding
5     principles of medical ethics for
6     psychiatrists are embodied in this
7     document and I didn't see a need to
8     explore elsewhere.
9          Q.    And if we look at
10    paragraph, Section 2, paragraph 5 of
11    your report, you list a number of
12    annotations to Section 4 of the
13    principles.
14         A.    Correct.
15         Q.    And you do not refer to any
16    other sections of the principles in
17    your report, correct?
18         A.    That's correct.
19         Q.    And if we could look at
20    PA-5, Section 6, I want to read it
21    to you.  "A physician shall in the
22    provision of appropriate care,
23    except in emergencies, be free to
24    choose whom to serve with whom to
25    associate and the environment in

```
 1              PAUL S. APPELBAUM, M.D.
 2        think that this provision says that.
 3            Q.   That's your interpretation
 4        of this provision, would that be
 5        fair to say?
 6            A.   I think you and I may have
 7        different interpretations.
 8            Q.   But as a matter of English
 9        language, would you agree that I
10        have characterized the facial
11        meaning of this?
12             MS. ROSENFELD:  Objection to
13         the form.
14            A.   No, I don't.
15            Q.   All right.  Is it your
16        opinion that it is per se unethical
17        for a psychiatrist to sue a patient
18        based upon the receipt of threats or
19        other abusive conduct by a patient?
20            A.   No.
21            Q.   Do you believe that a
22        psychiatrist's duty to patients
23        trumps his right as a citizen to sue
24        a patient?
25             MS. ROSENFELD:  Objection to
```

1              PAUL S. APPELBAUM, M.D.
2        there's a great deal of literature
3        and a general acknowledgement that
4        it is not always easy to perform an
5        accurate assessment of the degree of
6        risk and that there is a tendency
7        for a variety of reasons to
8        overestimate the degree of risk and
9        it is an area of ongoing active
10       research.
11            Q.   You've, in fact, written on
12       this issue a number of times,
13       correct?
14            A.   Yes.
15            Q.   And you, in fact, have
16       offered -- I may not be describing
17       this correctly -- a form of matrix
18       to assess risk of patients' threats?
19            A.   Within the context of
20       current knowledge, recognizing the
21       uncertainties, yes.
22            Q.   And has that matrix you've
23       proposed been universally accepted
24       by the psychiatric community?
25            A.   I don't think anything is

1            PAUL S. APPELBAUM, M.D.

2      universally accepted by the

3      psychiatric community.

4          Q.    There are differences of

5      opinion within the psychiatric

6      community as to how a psychiatrist

7      should assess the danger posed by a

8      patient, right?

9          A.    I think the difference is

10     less about how to assess the risk

11     because there's general agreement

12     about what the major risk factors

13     are based on the research than there

14     is perhaps agreement about the

15     degree to which those assessments

16     can be relied upon.

17         Q.    Would it be fair to say

18     that there is a consensus within the

19     psychiatric community that one

20     important element of risk assessment

21     is the clinician's judgment of the

22     situation?

23           MS. ROSENFELD:   Objection to

24      the form.

25           A.   I would frame that a little

```
 1              PAUL S. APPELBAUM, M.D.
 2      assessment and that there may be
 3      other variables that need to be
 4      taken into account as well.
 5          Q.    Let me ask it a different
 6      way.  Would you agree that three,
 7      I'll say three -- withdrawn.
 8              Would you agree that two
 9      responsible psychiatrists take you
10      and another psychiatrist you respect
11      looked at the same facts and sought
12      to analyze whether a psychiatrist's
13      apprehension of fear and belief of
14      threat was real was reasonable.  You
15      got that hypothetical?
16          A.    Yes.
17          Q.    Would you -- is it
18      possible -- withdrawn.
19              I would agree that two
20      responsible psychiatrists might look
21      at the same facts and one might
22      conclude that the treating
23      psychiatrist's belief about the
24      patient's danger was reasonable and
25      another responsible psychiatrist
```

