EXHIBIT C



Ziv E. Cohen, M.D., F.A.P.A.
Clinical Assistant Professor
Director, Principium Psychiatry, PLLC


Katie Rosenfeld, Esq.
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
Phone: 212.763.5000


RE: PAUL CONTI

October 7th, 2019


Dear Ms. Rosenfeld,

In accordance with my retention in the matter of Paul Conti v. John Doe to conduct a forensic psychiatric assessment of Paul Conti, please find attached my complete report. If you have any further questions, please don't hesitate to contact me.


Sincerely,

Ziv E. Cohen, M.D.

200 West 57th Street, Suite 304, New York, NY 10019 | T 212.335.0236 | F 646.607.5985 | zec2002@med.cornell.edu | zec@pricipiumpsychiatry.com

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

## Table of Contents

Sources...................................................................................................................2

Forensic Disclaimer ...........................................................................................2

Personal History.................................................................................................2

Treatment of John Doe .......................................................................................5
    Email and Text Messages ...........................................................................8
    Lawsuit ..........................................................................................................11

Past Psychiatric History..................................................................................12

Past Medical History ........................................................................................19

Medications ........................................................................................................19

Family Psychiatric History..............................................................................19

Employment History .........................................................................................19

Legal History ......................................................................................................19

Mental Status Examination .............................................................................19

Assessment..........................................................................................................20
    ██████████████████.........................................................20
    Fear for Personal Safety.............................................................................25
    Concern for Reputation and Medical License.........................................29
    Countertransference...................................................................................30
    ████████████████.............................................................31

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.


## Sources

Interview of Paul Conti, M.D., for 5 hours and 45 minutes, August 6th, 2019
Deposition of Paul Conti, M.D.
Deposition of Gregory Hamilton, M.D.
Deposition of Brooke Maylie, M.D.
Deposition of Edmund Torkelson, D.O.
Deposition of Thomas Conti
Deposition of John Doe
Medical record of Paul Conti, by Gregory Hamilton, M.D.
Medical record of Paul Conti, by Edmund Torkelson, D.O.
Selections form John Doe's medical record with Paul Conti, M.D., marked as Defense Exhibits
Email messages between Paul Conti and parents of John Doe
Email messages between Paul Conti and John Doe
Email messages between Paul Conti and Pacific Premier Group on John Doe
Summons, Paul Conti v. John Doe, United States District Court S.D.N.Y., November 27th, 2017
First Amended Anonymized Complaint, Paul Conti v. John Doe, United States District Court S.D.N.Y., February 7th, 2018
Declaration of Paul Conti, June 7th, 2019
Declaration of Paul Conti, May 31st, 2019
Discussion with Paul Appelbaum, M.D., September 22nd, 2019, 50 minutes.


## Forensic Disclaimer

Prior to the evaluation, it was explained to Dr. Conti that the evaluation was being conducted for forensic purposes. Specifically, it was explained that a doctor patient relationship would not be established and that doctor-patient confidentiality would not apply. Dr. Conti was informed that a report would be prepared and shared with the attorneys in the case, and that the examiner would likely be deposed and perhaps testify in court. He expressed understanding. Dr. Conti was encouraged to take as many breaks as he wished and advised to let this writer know if there was any topic he was not comfortable discussing. He expressed his full understanding.


## Personal History

Paul Conti was born on March 19th, 1969, in Trenton, New Jersey. He was the eldest of three children born to his married parents. His father was the owner of a regional real estate brokerage and his mother was a homemaker who later worked as a school teacher.



2

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



After high school, Dr. Conti matriculated at Lehigh University. He chose this college because he was good at mathematics, and Lehigh was well known for its engineering department. Here, too, Dr. Conti recalled that he struggled to "fit in." The student body was "eighty percent male" and there was a "heavy drinking culture." After three semesters, Dr. Conti transferred to the University of Pennsylvania. He majored in political science and minored in mathematics.

3

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

Dr. Conti recalled, however, that he struggled socially at the University of Pennsylvania as well. He stated, "West Philly in those days was not a happy place to live." He stated he "didn't have a robust social life there."

Dr. Conti recalled that a significant experience for him during college was when he took a semester leave of absence to attend classes at Ripon College in York, England. Dr. Conti greatly enjoyed being abroad, which he felt opened him up to the greater world in contrast to his narrow experiences growing up in Trenton. He took a keen interest in World War II and the Soviet Union. During his time in England, Dr. Conti travelled to Moscow and St. Petersburg.

When Dr. Conti graduated from the University of Pennsylvania, he found a job in New York "in consulting." After two years on the job, Dr. Conti decided to leave because he felt unfulfilled in his position. He took six months to travel. He then returned to consulting but quickly realized, "I don't want to do this." ███████ ███████████████████████████████ Dr. Conti thought, "I'm 24 years old, what am I doing with my life?" He applied to the Bryn Mawr post-baccalaureate program in premedical studies. During this program, he applied to and was accepted to Stanford Medical School. He had a year off between the post-baccalaureate program and medical school, and lived in San Diego teaching Stanley Kaplan examination preparatory classes.

Dr. Conti reported that in medical school, he decided to pursue a career in psychiatry based on his "interest in people." He realized that his interest in mathematics and world history was converging in an interest in human behavior. He joined the psychiatry residency at Stanford, which he attended for three out of four years. His wife, who was also a Stanford medical student, was accepted to a residency position in the Harvard hospital system. Dr. Conti therefore transferred for his last year of residency to Harvard, where he was chief resident. Following residency, Dr. Conti obtained a faculty appointment at Harvard and worked in nursing homes in the Boston area. When his wife graduated residency one year later, they planned to move to San Diego and pursue their careers together on the west coast.

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████

4

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

████████████████ Dr. Conti and his wife decided to move to Portland, Oregon, where her parents reside. Dr. Conti began working there on the inpatient psychiatric unit at the Providence Medical System. After two years, Dr. Conti left the hospital and started his own clinic to treat psychiatric, addiction, and pain disorders. Dr. Conti was chief executive officer and medical director of the clinic. After about three years, Dr. Conti sold his clinic to a larger addiction treatment center, Hazelden. Dr. Conti remained an employee of Hazelden until 2014.

Dr. Conti then started his private practice, Pacific Premier Group. He reported his practice group includes approximately 10 part time clinicians who collaborate to provide psychiatric care. Dr. Conti sees patients in Portland, New York, and Los Angeles. In addition, he makes house calls nationally and internationally. He stated, for example, that he travels to London regularly to see patients. In his deposition, however, he stated the client in London was not a psychiatric patient since he is not licensed to practice medicine in the United Kingdom. He explained the work with that client was "the kind of work that does not require a license."

