# EXHIBIT E

# DONALD MEYER, M.D.

1105 Massachusetts Avenue
Suite 11E
Cambridge, MA 02138
Telephone and Fax
617 491 6868

Assistant Professor of Psychiatry, part time
Harvard Medical School
Associate Director of Forensic Psychiatry
Beth Israel Deaconess Medical Center
e mail: donald_meyer@hms.harvard.edu

This is a confidential message, intended only for the person to whom it is addressed. It may contain information that is privileged under applicable law and exempt from disclosure.  If you are not the intended recipient, any use or reproduction of this communication is prohibited. If you receive this message in error, please notify me immediately and I will arrange for the return of the material at no cost to you. Thank you.

# CONFIDENTIAL REPORT

**Date:** November 11, 2019

**Parties Requesting the Evaluation**

Attorney Peter B. Schalk
Partner
Attorney Richard S. K. Diorio
Associate
Judd Burstein, P.C.
5 Columbus Circle, Suite 1501
New York, NY 10019
Tel.: (212) 974-2400
Fax: (212) 974-2944
pschalk@burlaw.com
rdiorio@burlaw.com
www.burlaw.com

**Identifying Information**
**Conti v Doe**

## I.      INTRODUCTION

I was retained as a rebuttal expert to offer opinions about the requisite professional psychiatric ethics concerning
a) Dr. Conti's interactions with his former patient, Mr. Doe, and
b) opinions proffered by Doe's psychiatric expert. The events in question are summarized in Section II below.

Standard of the Examination: Reasonable Medical Certainty

In New York State, the standard of care is "the level of care acceptable within the relevant professional community." *Tkacheff v. Roberts*, 47 N.Y.S.3d 782, 786 (3d Dep't 2017)

Answers to the questions above quoted are limited to the role of the relevant psychiatric factors.

This examiner reserves the right to supplement or amend these opinions in the event of becoming aware of additional pertinent information.

## II. Sources of Information

Memorandum answering questions on points of law

Dr. Cohen's Report on IME of Dr. Conti, with exhibits

John Doe's Expert's Report

Pacific Premier Group Records

Pacific Premier Group Bills

Transcript of Dr. Hamilton's deposition, and exhibits used at deposition

Transcript of John Doe's deposition, and exhibits used at deposition

Transcript of Dr. Conti's deposition

Transcript of Dr. Jenike's deposition, and exhibits used at deposition

Transcript of Dr. Lippert's deposition, and exhibits used at deposition

Sealed Complaint, with exhibits

Anonymized Complaint

First Amended Anonymized Complaint

Answer with Counterclaim

Orders, dated June 28, 2019, and August 20, 2019, denying redaction requests by Defendant's counsel

Letter from Defendant's counsel dated January 26, 2018, requesting certain material be redacted, endorsed on February 5, 2018 to deny the request

Unsealing Order and Anonymization Order, both dated December 27, 2017

Federal Rules of Civil Procedure 12 and 26

Confidentiality Stipulation and Order

WhatsApp Messages between Dr. Jenike and Doe

Conti Thomas deposition excerpts

Doe 2018 McLean Medical records excerpts

Conti Jenike emails re talking

Pre-filing negotiation emails

The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry [The Principles] 2013

## III.      Summary of Events

Dr. Conti is a Board-Certified Adult psychiatrist and the owner of Pacific Premier Group, a Portland based corporation providing comprehensive adult mental health consultation and treatment services.

Mr. Doe's parents met with Dr. Conti in late May, 2016. At their recommendation shortly thereafter, Mr. Doe sought consultation and then treatment with Dr. Conti.

Mr. Doe had a history of prior serious major mental illness that continued to the time he commenced treatment with Dr. Conti. At the time of his beginning treatment, he was diagnosed with Xanax dependence, recurrent major depressive disorder severe, rule out bipolar II, an unspecified anxiety disorder, a personality disorder and pathological gambling. He also had a prior history of hospitalization for treatment of Obsessive-Compulsive Disorder [OCD] and a history of suicidal ideation for which he had also been briefly involuntarily hospitalized. He continued to have anxiety about microbial contamination, a symptom and consequence of his OCD.

Other deposition testimony I reviewed indicated the presence of panic attacks [another psychiatric disorder], attacks that could be primary or alternatively secondary to Mr. Doe's Xanax abuse and dependence. 2018 Mclean Hospital records indicated Mr. Doe had expressed homicidal ideation towards Dr. Conti and towards a family member.

Of note, Mr. Doe also had access to millions of dollars of family assets that historically had been used to pay gambling debts, purchase drugs illegally, allegedly to hire prostitutes and to extricate himself from the consequences of his maladaptive conduct. These later facts provide historical context for the assessment of Mr. Doe's risk for future misconduct, a matter of legitimate concern to Dr. Conti concerning both Dr. Conti's safety and the assessment of Doe's threat to Conti's reputation and property. These facts would also be of legitimate concern to any mental health provider treating Mr. Doe. So too is the medical fact that Mr. Doe has a first cousin who committed suicide. That fact alone raises the relative risk of Mr. Doe's violence to himself.

Treatment at Pacific Premier Group involved meetings with Dr. Conti and with two other mental health professional associates of Dr. Conti, group meetings and involvement of the patient's parents.

Doe continued as Dr. Conti's patient until April 6, 2017 when Dr. Conti informed both Doe and Doe's parents that he could no longer safely continue the treatment. This decision was predicated on his patient's increasing non-adherence to Dr. Conti's treatment recommendations including irregular attendance to scheduled meetings, 7 figure gambling losses, cocaine use, an assault by Doe, alleged hiring of prostitutes and purchase and use of illegally obtained Xanax during a period when the patient was allegedly tapering his Xanax use under the direction of Dr. Conti.

Out-patient treatment of his patient's Xanax abuse having failed, Dr. Conti recommended his patient seek in patient hospitalization for treatment of his substance use disorder. He identified and recommended the Alina Lodge.

When a doctor terminates the treatment and, with it, ends the doctor patient relationship, there are four duties that nevertheless survive.
1- The duty to make a reasonable effort to refer the former patient to alternate medical care if additional care is needed. That duty was fulfilled by Dr. Conti's recommendation for Doe to seek residential, inpatient treatment at Alina Lodge for his Xanax addiction.
2- Maintain the Confidentiality of the patient's protected health information to the degree that is consistent with signed releases and legal exceptions.
3- Continue to be the keeper of the patient's medical records and to furnish medical records when presented with a signed release of information or other legal waiver.
4- The APA Ethical Code adds that psychiatrists must abstain from sexual activity with not only current but also former patients.

Apart from these above-enumerated duties, the doctor has ended his role as the former patient's healthcare provider and ended the doctor-patient relationship. The Principles identify no other duties that survive termination.

Following the end of the doctor-patient relationship, Doe sent a series of messages that were viewed by Dr. Conti as threatening to his person, to his reputation and to his business.

Dr. Conti reviewed his concerns of Doe's threats to Conti's physical safety with another Board-certified psychiatrist who proffered expertise in this area of assessment. That psychiatrist was also an Associate Professor of Psychiatry at the region's medical center. That psychiatrist agreed with Dr. Conti's assessment and was principally concerned that psychiatrists often underestimate their personal risk [a concern that is borne out by the medical literature].

Dr. Conti also sought legal advice from his present attorney. That attorney agreed that Doe presented a risk to Dr. Conti's person, reputation and property. The attorney opined that the allegations against Conti constituted defamation and harassment. The attorney unsuccessfully sought to negotiate an enforceable injunction against Doe's illegal conduct. When that negotiation failed, the attorney filed a claim under seal to the court.

Subsequent to that filing of a claim under seal, the Court chose to anonymize the defendant and redact parts of the claim. Courts have regularly been the arbitrator of protecting competing rights of individuals: in this case, Doe's right of confidentiality and Conti's right to safety of his person, his reputation and his possessions. It was a court that first opined, "The protective privilege ends where the public peril begins." [California Supreme Court in Tarasoff 1.]

Finally, Doe chose to file a counterclaim in which he alleged mental injury. That counterclaim that put his mental state at issue, paved the way for depositions of his current treaters and access to documentation of his mental illness and function and of his prior history to the extent that the prior history substantially informs his present state.

His counterclaim has thereby opened the most substantial portal of access to Doe's Protected Health Information.

## IV. Ethical Principles applicable to the events in question

To follow are the ethical rules relevant to Conti v. Doe including commentary about their application to specific facts at trial.

The American Psychiatric Association publishes The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry [The Principles]. The current edition is copyright 2013.

There are 9 separate principles, the very same as the ethical principles or the ethical code of the American Medical Association [AMA]. The principles do not enumerate all categories or all possibilities of unethical conduct. Rather the principles require interpretation as they are applied in context to specific facts. Interpretation is easier when there is only a single relevant principal. Interpretation is more nuanced and complex when multiple principles apply and particularly when there is conflict or competition between applicable Ethical principles or between The Principles and the law.