1           PAUL S. APPELBAUM, M.D.
2      might conclude that it was an
3      unreasonable belief?
4           MS. ROSENFELD:  Objection to
5       the form.
6           A.   I would hope that would not
7      be the case.  I think experienced
8      psychiatrists who know the
9      literature on risk assessment should
10     be able to at least concur with
11     regard to the general levels of risk
12     whether this is a low, medium or
13     high risk situation, there is in
14     fact literature suggesting that when
15     you group categories that way you
16     get higher levels of agreement.  I
17     can't guarantee that any two people
18     would necessarily agree.  But if
19     they are focused on the same
20     information, they should agree.
21          Q.   Well, let's take a Tarasoff
22     situation.  A patient -- a
23     psychiatrist has received -- learns
24     various facts from a patient,
25     observes other facts, considers

1          PAUL  S.  APPELBAUM,  M.D.

2     lawyers.   I  have  also  been  told  that

3     there  was  a  monetary  demand  that  was

4     made  in  that  period  of  time.

5          Q.    And  no  more  details?

6          A.    That's  about  what  I  know.

7          Q.    Did  you  ask  for  --  to  see

8     any  of  those  communications?

9          A.    No.

10          Q.    Well,  would  it  not  be

11     relevant  to  you  in  assessing  whether

12     or  not  Dr.  Conti  overreacted  to  the

13     threats  from  [John Doe]  to

14     examine  whether  or  not  he  had  first

15     made  efforts  to  avoid  suing

16     [John Doe]?

17          MS.  ROSENFELD:   Objection  to

18      the  form.

19          A.    So  I  think  the

20     overreactions  came  in  the  decision

21     to  view  [John Doe's]

22     communications  as  sufficiently

23     serious  to  warrant  the  filing  of  a

24     lawsuit.   What  transpired  between

25     the  lawyers  I  don't  know.   I  don't

Page 220

1              PAUL S. APPELBAUM, M.D.
2       know if I have ever been privy to,
3       as an expert, to communications
4       among the lawyers in a case.
5            Q.   Would be one way of --
6       would one way of interpreting your
7       opinion is that a doctor suing a
8       patient based upon threats made by
9       the patient should be a remedy, if
10      at all, remedy of last resort?
11           MS. ROSENFELD:  Objection.
12           A.   Yes, if at all a remedy of
13      last resort.
14           Q.   So engaging the
15      reasonableness of the doctor's
16      decision to employ the last resort,
17      wouldn't it be relevant for you to
18      assess the efforts that the doctor
19      made to avoid taking that last step?
20           A.   Arguably, depending on what
21      they were.
22           Q.   And you didn't do that in
23      this case?
24           A.   Well --
25           MS. ROSENFELD:  Objection to

Page 221

1              PAUL S. APPELBAUM, M.D.

2         the form.

3         A.    I haven't had available to

4    me the information about the

5    communications between the lawyers.

6         Q.    And you didn't ask for

7    them?

8         A.    If you want to present them

9    to me and ask for my opinion, I'm

10   happy to read them and give you my

11   opinion.

12        Q.    Well, let's look at --

13            (Exhibit PA-8, E-mail, marked

14        for identification, as of this

15        date.)

16        Q.    This is an e-mail from me

17   to then counsel for

18   [John Doe] in November of

19   2017.  Have you seen this document

20   before?

21        A.    No.

22        Q.    But you've seen numerous --

23   withdrawn.