████████████████████████████His wife works part time as a physician in his private practice, Pacific Premier Group.

## Treatment of John Doe

Dr. Conti stated that John Doe was referred to him by Dr. Peter Attia, a cardiologist with whom Dr. Conti shares office space in New York. Dr. Attia was attending to John Doe's father, and while he was there John Doe's parents received a phone call from John Doe. Dr. Conti reported that while Dr. Attia was there, "there were hugely distressing calls from the son. Peter [i.e. Dr. Attia] starts to realize he's frightening them, cursing at them. He called me from there, wanted to link me with them to help."

Dr. Conti reported that he first met John Doe's parents at the Peninsula Hotel in New York. He spoke with them about John Doe and proposed that he could provide mental health care for John Doe. Dr. Conti stated he envisioned the treatment he would offer as "Wrap around care, including substance abuse treatment and DBT treatment." [Dialectical Behavioral Therapy is a psychotherapy developed for borderline personality disorder.] Dr. Conti saw John Doe on the next day at the Mandarin Oriental Hotel in New York. Dr. Conti reported that his initial impression was "He is in general very interested in engaging in care. He wants to get meds," referring to his dependency on benzodiazepines such as clonazepam.

Dr. Conti stated to this writer that his initial treatment impression was that John Doe likely had a personality disorder and had "borderline, narcissistic, and

5

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

antisocial traits." Dr. Conti reported that his initial impression was that John Doe had an "inadequate personality." He further was aware from the outset that John Doe's "drug of choice" was Xanax, a benzodiazepine, which John Doe was using at quantities of up to 6 to 10mg per day. He also learned that John Doe was abusing cocaine intermittently.

Dr. Conti stated that his treatment plan was to refer John Doe to a "DBT informed therapist," Mark, in Dr. Conti's practice group, and to himself become John Doe's treating psychiatrist. Dr. Conti also referred John Doe to a female therapist in his practice group "because he had no healthy relationships with women," and the female therapist, Sonali, would provide family therapy. Dr. Conti stated his goal was to help John Doe "Build relationships and rapport, try to give him experiences of not being shamed but also with accountability."

In addition, Dr. Conti saw his role liaising with the parents as important. "I didn't feel anyone had ever spoken honestly with them about what was happening with John Doe." Dr. Conti explained that John Doe had received care at prestigious facilities and with well known doctors and that none of them had "leveled" with the parents that  John Doe had a personality disorder. Dr. Conti stated, "I tried to communicate to John Doe the need to work on his psychological issues/personality."

Dr. Conti reported that, on his advice, John Doe moved to Portland to engage in treatment with Dr. Conti and his team at Premier Pacific. "He came out to Portland in the summer of 2016." Dr. Conti reported that John Doe frequently missed appointments. Dr. Conti stated that even though John Doe would miss appointments, "When I wasn't there [i.e. when Dr. Conti was traveling to Los Angeles, New York, and London] he would be angry, he would complain about me…. He was scheduled to be seen three times per month, and he would actually come maybe one or two times."

Over the course of his work with John Doe, Dr. Conti began to feel that "through engagement in care [i.e. psychiatric treatment] he [i.e. John Doe] offsets responsibility to his parents." Dr. Conti explained that, in his opinion, John Doe was not seriously engaged in treatment but was using an apparent engagement in treatment to deflect responsibility for his behavior onto others, such as his parents. Dr. Conti stated, "[John Doe's] anger and fury towards his parents, I have never heard someone yell at his mother that way. With that angry menacing voice."

Dr. Conti reported that he believed John Doe's problems were rooted in his development. He stated, "I think he had insecure attachments, which led him to have poor 'role performance.' He was put into a 'sick role.' From an early age." Dr. Conti felt that John Doe had difficulty living up to his parents' expectations, and this led to

6

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

more and more severe feelings of inadequacy over time. In turn, his parents treated him as "different," and this led to a vicious cycle of feelings inadequacy.

Dr. Conti found it particularly challenging to work with John Doe's parents. He reported, "There is severe enabling in this family. In my whole clinical career I have never seen someone enable more. John Doe internalized that sense of self as inadequate. As his 'role performance' got worse, his personality disorder developed. By his mid teens. A lot of how he would feel good about himself was spending money."

Dr. Conti stated that, in his opinion, his parents did not create or enforce boundaries that John Doe needed for his development. By "cleaning up the messes," his family prevented him from experiencing "limits or boundaries." John Doe's resulting "Fury comes out usually towards his mother but often towards his father. He blames them. He extracts a lot of pain from them." Dr. Conti stated, "John Doe said in his deposition, he wrote those things to me because he wanted me to feel like he felt."

In the fall of 2016, John Doe traveled abroad for a family event. Dr. Conti stated that he strongly advised John Doe and his family against this trip. Dr. Conti believed John Doe would not be able to handle his emotions and behavior around his family. He stated, "John Doe would become filled with anger. Project it outwards. Blow everything up. To express his anger at the parents. He ran away from family [on the trip], threatening to kill himself. People were trying to find him."

Dr. Conti reported that John Doe came back to Portland around November 2016. Dr. Conti reported that during this time, he felt there was "minimal to no engagement in treatment" by John Doe. Dr. Conti stated, "My push to get him off Xanax became a point of contention. The parents were receptive to my efforts and said they need my help to set limits for him." Dr. Conti believed that John Doe "started to realize there was an alliance between his parents and me" and as a result was "missing a lot of sessions."

Dr. Conti stated that the sessions with John Doe were particularly challenging. He stated, "It was so hard to get a word in edgewise." Dr. Conti felt that John Doe was highly invested in blaming others and "externalizing" responsibility for his situation on causes outside himself. Dr. Conti stated, "He became more and more difficult to work with." In addition, it was challenging to taper John Doe off of Xanax. Dr. Conti stated, "If we went down by 0.5mg he would say he was sick and parents would get worried about him." It was also challenging to work with John Doe because he would travel out of Portland. Dr. Conti noted that although John Doe became angry during the sessions and blamed others, he never threatened to harm anyone and Dr. Conti was never afraid during the sessions.

7

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

Dr. Conti stated that by April 2017 he had decided to present John Doe with a "treatment contract" (i.e. an ultimatum) that stipulated "you must be in Portland, you must come to visits, you must taper Xanax." Although John Doe agreed to the treatment contract, he then moved to Los Angeles. Dr. Conti was frustrated that John Doe's parents agreed to this move. Dr. Conti stated, "His parents give no consequence. At this point I have no treatment alliance. I don't know where he is."