The Principles are enforceable via complaints to District Branch Ethics Committees for psychiatrists who are members of the APA. The Principles are not enforceable by the Ethics Committees on nonmembers but The Principals remain a significant though not exclusive source of ethical guidance for non-member psychiatrists, courts, administrative law agencies and healthcare peer review adjudicatory bodies [e.g. A hospital's Medical Executive Committee].

Section [Principle] 1:

A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.

The annotation reads, "1. A psychiatrist shall not gratify his or her own needs by exploiting the patient. The psychiatrist shall be ever vigilant about the impact that his or her conduct has upon the boundaries of the doctor-patient relationship, and thus upon the well-being of the patient. These requirements become particularly important because of the essentially private, highly personal, and sometimes intensely emotional nature of the relationship established with the psychiatrist."

*As can be inferred from the text, this section applies to psychiatrists' actively providing medical care to identified patients. It does not refer to post termination when the doctor patient relationship has ended. Were it to apply to conduct after the termination of the doctor patient relationship, the principle or annotation would say so.*

*In the current litigation, Mr. Doe made numerous allegations in his messages defaming Dr. Conti's provision of medical care. However, there are no such allegations in Doe's Counterclaim Suit against Dr. Conti.*

Section [Principle] 3

"A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient. 1. It would seem self-evident that a psychiatrist who is a law-breaker might be ethically unsuited to practice his or her profession. When such illegal activities bear directly upon his or her practice, this would obviously be the case. However, in other instances, illegal activities such as those concerning the right to protest social injustices might not bear on either the image of the psychiatrist or the ability of the specific psychiatrist to treat his or her patient ethically and well. Physicians lose no right of citizenship on entry into the profession of medicine."

*The last sentence is especially important in the case before the court since the case involves Dr. Conti's lawful right as a citizen to bring civil suit in response to unlawful threats against his personal safety and in response to defamation by Mr. Doe. Dr. Conti did so months after the termination of the doctor patient relationship. If these threats had occurred during the treatment relationship, Dr. Conti could have hospitalized his patient. That avenue of intervention ended with the termination of treatment. The fact Doe was his former patient does not deprive Dr. Conti of the legal rights afforded ordinary citizens. "Physicians lose no right of citizenship on entry into the profession of medicine."*

Section [Principle] 4

"A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.

1. Psychiatric records, including even the identification of a person as a patient, must be protected with extreme care.

2. A psychiatrist may release confidential information only with the authorization of the patient or under proper legal compulsion."

*Proper legal compulsion includes a psychiatrist's ethically using a collection agency or attorney to collect delinquent bills and in so doing revealing the patient's identity, that the patient has received psychiatric services and revealing exact nature of those services. There is a balancing of patient protections and physician's ordinary legal rights.*

5. "Ethically, the psychiatrist may disclose only that information which is relevant to a given situation. He or she should avoid offering speculation as fact."

*In the case of filing a civil suit, that requisite information must be determined in collaboration with the attorney. In this suit that alleges illegal misconduct, inclusion of relevant factors including diagnosis and past conduct to assess the defendant's capacity to conform his behavior and to judge his risk to the plaintiff.*

8. "When, in the clinical judgment of the treating psychiatrist, the risk of danger is deemed to be significant, the psychiatrist may reveal confidential information disclosed by the patient."

*It is of note that <u>no consultation</u> is ethically required to make this determination. In the case before the court, the plaintiff made a good faith determination that he was at risk and then had that determination confirmed in a consultation with a psychiatrist who is both Board Certified and an Associate Professor and who, as the plaintiff's treater, was familiar with the plaintiff's blind spots if any.*

Section [Principle] 6

"A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care."

*Section 6 affords the clinician physician wide discretion in choosing whom to treat. In the case before the court, Dr. Conti had a reasoned and reasonable basis to suspend his treatment of Doe based on Doe's non-adherence to the treatment recommendations, the risk to the patient as a result of that non-adherence and the lack of a sufficiently collaborative and trustworthy doctor patient relationship. Dr. Conti fulfilled his responsibility to recommend to his former patient a site for follow-up care, thereby not abandoning the patient.*

Section [Principle] 8

"A physician shall, while caring for a patient, regard responsibility to the patient as paramount."

*In regards to Conti v Doe, the phrase, "while caring for a patient," clarifies that the doctor's duty in Principle 8 to regard the responsibility to the patient as paramount changes when the doctor no longer is caring for a patient as happened when there is termination of a treatment. All but one of the threatening memos from Doe were sent after termination.*

## V. An additional opinion on Doe's mental state independent of Dr. Conti

As a result of Doe's filing a counterclaim action against Dr. Conti, Doe's treating psychiatrist [Dr. Jenike] and psychologist [Dr. Lippert] were each deposed. In the deposition of Dr. Jenike, he was questioned about their having requested another psychologist [Jesse Crosby, PhD] to join the treatment team because of his expertise

with Borderline Personality Disorder. Jenike and Lippert each provided Crosby with clinical information about Doe. Dr. Crosby made notes based on his opinion of what Jenike and Lippert had told him. These notes were read to Dr. Jenike during Jenike's deposition.

Dr. Crosby's notes provide a window into Doe's mental state. He was not yet part of the treatment team but both Jenike and Lippert had an interest in providing him a full and accurate picture of their patient.

1- An environment characterized by no limits and a lack of structure.
2- Patient comes from a family background of significant wealth but limited emotional support.
3- The prominent symptoms are emotional dysregulation.
4- Another prominent symptom is rage.
5- Another prominent symptom is dishonesty.
6- Another prominent symptom is manipulation. For example, he manipulates his father by threatening suicide.
7- The next prominent symptom is tantrums.
8- The deponent [Jenike] agreed that Doe's inappropriate messages to Conti were tantrums.
9- Doe was living in Boston to work on decreasing his dependence on Xanax. [*It would later be learned that Doe was illicitly using Xanax at a dose of 8-12 mg per day and was not decreasing his dose.]*
10- Crosby wrote, "He burned out the treatment team in the Boston area."
11- Doe was a last-minute cancelation for 4 scheduled appointments with Crosby.
12- Doe attended one meeting only when in August 2018 Dr. Jenike accompanied Doe to the appointment.
13- Doe reports symptoms of depression [low mood, isolation, low energy, loneliness, low self-worth and generalized suicidal ideation].
14- OCD obsessive thoughts about health and contamination.
15- Emotional distress, perceived abandonment, relationship instability, unstable mood, paranoia, relationship manipulation and thoughts about self-harm.

Doe was ultimately referred for in-patient treatment to a McLean Hospital site of his Xanax dependency, the same recommendation made by Dr. Conti.

There is independent documentation in the McLean records of Doe's having made threats of suicide and of homicide, including threats directed at his family and at Dr. Conti.

## VI. Ethical Analysis and rebuttal of the report submitted by the Expert for Doe

**On page 2, Section II.5,** Doe's expert quotes Section 4 of the APA Principle of Medical Ethics and states that it is the Applicable Standard for Ethical Conduct of a Psychiatrist.

As I noted earlier in my report, it is one of the applicable principles but not the only one. I refer the reader back to Section III in which I also cited other principles that are material to understanding the standard of care in this case.

Reviewing the wording of Section 4, the reader should note that release of confidential information [Protected Health Information or PHI] without permission from a patient is ethical when there is legal compulsion.

There are numerous settings in which release of protected health information may proceed in the absence of a patient waiver: court orders, Tarasoff like interventions, involuntary commitment hearings, mandated reporting for elders, children, and the disabled, testimony compelled by a judge and fitness for duty assessments under the ADA to name but a few.

Pointedly, there is nothing in Section 4 or any other Section of The Principles to suggest that legal remedies available to other citizens are vitiated when perpetrated by a former patient against a former treating psychiatrist.  The plaintiff consulted both another professional and a licensed attorney and both concluded the plaintiff was facing threats that are illegal.

Section 4 does indicate that confidential materials offered should be relevant and to the legal task. That is the relevant standard for disclosure and that ethical standard was upheld.

**In Section III of Doe's expert report**, in paragraphs 6-9 he identified his view of psychiatrists' training to deal with "problematic patient behavior." In these paragraphs, Doe's expert wrongly conflates 1) a patient's expression of intense negative emotion to the therapist with 2) a [present or former] patient's misconduct not rising to illegality and 3) a [present or former] patient's misconduct that is illegal. They are not the same thing and they require different responses from a therapist.

Doe's expert is correct that patients may express intense negative or intense positive emotion about the therapist to the therapist and that it is the task of the dyad of therapist and patient to make sense of the expressed emotion. It may be that the patient's emotion is a derivative of the psychiatric problem for which they sought treatment. As a rule, elements of a patient's important prior relationships may surface in the psychiatrist-patient treatment relationship. It is called transference. Transference refers to emotion not to [mis]conduct.

In the case before the court, Doe had a history of emotional dysregulation, unstable relationships and rage at and manipulation of others. It is reasonable to consider the possibility that the rage Doe feels at Dr. Conti might be related to the diagnoses for which he sought treatment.

Patients may sometimes yell at their therapists, try to physically intimidate the therapist or break things in the office. In general, therapists are taught to define

acceptable behavioral limits in treatment. The above-mentioned conduct though not illegal needs to be identified as clearly outside that which the therapist will tolerate. Interpretation takes a back seat and gives way to the setting of appropriate limits.