24            [John Doe] had sent

25   Dr. Conti a number of texts after

1           PAUL S. APPELBAUM, M.D.
2      discussing this issue of
3      psychiatrists, even in a therapeutic
4      type setting, observing conduct
5      that's in public or in front of a
6      number of other people being bound
7      by confidentiality in a litigation?
8           A.   No, but I think it's a
9      highly unusual circumstance.
10          Q.   Would it be fair to say
11     that this case itself is, in your
12     experience, highly unusual?
13          A.   I think there are many
14     aspects of it that are highly
15     unusual.
16          Q.   But the fact that there's a
17     litigation is highly unusual.
18          A.   For a psychiatrist to have
19     sued a patient is extraordinarily
20     unusual.
21          Q.   So would it be fair to say
22     that there are -- there's no body of
23     literature in the profession that
24     has addressed the propriety of a
25     client -- a patient -- a doctor

```
 1              PAUL S. APPELBAUM, M.D.
 2       suing a patient?
 3              MS. ROSENFELD:   Objection to
 4        the form.
 5          A.   There are not to my
 6       knowledge specific -- there is not
 7       specific literature that addresses
 8       doctors suing patients other than,
 9       as we said earlier, outside the
10       billing context.
11          Q.   In fact, in the billing
12       context it's even ethically
13       acceptable to provide patient
14       information to a collection agency?
15              MS. ROSENFELD:   Objection to
16        the form.
17          A.   Some information.  Namely
18       information about the patient's
19       name, address, dates of service,
20       charges, but certainly not
21       information that was communicated
22       within the -- within the treatment
23       session.
24          Q.   But in that circumstance
25       the information that was provided --
```

Page 238

1            PAUL S. APPELBAUM, M.D.

2      that what happened in the treatment

3      session is really irrelevant to

4      whether or not the money is owed?

5            A.    True.  And therefore is not

6      disclosed.

7            Q.    But certainly disclosing

8      the patient's name and other

9      identifying information and the fact

10     that the patient was being treated

11     can be disclosed for nonpayment of

12     fees?

13           A.    Yes.

14           Q.    But it's your opinion that

15     a doctor who sues because he

16     believes he was threatened and also

17     defamed, in particular believes he

18     was defamed, violates

19     confidentiality by suing even if he

20     makes sure that the complaint is

21     anonymized?

22            MS. ROSENFELD:  Objection.

23           A.    So not as a general matter,

24     no.  But in this specific case, yes.

25           Q.    And it was an ethical

Page 239

1           PAUL S. APPELBAUM, M.D.

2      violation because you don't think

3      that the lawsuit was warranted?

4           A.   It's an ethical violation

5      because in bringing this suit

6      Dr. Conti disclosed much more

7      confidential treatment related

8      information than was at all

9      necessary for the purpose for which

10     the disclosure was being made.

11          Q.   So your view is not that he

12     had no right to sue but that he

13     divulged too much in the lawsuit?

14          MS. ROSENFELD:   Objection.

15          A.   Part of my opinion is

16     certainly that.  We have also talked

17     about my opinion with regard to the

18     accuracy of his assessment of the

19     risk that he felt himself to be

20     under.  But assuming he was going to

21     bring a suit, I think he had an

22     obligation to do so in a way that

23     was least revealing of the

24     confidential treatment related

25     information and he clearly failed to

Page 240

```
 1              PAUL  S.  APPELBAUM,  M.D.
 2       do  that.
 3           Q.    How  about  a  doctor's  right
 4       to  sue  for  defamation,  do  you
 5       believe  a  psychiatrist  has  the  right
 6       to  sue  for  defamation?
 7           A.    I  think  in  theory,  yes,
 8       done  appropriately.
 9           Q.    And  if  a  court  were  to
10       conclude  that  an  adequate  case  for
11       defamation  had  at  least  been
12       pleaded,  would  that  provide  a  basis
13       for  concluding  that  the  doctor  had
14       not  acted  improperly  in  bringing  the
15       action?
16            MS.  ROSENFELD:   Objection.
17           A.    No.   It  would  indicate  that
18       the  court  believed  that  at  least  the
19       information  necessary  to  plead  a
20       defamation  claim  had  been  brought
21       but  it  doesn't  speak  to  the  question
22       of  whether  much  more  information
23       then  was  necessary  for  that  was
24       disclosed.
25           Q.    That's  not  my  question.
```