In April 2017, Dr. Conti therefore informed John Doe of "an enforced taper." Dr. Conti stated that he would begin to taper the Xanax, prescribing less each week until he stopped prescribing it. Dr. Conti mimicked John Doe, whom he recalled saying, "I'm so nervous if I don't get my medicine and [Dr. Conti] is only giving it to me a little at a time." Dr. Conti stated that, in his opinion, John Doe was "furious." Dr. Conti stated, "He was angry I had the gall not to give him what he wanted." Dr. Conti stated he was frustrated that John Doe's parents asked him to continue treating John Doe in these circumstances.

Although Dr. Conti discussed with this writer that his initial opinion was that John Doe was "antisocial," his termination letter to John Doe and his parents states, "The primary clinical diagnosis is characterological, involving narcissistic and borderline personality traits. I strongly believe that without treatment to address the characterological diagnosis, there will be no meaningful and/or sustainable improvement." Dr. Conti makes no mention of antisocial traits or the term he uses in court filings, "sociopath." In his termination letter, Dr. Conti writes, "I am also copying in the text I received today, which I believe is illustrative. [John Doe], while it is hard not to find it offensive, I see in it primarily your suffering, and it moves me to even greater hope that you will at some point engage in real treatment."

**Email and Text Messages**
In an email on April 7th, John Doe wrote, "For months and months I have always thought you have been a fucking fraud. Now I'm going to advise you one thing. I'm working to bring you down on malpractice. That's my goal. That's it. I will never let you do this to anyone." John Doe further wrote, "Buddy you just classified has (sic) one of the most horrible human beings with no hope. Leave my parents out of this one. You don't think reading that assessment it doesn't scare the shit out of me that I have no hope?"

In another email on April 7th, John Doe wrote, "I appreciate that beautifully constructed email. Written so well. When in fact you are a fucking fraud. Your (sic) able to beautifully write basically there is no hope for [John Doe] to be honest I have never gotten more hope in my life from one email. I have struggled. This has not

8

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

been easy." John Doe also used curse words in the email and stated that Dr. Conti had seen a prostitute in London.

Dr. Conti responded to these emails on April 7th, stating,

> "I have no idea what you are talking about regarding London. At one point in our conversation, I ducked into a market to get away from the wind, and there were some young people there…. In any case, it's hard for me to see how your email response does anything other than further validate the things I have asserted."

On April 9th, 2017, John Doe's mother responded to Dr. Conti. She wrote that she did not agree with Dr. Conti that John Doe had not improved, and that she had seen positive changes in John Doe over the course of his treatment with Dr. Conti. In addition, she stated, "We do not agree with what he wrote…. That being said, it is another indicator of how his mind is 'messed up.' We were surprised that you took his bate (sic) and responded the way you did. That is exactly the reaction he wanted, and he got what he wanted."

Dr. Conti reported that although he was offended by the messages, "In April I didn't feel threatened by them [i.e. the messages]. At the time I felt okay we have no treatment alliance and obviously care must end." As the emails form John Doe continued, Dr. Conti reported feeling more frustrated. In an email response from June 15th, Dr. Conti wrote, "Truth be told, I'm getting sick of this, and anyone who cares about Jeffrey's future should not only be sick of it, but frightened about where this leads." However, Dr. Conti states in an email from around the same time (June 14th), "I do not mind him insulting or cursing at me. In fact, the infamous "fuckface" email, which he copied to several people, led to a few good teaching moments in my office about maintaining perspective…." Dr. Conti then again shifts his tone, stating "That said, I cannot let myself be intimidated by wealth that someone, in this case John Doe, has threatened to use against me, nor can I let myself be slandered or defamed…." Dr. Conti also wrote, "I believe with all of my heart, training, and experience, [John Doe's behavior] arises from the distress inside of him that we have talked about on so many occasions."

Dr. Conti stated that he was particularly affected by the message he received on Father's Day. "Go stock up on your attorney you piece of shit malpracticeing (sic) mother fucker." Dr. Conti stated he was shocked that the patient was still thinking about him on Father's Day, two months after the termination. In an email on July 8th, Dr. Conti wrote to John Doe's parents, "I have thirteen years of education and training invested in my career, and I love what I do. I will not accept anyone

9

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

threatening my career." In this and other emails from this period, Dr. Conti makes no reference to John Doe threatening his person.

In an email seeking legal advice on July 8th, Dr. Conti asked for a referral to an attorney, and stated, "I also do not fight battles half heartedly, and when I am threatened, I respond aggressively. I believe that anything less emboldens the attacker." He later states in the same email, "At this point, I feel that my reputation, licensure, and ability to practice are being threatened...." Dr. Conti makes no mention of any concerns about a threat to his person.

In a note in John Doe's chart, (no date in the copy provided to this writer), Dr. Conti writes, "I have been receiving emails from Jeffrey that have been emotionally charged, profane, and legally threatening." He worries about "potential difficulties for me with state medical boards, malpractice accusations, etc." Again, Dr. Conti makes no mention of any threat to his person or his family. He makes no mention of John Doe having any history of violence or connection to the mafia or having antisocial traits or "sociopathy."

In an email on July 10th, Dr. Conti apprised John Doe's parents that he had sought an attorney to protect his interests. He mentioned no concerns for his personal or family's safety but explicitly referenced his concern for his professional standing.

On July 14th, John Doe sent Dr. Conti a further, long email, a summary of his treatment with Dr. Conti. He wrote, "I came to Portland in December with my tail between my legs knowing I was no fucking good and severely depressed. None of that's your fault or your responsibility at that time." In the course of his long email, which is alternatively mournful and angry, John Doe writes,

> "Now again it's not your fault I relapsed. I have to come to the grips that I became a drug addict via cvs (sic) which causes depression mood swings impulsively (sic). And I'm only quoting what you told me. So let's get one thing straight Mr (sic) Conti. Your observation of me being on xanax (sic) and the effects are 100000 percent correct."

In the same email, John Doe writes, "I'm coming with everything I can to make sure the pain you caused me you won't do to anyone else and I want to drain you of all your resources so you can't stand on your fake pulpit." John Doe states, "You make the first move."

John Doe wrote further emails in July expressing the hurt he believed Dr. Conti caused him and explicitly threatening a lawsuit. On August 19th, John Doe wrote again threatening a lawsuit,

10

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

> "Your a thief a bum and one of the worst humans I have ever met. Burn in fucking hell and I'm coming for you. Your fucking Portland billboards are going to be spotlight centered on your fraudulent ass. Fucking piece of shit cock sucker. I will fucking bury your ass alive. You mother fucker. The pain and depression you caused me you will pay in court of law. Fuck you."

John Doe wrote further such emails on September 7th, November 9th, November 23rd. Dr. Conti stated that as these emails continued, he began to fear for his person. In his emails to John Doe and his parents, however, Dr. Conti does not indicate any concern about his physical safety. Dr. Conti does express concerns about his reputation and career.