Mental health providers who do not protect the limits of the therapeutic setting put themselves at increased risk for being victimized by the very patients they seek to treat. Mental health providers are at substantial risk for being threatened, stalked, assaulted and even murdered as a consequence of a real or imagined grievance on the part of a current or former patient. One of the therapist risk factors is therapist's minimization of their own vulnerability. A second is that their training typically frames patients as only a vulnerable party rather than also recognizing that vulnerable people may also perpetrate harm.

Doe's expert mentions that patients may discuss their negative feelings with friends or relatives. I agree. However, the patient's right to say what they think and feel is not unlimited. Therapists who are being maligned to colleagues by a patient need to set limits on the patient. Those limits must clarify that the patient's conduct is not acceptable conduct in the treatment relationship. Discussion should proceed and perhaps a consultation to the treatment would be initiated. In the absence of an effective resolution, termination and referral to another clinician would be advisable in view of the patient's misconduct.

Finally, therapists may be exposed to unlawful threats to their person, their family, their reputation or their possessions. There is not general agreement about the response to these threats since typically the response needs to be tailored to the mental state of the patient. Different responses may be needed for a patient with a personality disorder than with a delusional disorder. Psychiatrists have a long history of being inappropriately passive in protecting their individual therapeutic and personal boundaries.

Section 6 of The Principles would apply: "A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve."

In the case before the court, Mr. Doe was a past not a current patient and there was no intact doctor patient relationship that could have supported a dialogue that would likely have led to a resolution of Doe's misconduct. Mr. Doe's pattern of repeatedly ignoring professional advice is documented.

According to Dr. Conti's counsel, Doe's conduct became illegal: parts of the communications were *per se* defamation. The fact that the illegal conduct may have arisen from transferential feelings is not exculpatory. Absent a finding of legal insanity, patients remain individually responsible for their illegal conduct. There is nothing in any ethical code that purports to vitiate a therapist's right to seek legal redress of being the target of an illegal act, in this case defamation and harassment. Consistent with the wording of Principle 4, confidential material may be ethically used in the process of legal redress if it is relevant to the legal action being taken.

**In Doe's expert's report, page 4, Section IV Opinion paragraph 10** he cited four areas of alleged ethical deficiency:

(A) responding to his former patient John Doe's behavior when the patient sent him the Messages;

(B) evaluating whether to commence a lawsuit against Doe in response to the Messages;

(C) safeguarding Doe's confidences and privacy when Dr. Conti did choose to commence litigation; and

(D) transferring care to Doe's next treating psychiatrist.

In paragraphs 11-16 of Section IV A., Doe's expert elaborated.

11. "In this case, it appears that Dr. Conti's psychiatric training and skills abandoned him, in that he failed to recognize Doe's behavior as a manifestation of the patient's transference."

Here Doe's expert wrongly focuses on possible transference emotions rather than the fact that the former patient is involved in illegal activity against his former doctor. This is the very sort of mistaken judgement that is in part to blame for a finding in a United States Department of Justice's National Crime Victimization Survey that the rate of victimization of psychiatrists was 4 times the rate of non-psychiatric physicians.

12. "A psychiatrist acting consistent with professional standards of care would seek outside consultation from an experienced colleague, in this case especially someone with forensic or other experience evaluating threats."

Doe's expert does not acknowledge or recognize that Dr. Conti performed according to this recommendation. He consulted Dr. Hamilton about the Tarasoff issues of threat. There is no ethical code requiring consultation with a forensic colleague. Furthermore, Conti also consulted an attorney which is completely consistent with what a substantial percentage of psychiatrists do in my jurisdiction and in Doe's expert's former jurisdiction. Dr. Conti observed this ethical standard of care.

While Doe's expert may not agree with the conclusions reached about Doe by Conti, that is not relevant to whether they observed the standard of care. Conti, Hamilton and Conti's attorney made good faith determinations. That process exceeds the ethical standard of care that is due. Clinicians of good will and excellent judgement can and do come to differing conclusions about a complex set of facts.

13. "One commonly recommended course of action in a situation where a patient is expressing anger towards his or her psychiatrist is to arrange a facilitated meeting between the patient and doctor, including others who are involved in the patient's life, if appropriate."

In my experience this is not a commonly recommended action. It is rare. In view of its rarity alone, I view this assertion as Doe's expert's personal opinion and should be so labeled. It does not represent the standard of care of either ethics or practice.

In addition, it does not apply to the specifics of the case of Doe. This course of action presupposes that the patient is in treatment with the doctor. Doe was a former not a current patient. Therefore #13's proposed course of action doesn't match the clinical setting with Doe.

Finally, a meeting including Doe and his parents had previously had a decidedly antitherapeutic effect according to the medical record. Based on clinical history, there is reason to believe that this course of action would roil not calm the troubled waters.

For all these reasons: rarity, inapplicability to a post termination problem and personal history documenting failure of such an intervention, I view Doe's expert's opinion in #13 as mistaken.

14. "Dr. Conti's treatment with his own psychiatrist, Dr. Hamilton, was not sufficient to satisfy this obligation to consult with an independent colleague about the situation. Dr. Hamilton was in a supportive role to Dr. Conti. But, as he stated clearly in his deposition, Dr. Hamilton never read the Messages or independently reviewed any of the facts. He accepted what Dr. Conti told him as true, and took Dr. Conti's perceptions as facts without making an independent judgment."

Here, Doe's expert is again factually mistaken. He incorrectly characterizes Hamilton's role as "supportive" in an effort to rebrand the interaction. Dr. Hamilton was Dr. Conti's psychiatrist. His role is much more substantial than "supportive." He is also Board Certified and an Associate Professor of Psychiatry.

Treating psychiatrists often make clinical supervisory recommendation to patients who are themselves mental health clinicians. No ethics code proscribes a treating psychiatrist from making these recommendations to a clinician-patient.

Of note, one school of psychoanalysis required of all trainees that the treating analyst also be a supervisor. They contended that a treater would be best positioned to know the trainee's psychological strengths and weaknesses.

Tarasoff consultations most often are with fellow clinicians and not forensic psychiatrists. Indeed, there is no mention of the need for forensic psychiatry in the ethics code. Most of these Tarasoff consultations are done with clinical colleagues. Most are over the phone. Most do not involve an independent review of records.

During deposition, Dr. Hamilton did read the actual notes. He opined that they were worse than he had assumed. His review of his Doe's notes supported his original analysis of risk. His opinion was militated.

The course of action described in 14 may reflect Doe's expert's personal preferences but it does not have a foundation for being proffered as the ethical standard of care.

15. "Without outside consultation, Dr. Conti's decision to respond to the Messages by filing the lawsuit against Doe was both disproportionate to the 'threat' posed by Doe, and inconsistent with Dr. Conti's stated fears of physical assault and legal liability."

This statement is factually incorrect. Dr. Conti obtained consultation from Dr. Hamilton and from his attorney. The former opined there was significant risk to Dr. Conti. The latter opined that Doe's misconduct was also illegal and recommended legal action when pre-filing negotiation failed. That failure was preceded by Doe's continuing to send threatening memos even during the negotiation phase and after Doe's attorney had provided assurance that Doe's conduct would cease.

No prudent psychiatrist would trivialize the risk posed by a patient making threats who had the means to carry out those threats who also was diagnosed with severe dependence on substantial doses of Xanax [a disinhibiting medication], a history of cocaine abuse [a known aggravator of aggression], a severe affective disorder, an

anxiety disorder and a cluster B personality disorder who was additionally more dysregulated than his baseline.

16. "In this case, the Messages, which were sent to a small number of people in addition to Dr. Conti, Were so obviously the product of an irrational response by an angry patient that no experienced psychiatrist would have taken them as a factual account of what transpired in John Doe's treatment, and in my opinion, it is highly unlikely that lay people would either."

In the state of New York, Conti's attorney opined the law views "the Messages" as defamatory. In New York State, Common-law malice requires an evil intent arising from ill will or spite. Conti took appropriate ethical legal action against Doe's illegal misconduct. The court agreed by ruling that Dr. Conti stated claim for defamation.

17. "Dr. Conti was obligated to exhaust all reasonable avenues to evaluate and assess whether a lawsuit against his patient, disclosing the patient's confidential treatment-related information, was truly necessary."

Here Doe's expert offers another personal opinion that is not part of the ethical standard of care when he opines, "all reasonable avenues." The record shows that Conti made multiple efforts to address ex-patient Doe's continued threats.

Doe persisted in his threatening, baiting messages. Dr. Conti reasonably concluded that his person and business and professional reputation were under threat, conclusions that were supported by two consultants. All three acted in good faith.

The confidential health information that was included in the First complaint complied with the relevance ethical standard for release of confidential health information, namely that the information be relevant to that which is required for the legal action undertaken.

As a further effort, attempts were made to negotiate a remedy to Doe's continued threats.

As a further effort, the complaint was filed under seal.

That in turn allowed the court to enter as an overseer of Doe's protected health information.

The court in turn entertained input from Doe's attorneys on Doe's behalf.