Page 241

```
 1              PAUL  S.  APPELBAUM,  M.D.
 2        I'm just asking you about the fact
 3        do you believe that the fact of
 4        suing for defamation is per se
 5        inappropriate?
 6              A.   No, I don't.
 7              Q.   And do you think that the
 8        fact that a court upheld a claim for
 9        defamation would be relevant to the
10        determination of whether a doctor
11        acted unethically in bringing the
12        suit?
13              MS. ROSENFELD:   Objection.
14              A.   No.  I don't think that
15        that determines one way or the other
16        whether the doctor acted
17        unethically.
18              Q.   So that how about if a
19        doctor were to win a defamation
20        suit, would that be relevant to
21        whether or not the doctor had acted
22        unethically?
23              A.   No.  I think it would speak
24        to the strength of the legal claim
25        but -- which would, as I was
```

1            PAUL S. APPELBAUM, M.D.

2       suggesting before, indicate that the

3       doctor had brought at least that

4       amount of information necessary to

5       prove the claim, but it wouldn't

6       speak to the ethical question of

7       whether he had brought much more

8       information than was necessary.

9            Q.   I understand that.  I'm

10      trying to separate out these issues.

11           One is, which I'm not asking

12      about right now, is whether the

13      doctor put too much information in.

14      I'm only asking about the question

15      if he brought a complaint for

16      defamation which met your standards

17      of providing the minimal amount of

18      information, would a court upholding

19      a complaint for defamation under

20      those circumstances in your view be

21      an indication that the doctor had

22      acted ethically?

23           MS. ROSENFELD:  Objection.

24           A.   No.  I think the doctor

25      either acted ethically or he didn't.

Page 243

1                PAUL S. APPELBAUM, M.D.
2         He might win or lose the defamation
3         claim but that is not material to
4         the question of whether he behaved
5         ethically or not.
6              Q.    Just so I understand, it's
7         your view that unlike other views in
8         this country, psychiatrists or other
9         doctors are ethically prohibited at
10        times from pursuing claims that --
11        to protect themselves -- pursuing
12        claims that -- for their own benefit
13        to protect their rights?
14             MS. ROSENFELD:   Objection.
15             A.    No, I wouldn't say that at
16        all.
17             Q.    So you are saying that a
18        doctor does have the right to bring
19        a meritorious defamation case as
20        long as he does not over-disclose?
21             MS. ROSENFELD:   Objection to
22         the form.
23             A.    In the right circumstances,
24        yes.
25             Q.    Can you think of a

1           PAUL S. APPELBAUM, M.D.

2      circumstance where a doctor would be

3      prohibited from pursuing a

4      meritorious defamation case by

5      reason of the ethical rules of

6      misconduct?

7           MS. ROSENFELD:  Objection.

8           A.   Sure.  Patient is manic or

9      psychotic or both and tells other

10     people that the doctor had abused

11     him in some way, beaten him with a

12     whip or hit him over the head with a

13     chair, arguably a defamatory

14     statement on the part of the

15     patient.  The psychiatrist's

16     response to that should not be to

17     sue the patient for defamation but

18     to recognize that that's part of the

19     patient's illness and to

20     appropriately treat or continue

21     treating that illness.

22          Q.   Just so I understand it.

23     So even if the manic patient managed

24     to get a story into the New York

25     Post that the doctor had sexually

Page 245

1              PAUL S. APPELBAUM, M.D.

2        abused him, there should be no

3        defamation claim?

4            A.    Insofar as the behavior of

5        the patient is a manifestation of

6        the illness, the appropriate

7        response is to treat the illness.

8            Q.    So in your view in the

9        hypothetical situation I have given

10       you, the doctor should remain silent

11       in the face of a false accusation of

12       sexually assaulting a patient?

13           A.    No, I mean I can't be that

14       broad in a statement like that.