**Lawsuit**

Dr. Conti stated that as the emails progressed, he feared for his person and his career. Dr. Conti believed that John Doe is a "sociopath" and "focused on me as the cause of his problems." Dr. Conti stated, "I legitimately perceived a real and potential risk to me physically and career, occupationally. My ability to make a living." Dr. Conti's first mention of his fear for his safety was in the claim he filed in federal court on November 27th, 2017.

Dr. Conti stated his belief that the lawsuit would be a "deterrent to [John Doe] killing me." Dr. Conti stated that he came to this conclusion after consulting lawyers in Portland and in New York. He also spoke with a former lawyer of the Kennedys. Dr. Conti stated that, in his opinion and consistent with legal advice, the best way to "reign in the 'rabid dog,' John Doe," was to "shame the family and John's Doe's father."

Dr. Conti did not consult with any psychiatrists other than Dr. Hamilton, his personal treating psychiatrist. Dr. Conti reported that he did not give John Doe's messages to Dr. Hamilton or read them to him. Dr. Hamilton confirmed in his deposition that he never read or had read to him John Does messages.

Dr. Conti stated he did not call the police. He stated that, in his opinion, calling the police was "futile." He did not pursue an order of protection. Instead, he filed a civil suit, asking for monetary compensation. The suit also included a request for a protection order. In Dr. Hamilton's deposition, which Dr. Conti attended, Dr. Conti became upset and shouted "lies!" when defense counsel stated Dr. Conti's first settlement proposal made a monetary demand of 1.25 million dollars. Dr. Conti conceded in his deposition that he had forgotten about this demand. To this writer, Dr. Conti stated, "I know money was asked for, I have no idea what amount it was."

11

Paul Conti Report
Ziv E. Cohen, M.D.

October 7th, 2019

Dr. Conti stated that, due to his fears of John Doe, he didn't enact a business plan to expand his practice. However, he also reported that he had not begun to implement the plan prior to John Doe's emails. Similarly, he stated that he and his wife had been thinking of moving to a house. They had not actually set a date for the move or found a house to purchase. However, Dr. Conti asserted that because of John Doe's emails, he and his wife did not proceed further with their plans to buy a house.

## Past Psychiatric History



October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



14

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



15

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



Paul Conti Report
Ziv E. Cohen, M.D.

October 7th, 2019



October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

## Past Medical History

██████████████████████████████████████████████

## Medications

████████████████████████████████████████████████
████████████████████████████

## Family Psychiatric History

████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████

## Employment History

Dr. Conti reported that after graduating from college he worked at a financial services firm for several years. He then decided to pursue a career in medicine. Following medical school, he began his residency in psychiatry at Stanford University. He later transferred and completed his residency at Harvard University for personal reasons.

Following graduation from residency, Dr. Conti worked at a Harvard affiliated hospital. Dr. Conti then began working at a local hospital in Portland. He later left the hospital and started his own addiction clinic. The clinic was sold to another addiction facility, Hazelden. After two years at Hazelden, Dr. Conti started his current private practice.

## Legal History

Dr. Conti denied any previous involvement in a law suit. However, in his deposition he reported he may have been a co-plaintiff in a medical malpractice suit filed by his wife. He also stated in an email that he had counter-sued a former employee.

## Mental Status Examination

████ ████ ████ ████ ████ ████ ████ ████

██

Paul Conti Report
Ziv E. Cohen, M.D.

October 7th, 2019



## Assessment

Dr. Paul Conti is a 50 year old psychiatrist who filed a lawsuit against his former patient, John Doe, in which he alleges that he suffers from █████████████ ████████ as the result of electronic messages sent to him by John Doe. In addition, Dr. Conti asserts that the messages caused him to objectively fear for his personal and professional reputation. He concluded the best way to address his safety and reputational concerns was to file a law suit against John Doe. Below, each of these assertions is addressed.



October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



22

Paul Conti Report
Ziv E. Cohen, M.D.

October 7th, 2019



October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



24

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.



**Fear for Personal Safety**

In addition to arguing that he developed ███ from John Doe's messages, Dr. Conti asserts that his fear for his personal safety was rooted in an objective clinical assessment of John Doe. That is, he argues that in his assessment John Doe is a "sociopath" and that for this reason he had good reason to fear him. This argument is distinct from Dr. Conti's assertion that John Doe caused him to develop ███. Essentially, Dr. Conti argues that because of his objective assessment of John Doe as a "sociopath," he had no choice but to curtail his business plans and to worry about his family's safety.

Dr. Conti explained that the basis for his assessment that John Doe is a "sociopath" is:
-John Doe's past alleged involvement with organized crime
-John Doe's treatment of women
-John Doe's treatment of his parents

Sociopathy is not an official psychiatric diagnosis. In fact, it is an antiquated and out of date term, no longer in usage. Antisocial Personality Disorder (ASPD) is the official DSM 5 diagnosis for a person with a tendency to break the law due to a lack of normal moral boundaries. "Psychopathy" is the modern term that refers to the most extreme individuals within the overall category of ASPD. Individuals with psychopathy show the following characteristics:

25

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

-persistent antisocial behavior (i.e. law-breaking)
-impaired empathy and remorse
-shallow affect
-superficial charm
-manipulativeness
-lack of empathy
-criminal versatility
-impulsiveness
-irresponsibility
-poor behavior controls
-juvenile delinquency

Individuals with psychopathy are considered very difficult to treat and engage in consistent rule breaking and criminal behavior. As minors, they meet criteria for a diagnosis of conduct disorder. Dr. Conti cites John Doe's borrowing money to support his gambling, treatment of women, and treatment of his parents to support a diagnosis of "sociopathy." Elsewhere, however, Dr. Conti asserts that John Doe has "narcissistic and borderline personality disorder."

There is considerable overlap between narcissistic/borderline personality disorder and psychopathy. That is, individuals with psychopathy may meet diagnostic criteria for antisocial, narcissistic, and/or borderline personality disorder. However, individuals with narcissistic and borderline personality disorders do not normally meet criteria for psychopathy. Psychopathy is much less common than narcissistic and borderline personality disorders. For John Doe to have psychopathy, he would need to display not just the characteristics of narcissistic and borderline personality disorder but the additional characteristics listed above of psychopathy.  Of note, during his treatment of John Doe, Dr. Conti never diagnosed John Doe with psychopathy, sociopathy, or antisocial personality disorder based on the available records.

Based on Dr. Conti's report, he did not have knowledge or belief that John doe displayed persistent antisocial behavior (i.e. law breaking) or criminal versatility (i.e. engaging in a variety of different kinds of criminal behavior over time). The other characteristics of psychopathy listed above are common to psychopathy and to narcissistic/borderline personality (such as poor empathy, manipulativeness, impulsiveness).