Ironically, the greatest threat to the privacy of Doe's confidential health information flows directly from Doe's counterclaim against Dr. Conti in which he alleged mental injury.

18. "The relevant information would include the facts comprising the Patient's allegedly actionable conduct towards Dr. Conti (namely, the Messages), and how those Messages impacted Dr. Conti, if at all."

The psychiatric ethical standard to be applied is that the information be relevant to that which is required for the legal action undertaken taken. This standard is stated in The Principles.

In view of the complaint including threat to the person and threat to property and reputation, information material to psychiatric risk assessment is relevant and ethical. That risk assessment will necessarily include past conduct, past and present psychiatric diagnoses, past and present drug abuse and environmental factors that might enable or restrain Doe's actions.

There is nothing in physicians' codes of ethics intended to restrict what a physician's attorney is ethically tasked to do professionally. When filing a complaint, the attorney is bound to provide a compelling narrative to the court showing not only that the bare technical elements of a claim have been pleaded but also that an injustice has been done to the plaintiff that requires court intervention.

19. "The Complaint includes many allegations that go beyond what is appropriate to this situation."

To elucidate the application of the relevance standard to this situation, a psychiatrist should consider what factors that psychiatrist would consider relevant to the assessment of risk posed by Doe.

"Examples from the Complaint of such extraneous material include:

a. 'The Patient's parents sought out Dr. Conti "to help their son address his drug addiction . ..' Paragraph I;

His drug addiction and the role of his immediate family are relevant to the clinical risk assessment of Doe.

b. "Doc's parents consistently rewarded and enabled him regardless of how outrageous his conduct was .... " Paragraph 1;

Social inhibitors and facilitators of Doe's misconduct are relevant to the assessment of risk.

c. "The patient's family is 'extraordinarily wealthy' .... " Paragraph 2:

Doe's access to funds is relevant to the assessment of his risk of enacting his threats.

d. "The Patient suffers from 'drug addiction' and 'severe psychiatric problems' .. .. " Paragraph 2;

Risk assessment must consider the relevant psychiatric factors.

e. "[The Patient] was born into a life of incredible luxury. He is the son of the wealthiest families [redacted] and known for [redacted]." Paragraph 3;

This allegation was redacted to protect Doe and wealth is a relevant factor for consideration to risk assessment since it may inform the relative capacity to carry out a threat.

f. "The Patient 'is every parent's nightmare.'" Paragraph 3;

This sentence should be more factually re-written.

g. The Patient suffers from "Narcissistic Personality Disorder, including Borderline and Antisocial Traits." Paragraph 3;

Doe's diagnoses are relevant to risk assessment.

h. "The Patient's condition 'manifests itself in a variety of ways, including an addition to Xanax. frequent cocaine use (often with prostitutes), thefts of money from his parents, multi-million dollar gambling losses ... .'" Paragraph 3;

Drug abuse and other illegal conduct are relevant to risk assessment.

I. "Doe's father is very protective of his family's reputation" and was "desperate to avoid" "public scandal." Paragraph 4;

This fact is relevant to the assessment of Doe's climate of social restraint or absence thereof.

J. "The Patient 'rebelled against any effort to curb his drug use, or otherwise limit any of his destructive behaviors…..'" Paragraph 5;

His history of drug use is relevant to risk assessment.

k. "The Patient 'led a hedonistic lifestyle .. . .'" Paragraph 9; and

This sentence should be more factually re-written.

l. "The Patient's family has 'emboldened him by continuing to provide him with virtually unlimited access to money and its trappings, such as private air travel.'"
Paragraph 9.

This sentence is relevant to assessing Doe's risk of his taking action on his threats.

20. "The information Dr. Conti disclosed is particularly sensitive and was not appropriate for the purpose at hand, including information about alleged drug abuse, sexual conduct, diagnoses, and the degree of the Patient's wealth."

All of the above referenced information is relevant to and appropriate for the assessment of Doe's risks to the plaintiff.

21. Doe's expert opined a "a lack of sufficient care to protect patient confidences" as exemplified by:
a) "the filing of this public lawsuit against his former patient John Doe",

No physician code of ethics restricts a physician's right to file suit to remedy that physician's being an object of another's illegal conduct.

b) "responding to other patients' criticisms of him by posting comments about the patients on the website Health Grades,"

No physician code of ethics restricts a physician's right to respond to complaints on an Internet Web Site so long as the response does not reveal confidential information.

c) "disclosing the names of other patients in his deposition testimony in this action,"

I am aware of Dr. Conti revealing only one name of a former patient and that patient had publicly identified himself as a patient of Dr. Conti's.

d) "and disclosing sensitive, confidential materials to his lawyers."

An ethical psychiatrist may disclose confidential facts to his attorney if those facts are relevant to the legal action being undertaken.

22. "The APA's Annotations, including those related to confidentiality, rest on the premise that a psychiatrist must prioritize the wellbeing of the patient."

This duty applies to persons who are in treatment with the psychiatrist. The case before the court concerns a former patient who is acting against the law. Nothing in The Principles constrains a psychiatrist from taking legal action against a person, be that person a patient, a former patient or never a patient, who is acting illegally against the psychiatrist.

23.     This paragraph contains 4 separable assertions that I have chosen to designate a, b c and d so that I can respond to them individually.

a) "Here, Doe testified that he was in fact harmed by Dr. Conti's disclosure, as did his then-current treating doctors who also testified that he was harmed by Dr. Conti's disclosures."

It is possible that the disclosures may have harmed Mr. Doe but at this time that is not proven.  Furthermore, Doe's risk of harm to himself is a foreseeable possibility that flows from his choice to conduct himself unlawfully.

There are three other factors which thus far have not been considered. First, Doe is a man with long standing major mental illness who has had similarly severe exacerbations of his illness.

Second, Doe is known to get very angry and then be consumed with shame and guilt for his misconduct. Rage is a psychologically corrosive emotion for Doe. Nelson Mandela may have said it best when he remarked, "Revenge is the poison we drink thinking it will kill our enemies."  It is likely, Doe's protests notwithstanding, that Doe's misconduct is weighing on him and fostering his feelings of shame and guilt. Treaters are advised to help patients integrate appropriate shame and guilt over conduct which the patient may reasonably regret.

Third, Doe has a long history of hostile-dependent emotions in relationships. He does not tolerate feeling dependent on another person and then becomes angry at them for making him feel so dependent. His outrage over real or imagined betrayals segues to painful separation and then Doe's suffering from feeling alone. Doe makes comments about feeling abandoned in his memos long before any suit was filed.

Doe's counter suit has for the moment reattached him to his former Doctor in an unwitting acting out of Doe's unrecognized wish to reestablish connection with Dr. Conti. In so doing, Doe, by his own hand, exposed himself to a massive release of his protected health information.

b) "This is also why it is exceedingly rare, if not unknown, for a psychiatrist to sue his patient."

Suits of this type have been rare. A similar reaction was had when the estate of Titania Tarasoff filed suit against the University of California. Now it is established in all but a few jurisdictions in the United States. This case concerns the rights of a past patient and the rights of a former psychiatrist.  We appropriately recall that "the protective privilege ends where public peril begins."

c) "It is my opinion that Dr. Conti did not act with the welfare of his patient in mind when he filed this lawsuit, and breached his ethical duties in this regard as well."

I have responded previously to counter Doe's expert's assertion of this alleged breach of ethical duties. In this iteration of the allegation, I think Doe's expert's sentence should have been more accurately written, "Dr. Conti did not act with the welfare of *only* his *former* patient in mind." Conti also acted in response to the illegal threat being perpetrated by his former patient while contemporaneously fulfilling his ethical and legal duties to his former patient. There is nothing unethical about a psychiatrist responding to illegal conduct perpetrated by a former patient. The binary assertion of Doe's expert serves neither the doctor nor the patient.

A correct ethical analysis of these facts before the court identifies and responds to the rights of both former patient and the doctor. The fact that Doe's expert might have a different remedy does nothing to impugn the ethical nature of the good faith actions of qualified professionals who made their decisions contemporaneously with events.

24. "Dr. Conti remained under a continuing duty to protect the Patient, even after his treatment ended."

This statement is factually incorrect. The "duty to protect" is a phrase that arises from Tarasoff II and his nothing to do with physician duties that survive termination with a patient.

The doctor has a duty to be a keeper of records and to keep confidentiality except with signed releases or with lawful exceptions, examples of some of which I provided in Section III.

25. "The fact that the Complaint was initially filed under seal and later as John Doe was not sufficient to render Dr. Conti's conduct proper or permissible."

Filing under seal was one of many efforts by Dr. Conti and his attorney to protect Doe's healthcare information even as they were lawfully and ethically observing the relevance standard prescribed in The Principles for when a doctor is following a legal process.

I again am reminded that the greatest disclosure of Doe's protected health information flows from his counter suit which brought his mental state to issue.

26. "Further with regard to Dr. Conti's obligations towards a former patient [when transferring care]. a) a physician who has been treating a patient who chooses to seek care elsewhere has a duty to ensure that the transfer of care to a new treater is affected properly."

A psychiatrist who terminates with a patient must make reasonable efforts to provide an alternate referral to a patient if further treatment is indicated. No psychiatrist has the authority over his former patient to "ensure the transfer is effected" and it is nowhere so stated in The Principles.