15           Q.    You said a minute ago that

16       if a patient makes an outrageous

17       allegation and they are in a manic

18       state, the doctor should not sue for

19       defamation, should be doing dealing

20       with it within the confines of the

21       relationship.

22               I then asked you well, suppose

23       the patient manages to get the story

24       into the newspaper, perhaps because

25       of who the patient is, and there's a

1          PAUL S. APPELBAUM, M.D.

2      page 3 story in the New York Post

3      that this doctor whipped his

4      patient.  Is it your view that the

5      doctor under those circumstances

6      should remain silent and just allow

7      that story to go unrebutted?

8          A.   No, it's not my view that

9      the doctor should remain silent and,

10     you know, I will concede to you and

11     I have said this clearly I think

12     already, that there may be

13     circumstances under which defamation

14     claims are appropriate to pursue.

15     But merely because a defamatory

16     statement has been made is not

17     necessarily one of those situations

18     when there are other ways and better

19     ways to deal with it within the

20     framework of the treatment.

21         Q.   Well, is there any standard

22     expressed in ethical rules as to

23     what the dividing line is between

24     when it's appropriate for a

25     psychiatrist to sue for defamation

Page 247

1              PAUL S. APPELBAUM, M.D.

2         and it's not appropriate for a

3         psychiatrist to sue for defamation?

4              A.   Not that I'm aware of

5         because I have never before this

6         case ever heard of a psychiatrist

7         who sued a patient for defamation.

8              Q.   In terms of the other steps

9         that a psychiatrist might take,

10        would seeking to find a pretrial

11        resolution -- a prelitigation

12        resolution of some kind be a step

13        that a psychiatrist might take as in

14        an effort to avoid making disputes

15        public?

16             A.   Yes.

17             Q.   Okay.  And that would in

18        the abstract not be an unreasonable

19        attempt to solve the problem of

20        confidentiality?

21             A.   In the abstract, no.

22             Q.   It would be --

23             A.   It would not be

24        unreasonable.

25             Q.   It would not be

1           PAUL S. APPELBAUM, M.D.
2           A.   So the principle -- so I
3     just want to clarify here --
4           Q.   Or conduct.
5           A.   Yeah, conduct.  Principles
6     are, you know, much, much broader
7     and overarching.  We are talking
8     about specific behaviors.
9           Q.   Spectrum of conduct.  In
10    your opinion, where on the spectrum
11    of conduct, given that this is a
12    unique circumstance, where in the
13    spectrum of agreement on conduct
14    would your opinion in this case lie?
15          A.   I think you would find very
16    substantial agreement among
17    psychiatrists with regard to the
18    opinions that I expressed in this
19    case about the application of the
20    ethics of psychiatry.  To know for
21    sure we'd have to go out and ask a
22    lot of psychiatrists but that is my
23    belief.
24          Q.   Well, I just want to ask
25    you a couple more questions.  Do you

1            PAUL S. APPELBAUM, M.D.

2      have in your own mind an estimate of

3      what percentage of the psychiatric

4      community would agree with your

5      conclusions?

6            A.   No.

7               MS. ROSENFELD:  Objection.

8            A.   I can't give you a number.

9            Q.   Is it your view that there

10     would be -- would it be a plurality

11     of psychiatrists who would agree

12     with your conclusions?

13               MS. ROSENFELD:  Objection.

14           A.   I would think at the very

15     least a plurality but -- indeed a

16     majority, but I don't think I can

17     put a number on that.

18           Q.   Okay.  It's because this

19     situation is so unusual you really

20     can't, so to speak, handicap how

21     accepted your conclusions would be

22     with respect to the facts of this

23     case?

24               MS. ROSENFELD:  Objection to

25      the form.