Regarding John Doe's alleged relationship with organized crime, Dr. Conti stated that John Doe had reported to him borrowing money from organized crime to pay for his gambling habits. John Doe's father would then pay these debts so as to avoid any harm coming to his son. Dr. Conti conceded that this was the sole extent, to his

26

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

knowledge, of John Doe's contact with the mafia. He conceded that John Doe had never reported or suggested to him, nor had he ever come to believe for any reason, that John Doe had conspired with the mafia to commit any crimes.

In addition, Dr. Conti conceded that he did not believe John Doe to own any weapons, to have any history of using weapons, or to have sought to inflict violence on any individual. Based on the information reported by Dr. Conti, there is no evidence that John Doe's alleged dealings with the mafia were indicative of any "psychopathic behavior." It is well known, on the contrary, that individuals with addictions such as gambling may exercise poor judgment in the furtherance of their addiction.

With regard to John Doe's treatment of women, Dr. Conti explained that John Doe had revealed past behaviors of touching women inappropriately and without their consent while in casinos. Although this behavior, if true, is clearly inappropriate, it does not indicate "psychopathy."

John Doe shows considerable remorse in his messages to Dr. Conti. He states that Dr. Conti was "100,000 percent" correct in his assessment of him, and takes responsibility for two of his relapses to Xanax. He expresses anguish at having been abandoned, in his opinion, by Dr. Conti. These feelings would be alien to a psychopath, who thinks only of exploiting others and has no capacity for remorse of idealization of or dependency on others.

John Doe's email are not consistent with a psychopath. John Doe reflects thoughtfully in the emails about his own faults and those of Dr. Conti. His emails are angry, use foul language, and are aggressive at times. However, they also register a strong sense of shame, disappointment in himself, a desire to be close to his parents and family. These are not sentiments that are consistent with psychopathy. John Doe does accuse Dr. Conti more than once of malpractice in these messages. In medicine, it will happen from time to time that an emotional or angry patient will accuse the psychiatrist of malpractice. Most of these patients will calm down and move on to another treatment provider. It is in no way unique or a mark of psychopathy to accuse a doctor of malpractice, even when it is done in foul or aggressive language. What stands out in the emails from John Doe is the asymmetrical nature of the doctor-patient relationship. John Doe is clearly stating that in his mind, Dr. Conti wielded enormous power over him. Dr. Conti's power stemmed from his ability to prescribe a medication on which John Doe was dependent, and on his being able to report on John Doe's progress to his parents. John Doe expresses in his emails the sentiment that Dr. Conti abused that power by creating narratives about John Doe which "shamed" him to his parents. John Doe's response was to lash out in anger.

27

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

This emotional response is not characteristic of psychopaths, who are cool, calculated, and unemotional.

Thus, the available evidence presented by Dr. Conti and the emails is supportive of a diagnosis of narcissistic/borderline personality. It is not supportive of psychopathy. Dr. Conti's argument that he was afraid because John Doe was a "psychopath" is also not consistent with Dr. Conti's report of his reactions to John Doe when they worked together: he was never afraid of John Doe or intimidated by him.

Dr. Conti conceded that he at no point sought consultation with a forensic psychiatrist to determine whether his opinion that John Doe was a psychopath was valid. In addition, he at no point referred John Doe for a treatment that would be geared towards psychopathy.

It is therefore my opinion, to a reasonable degree of medical certainty, that Dr. Conti's subsequent assessment that John Doe is a psychopath is factually inconsistent with the evidence Dr. Conti presents in support of his argument. In this case, Dr. Conti appears to be acting as his own expert, arguing that because, in his opinion, John Doe is a psychopath, he was therefore justified in fearing for his safety. It is this writer's opinion that Dr. Conti's supposedly expert opinion on John Doe's psychopathy is faulty and does not meet standards for making this diagnosis. This is evidenced, among other reasons, by Dr. Conti using the term "sociopath," which is simply no longer a diagnosis in psychiatry.

In his deposition, Dr. Hamilton stated that it was important to take John Doe's threats seriously because Dr. Hamilton's research showed that when psychiatrists were killed "they almost always knew it, had been warned, and they denied the warning and ignored it." Dr. Hamilton's conclusion presents a fallacy: While it can occur that a psychiatrist who is assaulted by a patient had some warning about the patient's intentions, it is not true that in most cases where a patient threatens to sue a physician the physician will be physically harmed or even sued.

In addition, Dr. Hamilton states in his deposition that he advised "that [Dr. Conti] should take that seriously and protect himself." However, Dr. Hamilton does not describe what would constitute, in his opinion, the proper or best way for a psychiatrist to protect himself. In a review of the literature on harassment of psychiatrists, this writer found no psychiatric journal article that advised that the best way—or even a possible way—of protecting oneself as a psychiatrist was to pre-emptively sue the patient. It clearly is not part of psychiatric training for the management of difficult patients. Dr. Conti's and Dr. Hamilton's portrayal of Dr. Conti's decision to sue John Doe as being part of the proper practice of psychiatry

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

with a difficult patient who during termination makes emotional threats to sue is not supported by psychiatric practice or psychiatric literature.

In addition, Dr. Hamilton stated in his deposition that the diagnosis of John Doe is not relevant to determining the nature of the threat he may pose to Dr. Conti. In fact, it is well known in forensic psychiatry that diagnosis is an important factor in determining the potential threat posed by a psychiatric patient. For example, a patient with schizophrenia is much more likely to be violent when having active psychotic symptoms than when treated with medication, with may render him harmless. In the case of John Doe, a narcissistic or borderline patient who feels insulted, mistreated, or shamed by his psychiatrist (all of which John Doe expressed in his messages to Dr. Conti) and who impulsively and emotionally threatens a lawsuit is typically best addressed by acknowledging whatever fault the clinician may have committed, referring the patient to another provider, and allowing for the passage of time. Patients with narcissistic and borderline personality disorders are more prone to feeling insulted by the psychiatrist and are more prone to threatening a lawsuit. Their risk of violence is low.

It is therefore my opinion, to a reasonable degree of medical certainty, that a reasonable psychiatrist in Dr. Conti's position would not view John Doe as a "sociopath" to be feared and would consult an expert in personality disorders if he was unsure of how to assess or respond to the patient's reaction to termination.

**Concern for Reputation and Medical License**

Dr. Conti stated that his motivation in pursuing a lawsuit against John Doe was purely in order to safeguard his reputation and person. He stated that he came to the conclusion that this was the best way to safeguard himself after consulting with lawyers in Portland and in New York. Dr. Conti stated that he went the extra length to consult with an attorney who had represented the Kennedy family. He stated he spoke to this attorney on the telephone for an hour. The attorney advised him that the best way "to shut this down," in Dr. Conti's words, was to sue John Doe.