In the case before the court, Conti referred Doe to a specific hospital for inpatient treatment. Doe did not choose to follow the recommendation as is his legal right. Doe subsequently followed the same recommendation when he was under the care of another treater. The fact that this same recommendation as had been made by Conti supports that Conti's recommendation was medically sound.

b)" the former psychiatrist has a duty to furnish the nature and course of the former patient's treatment [verbally or in writing]."

A former patient always has lawful access to his past medical information and may have it sent to whom he chooses with the authorization of an appropriate release. No release of records was requested by Doe, Jenike or by McLean.

c) "The materials that I reviewed indicate that Dr. Conti refused to discuss the Patient's treatment with his current psychiatrist, Dr. Jenike, without compensation."

A prior psychiatrist may ethically fulfill his duty to the former patient by providing a copy of the past medical records, by speaking with the new treater or some combination.

I have reviewed the written materials between Drs. Conti and Jenike and reproduce them here for the readers' review. A careful review of the wording does not indicate a proffer of a *quid pro quo*. There is nothing unethical about inquiring about a past due balance or asking to be compensated for future time spent. Inquiring about a past due balance is preferable as a first step in lieu of directly proceeding to debt collection which is also an ethical and lawful course of action.

Providing past medical information about Doe's treatment is ethically required and could ethically be provided either by furnishing the record or by conversing with the current treater.

"Dr. Jenike,

» I am happy to talk if you and  Doe  think that would be helpful to him. I would like a straight-forward

authorization from Doe to do this, and I would also request authorization to bill for any time spent in clinical conversation. I have spent a fair amount of unbillable time since we ended care, and there is also a small outstanding balance from before which I would appreciate clearing. Thanks very much.
> > Take care,
» Paul"

## VII. Opinion

Based on my clinical and ethical analysis of the materials reviewed, based on my training, experience and expertise in the assessment of psychiatric conduct, psychiatric ethics and the care of psychiatric patients, it is my opinion that Dr. Conti's actions were well within the applicable ethical standard of care.

## VIII. Additional conceptual findings relevant to my Opinion

1-    A proper ethical analysis must include all the facts at issue and consideration of the relevant rights of individuals.

2-    The Principles are largely but not exclusively focused on the ethical duties psychiatrists have to their patients in treatment.

3-    Nowhere in The Principles are psychiatrists proscribed from taking legal action against a former patient.

4-    The case before the court involves a former not a current patient.

5-    The psychiatric ethical duties due to a former patient are very specific and very different than those due a patient who is in treatment.

6-    The fact that psychiatrists infrequently take legal action has no probative merit in deciding whether the actions of Dr. Conti were in fact within the ethical standards of care.

7-    Another psychiatric meeting with the former therapist is not typically recommended for a past patient when it was the psychiatrist who ended the treatment and when the doctor-patient relationship had not been intact.

8-    Patients in a psychotherapy are invited to talk about their all their feelings including those emotions that are rageful. Acting on those feelings is inconsistent with psychotherapy. It is counter therapeutic for the patient and puts the therapist at risk. Limits must be set and observed or the therapy should be ended.

9-    In this case, 3 qualified professionals observed in good faith the correct professional process for their respective disciplines.

10-    An after-the-fact fourth professional [an expert] is subject to hindsight bias and to the belief that "I think they could have done more." That belief cannot be tantamount to a conclusion of not meeting the applicable standard of care.

11-    Professionals who in good faith observe the correct professional process of their discipline can and do come to differing conclusions about a complex set of facts.

12-    According to the literature, risks to psychiatrists from present and former patients is significant. The literature also documents that personality disorders represent 38% of patients who were violent to their psychiatrist. Drug abuse and mood disorders add additional risk. Therapist denial and minimization of the threat are serious contributing factors [as had correctly been opined by Dr.

Hamilton.] The lack of assertive response from law enforcement is also documented in the literature.

13-          The following is the abstract of an article about psychiatrist victims of patient stalkers.

"Stalking is a thriving social and criminal concern and a risk inherent in our personal and professional lives. Health care professionals, particularly psychiatrists and other mental health practitioners, are vulnerable to being stalked by their patients and, far from providing helpful insights that discourage the behavior, their training can be a hindrance. Neither a psychiatrist's gender nor seniority confers protection from the protracted vengeance or infatuation of a patient-turned-stalker, any more than does working through the transference and soldiering on. The ensuing social, psychological, and vocational damage can, however, be minimized through early recognition, informed advice, and the support, not censure, of our colleagues."
**J Am Acad Psychiatry Law 41:200–5, 2013**

**IX. Compensation:** I am being paid $475/hour for all services in this case.

## X. QUALIFICATIONS OF THE PSYCHIATRIST OFFERING THIS OPINION

The undersigned psychiatrist is a graduate of Tufts University School of Medicine. He is licensed to practice medicine in the Commonwealth of Massachusetts. He is a Diplomate in Psychiatry of The American Board of Psychiatry and Neurology. He is Board Certified in Forensic Psychiatry by The American Board of Psychiatry and Neurology.

He serves as an Assistant Professor of Psychiatry, part time, on the faculty of Harvard Medical School and as the Associate Director of Forensic Psychiatry at Beth Israel Deaconess Medical Center. He serves on the staffs of the Beth Israel Deaconess, Mount Auburn and Cambridge Hospitals.

He is a Distinguished Life Fellow of the American Psychiatric Association and former co-chair of The Ethics Committee of the Massachusetts Psychiatric Society.

He has been a Massachusetts Board of Registration Medicine approved examiner for over two decades. He has authored numerous scholarly articles and book chapters about forensic psychiatric examinations of physicians for administrative law agencies, physician health services programs and physician peer review committees and on the standard of medical and ethical care for psychiatrists.

He has performed over 140 forensic examinations of health care professionals to assess their professional conduct and fitness.

He was the co-chair of the Massachusetts Psychiatric Society Ethics Committee for 6 years. During that time, he oversaw all the Ethics Committee investigations and adjudications.

He has been a 12-year member of the Ethics Committee of the American Academy of Psychiatry and Law.

He has been an 18-year member of the Peer Review Committee of the American Academy of Psychiatry and the Law.

He has 39 years of experience both treating patients including those such as Doe and training residents in the treatment of patients including those such as Doe.

He is a co-author of a text on the supervision of psychodynamic [psychanalytic] psychotherapy. Initially published by Yale in 1995, it remains in print.

Additional professional information inclusive of publications and testimony is provided in my accompanying curriculum vitae.

Respectfully submitted, November 11, 2019,

Donald Meyer, M.D.

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

**Name:**        Donald Jay Meyer, MD DLF APA

**Office:**       1105 Massachusetts Ave. Suite 11E Cambridge, MA 02138

**Work Phone:**   617 491 6868

**Work Email:**   donald_meyer@hms.harvard.edu

**Work Fax:**     617 491 6868

### Education

| | | |
|---|---|---|
| 1971 | B.S. | Antioch College, Yellow Springs, Ohio |
| 1975 | M.D. | Tufts University School of Medicine, Boston MA |

### Postdoctoral Training

| | | |
|---|---|---|
| 1975-1976 | Intern, Internal Medicine | Hartford Hospital, Hartford, CT |
| 1977-1980 | Resident, Adult Psychiatry | Beth Israel Hospital, Boston, MA |
| 1980-1981 | Fellow, Psychopharmacology and Consultation Liaison [C/L] | New England Medical Center, Boston, MA |

### Faculty Academic Appointments

| | | |
|---|---|---|
| 1977-1980 | Clinical Fellow in Psychiatry | Harvard Medical School |
| 1980-1981 | Clinical Fellow in Psychiatry | Tufts U. School of Medicine |
| 1980-2001 | Clinical Instructor in Psychiatry | Harvard Medical School |
| 2001-Present | Assistant Professor in Psychiatry Part time | Harvard Medical School |

### Appointments at Hospitals/Affiliated Institutions

| | | |
|---|---|---|
| 1980- Present | Associate in Psychiatry | Beth Israel Deaconess Medical Center [BIDMC] |
| 1988- Present | Active Staff | Mount Auburn Hospital [MAH] |
| 1985- 1997 | Courtesy Staff | Somerville Hospital |
| 1997-Present | Courtesy Staff | Cambridge Hospital |

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

| | | |
|---|---|---|
| 2002-Present | Associate Director, Forensic Psychiatry | BIDMC |
| 2005- Present | Member, Board of Directors | Mount Auburn Cambridge Independent Practice Association [MACIPA] |

## Other Professional Positions

### Current and recent professional positions

| | | |
|---|---|---|
| 1980- Present | Private practice of adult general psychiatry | |
| 1993-Present | Member, Program in Psychiatry and Law | Massachusetts Mental Health Center at BIDMC |
| 1995-Present | Critical Patient and Critical Incident Consultant | BIDMC & MAH |
| 1999-2008 | Examiner, Oral (Part II) Specialty Board In Psychiatry | American Board of Psychiatry and Neurology |
| 2000-2018 | Attending Psychiatrist | Multiple Sclerosis Center, MAH |
| 2002-Present | Associate Director of Forensic Psychiatry | BIDMC |
| 2005-Present | Member, Board of Directors | MACIPA |
| 2007-2010 | Psychiatric Consultant | Massachusetts Correctional Legal Services |
| 2012-2015 | Psychiatric Co-director, COMPASS [*Care of Mental, Physical and SU Syndromes*] | CMS Innovation Grant, MACIPA |
| 2015-Present | Psychiatric Co-director, Systematic Case Review Health coach chronic disease management | MACIPA |