1          PAUL S. APPELBAUM, M.D.
2      A.   Well, so that's not what I
3   said a few minutes ago.  What I said
4   a few minutes ago was I think my
5   conclusions with regard to this case
6   in fact would represent the views of
7   a clear majority of psychiatrists
8   and the dominant view in the
9   profession.
10      Q.   But that's based upon
11   your --
12      A.   My sense of the ethics of
13   psychiatry and the ways in which
14   those ethics are applied to specific
15   questions in psychiatry.
16      Q.   I'm going to ask a few more
17   questions.  We are getting to the
18   end by the way.  By the way, are
19   there any rules -- are there any
20   ethical principles about
21   overcharging psychiatric patients?
22      A.   Yes.  Charges should be
23   within a reasonable range and
24   certainly patients should,
25   particularly in vulnerable patients

Page 265

1            PAUL S. APPELBAUM, M.D.

2            MR. BURSTEIN:  Yeah, June 14,

3        2017, starting with June 14 of

4        2017.

5            Q.   And if we look at the

6        second page, Dr. Jenike -- Dr. Conti

7        writes to Dr. Jenike, "I'm happy to

8        talk to you and John Doe .  Think that

9        would be helpful to him."

10           Now, in the first instance we

11       have agreed that the offers that

12       Dr. Conti made in April on

13       termination in his e-mail were

14       appropriate offers?

15           A.   Yes.

16           Q.   And now, this is a couple

17       months later and he writes, "I'm

18       happy to talk if you and John Doe

19       think that would be helpful to him.

20       I would like a straightforward

21       authorization from John Doe to do

22       this."

23           That's nothing improper about

24       wanting an authorization from

25            John Doe , correct?

```
 1              PAUL S. APPELBAUM, M.D.
 2         A.   Yes.
 3         Q.   In fact, it would be
 4    required?
 5         A.   Yes.
 6         Q.   "And I would also request
 7    authorization to bill for any time
 8    spent in clinical conversation."
 9         Now, he then goes on to say,
10    "I have spent a fair amount of
11    unbillable time since we ended care
12    and there is also a small
13    outstanding balance from before
14    which I would appreciate clearing."
15         Certainly it wasn't
16    unreasonable for Dr. Conti to ask
17    that a prior balance be paid?
18         A.   No.
19         Q.   Okay.  And there was also
20    no obligation for him to talk to
21    Dr. Jenike, correct?
22         A.   Correct.
23         Q.   He could have just said I'm
24    going to send the files, right?
25         A.   Correct.  Although I would
```

1             PAUL S. APPELBAUM, M.D.
2     suggest that if upon receipt of the
3     files Dr. Jenike then said thanks
4     for the files but you know I have a
5     couple of questions, can we talk on
6     the phone, that there is an
7     obligation to respond to questions.
8          Q.   But that never happened in
9     this case?
10         A.   As far as I'm aware, no.
11         Q.   And in fact, Dr. Jenike
12    never even asked for Dr. Conti's
13    files; isn't that correct?
14         A.   I don't know the answer to
15    that.
16         Q.   And Dr. Conti -- do you
17    read this e-mail saying that he
18    would not speak to Dr. Jenike under
19    any circumstances unless he was paid
20    for his time?
21         A.   That's how I read that.
22         Q.   So when he says I would
23    also request authorization to bill
24    for any time spent in clinical
25    conversation, he wasn't saying that

1          PAUL S. APPELBAUM, M.D.

2      he would not assist in transition,

3      right?

4          A.   I think what he's saying is

5      if you want to talk to me on the

6      phone, I want to be able to bill for

7      that time.

8          Q.   But he had no obligation to

9      speak to him on the phone?

10          A.   Well, he had an obligation

11      to communicate the information.

12          Q.   But he never said he

13      wouldn't send his files to

14      Dr. Jenike, did he?

15          A.   He didn't offer to send

16      those files in lieu of a

17      person-to-person communication.

18      What Dr. Jenike -- well, what he

19      seems to be addressing here, whether

20      it was at Dr. Jenike's request or at

21      the patient's request, is the

22      question of can we talk on the phone

23      and you can tell me about your

24      treatment of  John Doe .  And his

25      response is, A, I want an