Of note, Dr. Conti only spoke with his treating psychiatrist and did not consult any other physicians. His treating psychiatrist stated, however, that Dr. Conti did not even provide him with John Doe's messages. Dr. Conti did not seek out consultation with experts on borderline personality or narcissistic personality to help guide his thinking about John Doe's behavior and messages. Consultation with a medical colleague is considered standard of care when treating difficult cases.

Dr. Conti conceded that he had not consulted with his malpractice insurance regarding his concerns for his reputation and his medical license. When asked why

29

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

he did not take this step, Dr. Conti stated, "Because it was futile, and I don't do futile things." On another occasion, he stated, "I didn't have time to speak to so many people about it." Speaking with the malpractice insurance is standard when a physician is concerned about a potential lawsuit. Given that Dr. Conti had consulted lawyers in two states and even spoken to a lawyer who represented the Kennedys, it seems unlikely that he was unable to take the step of speaking to his malpractice insurance.

Dr. Conti was asked whey he did not file a police complaint against John Doe. Dr. Conti responded that he believed a police complaint would not restrain John Doe. He referred to John Doe as a "rabid dog" and stated that the only way to force John Doe's father to "restrain the rabid dog" was to file a lawsuit, which would cause John Doe's family embarrassment and serve as a deterrent to John Doe sending further unwanted messages or threatening Dr. Conti's reputation. Dr. Conti further stated that the lawsuit would make it impossible for John Doe to harm him by creating a public record, so that should any harm come to Dr. Conti, "the police would know where to look." This writer pointed out that filing a police complaint or discussing the case with his wife or a professional colleague would accomplish the same purpose. Moreover, third parties were already alerted to John Doe's anger towards Dr. Conti by being copied on some of the messages. This writer therefore pointed out that it seemed illogical for Dr. Conti to feel that a lawsuit was the only way to create a record of what was happening. Dr. Conti responded by insisting that he was only following what he believed was the best legal advice available to him.

It is therefore this writer's opinion, to a reasonable degree of medical certainty, that avenues other than a lawsuit were available to Dr. Conti as a psychiatrist with concerns regarding a former patient's behavior. These other avenues would have been addressed in a call to his malpractice insurer and consultation with a colleague with expertise in personality disorders.

### Countertransference

When treating a patient, a psychiatrist will naturally develop a set of feelings, dispositions, and attitudes towards the patient. These feelings are referred to as the psychiatrist's "countertransference." It is necessary for the psychiatrist to manage his or her countertransference, otherwise it can interfere with the treatment or even impair the psychiatrist's judgment. The more difficult the patient is to treat, the more likely the psychiatrist will struggle with issues of countertransference.

Given Dr. Conti's statement to the present examiner that he viewed John Doe as a "rabid dog," and felt a lawsuit was needed to induce John Doe's father to "restrain the rabid dog," Dr. Conti was asked by this examiner about his countertransference

30

October 7th, 2019

Paul Conti Report
Ziv E. Cohen, M.D.

to John Doe. Specially, Dr. Conti was asked whether he felt his lawsuit against John Doe was driven by his countertransference. Dr. Conti stated that he had explored his feelings towards John Doe in his own psychotherapy and felt he had dealt with his countertransference.

As a psychiatrist who supervises psychiatric residents as well as colleagues, the present writer is often called upon to assist psychiatrists in managing difficult patients. Issues of countertransference are frequently discussed and assessed with such supervisees and colleagues. Based on the available evidence presented in this report, it is this writer's opinion, to a reasonable degree of medical certainty, that Dr. Conti's countertransference towards John Doe was not and is not currently well managed by Dr. Conti, and that it plays a significant role in his attitudes towards and assessment of John Doe.



Respectfully Submitted,

Ziv E. Cohen, M.D.

10/4/19

**Ziv Ezra Cohen, M.D., F.A.P.A, PLLC**
200 W 57th St, Suite 304
New York, NY 10019
zec2002@med.cornell.edu
O:  212-335-0236
C:  646-660-0111
F:  646-607-5985

**LICENSE**
New York State Medical, #241-935, valid until 3/31/18 Board Certification, American Board of Neurology and Psychiatry, April 2009, valid until 2019, with added qualifications in Forensic Psychiatry

**EXPERIENCE**
**Clinical Assistant Professor of Psychiatry, Weill Cornell Medical College of Cornell University**, **and Medical Staff, New York Presbyterian Hospital,** 12/1/14-present.
Teaching and supervision of medical students, residents in psychiatry, and forensic psychiatry fellows. Topics include general psychiatry, psychopharmacology, psychotherapy, military psychiatry, and forensic psychiatry.

**Adjunct Assistant Clinical Professor of Psychiatry, Columbia College of Physicians and Surgeons, Columbia University,** 10/1/17-present.
Teaching and supervision of psychiatry residents on intervential psychiatry, including Transcranial Magnetic Stimulation and Ketamine. Teaching on treatment resistant depression.
Teaching and supervision of forensic psychiatry fellows on a range of topics including correctional psychiatry, law enforcement psychiatry, military psychiatry, and others.

**Private Practice in Psychiatry,** NY, NY, 6/30/12-present.
Psychotherapy and psychopharmacology based treatment of psychiatric disorders in adults and adolescents. Focus on mood disorders, anxiety disorders, and attentional problems.

**President, American Society for Adolescent Psychiatry,** NY, NY 2017 to 2018. Responsibilities include providing overall leadership, strategic planning, and organizational objectives at the national level.

**President, New York Society for Adolescent Psychiatry,** NY, NY, 2015 to 2017. Responsibilities include providing overall leadership, strategic planning, and organizational objectives at the New York State level.  Includes directing the executive committee with regard to educational conferences, membership, and finances.

**President, Tristate Chapter, American Academy of Psychiatry and the Law,** NY, NY, January 21st 2017- January 20th, 2019. Responsibilities include providing overall leadership, strategic planning, and organizational objectives for the New Jersey, New York, and Connecticut chapter of the leading national organization of forensic psychiatrists. Includes meetings with the executive committee with regard to educational conferences, membership, and finances.

**Fellow in Forensic Psychiatry, New York State Psychiatric Institute/Columbia College of Physicians and Surgeons,** NY, NY, 7/1/13-6/30/14.

> Responsibilities included carrying out criminal forensic psychiatric evaluations including competency to stand trial, mental state at the time of the offense, and risk assessment for insanity acquitees; civil forensic psychiatric examinations, including asylum cases and child custody; treatment of prison inmates; and mastering the legal and ethical principles underlying mental health law in the United States.