### Past professional positions:

| | | |
|---|---|---|
| 1976-1977 | Emergency Room Physician | Chelsea Hospital Chelsea, MA |
| 1981-1984 | Outpatient staff psychiatrist | Cambridge Hospital |
| 1981-1983 | In-patient attending psychiatrist | Cambridge Hospital |

2

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

| 1983-1988 | Attending psychiatrist Consultation Liaison Service | Cambridge Hospital |
| 1983-1988 | Director, Outpatient Eating Disorders Program | Cambridge Hospital |
| 1986-1988 | Director, Outpatient Consultation Liaison Service | Cambridge Hospital |
| 1986-1989 | Consultant and supervisor Behavioral Medicine | Cambridge Hospital |

## Major Administrative Leadership Positions

**Local**

| 2005-present | Board of Directors | MACIPA |
| 2009-present | Chairperson, Dispute Resolution Committee | MACIPA |

**Regional**

| 2002-2008 | Co-chair, Ethics Committee. | Massachusetts Psychiatric Society [MPS] |

## Committee Service

**Local**

| 1991-2010 | Elected representative; Clinical Services Committee, Dept of Psychiatry | MAH |
| 1997-2000 | Elected representative, Mental Health Subcommittee | MACIPA |
| 1998-2003 | Elected representative, Steering Committee | Care Group Behavioral Health |
| 2009-Present | Chair, Dispute Resolution Committee | MACIPA |

**Regional**

| 1991 | Nominating Committee | MPS |
| 1996-1998 | Psychiatric Advisory Board | Massachusetts Board of Registration in Medicine |
| 1999-2001 | Co-chair, Task force: Medical Clearance Guidelines | MPS & Massachusetts |

3

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

|  |  | College of Emergency Physicians |
|--|--|--|
| 1999-2008 | Ethics Committee | MPS |
| 2002-2008 | Co Chair, Ethics Committee | MPS |

The ethics committee is responsible for investigating and adjudicating all complaints about MPS members and for educational activities for the membership. The co-chairs are also responsible for ad hoc consultation to the MPS membership.

**National and International**

| 1999-2002 | Early Career Development | American Academy of Psychiatry and Law [AAPL] |
|--|--|--|
| 2001-Present | Suicidology Committee | AAPL |
| 2001-Present | Peer Review of Expert Testimony | AAPL |
| 2007-Present | Ethics Committee | AAPL |
| 2008- 2014 | Guttmacher Awards Committee | APA |
| 2010- 2017 | Early Career Development | AAPL |
| 2015-2016 | Task force to revise Disability Guidelines | AAPL |
| 2015-2016 | Pro bono forensic psychiatrist | Seth Wessler, Journalist, *The Nation*, Suicides in Private Federal Prisons |
| 2015- Present | Forensic Psychiatry Committee [authors Board certification examinations] | American Board of Psychiatry and Neurology |

## Professional Societies

| 1980-Present | General Member | Massachusetts Psychiatric Society |
|--|--|--|
| 1980-2002 | General Member | American Psychiatric Association |
| 2003-2010 | Distinguished Fellow | American Psychiatric Association |
| 2010- present | Distinguished Life Fellow | American Psychiatric Association |
| 1997- Present | General Member | American Academy of Psychiatry and Law |
| 2000- Present | General Member | Massachusetts Medical Society |

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

| | | |
|---|---|---|
| 2002- Present | General Member | American Medical Association |

**Editorial Activities**

**Other Editorial Roles**

| | | |
|---|---|---|
| 2000-2008 | Forensic Psychiatry Manuscript Reviewer | American Psychiatric Publishing |
| 2003-Present | Forensic Psychiatry Manuscript Reviewer | Journal of the American Academy Psychiatry and Law |
| 2004-2006 | Forensic Psychiatry Manuscript Reviewer | Psychiatric Services |
| 2007-2008 | Forensic Psychiatry Manuscript Reviewer | Current Psychiatry |
| 2011- Present | Editorial Board | International Journal of Law and Psychiatry |

# Report of Local Teaching and Training

**Formal Teaching of Residents, Clinical Fellows and Research Fellows (post-docs)**

| | | |
|---|---|---|
| 2006- 2010 | Faculty, Psychiatric residents' course on Ethics | Longwood Residency |
| 1985-1988 | "Adaptation to Illness" | Core Psychiatry Clerk-ship, Cambridge Hospital |

**Clinical Supervisory and Training Responsibilities**

| | | |
|---|---|---|
| 1981- Present | Supervisor of BIDMC [formerly Longwood] Residents, Inpatient and Outpatient services | HMS Longwood Residency |
| 1989-2001 | Supervisor of Psychology post-doctoral fellows | Mount Auburn Hospital |
| 1992- 2018 | Visit Rounds Visiting faculty Consultation Liaison Service | Cambridge Health Alliance |
| 1981-1984 | Outpatient supervising psychiatrist | Cambridge Hospital |

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

| | | |
|---|---|---|
| 1981-1983 | In-patient supervising psychiatrist | Cambridge Hospital |
| 1983-1988 | Supervising psychiatrist<br>Consultation Liaison Service | Cambridge Hospital |

**Formal Teaching of Peers (e.g., CME and other continuing education courses)**

| | | |
|---|---|---|
| 1984 | The Supervisory Process | Cambridge Hospital CME Course on Psychotherapy Supervision |
| 1986 | Supervision: How personal should it be? | Cambridge Hospital CME Course on Psychotherapy Supervision |
| 1995 | Legal Liabilities of Supervision | HMS/MMHC CME Course on Risk Management |
| 1996 | Supervisor Liability | HMS/MMHC CME Course on Risk Management |
| 1997 | Supervisor Liability | HMS/MMHC CME Course on Risk Management |
| 1999 | Coordination of Care with Multiple Mental Health Clinicians | HMS/MMHC CME Course on Risk Management |

**Local Invited Presentations**

| | | |
|---|---|---|
| 1985 | The Supervisory Dialogue | Psychiatry Grand Rounds, Cambridge Hospital |
| 1987 | Supervision: How personal should it be? | Brandeis Mental Health Service |
| 1988 | Somatization: On losing and finding feelings | BIDMC C/L Service |
| 1988 | Somatization: On losing and finding feelings | MGH C/L Service |
| 1999 | Risk management in mental health supervision | Psychiatry Grand Rounds Mount Auburn Hospital |
| 2000 | Coordination of care with multiple mental health clinicians | Psychiatry Grand Rounds, Longwood |
| 2002 | Fitness for Duty Evaluations | Forensic Psychiatry Service, BIDMC |

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

| 2002 | Fitness for Duty Evaluations | Mount Auburn Hospital Employee Assistance Program |
|------|------------------------------|---------------------------------------------------|
| 2004 | Coordination of care with multiple mental health clinicians | Psychiatry Grand Rounds, Brown University |
| 2004 | The standard of care: testimony and admissibility | Forensic Psychiatry Service, BIDMC |
| 2004 | Expert testimony: being as good, not better than the facts | Forensic Psychiatry Service, BIDMC |
| 2004 | Expert testimony: being as good, not better than the facts | Program in Psychiatry and the Law MMHC/BIDMC |
| 2004- | Psychiatric Faculty, Trial Advocacy Workshop | Harvard Law School |
| 2006 | Administrative Inquiries of Allegations of Physician Misconduct | Psychiatry Grand Rounds, Longwood |
| 2007 | Responding to a justified or unjustified allegation of misconduct | Psychiatry Grand Rounds, Longwood |
| 2007 | Responding to a justified or unjustified allegation of misconduct | Psychiatry Grand Rounds, Mount Auburn Hospital |
| 2008 | Psychological testing for forensic psychiatry | Forensic Psychiatry Service, BIDMC |
| 2009 | Psychiatric Malpractice | Forensic Psychiatry Service, BIDMC |
| 2009 | Legal competency to be a litigant | Forensic Psychiatry Service, BIDMC |
| 2010 | A case of a treating clinician in court | Forensic Psychiatry Service, BIDMC |
| 2011 | Risk analysis after patient therapist sex | Forensic Psychiatry Service, BIDMC |