**Research Fellow in Forensic Psychiatry, New York State Psychiatric Institute/Columbia College of Physicians and Surgeons,** NY, NY, 7/1/12-

> 6/30/13. Responsible for carrying out research on topics in forensic psychiatry. Projects included working with Veterans Courts, survey research on PTSD in criminal defense, VA collaborative research on suicide amongst incarcerated veterans, and research into restoration of competency at Mid Hudson Forensic Psychiatric Center.

**Israel Defense Forces Medical Corps**, Israel, 3/7/11-7/1/12.  Role: Medical Officer and Staff Psychiatrist for Israel Defense Forces soldiers in active duty; treatment of reservists and veterans with PTSD; IDF mental health policy; disaster psychiatry.

**Instructor in Psychiatry, Weill Cornell Medical College,**  and **Attending Psychiatrist, New York Presbyterian Hospital,** New York, NY, 7/1/2008 – 9/31/10.

> Clinical responsibilities included serving as attending psychiatrist for six inpatients daily, attending psychiatrist in the emergency room weekly, electroconvulsive therapy (ECT), treating medical and graduate students, and maintaining a private practice in psychiatry. Academic responsibilities included involvement in resident and medical student education and curriculum development.  Involved in root cause analysis reviews for the Weill Cornell Department of Psychiatry regarding inpatient and outpatient outcomes.

**Psychiatry Resident, Payne Whitney Clinic**, Weill Cornell Medical Center, New York Presbyterian Hospital, June 2004 - June 2008

> Duties included rotating through internal medicine, neurology, and emergency medicine departments (internship). Residency duties included working in inpatient and outpatient psychiatric departments, with primary responsibility for patients. Education included lectures, seminars, written and oral presentations, grand rounds, and direct supervision sessions with faculty.
> Leadership responsibilities: Outpatient Department Chief (selected by faculty) 2006-2007, which included role of assisting in management of outpatient clinic; Residency Council, which included planning weekly educational meetings for residents; planning yearly department holiday show; and organizing social gatherings for residents.

**On Call Psychiatrist, Lennox Hill Hospital,** NY, NY, July 2007-July 2008 (approximate dates).

> Responsible for psychiatric cases in the general emergency room, for the inpatient unit, and for consultation-liaison cases throughout the hospital.

**Psychoanalytic Fellowship, New York Psychoanalytic Institute**, New York, NY, Sept 2006 – June 2007
> Bimonthly seminar exploring psychoanalytic concepts through seminal papers, and case histories. Ongoing psychoanalytic cases presented by faculty and discussed.

**Medical Consultant**, **Abelson Law Firm** and **Stein, Mitchell, and Mezines Law Firm,**
> Washington, DC, June 2003 - June 2004, and June 2008-September 2010. Involved in chart review and assisted in the litigation process, literature review and providing opinions.

## TEACHING

Clinical Assistant Professor of Psychiatry, Weill Cornell Medical College: Director of Forensic Curriculum: in charge of approximately 20 forensic psychiatric lectures across PGY2-PGY4 years, including directly providing approximately 10 lectures. In addition, supervisor of PGY 4 resident in elective in forensic psychiatry, involving weekly supervision.

Adjunct Assistant Professor of Clinical Psychiatry, Columbia University: Cornell-Columbia Fellowship in Forensic Psychiatry: directly supervise forensic psychiatric fellows in forensic psychiatric cases, provide 6 lectures to fellows in topics including veterans in the criminal justice system, PTSD as a criminal defense, military forensic psychiatry, the insanity defense, Americans with Disabilities Act, and

Research Module Coordinator and Instructor, Combined Forensic Curriculum for New York Forensic Psychiatry Fellowships, NY, NY, 2014-present. Provide a curriculum of 6 lectures to the forensic fellows who meet weekly for a joint curriculum across 4 forensic fellowships in New York (NYU, Cornell-Columbia, Albert Einstein, Rutgers): lectures focus on landmark papers in forensic psychiatry.

## EDUCATION AND TRAINING

**Residency in Psychiatry,** Weill Cornell Medical Center/New York Presbyterian Hospital.

**Albert Einstein College of Medicine**, Bronx, NY
**M.D.**, 2003

**Goucher College**, Baltimore, MD
**Bachelor of Arts**, *Summa cum Laude*, 1999
Major: Biology; Minor: Chemistry

## ACADEMIC HONORS AND AWARDS

Schonfeld Award for Distinguished Service, New York Society for Adolescent Psychiatry and the New York Academy of Medicine, June 23rd, 2016

Honors in NIMH research elective in schizophrenia in the Clinical Branch for Brain Disorders, 2002-2003

Phi Beta Kappa, 1999

Jessie L. King Prize for Excellence in the Natural Sciences, 1999

National Dean's List, 1996-1997, 1997-1998, 1998-1999

**ACTIVITIES**
Einstein Youth Violence Project, Member and Youth Mentor, 1999-2002
Einstein Quarterly of Biology and Medicine
      Assistant Editor, 1999-2001
      Associate Editor, Responsible for History, 2001-2002

**PROFESSIONAL ORGANIZATIONS**
American Society for Adolescent Psychiatry, Member
American Psychiatric Association, Fellow
American Medical Association, Member
American Academy of Psychiatry and the Law, Member
American Academy of Forensic Sciences, Associate Member
New York Academy of Medicine, Member

**COMMITTEES AND APPOINTMENTS**
President, American Society for Adolescent Psychiatry, 2017-2018
President, Tristate Chapter of American Academy of Psychiatry and the Law, 2017-2019
President, New York Society for Adolescent Psychiatry, 2016-2018
Forensic Committee Co-Chair, New York County Branch, American Psychiatric Association, 2016-2018
Program Chair, American Society for Adolescent Psychiatry Annual Meetings, 2016 and 2017
Trauma and Stress Committee, Member, American Academy of Psychiatry and the Law, member, 2014-present
Program Chair, Tristate Chapter of American Academy of Psychiatry and the Law Annual Meeting, 2016-2017, 2017-2018

**PUBLICATIONS**
**Articles:**
Missner S.C., Cohen Z.E. (2019). The Impact of the Psychiatrist on the Life Care Plan. *Journal of the American Academy of Psychiatry and the Law*, 47(2) online. DOI:10.29158/JAAPL.003837-19
Cohen, Z.E. & Appelbaum, P.S. (2016) Experience and Opinions of Forensic Psychiatrists Regarding PTSD in Criminal Cases. *Journal of the American Academy of Psychiatry and the Law*, 44:41–52
Cohen, Z.E.  Reflections of an Israel Defense Forces Military Psychiatrist. *AAPL Newsletter,* 2015;40(3)11-26
Fisher C.E., Cohen, Z.E., Hoge S.K., & Appelbaum P.S. (2015). Restoration of Firearm Rights in New York. *Behavioral Sciences and the Law*, DOI: 10.1002/bsl.2171
Cohen, Z.E. (2000). Against Relativism. *Einstein Quarterly of Biology and Medicine, 17,* 198-202.
Cohen, Z.E. (2000). Science Without Laws. *Einstein Quarterly of Biology and Medicine*, *17,* 39-44.