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

| 2012 | Legal basis and legal process of peer review | Forensic Psychiatry Service, BIDMC |
|------|----------------------------------------------|-------------------------------------|
| 2014 | The intersection of maladaptive personality traits and performing essential job functions | Forensic Psychiatry Service, BIDMC |
| 2014 | North Caroline Dental Board v FTC Local administrative control v FTC | Program in Psychiatry and Law |
| 2014 | North Caroline Dental Board v FTC Local administrative control v FTC | Forensic Psychiatry Service BIDMC |
| 2015 | Forensic assessments of professionals with delusional disorder | Forensic Psychiatry Service BIDMC |
| 2016 | Forensic assessment of examinees Assessing mTBI: the current science | Forensic Psychiatry Service BIDMC |
| 2017 | The Ethics of the Goldwater Rule | Forensic Psychiatry Service BIDMC |
| 2018 | The Ethics of the Goldwater Rule | Program in Psychiatry and Law MMHC @ BIDMC |
| 2018 | The Goldwater Rule: The Ethics of Psychiatric Opinions in the Public Forum | Psychiatry Grand Rounds, Longwood |

# Report of Regional, National and International Invited Teaching and Presentations

## Invited Presentations and Courses

**Regional**

| 1997 | Psychiatrist as Supervisor: Risk Management Issues | MPS Risk Management Conference |
|------|----------------------------------------------------|--------------------------------|
| 2004 | Coordination of Care with Multiple Mental Health Clinicians | MPS Early Career Psychiatrists Series |
| 2005 | Beyond Malpractice: On not going out of Bounds | MPS Risk Management Conference |
| 2008 | Responding to a justified or an unjustified allegation of misconduct | MPS Risk Management Conference |

8

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

| 2008 | Forensic psychiatric assessments of Physicians | Massachusetts Medical Society [MMS]: Caring for Caregivers |
|---|---|---|
| 2009 | Forensic psychiatric assessments of healthcare providers | Massachusetts Medical Society [MMS]: Caring for Caregivers |

**National**

| 1988 | Somatization: On losing and finding feelings | APA Annual Meeting: workshop |
|---|---|---|
| 1989 | Difficult supervisions | APA Annual Meeting: workshop |
| 1991 | Psychotherapy Supervision | American Psychoanalytic Meeting |
| 1992 | Supervisors, supervisees: What do we Expect from each other? | APA Annual Meeting: workshop |
| 1996 | Stages of Competence in Learning Psychotherapy | APA Annual Meeting: workshop |
| 1998 | Supervision: How personal should it be? | Minneapolis Psychoanalytic Association |
| 2000 | Co-chair, Split Treatment: Clinical, Ethical and Legal Issues | APA Annual Meeting: workshop |
| 2005 | The Physician's Psychosomatic Dilemma | APA Annual Meeting: workshop |
| 2006 | Caveat Vendor for the forensic psychiatrist: Being as good, not better than the facts | AAPL annual meeting |
| 2006 | Consulting to, teaching and supervising non-psychiatric healthcare providers | American Academy of Psychosomatic Medicine |
| 2007 | Scientific Updates: Suicide risk assessment and management in split treatment | APA Annual Meeting (chosen for inclusion in APA's DVD of Best of the 2007 meeting) |
| 2009 | Certainty and Expert Mental Health Opinions in Legal Proceedings: Ethical Perspectives | International Academy of Law and Mental Health annual meeting |
| 2010 | Whither the relationship: Consulting to PCPs about depression and adherence | APA Annual Meeting: workshop |

9

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

| | | |
|---|---|---|
| 2010 | Regulatory peer review of AAPL ethical Guidelines: a Debate | AAPL Annual meeting |
| 2011 | Forensic Psychiatric Assessments of Allegedly Impaired Attorneys | National Organization of Bar Council & Association of Professional Responsibility Lawyers; Toronto Canada |
| 2012 | Ethics dilemmas in forensic psychiatry Ask the committee | AAPL Annual meeting |
| 2012 | Managing expert attorney interactions Early career psychiatrists | AAPL Annual meeting |
| 2013 | Professional Society Peer Review: The Expert Witness as Defendant | 33rd International Congress on Law and Mental Health [Amsterdam] |
| 2016 | Placebo: parsing and using its therapeutic Action | APA Annual Meeting: workshop chair |
| 2017 | The Goldwater Rule: Debate | APPL Annual Meeting: Debate Debate Chair & Presenter |

## **Report of Clinical Activities and Innovations**

### **Current Licensure and Certification**

| | | |
|---|---|---|
| 1976 | Licensure | Commonwealth of Massachusetts |
| 1982 | Certification, Adult Psychiatry | American Board of Psychiatry and Neurology |
| 1998 | Certification, Forensic Psychiatry | American Board of Psychiatry and Neurology |
| 2008 | Recertification, Forensic Psychiatry | American Board of Psychiatry and Neurology |
| 2018 | Recertification, Forensic Psychiatry | American Board of Psychiatry and Neurology |

### **Practice Activities**

**Forensic psychiatry practice expertise**:
Competency examinations (Commitment, Competency to stand trial, Guardianship, Testamentary Capacity)
Criminal responsibility and diminished capacity
Disability
Fitness for duty assessments
Physician Misconduct
Psychiatric Malpractice
Psychiatric Ethics

10

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

Psychological Injury including assessment and treatment of **PTSD**
Traumatic Brain injury
Risk assessment and mitigation

**Clinical psychiatry practice expertise**
Long and Short Term Individual Psychotherapy
Consultation/Liaison Psychiatry
Collaborative Care Psychiatry [Out-patient Consultation/Liaison Psychiatry]
Couples Therapy
In-patient and Outpatient Psychiatric Consultation
Psychosomatics
Psychopathology with coexisting medical illness
Psychopharmacology
Psychotherapy Supervision
PTSD

Since 1980, I have had a private practice of general adult psychiatry. My practice has included individual and couple's treatment, long and short-term modalities, verbal (psychodynamic and cognitive behavioral) and pharmacologic therapies, for patients who, diagnostically, have ranged from relatively healthy to the most psychiatrically disturbed.

Since1992, I have had a private practice of forensic psychiatry. Since 2002 I have been the Associate Director of Forensic Psychiatry at Beth Israel Deaconess Medical Center, Boston.

I have performed examinations of criminal defendants on their competency to stand trial, the presence or absence of diminished capacity and legal insanity.

I have performed many examinations to ascertain fitness for duty, civil competencies (i.e. guardianship, testamentary capacity, capacity to give medical informed consent), commitment, psychiatric injury, psychiatric disability and psychiatric malpractice.

I have also performed many examinations of health care providers at various stages of administrative investigation and adjudication. The administrative agencies have included hospitals, hospital departments, universities, residency training programs, Physician Health Services of the Massachusetts Medical Society and different state medical boards in the New England region. I am approved by the Massachusetts Board of Registration in Medicine as a forensic psychiatric examiner.

Combining my clinical and forensic backgrounds, I have served as consultant to BIDMC and MAH inpatient and outpatient services regarding prospective risk assessment and mitigation and regarding retrospective peer review of critical incidents.

From 2001-2018, I was the consultation-liaison psychiatrist for the Multiple Sclerosis Center at MAH.

From 2012-2015, I served as the psychiatric co director for COMPASS [*Care of Mental, Physical and Substance Use Syndromes*], a CMS Innovation Grant for which MACIPA was a clinical site. The goal of the program was to deploy an IMPACT model system in primary care.

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

At the end of the grant, I began serving as psychiatric co-director MACIPA's successor program, a heath coach chronic disease management program, named SCR for systematic case review.

**Journal articles**

**Meyer, D**.  Medical Treatment of Spasmodic Torticolis.  Journal of Clinical Psychopharmacology, 1:244-5, July 1981

**Meyer, D**. and Halfin, V. Toxicity Secondary to Meperidine in Patients on Monoamine Oxidase Inhibitors.  Journal of Clinical Psychopharmacology, 1:319-321, September 1981

**Meyer D.**  Book Review:  Models of Brief Psychodynamic Psychotherapy: A Comparative Approach by Messer, S., Warren C.; Psychiatric Services, vol. 48, No. 11, p 1477 November 1997

**Meyer D.** The Psychiatrist as Supervisor: Risk Management Issues. Rx for Risk, vol. 5, issue 3, pp. 1, 7-8, August 1997 (The Risk Management News Letter for The APA-PRMI)

**Meyer DJ**, Simon RI.  Split Treatment: Clarity between Psychiatrists and Psychotherapists. Part I. Psychiatric Annals vol. 29: 5 pp.  241-245 May 1999

**Meyer DJ**, Simon RI.  Split Treatment: Clarity between Psychiatrists and Psychotherapists.  Part II Psychiatric Annals vol. 29:6 pp. 327-332 June 1999

**Meyer DJ** Larry Hollingsworth Strasburger, MD: Twenty Seventh President of The American Academy of Psychiatry and the Law.  Journal of the American Academy of Psychiatry and the Law 30:14-18, 2002

**Meyer DJ**.  Split Treatment and Coordinated Care with Multiple Mental Health Clinicians: Clinical and Risk Management Issues.  Primary Psychiatry April 2002 vol. 9:4 pp 56-60

**Meyer DJ**, Price, M. Forensic Psychiatric Assessments of Behaviorally Disruptive Physicians. Journal of the American Academy of Psychiatry and the Law  vol 34:1 pp72-81 2006

**Meyer DJ**. Psychiatric Malpractice and Administrative Inquiries of Alleged Physician Misconduct. Psychiatric Clinics of North America vol. 29 2006 pp 615-628