**Book Chapters:**
Cohen, Z.E., (2007). Dangerousness Assessment. In Stephen J. Ferrando (ed.), *Psychiatry In-Review Study Guide*, Educational Testing and Assessment Systems (ETAS).

Cohen, Z.E., (2007). Suicide. In Stephen J. Ferrando (ed.), *Psychiatry In-Review Study Guide*, Educational Testing and Assessment Systems (ETAS).

**Abstracts and Invited Presentations:**
May 19th, 2019: *Youth Gun Violence Towards Others: Forensic Psychiatric Issues*. Presentation Session, American Psychiatric Association Annual Meeting, San Francisco, CA.

April 5th, 2019: *Novel Therapeutics: Ketamine in the Treatment of Depression*, The Society for Liaison Psychiatry, Spring Symposium, New York, N.Y.

June 7th, 2018: *Panel: Human Ecology of Adolescent and Young Adult Male Health & Healthcare*, National Summit on Adolescent and Young Adult Male Health, Washington, D.C..

March 16, 2018: *Emerging Adults, Veterans, and Criminal Justice*, American Society for Adolescent Psychiatry National Conference, New York, N.Y.

February 13, 2018: *Homicide in the Hospital: A Case of the Insanity Defense,* Division of Psychiatry and the Law, Columbia University, New York, N.Y.

April 19th, 2017: *Telepsychiatry and Mental Hygeine Legal Examinations*, (with Peter Scheidt, Esq.), New York State Judicial Institute, White Plains, N.Y.

March 24th, 2017: Memorial Sloan Kettering Cancer Center, Grand Rounds, New York, N.Y. *Transcranial Magnetic Stimulation for Treatment Refractory Depression: From Theory to Practice*.

November 4th, 2016: *Academic Career Biography,* Presentation to the Department of Psychiatry at the Weill Cornell Medical College/New York Presbyterian Hospital, New York, N.Y.

June 23rd, 2016: *Veterans and Criminal Justice*, New York Academy of Medicine, Schonfeld Award Lecture, New York, N.Y.

May 24th, 2016: *Veterans Forensic Psychiatric Issues*, Queens Law Assoociates, Forest Hills, Queens, N.Y.

April 29th, 2016: *Veterans Forensic Psychiatric Issues,* Veteran Defense Point Person Training, Veterans Defense Program, New York State Defenders Association, SUNY New Paltz, N.Y.

April 15th, 2016: *Treatment of a Pretrial Detainee with Psychosis*, Morbidity and Mortality at Department of Psychiatry, Weill Cornell Medical Center/New York Presbyterian Hospital, NY, NY.

March 22nd, 2016: *Violence Risk Assessment in the Psychiatric Emergency Room*, Grand Rounds at Department of Psychiatry, Lincoln Medical Center, Bronx, NY.

March 9th, 2016: *Veterans Treatment Courts: Response to a Public Health Crisis*, Division of Law, Ethics, and Psychiatry, Columbia University Medical Center, New York, NY.

November 12th, 2015: *PTSD in Veteran Cases,* Veteran Defense Point Person Training, Veterans Defense Program, New York State Defenders Association, Hempstead, N.Y.

June 10, 2014:  *Risk Factors for Readmission for Restoration of Competency to Stand Trial in New York State*, Division of Law, Ethics, and Psychiatry, Columbia University Medical Center, New York, NY.

October 25, 2013:  *Forensic Psychiatrists' Experience with PTSD: Criminal Cases*, Poster Presentation at American Academy of Psychiatry and the Law annual meeting, San Diego, CA.

October 24, 2013:  *Veteran Status of Prison Suicides in New York State*, Poster Presentation at American Academy of Psychiatry and the Law annual meeting, San Diego, CA.

February 21, 2013:  *Veteran Treatment Courts, Trend for the Future?* Presentation at American Academy of Forensic Sciences annual meeting, Washington, D.C.

December 7, 2012:  *Military Psychiatry in the Israel Defense Forces*, Presentation to faculty and residents at Weill Cornell Medical College Department of Psychiatry, New York, N.Y.

**CITATIONS IN LEGAL DECISIONS**
RYAN v. COUNTY OF NASSAU, No. 12-CV-5343(JS)(SIL), Memorandum and Order, Hon. Joanna Seybert, United States District Court, E.D. New York, March 31, 2016

U.S. v. MARMOLEJOS, No. 18-CR-303-1 (JMF), Memorandum and Order, Hon. Jesse Furman, United States District Court, S.D. New York, May 21st, 2019

**MEDIA ARTICLES**
What 'The Joker' gets wrong about mental illness. Ziv Ezra Cohen. New York Daily News, October 4th, 2019. accessed at: https://www.nydailynews.com/opinion/ny-oped-what-the-joker-gets-wrong-about-mental-illness-20191004-eypdpcp3njhxncr7ouvnztdpwq-story.html

**LANGUAGE SKILLS**
Fluent in Hebrew. Reads Greek and Latin.

**INTERESTS**
Fitness, Travel, film.



**Weill Cornell** Medicine — NewYork-Presbyterian

Ziv E. Cohen, M.D., F.A.P.A.
Clinical Assistant Professor
Director, Principium Psychiatry, PLLC

October 7th, 2019

Katherine Rosenfeld, Esq.
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue at Rockefeller Center, 10th Floor
New York, NY 10020
Phone: 212.763.5000
krosenfeld@ecbalaw.com

Dear Ms. Rosenfeld,

In the past four years, I have testified or been deposed in the following cases:

FEDERAL

- RYAN v. COUNTY OF NASSAU, No. 12-CV-5343(JS)(SIL), 2016 U.S. Dist. (E.D.N.Y.)
- UNITED STATES OF AMERICA v. GERMAN MARMOLEJOS, No. 18-CR-303-1 (JMF), 2019 U.S. Dist. (S.D.N.Y.)

STATE

- PEOPLE OF NEW YORK v. SPENCE ANDREWS, Ind. No. 2488/13, 2016, NY Supreme Ct
- PEOPLE OF NEW YORK v. HENRY WACHTEL, Ind. No. 1669/12, 2018, NY Supreme Ct
- STROHLI v. STROHLI, Index No. 1364/2013, 2018, NY Supreme Ct

Sincerely,

Ziv E. Cohen, M.D