**Meyer DJ**. Commentary: Legislators—How did the deciders decide? Who shall serve as their experts? Journal of the American Academy of Psychiatry and the Law vol 35:3 pp323-324 2007

**Meyer DJ**, Drogin EY.  Administrative Law Adjudications of Healthcare Professionals: Mental Health Expert testimony. Journal of Psychiatry and Law, 39:465-476 2011

**Meyer DJ**, Price, M. Peer review committees and state licensing boards: responding to allegations of physician misconduct. Journal of the American Academy of Psychiatry and the Law 40:193-201, 2012

**Meyer DJ**, Price, M. Peer review and psychiatric physician fitness for duty evaluations: analyzing the past and forecasting the future. International Journal of Law and Psychiatry, 35:445-451 2012

Drogin EY, Commons ML, Gutheil TG, **Meyer DJ**, Norris DM. Certainty" and expert mental health opinions in legal proceedings. International Journal of Law and Psychiatry, 35:348–353 (2012)

Candilis PJ, Dike CC, **Meyer DJ**, Myers WC, Weinstock R. Should AAPL Enforce its Ethics? Challenges and Solutions. J Am Acad Psychiatry Law *42:3:322-330* (September 2014)

Lipsitt DR, Joseph R, **Meyer DJ**, Notman MT. Medically Unexplained Symptoms: Barriers to Effective Treatment When Nothing Is the Matter. www.harvardreviewofpsychiatry.org  Vol 23 • Number 6 • November/December 2015 pp438-448

Anfang SA, Gold LH, **Meyer DJ.**  AAPL Practice Resource for the Forensic Evaluation of Psychiatric Disability. Journal of the American Academy of Psychiatry and Law, 46: Supplement: S1-S50 2018

**Textbooks and textbook chapters**

Jacobs, D., David, P., **Meyer, DJ.**: The Supervisory Encounter; Yale University Press, New Haven, Connecticut. (1995) Translated and published in Russian in 1997; co-authored. Remains as of 2019 in publication.

**Meyer DJ**, Simon RI. Psychiatric Malpractice and the Standard of Care in Textbook of Forensic Psychiatry; edited by Robert I. Simon, M.D., and Liza H. Gold, M.D., American Psychiatric Publishing, Washington, DC, 2004

**Meyer DJ**, Simon RI. Split Treatment in Textbook of Suicide Assessment and Management; edited by Robert I. Simon, M.D., and Robert E. Hales, M.D., American Psychiatric Publishing, Washington, DC, 2006 pp 235-251

**Meyer DJ**, Simon RI, Shuman D. Professional Liability in Psychiatric Practice and the Requisite Standard of Care in Textbook of Forensic Psychiatry 2nd edition; edited by Robert I. Simon, M.D., and Liza H. Gold, M.D., American Psychiatric Publishing, Washington, DC.  2010.

Drogin EY, **Meyer DJ** Psychiatric and Psychological Malpractice in Handbook of Forensic Assessment: Psychological and Psychiatric Perspectives; edited by Eric Y. Drogin, J.D., Ph.D., ABPP, Frank M. Dattilio, Ph.D., ABPP, Robert L. Sadoff, M.D., and Thomas G. Gutheil, M.D.; John Wiley and Sons, Hoboken, NJ 2011 pp 543-570

**Meyer DJ**. Split treatment of suicidal patients: coming of age, in Textbook of Suicide Assessment and Management, 2nd Edition; edited by RI Simon and RE Hales. American Psychiatric Publishing, Washington, DC, 2012, pp. 263-279

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

Price M, **Meyer DJ.** Fitness for duty evaluations of physicians: treating providers and protecting the public in <u>Clinical Guide to Mental Disability Evaluations</u>; edited by LH Gold and DL Vanderpool. Springer, New York, 2013, pp 337-367

**Meyer DJ,** Drogin EY. Expert Testimony and Cross Examination in <u>The Encyclopedia of Clinical Psychology</u>, edited by RL Cautin and SO Lilienfeld. John Wiley & Sons, Inc., Hoboken, NJ Volume II, pp 1173-1183 2015

**Meyer DJ**, Gutheil TG The Expert Witness in <u>Textbook of Forensic</u> <u>Psychiatry 3rd edition</u>; edited by Liza H. Gold, M.D. and Richard Frierson, American Psychiatric Publishing, Washington, DC.  (2017)

Price M, **Meyer DJ.** The Aging Professional in J. C. Holzer, R. Kohn, J. R. Ellison, & P. R. Recupero (Eds.), <u>Geriatric Forensic Psychiatry: Principles and Practice</u>. Oxford. New York, NY (2018) 2019 Guttmacher Award recipient

**Clinical Guidelines**

From 1999-2001, Dr. Mark D. Pearlmutter, then President of the Massachusetts College of Emergency Physicians, and I co-chaired a taskforce jointly convened by The Massachusetts College of Emergency Physicians and The Massachusetts Psychiatric Society. The purpose was to formulate The Guidelines of The Medical Clearance Exam in the evaluation and management of the psychiatric patient in the emergency department. Our taskforce's guidelines were endorsed by both societies in 2001 and again in 2008 and were distributed to all emergency rooms in Massachusetts.

2015-2016 Stuart Anfang MD (chair), Liza H Gold MD, and **Donald J Meyer MD** together composed a task force to revise and update to the 200 page Guidelines for Forensic Evaluation of Psychiatric Disability of the American Academy of Psychiatry and Law. The result was reviewed and voted on by the AAPL council and published in November 2018:

Anfang SA, Gold LH, **Meyer DJ.**  AAPL Practice Resource for the Forensic Evaluation of Psychiatric Disability. <u>Journal of the American Academy of Psychiatry and Law</u>, 46: Supplement: S1-S50 2018

**Deposition and Trial Testimony since September 2008**

Commonwealth of MA vs Richard McMullen
October 28, 2008; New Bedford Superior Court
Attorney Kevin Connelly; Office of the District Attorney; Bristol District, Bristol, MA

MA Board of Registration in Medicine v Joseph Jackson, DO
2009 Division of Administrative Law Appeals
Eve M. Slattery, Esquire; Dwyer & Collora LLP; 600 Atlantic Avenue; Boston, MA 0221 0-2211

Harry Kasparian v. Elaine Kasparian Docket NO 08D-0343-DV1
December 15, 2009 Deposition for Essex Probate Court
Robert J. Rivers, Jr., Esq.; Partner, Lee & Levine LLP 222 Berkeley Street, Suite 1400 Boston, MA  02116

Curriculum Vitae and Bibliography for Donald Jay Meyer, M.D.

Ronald Avallone and Marianne Beauregard, his wife, Plaintiffs v H Edward Dean in his official capacity as Sheriff of Marion County, Defendant; Case NO.: 06-1898-CAB
November 2010; Circuit Court, Fifth Judicial Circuit, in and for Marion County, Florida
J. Richard Moore Jr., Esq.; Rahaim, Watson, Dearing & Moore, P.A.; 3127 Atlantic Blvd. Jacksonville, Fl. 32207

Maine Board of Bar Examiners v Robert Weinberg, MD JD
July 25, 2011 Augusta, ME
Peter J. DeTroy, Esq.; Norman Hanson & DeTroy, LLC; 415 Congress Street; Portland, ME 04112-4600

Cindy l Kirouac v Patrick R Donahoe, Postmaster General, United States Postal Service
Case No. 2:11-cv-00423-JAW Deposition September 20, 2012
Evan J. Roth, AUSA; U.S. Attorney's Office;100 Middle Street, East Tower, Sixth Floor
Portland, Maine   04101; (207) 780-3257 Evan.Roth@usdoj.gov

James B. Whitney v. Berna Turam, Suffolk Probate & Family Court, Docket No. IOD-17S9-DV1
Trial testimony August 27, 2012; September 25, 2012
Edward Dombroski, Esq. Travers Dombroski; 75 Federal Street, Boston, Massachusetts 02110
telephone 617 423 0099; facsimile 617 423 5880 www.traverslaw.com

Natalie Friend v American Airlines Flight #331, United States District Court Southern District of Florida, Miami Division, Case No. 10-20131-CV-Leonard/O'Sullivan In RE: American Airlines Flight 331. Video-taped Deposition January 7,2013. Attorney Alice B. Braustein, Lawson & Weitzen, LLP, 88 Black Falcon Avenue, Boston, MA 02210, Phone: 617.439.4990

Martha Scheffer v. Stacey Starr, Worcester District Court
January12, 2017, Douglas L Price, Esq., MORRISON MAHONEY LLP, 250 Summer Street, Boston, MA  02210 T 617.439.7598

MA Board of Registration in Medicine v Ellen Scepansky MD February 28, 2019

Aaron Woodside, Plaintiff, v. Angela Zarrelli-McQuiston, Defendant. Docket 18W0918
Essex Probate and Family Court, Salem, MA. February 28, 2019
Attorney Carlos A Maycotte, Fitch Law Partners LLPP, One Beacon Street, Boston, MA 02108
617 542 5542 cam@fitchlp.com;
Attorney Nicolas Gordon, 200 Chauncy St, Mansfield, MA 02048; (774) 254-4411,
attorneynickgordon84@gmail.co