UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL CONTI, | |
| | Plaintiff / Counterclaim-Defendant |
| -against- | |
| JOHN DOE, | |
| | Defendant / Counterclaim-Plaintiff. |

No. 17-CV-9268 (VEC)

**JOHN DOE'S MEMORANDUM OF LAW IN OPPOSITION TO
PAUL CONTI'S MOTION TO PRECLUDE EXPERT TESTIMONY**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## <u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .............................................................................................................2

I.    ALL OF DR. APPELBAUM'S OPINIONS ARE RELEVANT AND
ADMISSIBLE..................................................................................................2

    A.    Dr. Appelbaum's Opinions Concerning Conti's Clinical Assessment
of the Messages and Conti's Decision to Sue for Money Are Central
to the Case ...........................................................................................3

        1.    Conti's Failure to Place the Messages in Context or Conduct a
Proper Risk Assessment Is Highly Relevant to Justification...........6

        2.    Whether a Lawsuit for Money is an Appropriate Response
to Alleged Fears of Violence for Hire Is Highly Relevant
to Justification .................................................................................8

        3.    Conti's Other Post-Termination Behavior Is Relevant
to Whether He Genuinely Feared Danger or Just Wants
Money and Revenge ........................................................................9

    B.    Dr. Appelbaum's Opinion that Conti Disclosed More Confidential
Medical Information Than Necessary in His Pleadings Is Admissible .....10

    C.    Dr. Appelbaum's Opinions Are Reliable..................................................14

        1.    Dr. Appelbaum's Opinion About Conti's Response
to the Messages Is Grounded in Well-Established
Psychiatric Practice ......................................................................16

        2.    Dr. Appelbaum's Opinion that Conti's Filing of This Lawsuit
Was Disproportionate to Any Alleged Threat Is Reliable............19

        3.    Dr. Appelbaum's Opinion that Conti's Pleadings Include
Unnecessary Disclosures Is Properly Grounded in Psychiatry,
Not Law ........................................................................................22

        4.    Dr. Appelbaum's Opinion on Transfer of Care
Is Straightforward .........................................................................24

II.    ALL OF DR. COHEN'S OPINIONS ARE RELEVANT
AND ADMISSIBLE..........................................................................................24

A.    All of Dr. Cohen's Opinions Are Relevant to Disputed
       Issues of Fact...................................................................................25

B.    Doe Can Have Multiple Psychiatrists Offer Similar Opinions,
       As Conti Will ....................................................................................29

C.    Dr. Cohen May Properly Testify About What Conti Told Him
       and Other Facts Relevant to His Opinion ....................................29

CONCLUSION.....................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE NO.</u>

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ................................................................. 16

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
    814 F.3d 132 (2d Cir. 2016) ................................................................. 12

*Burton v. Matteliano*,
    81 A.D.3d 1272 (4th Dep't 2011) ...................................................... 3, 4

*Chanko v. Am. Broad. Cos.*,
    27 N.Y.3d 46 (2016) ......................................................................... 3, 4

*Chill v. Calamos Advisors LLC*,
    417 F. Supp. 3d 208 (S.D.N.Y. 2019) .......................................... 11, 13

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .............................................................. 3, 15, 26

*Disabled in Action v. City of New York*,
    360 F. Supp. 3d 240 (S.D.N.Y. 2019) ................................................ 15

*Humphers v. First Interstate Bank of Or.*,
    696 P.2d 527 (Or. 1985) ....................................................................... 4

*I.M. v. United States*,
    362 F. Supp. 3d 161 (S.D.N.Y. 2019) ................................................ 17

*In re IPO Sec. Litig.*,
    174 F. Supp. 2d 61 (S.D.N.Y. 2001) .................................................. 12

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) .................................................. 3

*In re Mirena IUD Prods. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) ................................................ 22

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) .......................................... 12, 13

*Joffe v. King & Spalding LLP*,
    No. 17-CV-3392, 2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) ...................... 12

*Kranis v. Scott,*
      178 F. Supp. 2d 330 (E.D.N.Y. 2002) ............................................................ 11

*McCabe v. Comm'r,*
      688 F.2d 102 (2d Cir. 1982) ........................................................................... 14

*Pension Cmte. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
      691 F. Supp. 2d 448 (S.D.N.Y. 2010) ............................................................ 16

*Rojas v. Alexander's Dep't Store, Inc.,*
      924 F.2d 406 (2d Cir. 1990) ........................................................................... 28

*Stitts v. United States,*
      811 F.2d 736 (2d Cir. 1987) ........................................................................... 11

*Tarasoff v. Regents of Univ. of Cal.,*
      17 Cal. 3d 425 (1976) .......................................................................... 8, 9, 17

*U.S. Info. Sys., Inc. v. IBEW Local No. 3,*
      313 F. Supp. 2d 213 (S.D.N.Y. 2004) ............................................................ 13

*Ulico Cas. Co. v. Clover Capital Management, Inc.,*
      217 F. Supp. 2d 311 (N.D.N.Y. 2002) ..................................................... 11, 14

*Zeak v. United States,*
      No. 11-CV-4253, 2014 WL 5324319 (S.D.N.Y. Oct. 20, 2014) ..................... 14

**Statutes and Rules**

22 NYCRR part 1200 ............................................................................................. 12

Fed. R. Civ. P. 12 ..................................................................................................... 4

Fed. R. Civ. P. 35 .............................................................................................. 25, 26

Fed. R. Evid. 702 advisory cmte. note (2000) ...................................................... 19

Fed. R. Evid. 703 ................................................................................................... 30

Fed. R. Evid. 704 ................................................................................................... 13

**Other Authorities**

N.Y. Pattern Jury Instructions § 3.59 ...................................................................... 4

## PRELIMINARY STATEMENT

This is a case about a psychiatrist and a patient.  It arises from a series of offensive messages sent by John Doe, the patient, to Paul Conti, the psychiatrist, which Conti alleges are defamatory.  As it has been litigated and as it will be presented at trial, however, the case is less about how third-party recipients reacted to the messages—all will testify that they viewed them as unworthy of belief—and more about Conti's own clinically unfounded, historically unprecedented, and unethical reaction to those messages—which was to dump Doe's most sensitive medical information into a public lawsuit for money.  At the heart of the case is Conti's justification defense to Doe's counterclaim for breach of confidentiality.  Although Conti concedes that Doe himself was not a physical threat, Conti claims that he was justified in loading up his pleadings with Doe's most intimate secrets because this lawsuit was a response to his fear that Doe would use his family's wealth to orchestrate violence against Conti or Conti's family.

Receiving provocative, offensive, or even threatening communications from patients is endemic to the difficult work of treating people with serious mental illness.  For that reason, an entire body of ethical principles and standard professional practices exists to help psychiatrists contextualize a patient's communications; assess whether the patient poses an actual risk of physical harm; and decide whether, when, and how to breach a patient's confidence, which is supposed to be a drastic measure of last resort.  That Conti breached or ignored virtually all of these principles and practices in filing this lawsuit is crucial in understanding why his disclosure of Doe's confidential medical information was unjustified.  Explaining the prevailing standards of the profession, describing how psychiatrists are expected to put those standards into practice, and analyzing how Conti deviated from those standards is exactly what expert testimony is for.

Conti's broad-brush motion to preclude the testimony of Drs. Paul Appelbaum and Ziv Cohen—Doe's distinguished experts in psychiatric ethics and forensic psychiatry—ignores the

1

law governing the parties' claims and defenses and the disputed issues of fact that the jury will be asked to resolve.  Substantial expert testimony is not just *appropriate* in this case.  It is *necessary* to provide lay jurors with an appropriate framework to evaluate Conti's behavior, especially because Conti is a psychiatrist and will invoke his specialized knowledge and experience to justify his own actions.  Absent expert guidance, jurors may well rely on their own unfounded conceptions of patient confidentiality, as most people who have filled out forms at their doctors' offices have a vague idea that "HIPAA" protects their confidences.  Precluding experts from testifying about how psychiatrists are supposed to respond to situations like this one, and how Conti measured up to those professional standards, would leave the jury with nothing but speculation and Conti's self-serving assertions against which to evaluate his defense.

The Court should admit the opinions of Drs. Appelbaum and Cohen to give the jury a framework for decision.  To do otherwise would turn this case into a standardless free-for-all in which the only psychiatrist who can speak to fundamental questions of psychiatric practice is the plaintiff himself.

## ARGUMENT

## I.     ALL OF DR. APPELBAUM'S OPINIONS ARE RELEVANT AND ADMISSIBLE

Dr. Paul Appelbaum is, simply put, one of the world's most distinguished psychiatrists and perhaps the leading expert in psychiatric ethics in the United States.  He is the past president of both the American Psychiatric Association (APA) and the American Academy of Psychiatry and the Law and is the Director of the Center for Law, Ethics & Psychiatry at Columbia University.  Appelbaum Report (Bartholomew Decl. (Dkt. #192) Ex. A) ¶ 1.  He is also a practicing clinician with extensive forensic experience whose research has focused on the management of dangerous behavior by mentally ill patients.  *See id.*; *id.* Ex. 1 at 9, 12 (past and ongoing funding for research in risk assessment of violence and neurobiology of violence from

2

MacArthur Foundation and National Institute of Mental Health). Conti does not dispute that Dr. Appelbaum is highly qualified. Instead, he worries that Dr. Appelbaum is *too* distinguished to testify, speculating that Dr. Appelbaum's "pedigree" will be "exploit[ed]" to convince the jury to agree with him. Conti Br. (Dkt. #193) at 9. The law recognizes no such problem.

Much of Conti's argument for precluding Dr. Appelbaum's testimony is based upon its purported irrelevance or unhelpfulness to the jury. *See, e.g.*, *id.* at 8 (claiming that "the only purpose" of most of Dr. Appelbaum's opinions is "to attack Dr. Conti personally on irrelevant matters"). But the helpfulness of an expert's opinion depends, most of all, upon the parties' claims and defenses and the specific factual issues in dispute. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 469 (S.D.N.Y. 2018) (helpfulness primarily a matter of relevance); *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-92 (1993) (discussing "fit" between expert testimony and "pertinent inquiry" in case). Conti's motion makes no reference to the elements of Doe's claim. And it fails to identify Conti's principal defense: that he was justified in disclosing confidential medical information in this lawsuit for money to cause Doe's father to restrain Doe from hiring someone to cause serious physical harm to Conti or Conti's family. Focusing on the actual issues in dispute in the case, the propriety—indeed, the crucial importance—of all of Dr. Appelbaum's opinions becomes clear. And Dr. Appelbaum's opinions are reliable because they are well grounded in prevailing professional standards, extensive personal experience, and specialized knowledge in risk assessment.

A.     **Dr. Appelbaum's Opinions Concerning Conti's Clinical Assessment of the Messages and Conti's Decision to Sue for Money Are Central to the Case**

Doe's counterclaim is for breach of doctor-patient confidentiality, a species of breach of fiduciary duty. *See, e.g.*, *Chanko v. Am. Broad. Cos.*, 27 N.Y.3d 46 (2016); *Burton v. Matteliano*, 81 A.D.3d 1272 (4th Dep't 2011). Under New York law, in order to prevail, Doe

3

must prove: (1) he had a doctor-patient with Conti; (2) Conti acquired information about Doe's treatment or diagnosis; (3) Conti disclosed such information to a person unconnected with treatment in a manner that allowed Doe to be identified; (4) Doe did not consent to the disclosure; and (5) Doe suffered damages.[1]  *See* N.Y. Pattern Jury Instructions (P.J.I.) § 3.59.

As set forth in more detail in Doe's partial motion to preclude rebuttal expert testimony, there is no real dispute that Conti's sealed pleadings disclosed confidential information about Doe's treatment and diagnosis to unconnected persons in an identifying manner without Doe's consent.  *See, e.g.*, Dkt. #188 at 3-6.  Conti's primary position at trial will be the affirmative defense of justification.  *See Burton*, 81 A.D.3d at 1274.  Conti claims that he had a "duty to protect" himself and his family from serious physical injury brought about by Doe.  Conti Tr. (Celli Decl. Ex. A) at 169:13-18.  Specifically, he claims to have feared that Doe would hire someone to injure or kill him and claims to believe that this lawsuit has caused Doe's father to restrain Doe from doing so.  *See id.* at 287:6-11.  Conti claims that, in light of Doe's diagnoses and clinical history, the entirety of what Doe has ever said and done is relevant to the alleged threat he poses.  *Id.* at 171:12-18.  For that purported reason, Conti gave all of Doe's confidential medical information—including medical records and other materials provided by Doe's family to facilitate treatment—to his civil attorneys and deferred to his counsel about what information to include in the pleadings.  *See id.* at 236:10-237:2.  Importantly, the Pattern Jury Instructions do not address Conti's justification defense in any detail.  *See* N.Y.P.J.I. § 3.59.  The jury will simply be instructed to find whether Conti's disclosure was justified under the circumstances.

---

[1]  Conti's moving brief could be read to suggest that he is confused about the nature of Doe's claim.  *See* Conti Br. 7 (calling it "vague").  If any confusion exists, Doe is not responsible for it.  Directly relevant precedent exists from the highest courts of New York and Oregon, *see Chanko*, 27 N.Y.3d at 46; *Humphers v. First Interstate Bank of Or.*, 696 P.2d 527 (Or. 1985), and the elements under New York law are right there in the "Breach of Fiduciary Duty" section of the Pattern Jury Instructions.  If Conti believed that the counterclaim was not adequately pleaded, he could have moved to dismiss or for a more definite statement.  *See* Fed. R. Civ. P. 12(b), (e).  He did neither.

Doe plans to attack Conti's justification defense in at least three ways, each of which, when proven, will independently be sufficient to defeat it.  *First*, Doe will prove that Conti did not actually believe, and certainly did not *reasonably* believe, that Doe posed a real threat of serious physical injury.  Absent a reasonable belief that Doe posed a serious threat, Conti has no justification for disclosing any of Doe's confidential medical information in this lawsuit (or by any other means).  *Second*, Doe will show that, even if he is deemed to have posed some threat, disclosing confidential patient information in a *lawsuit for money* was not justified because Conti failed to pursue less intrusive alternatives and because suing for money is not a rational way to prevent violence.  *Third*, Doe will demonstrate that, even assuming *some* disclosure in a lawsuit for money was an appropriate response to a legitimate threat, Conti violated the ethical rules by disclosing far more information than was necessary to disclose under the circumstances.

Conti's motion baldly asserts—without any foundation in the facts, the law, or even his own explanation for his behavior in his sworn deposition testimony—that the first two of these three responses to his justification defense are irrelevant "ancillary" issues.  Conti Br. 18; *see also id.* at 8 (asserting, *ipse dixit*, that the first two of these three responses are not even "arguably relevant").  Conti's assertion is completely divorced from reality and ignores the entire thrust of Dr. Appelbaum's testimony.  Whether Conti had *any* justification for disclosing any confidential patient information *at all*—and particularly in a lawsuit for money—is at the very heart of this case.  Dr. Appelbaum's opinions in these areas are directly relevant and will help the jury understand how a psychiatrist should respond, as a matter of ethics and a matter of practice, to receiving provocative messages from a patient.  Conti's dramatic deviation from accepted professional standards casts grave doubt on the reasonableness and the credibility of his claimed justification that he acted solely to protect himself from danger.

5

1.     **Conti's Failure to Place the Messages in Context or Conduct a Proper Risk Assessment Is Highly Relevant to Justification**

Whether Conti actually believed that Doe posed a risk of serious physical harm, and whether any such belief was reasonable, are crucial disputed issues of fact on Conti's justification defense to Doe's counterclaim.  As Conti himself testified:

> Q.     And what is your basis for saying, if you have one, that you were privileged, permitted to disclose confidential medical information – this line about drug addiction, about [John Doe] without his consent?
>        . . .
>
> A.     There is a standard which is frequently called the *Tarasoff* standard, and the standard establishes a duty to protect.  And if you feel that there is a duty to protect someone, then you not only can release information that's pertinent, but you should release information that is pertinent.  Under those rules, under those guidelines, I made the choices that I made in order to try to protect myself, because I felt extremely threatened.
>
> Q.     . . . [W]hen you talk about the duty to protect, you're talking about what you testified to a few minutes ago, which is where a physician has a belief that there is a reasonable probability that somebody's going to—that the patient is going to hurt himself or herself or somebody else, right?
>        . . .
> A.     Yes.
> Q.     *And it has to be reasonable probability of serious injury, right?*
> A.     *Right.*

Conti Tr. 169:13-170:19.  The APA's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry (the "Principles," Celli Decl. Ex. B)—recognized by all parties and experts as, at minimum, widely accepted in the field—similarly provides that confidential information may be disclosed "[w]hen, in the *clinical judgment* of the treating psychiatrist, the risk of danger is deemed to be significant."  Principles § 4.8 (emphasis added).  If Conti did not believe that Doe posed a serious risk of physical harm, or if that belief was *un*reasonable and *not* grounded in clinical judgment, Conti cannot have been justified in any disclosure of any kind.

Dr. Appelbaum's opinions are directly relevant to this central issue.  Dr. Appelbaum's opinion begins with a discussion of how a psychiatrist faced with a challenge of this sort can

exercise proper clinical judgment.  He will explain how a reasonable psychiatrist acting

consistent with prevailing professional standards would use clinical judgment to understand

Doe's messages and determine whether they were threatening.  As Dr. Appelbaum opines,

psychiatrists are trained to recognize that patients' expressions of anger "are often evidence of

the very disorders that are the object of treatment" and offer an opportunity to help patients

understand their behavior's effect on others.  Appelbaum Report ¶¶ 7, 9.  Psychiatrists are also

trained to manage their emotional reactions to patients and to respond to patients based upon

clinical judgment rather than their own emotion, known as "acting out the countertransference."

*Id.* ¶ 9.  As Dr. Appelbaum opines, Conti failed to recognize Doe's messages as "a manifestation

of the patient's transference"—that is, an expression of Doe's anger about perceived

abandonment, a hallmark of borderline personality disorder.  Conti also "failed to recognize his

countertransferential emotions for what they were" and "lost professional objectivity in dealing

with John Doe," responding to Doe out of anger rather than clinical judgment.  *Id.* ¶ 11.

As Dr. Appelbaum further explains, Conti failed to evaluate the risk posed by Doe in a

reasonable manner consistent with prevailing professional standards.  Had Conti properly

recognized "that he was not in a position to evaluate the situation dispassionately," the

appropriate professional response would have been to "seek outside consultation from an

experienced colleague, in this case especially someone with forensic or other experience

evaluating threats."  *Id.* ¶ 13.  Conti failed to do so.  *Id.*  Nor did Conti contact law enforcement

or his malpractice insurance carrier to seek their guidance concerning risk management—"the

first step that any consultant would advise in such circumstances and a step that psychiatrists are

advised to take by their insurers immediately after a threat is received."  *Id.* ¶ 15.

In short, inappropriate and angry communications from patients to their psychiatrists are

a familiar occupational hazard.  Where a body of professional standards exists to guide psychiatrists in this common situation, the jury should be informed of them.  Dr. Appelbaum's explanation of how a trained psychiatrist should respond to such a situation will help the jury assess whether Conti's alleged fear of physical harm was a reasonable exercise of clinical judgment.  It will also help the jury decide whether Conti really perceived a threat—or is just making it up, or exaggerating his "fears," as an after-the-fact rationalization for breaching patient confidentiality in pursuit of money and revenge for Doe's ego-wounding criticism to wealthy East Coast professionals whom Conti desperately sought to impress.  From the fact that Conti did not act as a well-trained professional should act when concerned about a potential threat from a patient, the finder of fact could logically infer that he perceived no such threat in the first place.

### 2. Whether a Lawsuit for Money is an Appropriate Response to Alleged Fears of Violence for Hire Is Highly Relevant to Justification

Whether Conti was justified in disclosing any confidential medical information *in a lawsuit for money* is a similarly crucial disputed issue for the jury to resolve.  As Conti acknowledges, assuming that he reasonably perceived a serious threat from Doe, he could disclose confidential medical information only to the extent *minimally necessary* to address it:

> Q.    [T]o violate or break confidentiality under that standard, that we've been talking about, the *Tarasoff* standard, you have a duty as well to be circumspect and only use information that's minimally necessary?
>
> A.    Yes.

Conti Tr. 171:20-172:6.[2]  Doe's position is that no disclosures in a lawsuit for money were necessary, both because less intrusive ways of addressing any alleged threat existed and because suing for money is not a rational way to address a purported threat to one's life.

---

[2]    *See also Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 442 (1976) ("We conclude that the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield *to the extent to which disclosure is essential* to avert danger to others." (emphasis added)).  This is not really a *Tarasoff*

Dr. Appelbaum offers a number of opinions directly relevant to these issues. Based on ethical standards governing the profession, Dr. Appelbaum will explain that, before filing suit, Conti was required to "exhaust all reasonable avenues to evaluate and assess whether a lawsuit against his patient, disclosing the patient's confidential treatment-related information, was truly necessary." Appelbaum Report ¶ 17. His burden to explore alternatives was particularly significant here, given the vast scope of the disclosure. *See id.* Conti failed to take other standard steps for responding to patient provocations, which would allow him to assure himself that a lawsuit was really necessary. He did not pursue less intrusive alternatives like contacting law enforcement or his insurer. *Id.* ¶ 16. Nor did he consult an experienced forensic colleague. *Id.* ¶¶ 13-15. Had Conti done any of these things, he likely would have been counseled not to sue Doe. *Id.* ¶ 16. Moreover, setting aside the question of alternatives, a civil lawsuit for money—particularly one unaccompanied by any request for emergency relief—is an inherently unreasonable way to achieve Conti's professed goals, as it "is unlikely to be an effective means of protection from genuine threats of harm from an angry and vindictive patient." *Id.* ¶ 15.

### 3.   Conti's Other Post-Termination Behavior Is Relevant to Whether He Genuinely Feared Danger or Just Wants Money and Revenge

While admittedly less central to the case, Conti's insistence on being paid to discuss the transition of care with Doe's next treating psychiatrist, Dr. Michael Jenike, is still relevant to Doe's counterclaim. After establishing care with Doe a few months after Conti fired Doe as a patient, Dr. Jenike reached out to Conti to talk. Conti responded: "I'm happy to talk . . . . I would like a straightforward authorization from [Doe] to do this. And I would also *request authorization to bill for any time* spent in clinical conversation. I have spent a fair amount of

---

case, as *Tarasoff* concerns a psychiatrist's legal duty (in some jurisdictions) to directly warn a third party of a threat posed by an ill patient. It is nonetheless relevant that Conti himself invokes *Tarasoff*, and that *Tarasoff* permits disclosure of patient confidences only to the extent *essential* to prevent danger.

unbillable time since we ended care and there is also a small outstanding balance from before which I would appreciate clearing." Celli Decl. Ex. C (emphasis added).

The overarching theme of Doe's response to Conti's justification defense is that Conti just wants money from, and revenge against, Doe and his family and is willing to disregard his most solemn obligations as a physician in pursuit of those ends. Doe's over-the-top, profane emails irritated Conti, and they struck a chord with him such that he then lashed out at his patient in an uncontrolled and unprofessional way. Conti's refusal to discuss transition of care with Dr. Jenike unless paid is probative of his real motives—greed and spite—and his willingness to transgress ethical boundaries when so motivated. Dr. Appelbaum will offer discrete and tailored testimony on this issue to inform the jury that a psychiatrist must communicate about basic transition issues with successor treaters and "cannot refuse to communicate with a new treater *or demand payment for doing so*."[3] Appelbaum Report ¶ 26 (emphasis added).

### B. Dr. Appelbaum's Opinion that Conti Disclosed More Confidential Medical Information Than Necessary in His Pleadings Is Admissible

While not disputing the *relevance* of Dr. Appelbaum's opinion that the specific medical information disclosed in Conti's pleadings is unnecessary, *see* Appelbaum Report ¶¶ 18-20, Conti argues that this opinion "usurps the role of the Court." Conti Br. 8. Conti is wrong.

This case is no different than countless others in which an expert properly testifies to the content of a prevailing professional standard and opines as to whether, as a matter of fact, the defendant's conduct met that standard. Doe's claim is for breach of fiduciary duty, and experts in fiduciary duty cases frequently testify about the scope of the defendant's duties in light of industry standards and whether those duties were appropriately discharged. For instance, in

---

[3]     Doe agrees that Dr. Appelbaum need not opine as to whether Conti in fact refused to talk to Dr. Jenike unless he got paid, which is a lay question of the (obvious) meaning of Conti's email.

*Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208 (S.D.N.Y. 2019), the plaintiffs alleged that a mutual fund's board breached its fiduciary duties to investors by authorizing its investment manager to charge excessive fees.  The Court admitted extensive expert testimony concerning, *inter alia*, (1) whether the fund's decision to overhaul its management team and pay it more was a reasonable way to benefit its shareholders; (2) whether the fees were in fact excessive; (3) whether the board exercised sufficient care and conscientiousness in reviewing the manager's compensation; and (4) whether the manager's performance justified its higher compensation. *See id.* at 236-42 (admitting expert testimony on these subjects and more).  Similarly, in *Ulico Cas. Co. v. Clover Capital Management, Inc.*, 217 F. Supp. 2d 311 (N.D.N.Y. 2002), a case about a pension fund's fiduciary duties under ERISA, the court admitted expert testimony opining that the fund's sale of certain securities was unreasonable in light of prevailing professional standards for managing portfolio risk.  *See id.* at 317-18.

In the same vein, because juries usually have "no understanding of what constitutes reasonable behavior in a complex and technical profession such as medicine," a plaintiff in a medical malpractice case is typically *required* to introduce expert testimony about "accepted standards of practice" and how "the defendant deviated from those standards."  *Stitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987).  The same is true of legal malpractice.  *See Kranis v. Scott*, 178 F. Supp. 2d 330, 335 (E.D.N.Y. 2002).  While this is not a malpractice case, of course, Conti's justification defense presents the same kinds of factual questions:  What is the prevailing standard in psychiatry for disclosing patient confidences, and did Conti meet it?

Conti's contrary argument rests entirely on cases holding that courts do not hear experts in domestic law because courts *are* the experts in domestic law and play that role in instructing juries.  *See* Conti Br. 8-13 (citing *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814

F.3d 132, 144 (2d Cir. 2016); *In re IPO Sec. Litig.*, 174 F. Supp. 2d 61, 69 (S.D.N.Y. 2001); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 558 (S.D.N.Y. 2004); *Joffe v. King & Spalding LLP*, No. 17-CV-3392, 2019 WL 4673554, at \*14-18 (S.D.N.Y. Sept. 24, 2019)).

This case law is wholly inapposite. The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry are just that—principles of medical ethics, written by doctors for doctors, with commentary by psychiatrists for psychiatrists. They are not law and, respectfully, are not the subject of the Court's training or expertise. What they say and mean— and how an ethical member of the profession would act upon them in practice—are matters for a psychiatrist to address in expert testimony, not for the Court to address in a jury charge.

In *Joffe*, for example, the plaintiff attorney alleged that he had been terminated for reporting ethical violations; to make out a prima facie retaliation case, he needed to show he had a good-faith, reasonable belief that the conduct he reported was unethical. 2019 WL 4673554, at \*14-15. The defendant disclosed an expert in attorney ethics, Bruce Green, who opined that the conduct reported by the plaintiff was not unethical and that the plaintiff had no obligation to report it. *Id.* at \*14. The Court found Green's opinions relevant, but excluded them as "not helpful to the jury" because they "rest[ed] entirely on his interpretation of the text of the [New York Rules of Professional Conduct (RPC)]." *Id.* at \*17. The Court's ruling was based on case law holding that expert testimony about domestic law infringes the Court's sole prerogative to instruct the jury on the law. *See id.* As the Court explained, "an expert opinion as to the meaning of the RPC must be consistent with controlling caselaw for it to be valid—and yet, if the testimony were to be premised on the expert's interpretation of judicial precedent, the testimony would impinge on the Court's obligation to instruct the jury on the law."[4] *Id.* at \*17.

---

[4] The New York Rules of Professional Conduct are promulgated by the judiciary, codified as rules of the State, and enforceable by state action. *See* 22 NYCRR part 1200.

These concerns are absent here.  It is not the Court's role to keep abreast of or authoritatively interpret the advisory ethics opinions issued by the APA or the American Medical Association. Nor is it the Court's responsibility or sole prerogative to instruct the jury in medical ethics.

In *In re Rezulin Products Liability Litigation*, an MDL concerning drug defects, the plaintiffs disclosed a "drug safety" expert who opined that the defendant had a duty to fully disclose all known risks as a matter of "patient's rights."  309 F. Supp. 2d at 557.  The court concluded that the expert's opinions about "patient's rights" were "at best thinly-disguised legal or quasi-legal principles" designed to supplant established law concerning the adequacy of warnings, embodied in FDA regulations and the "learned intermediary" doctrine.  *Id.* at 557-58. In other words, the testimony was an end run around the court's legal instructions about the adequacy of a warning, restyled as "industry practice."  *See id*.  No such accusation is or can be leveled against Dr. Appelbaum here.  Conti does not point to any controlling law that he believes Dr. Appelbaum's testimony is designed to supplant or usurp; to the contrary, he expressly *denies* that the Principles "articulate a common law standard."  *Id*.  Conti just prefers that the jury be dully handed the Principles on a piece of paper, rather than educated about them by a qualified expert, because he believes it would be less damaging to his case.  *See id.* at 9-10.

Contrary to Conti's argument, moreover, Dr. Appelbaum's opinion is not "objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704; *cf.* Conti Br. 10.  "[C]ourts generally permit expert testimony concerning mixed questions of fact and law," while excluding expert testimony that "merely states a legal conclusion" and thereby invades the purview of the court to charge the jury.  *U.S. Info. Sys., Inc. v. IBEW Local No. 3*, 313 F. Supp. 2d 213, 239 (S.D.N.Y. 2004); *see also Chill*, 417 F. Supp. 3d at 236-42 (discussing expert testimony going to the ultimate factual issue of whether a breach of fiduciary duty occurred).  In medical

malpractice cases, experts are *expected* to opine as to the ultimate factual issues of whether the defendant deviated from the applicable professional standard of care and, if so, whether it caused the plaintiff's injury. *See, e.g.*, *Zeak v. United States*, No. 11-CV-4253, 2014 WL 5324319, at *9-11 (S.D.N.Y. Oct. 20, 2014) (dismissing medical malpractice claim because plaintiff's expert failed to identify standard of care or opine as to whether it was breached).

Dr. Appelbaum is not testifying to questions of law or as an expert in law. He is testifying as a psychiatric expert and opining about matters of fact, including whether the disclosures in Conti's pleadings were necessary to the situation at hand. *See, e.g.*, *McCabe v. Comm'r*, 688 F.2d 102, 104 (2d Cir. 1982) (whether a business expense is "necessary" is "doubtless [a] pure question of fact"). Dr. Appelbaum reviewed Doe's medical records; Conti's clinical records; the testimony of Doe, Doe's current treaters, Conti, and Dr. Hamilton; and Doe's messages. Appelbaum Report ¶ 2. He is well positioned to opine about what Conti should have done under the circumstances if acting in accordance with prevailing professional standards. His opinion is that, even assuming a lawsuit was warranted, the pleadings should have included no more than "the facts comprising the [p]atient's allegedly actionable conduct towards Dr. Conti (namely, the [m]essages), and how those [m]essages impacted Dr. Conti, if at all." Appelbaum Report ¶ 18. Comparing Conti's conduct to an alternative, appropriate response to the same facts is proper expert testimony. *See, e.g.*, *Ulico Cas. Co.*, 217 F. Supp. 2d at 317-18 (admitting expert testimony that fund manager should have assessed risk differently and would have better accomplished goals by holding rather than selling particular bonds).

### C.    Dr. Appelbaum's Opinions Are Reliable

Citing virtually no case law, Conti next argues that certain of Dr. Appelbaum's conclusions are unreliable, offering a scattered assortment of one-sentence objections that pluck

small fragments of Dr. Appelbaum's deposition testimony out of context.  Read in context and as a whole, Dr. Appelbaum's sober, reasoned, and intellectually honest testimony speaks for itself.

Conti's argument has two repeated themes, both of which are meritless.

*First*, Conti claims that Dr. Appelbaum's opinions are unreliable because Dr. Appelbaum does not assert that the conclusions of those who disagree with him are "unreasonable."  Conti Br. 13, 16.  But the law does not require an expert to pretend that anyone who disagrees with him must be *unreasonable* in order to have his own testimony admitted in court.  The legal standard governing reliability is whether an expert's conclusions are "the product of reliable principles and methods reliably applied."  *Disabled in Action v. City of New York*, 360 F. Supp. 3d 240, 244 (S.D.N.Y. 2019).  As the Supreme Court emphasized in *Daubert*, the hallmark of the scientific method is continuous testing and refinement.  *See* 509 U.S. at 593.  *Of course* qualified experts can reliably apply reliable principles to the same facts and reach different results.  Were it otherwise, two experts could never properly testify on opposing sides of the same issue in a case.

Conti likewise criticizes Dr. Appelbaum for not projecting that the "conclusions" he reached in this case would be "universally accepted," or even accepted by a majority of psychiatrists.  Conti Br. 13.  This argument misstates the applicable law.  The relevant question on a *Daubert* motion is whether Dr. Appelbaum's *methods* are *generally accepted*, not whether psychiatrists would reach hypothetical unanimity, or anything close to it, about his assessment of Paul Conti's conduct, specifically.[5]  *See Disabled in Action*, 360 F. Supp. 3d at 246 (*techniques* used by the expert must be generally accepted within the relevant professional community).

---

[5] Conti's reliance on these fragments is also misplaced, as Doe correctly objected to Conti's questions about Dr. Appelbaum's "conclusions" writ large as vague and compound.  *See* Appelbaum Tr. (Celli Decl. Ex. D) at 253:24-254:15.

*Second*, Conti repeatedly asserts that Dr. Appelbaum's opinion is grounded in nothing other than his "personal opinion," "personal views" or "*ipse dixit*." Conti Br. 12, 13, 14. As explained in more granular detail in the subsections below, this bare assertion ignores the actual opinions offered by Dr. Appelbaum in his report. The Court's reliability inquiry must focus on the connection between the expert's "opinion" and the "existing data," to determine whether the expert's conclusions reliably flow from the known facts and the analysis applied. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Here, Dr. Appelbaum reliably identifies prevailing professional standards—which he is highly qualified to identify based on his experience, and which Conti does not meaningfully dispute are prevailing—and logically applies them to the facts of the case. That is exactly what an expert is supposed to do.

### 1.    Dr. Appelbaum's Opinion About Conti's Response to the Messages Is Grounded in Well-Established Psychiatric Practice

Dr. Appelbaum's opinion about Conti's conduct in response to the messages is well grounded in foundational psychiatric concepts. Conti ignores Dr. Appelbaum's actual opinions on this topic, and argues against a straw man instead.

First, as Dr. Appelbaum explained—and is plainly qualified to know, as a distinguished clinician with four decades of experience and the past president of the APA—basic psychiatric principles should inform a psychiatrist's response to all patient communications. *See Pension Cmte. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 464-65 (S.D.N.Y. 2010) (reliability inquiry for expert testimony on prevailing professional standards "largely depends on whether he has drawn the proferred industry standards from an adequate source—in this case, his experience"). Those principles include "that a psychiatrist, in responding to patient communications . . . needs to attempt to understand them in the context of the treatment and the patient's condition, not necessarily taking them at face value" but instead

16

seeking to understand their "latent meaning." Appelbaum Tr. (Celli Decl. Ex. D) at 26:14-27:3. As in every interaction with a patient, the psychiatrist must respond to such communications "in a way that's consistent with the overall thrust of treatment." *Id.* at 27:3-6. While responsibilities to former patients may differ to some extent, those responsibilities continue to include "not responding in a counter-therapeutic way and keeping in mind the long-term welfare of the patient." *Id.* at 28:7-18. These basic concepts undergird Dr. Appelbaum's opinions that Conti failed to put Doe's communications in context, failed to recognize their "clear transferential bases," *id.* at 192:17, and failed to manage his own emotional reactions and respond therapeutically rather than out of anger or pique.

Second, Conti cannot and does not question that it is the prevailing professional standard to seek consultation from an experienced colleague to properly assess risk in situations like this one. Even as he opines that "no ethical code *requir[es]* consultation," Meyer Report (Bartholomew Decl. Ex. E) at 11 (emphasis added), Conti's own expert, Dr. Meyer, acknowledges that consultation is what is usually done, and *what he would have done*, under the circumstances: "I think I would probably get consultation from a colleague who does—who's familiar with threat assessments and *Tarasoff* kind of situations." Meyer Tr. (Celli Decl. Ex. E) at 169:13-24. The experts disagree about whether Conti's own treating psychiatrist, Dr. Hamilton, could and did fulfill this responsibility in light of Dr. Hamilton's therapeutic role, lack of forensic background, and limited information, etc. But that is an issue for the jury to sort out, and it does not change the reliability of Dr. Appelbaum's opinion that Conti should have sought independent consultation on the alleged "threat" and never did. *See, e.g.*, *I.M. v. United States*, 362 F. Supp. 3d 161, 194-95 (S.D.N.Y. 2019) (factual dispute between experts as to when exactly drug should be administered in resuscitation was for jury to resolve, and did not negate

17

reliability of expert's opinion that drug should have been administered sooner than it was).

Third, Dr. Appelbaum's opinion that prevailing professional standards require exhausting less intrusive alternatives before disclosing confidential patient information in a lawsuit is indisputably reliable.  Conti's counsel did not even bother asking Dr. Appelbaum about this issue at his deposition.  The Principles themselves state that psychiatric records must be "protected with extreme care," that a psychiatrist must be "circumspect in the information that he or she chooses to disclose," and that a psychiatrist may even ethically resist *court orders* to disclose patient confidences under some circumstances.  *See* Principles §§ 4.1, 4.9.  That a psychiatrist is not using extreme care or being circumspect if he discloses confidential information in a lawsuit when he could just as easily accomplish his goals without doing so is a reliable and logical inference.  It is also an inference that Dr. Appelbaum has ample authority to identify as the standard in the profession, having overseen the APA's development of ethics education for psychiatrists and run the drafting process for the World Psychiatric Association's code of ethics. *See* Appelbaum Tr. 20:3-22.  Indeed, Dr. Meyer, Conti's own expert, *agrees* that any efforts by Conti to exhaust alternatives short of filing a lawsuit would be "relevant" to whether Conti's disclosures were justified, and that it would have been "appropriate for Dr. Conti to see if he could exhaust other avenues of resolution first," or at least to "try."  Meyer Tr. 71:17-72:7.

Conti's motion has nothing to say about any of these issues—that is, about Dr. Appelbaum's actual opinions concerning Conti's response to the messages.  *See* Conti Br. 13-14. All Conti can do is point to the absence of peer-reviewed articles or authoritative APA guidance specifically addressing what to do when receiving offensive text messages or emails from a former patient.  *See id.*  But the absence of such written materials in no way renders Dr. Appelbaum's opinions unreliable because they are grounded in general principles that are widely

accepted in the profession and reliably applied here.  Written guidance that speaks to the narrow question at hand is not, under any circumstances, a requirement for the admission of expert testimony.  *See* Fed. R. Evid. 702 advisory cmte. note (2000) ("In some fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

Nor does Dr. Appelbaum's fair-minded acknowledgment that a psychiatrist is not *per se* prohibited from filing a defamation lawsuit undermine the reliability of his opinion.  *Cf.* Conti Br. 14.  That is so because Dr. Appelbaum's opinion *is not that psychiatrists cannot file defamation lawsuits*.  His opinion is that *this lawsuit* was ethically impermissible because Conti did not contextualize the messages, lost objectivity, unreasonably miscalculated the risk, and failed to exhaust alternatives, and because the lawsuit itself bears no relationship to its stated aim of preventing violence and discloses too much confidential information.

## 2. Dr. Appelbaum's Opinion that Conti's Filing of This Lawsuit Was Disproportionate to Any Alleged Threat Is Reliable

Dr. Appelbaum's opinion that the filing of this lawsuit was disproportionate to any threat posed by Doe and unlikely to achieve Conti's goals is well grounded in Dr. Appelbaum's experience and his extensive knowledge of risk factors associated with violence.

To begin, as Dr. Appelbaum clearly explained in his deposition testimony, his opinion that this lawsuit is disproportionate to the alleged "threat" posed by Doe is based in part on his opinions that Conti (1) failed to properly understand the messages as transferential, (2) failed to maintain clinical objectivity, and (3) failed to obtain consultation.  *See* Appelbaum Tr. 177:21-181:7 (Conti's "miscalculation" of risk based in part on patient's transference, Conti's countertransference, and "failure to obtain consultation").  Those opinions are, in turn, reliable for the reasons explained above.  *See supra* § I.B.1.

Dr. Appelbaum's opinion is also based on his empirical knowledge of the risk factors associated with violence.  Conti's counsel questioned Dr. Appelbaum extensively at his deposition about Conti's stated justification that filing this case would cause Doe's father to restrain Doe from hiring someone to commit violence.  *See* Appelbaum Tr. 201-210.  Conti's choice to ignore that testimony on this motion is revealing, as the testimony shows the ample foundation for Dr. Appelbaum's opinion.  As Dr. Appelbaum explained, Doe's wealth is "not relevant to the overall issue of the degree of danger he posed" because it goes to "means rather than intent," i.e., how rather than whether Doe would commit violence.  Appelbaum Tr. 203:7-204:11.  Dr. Appelbaum further explained that the idea of Doe's parents imposing consequences upon him—or, in Conti's terms, keeping the "rabid dog . . . on the leash," Conti Tr. 292:19-20—bears no meaningful relationship to Doe's likelihood of committing violence.  Dr. Appelbaum explained: "The truth of the matter is that people who commit violence, particularly impulsive violence, rarely focus on the details of their legal defense or the resources that could be available after the fact.  So I would not consider that a material issue with regard to . . . the degree of risk that he presented."  *Id.* at 204:12-205:23.

Dr. Appelbaum is a leading authority in risk assessment, having published extensively in the area and co-led a ten-year MacArthur Foundation study that literally redefined the field by developing a new decision tree for risk assessment and resulted in the publication of an award-winning text called *Rethinking Risk Assessment*.  *See* Appelbaum Report Ex. 1 at 6 (award for outstanding contribution to the literature on risk assessment); *id.* at 26, 29, 31-33, 51-53 (approximately a dozen peer-reviewed publications on risk assessment).  Conti provides no basis whatsoever to question Dr. Appelbaum's empirical knowledge in this area.  Instead of engaging with the actual foundation on which Dr. Appelbaum's opinions rest, Conti just notes again that

no written guidance forbids suing a patient.  *See* Conti Br. 14-15.  That fact is irrelevant to, and does not affect the reliability of, Dr. Appelbaum's opinion that *this lawsuit* was disproportionate to any "threat" because Conti miscalculated the risk and because a damages lawsuit is not a reasonable tool of violence prevention.

Conti's argument that Dr. Appelbaum cannot "express a conclusion about the level of threat posed by Doe" because he did not examine or diagnose Doe misses the point entirely. Conti Br. 15.  Dr. Appelbaum's opinion is that Conti did not reasonably assess the threat posed by Doe *based upon the information and resources available to Conti*.  As Dr. Appelbaum explains, had Conti been acting consistent with professional standards, he would have: (1) placed Doe's communications within the therapeutic context as a borderline patient showing hypersensitivity to perceived abandonment after his psychiatrist ended treatment by email; (2) evaluated his own emotional response to the situation to avoid "acting out the countertransference"; (3) recognized that he had lost objectivity and consulted with an experienced forensic colleague to soberly assess the risk; (4) contacted law enforcement and/or his malpractice insurer for advice; and (5) seen the messages as "the product of an irrational response by an angry patient."  Appelbaum Report ¶¶ 11-16.  None of these opinions depends in any way on what disorders Dr. Appelbaum thinks Doe may have.  They address the way a reasonable psychiatrist *in Conti's position* should have responded to his patient's messages.  For these reasons, Dr. Appelbaum reasonably declined to speculate about how he would have diagnosed Doe.  His unwillingness to indulge in irrelevant speculation about what diagnosis he might have offered had he examined Doe makes his opinions more reliable, not less.

That Dr. Appelbaum did not review pre-litigation settlement communications between Conti's lawyers and Doe's Ohio lawyers is, at most, fodder for cross-examination.  Conti Br. 15;

*see In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (failure of expert to consider some allegedly relevant documents best addressed by cross-examination).  But it is not even that.  Dr. Appelbaum was aware that Conti demanded money before filing suit; he simply had not seen the lawyer-to-lawyer emails associated with the demand.  Appelbaum Tr. 218:18-219:9.  More important, any conclusion to be drawn from those communications—in which Conti demanded a $1.25 million payment to his business in exchange for not filing this lawsuit—is consistent with and reinforcing of Dr. Appelbaum's other opinions.  Celli Decl. Ex. F (calling for $1.25 million payment to "PPG," or Pacific Premier Group).  Both sides agree that efforts by Conti to exhaust alternatives short of filing a lawsuit are, at minimum, relevant to whether his disclosures of confidential patient information were justified.  *See supra* § I.A.2.  If Conti believes that Dr. Appelbaum erroneously overlooked emails surrounding his attempt to extract a $1.25 million payment to his business from Doe—even as Conti failed to seek forensic consultation or contact law enforcement or his insurer—his lawyers can certainly raise that issue on cross.  But Dr. Appelbaum not having laid eyes on the email conveying Conti's extravagant (or, some might say, extortionate) pre-filing demand hardly renders his opinions *unreliable*.

### 3.    Dr. Appelbaum's Opinion that Conti's Pleadings Include Unnecessary Disclosures Is Properly Grounded in Psychiatry, Not Law

Dr. Appelbaum's acknowledgment that he is not a lawyer and cannot address which facts are legally required in a complaint makes his opinions about the overdisclosure of confidential material in Conti's pleadings more reliable, not less.  *Cf.* Conti Br. 16-17.  Unlike Dr. Meyer, whose opinions are based upon rank, uninformed speculation about the kind of information that would make a claim "credible" or what a court would "want to hear," *see generally* Dkt. #188, Dr. Appelbaum properly set aside legal questions about pleading standards and analyzed Conti's pleadings from the perspective of psychiatric ethics.

22

Dr. Appelbaum's opinions concerning the specific pieces of confidential information included in Conti's pleadings are threefold.  First, "even in the context of a valid legal claim, a psychiatrist is obligated to disclose the minimum amount of information necessary to establish the claim."  Appelbaum Report ¶ 18.  Second, a psychiatrist's duty in this area is non-delegable to lawyers or anyone else: he must "exercise . . . independent judgment . . . regarding what is necessary to disclose."  *Id.*  Third, the specific materials in the complaint are not "relevant to this situation."  *Id.*  Information about alleged drug use, alleged sexual conduct, diagnoses, and alleged family history is "particularly sensitive" but does not "directly touch upon the time, place or manner in which the Messages were sent, or their impact, if any, on Dr. Conti."  *Id.*  None of these opinions, unlike Dr. Meyer's, rely upon any impermissible speculation about the needs of the legal system or requirements of the Federal Rules of Civil Procedure.

The absence of "any standards or articles" specifically addressing "the safeguarding of confidences and privacy when a psychiatrist sues a patient for reasons other than nonpayment of fees" is, as Dr. Appelbaum points out, unsurprising.  Conti Br. 16; *see* Appelbaum Tr. 41:11-23.  Conti's decision to file such a lawsuit is "so unusual and perhaps unique" in the annals of psychiatry that one would not expect any sources to address it.  Appelbaum Tr. 41:19-23.  In any case, the absence of documentary sources narrowly addressing psychiatrists' damages lawsuits against patients for money for reasons other than nonpayment of fees does not change the reliability of Dr. Appelbaum's application of generally accepted principles to this situation.

Dr. Appelbaum's unawareness of the court system's procedural mechanics that led to an anonymized complaint appearing on the docket is, at most, cross-examination material.  *Cf.* Conti Br. 16-17.  It is also tangential to, and does not affect the reliability of, Dr. Appelbaum's opinion that Conti's original, non-anonymized filing (a) constituted an improper disclosure to

23

"persons working within the court system" and (b) improperly "created a risk that such material would be more widely disseminated as the case progressed," including to lawyers, court reporters, and, eventually, the readers of a mass-circulation tabloid.  Appelbaum Report ¶ 25.

### 4.     Dr. Appelbaum's Opinion on Transfer of Care Is Straightforward

With respect to the transfer of care to Dr. Jenike, Dr. Appelbaum will offer the entirely uncontroversial opinion that a psychiatrist "cannot refuse to communicate with a new treater or demand payment for doing so."  Appelbaum Report ¶ 26.  That Conti could have communicated by sending records to Dr. Jenike instead of talking on the phone is immaterial to the reliability of this basic proposition, especially because Dr. Jenike did not ask for records and Conti did not offer to send them.  *See* Appelbaum Tr. 266-72 (full context of questioning on this issue).[6]

## II.     ALL OF DR. COHEN'S OPINIONS ARE RELEVANT AND ADMISSIBLE

Dr. Ziv Cohen is an experienced forensic psychiatrist who maintains a private practice in New York City and serves as a clinical assistant professor of psychiatry at Weill Cornell Medical College, where he previously completed his residency.  Cohen Report (Bartholomew Decl. Ex. C) Ex. 1 at 1. 

the disorder that Conti now claims to suffer as a result of Doe's messages.  *See id.* at 2.  Dr. Cohen has published peer-reviewed scholarship about ▮▮▮▮, *id.* at 4, and has lectured about ▮▮▮▮ to medical students, *id.* at 3.  On August 6, 2019, Dr. Cohen performed an in-person independent medical examination (IME) of Dr. Conti for nearly six hours.  Cohen Report 1.  Dr. Cohen

---

[6]     Finally, Conti disclosed Dr. Meyer specifically as a rebuttal expert to respond to the opinions of Dr. Appelbaum.  To the extent Dr. Appelbaum is precluded from testifying on any of these subjects, Dr. Meyer should of course be precluded from offering his responsive opinion(s), as there would be no testimony for him to rebut.

thoroughly documented the relevant medical and factual history and his own clinical impressions in a 31-page report. *See id.*

Conti's psychiatric condition became relevant to this lawsuit in the first place because Conti affirmatively disclosed his treating psychiatrist, Dr. Hamilton, as a witness with knowledge of his damages. *See* Celli Decl. Ex. G. Doe then requested Dr. Hamilton's records, which showed that Dr. Hamilton had diagnosed Conti with ████████████████ as a result of Doe's messages, and had restated the ████ diagnosis repeatedly in Conti's chart over many months—not contemporaneously with the messages, but well after this lawsuit was filed and just after Doe filed a motion to dismiss arguing that Conti failed to plausibly allege severe emotional distress. *See* Celli Decl. Ex. H; Dkt. #20 (motion to dismiss filed January 26, 2018). Dr. Hamilton changed Conti's diagnosis from ████ to ████ while testifying at his deposition in this case. The Court then granted the parties' cross-motions for IMEs.

### A. All of Dr. Cohen's Opinions Are Relevant to Disputed Issues of Fact

Conti does not and cannot dispute Dr. Cohen's qualifications. Nor does Conti question the reliability of Dr. Cohen's method: a thorough forensic examination involving a detailed review of treatment records, a lengthy in-person interview, and a detailed clinical assessment. Instead, Conti principally criticizes Dr. Cohen for allegedly straying beyond the purview of an expert retained to conduct an IME under Federal Rule of Civil Procedure 35. *See* Conti Br. 18-21. This argument fails on a few grounds, the most important of which is that Conti seeks to impose far too cramped a view of "relevance" on the review conducted by a defense expert on the question of mental and emotional distress damages.

As an initial matter, Conti simply assumes that a court's rationale for granting a motion for an IME under Federal Rule of Civil Procedure 35 necessarily and automatically sets limits on the admissibility of the IME expert's testimony under the Federal Rules of Evidence. It does not,

as the absence of case law supporting Conti's position shows.  Reliable opinions formed during an IME are admissible if they relevant to issues in dispute at trial, helpful to the trier of fact, properly disclosed to the adverse party, and subject to discovery and cross-examination.  The standards of Rule 35—which covers the right to obtain discovery—are beside the point; what comes in at trial is subject to *Daubert* and the Federal Rules of Evidence, nothing more.

Moreover, Conti mischaracterizes the Court's mandate for an IME as being somehow limited to the question whether the defamatory portions of Doe's messages caused Conti's injury.  *See* Conti Br. 19 (citing 6/27/19 Tr. (Dkt. #122) at 13:5-14).  It was not.  Notably, in taking this position, Conti quotes only from the colloquy on the IME motions that preceded the Court's ruling, not from the ruling itself.  As the Court explained in *actually granting* an IME, however, the core of the inquiry under Rule 35 is "whether an IME is necessary to allow [Doe] a fair chance to rebut [Conti's] claims of emotional distress."  6/27/19 Tr. 17:2-3.  The Court explained that Conti alleges "severe and complex" emotional distress, a "specific psychological diagnosis," and "symptoms that are well beyond the ken of a lay jury."  *Id.* at 17:24-18:3.  The Court also observed that Conti relies on his own expertise to explain his symptoms, and that Conti would likely "continue to [do so] in he testified in front of a jury."  *Id.* at 18:7-9.  Dr. Cohen's mandate was to examine all issues relevant to Conti's "symptoms and diagnosis" to give Doe a "fair chance" to contest Conti's claim of *emotional damages*.  *Id.* at 18:10-12.

Most important, Conti fails to appreciate that all of Dr. Cohen's opinions are directly relevant to Conti's diagnosis, symptoms, and/or damages.  In attempting to limit Dr. Cohen's testimony exclusively to whether Conti has ██ or ██, Conti ignores the relevant diagnostic criteria and his own repeated claims that his distress is rooted in his clinical assessment of Doe.

<u>Trauma</u>.  First, Dr. Cohen's opinion that "a reasonable psychiatrist, who had terminated

with a patient whom he assessed to have borderline personality, could not plausibly interpret [Doe's] messages as a direct threat on his person" is directly relevant even to the narrow question of whether Conti has ███████████. Cohen Report 22. Conti's failure to mention the diagnostic criteria for those disorders in his motion is highly revealing. The first and perhaps most essential diagnostic criterion for both ██████████████████████████████████ ██████████████████████ Celli Decl. Exs. I, J. Without having suffered ███████ ██████████████—a person simply cannot be deemed to suffer from those disorders. *See id.* Whether Doe's messages *constitute* █████████████████████████████ ██████████ is therefore crucial to Conti's diagnosis. Dr. Cohen's opinion that a reasonable psychiatrist in Conti's position could not have interpreted the messages as such goes directly to whether Conti meets the diagnostic criteria under which he claims emotional injury.

Clinical Assessment of Doe. Dr. Cohen's opinions that a reasonable psychiatrist in Conti's position could not have believed Doe to be a "psychopath" or a "sociopath" are also directly relevant to Conti's alleged emotional damages. As the Court observed in authorizing an IME, Conti has repeatedly used his psychiatric knowledge to explain his own emotional reaction to Doe's messages. In his interview with Dr. Cohen, Conti stated that he "legitimately perceived a real and potential risk to me physically and [my] career, occupationally" because he believed Doe to be a "sociopath." Cohen Report 11. Conti also told Dr. Cohen that he believed Doe to be a "psychopath" and Doe's behavior to be "psychopathic." *E.g.*, *id.* at 27. Because Conti claims that the emotional distress Doe caused him is rooted, in part, in his belief that Doe is a "sociopath" or "psychopath," it is relevant for Dr. Cohen to opine that (a) "sociopath" is not a recognized diagnosis; (b) Doe was never diagnosed with antisocial personality disorder (ASPD) or psychopathy, the most extreme form of ASPD; and (c) the evidence available to Conti,

particularly the messages themselves, offers no support for the notion that Doe is a psychopath. *See* Cohen Report 25-28.  This is precisely the role the Court envisioned for Dr. Cohen: scrutinizing Conti's use of (pseudo) psychiatric terms in explaining his own injuries to give Doe a "fair chance" to contest Conti's emotional damages.  6/27/19 Tr. 18:10-12.

  Dr. Cohen's opinion that has Conti has ████████████████ also bears directly on Conti's alleged emotional damages because it provides an alternative explanation for them. Based upon the treatment records and his interview, Dr. Cohen opines that Conti has a ████████████████████████ Cohen Report 31.  Conti himself acknowledges ████████████████████████ ██████████████████████████████ ████████████ Cohen Report 31.  Conti's ████████████ provides another explanation for the mental anguish he claims to be feeling as a result of Doe's messages:  Rather than having been traumatized by threats, he is just peeved at being insulted before a prominent audience.  *See id.*  Dr. Cohen's testimony on this point is therefore plainly relevant.  *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 410 (2d Cir. 1990) (evidence that provides an alternative explanation of a disputed fact is relevant).  Conti does not challenge the reliability of this testimony; nor could he, as evaluating whether a person has certain personality traits is what forensic psychiatrists do, and Dr. Cohen's observations are well grounded in the record.  The same logic applies to Dr. Cohen's opinion that Conti's countertransference "was not and is not . . . well managed" and "plays a significant role in his attitudes towards and assessment of John Doe."  Cohen Report 31.  The possibility that Conti may just be *mad* at Doe, not that he has a clinically sound basis to *fear* Doe, is an alternative explanation for Conti's claimed distress.

  Finally, in addition to being relevant to Conti's justification defense for the same reasons

28

that Dr. Appelbaum's opinions are relevant, *see supra* § I.A, Dr. Cohen's opinions that a reasonable psychiatrist would have responded to Doe's messages by seeking consultation and exploring alternatives to suit are relevant to whether Conti's claimed damages are genuine.  Dr. Cohen is qualified to opine about how a reasonable psychiatrist would typically respond to allegedly distressing patient threats.  The finder of fact could reasonably infer from Conti's failure to so respond that he did not in fact suffer the distress he claims to be suffering.

**B.      Doe Can Have Multiple Psychiatrists Offer Similar Opinions, As Conti Will**

Conti's attempt to preclude Dr. Cohen's testimony because it is "redundant" to Dr. Appelbaum's has no legal support beyond a passing reference to Federal Rule of Evidence 403. Conti Br. 21.  No principle of law forbids two experts from providing mutually reinforcing testimony on similar topics, and any ruling concerning alleged cumulativeness or waste of time is best reserved until the parties have filed a joint pretrial order.  Most important, precluding Dr. Cohen's opinion on the grounds of "redundancy" would be inequitable and unwarranted on the facts of this case.  Conti is expected to call *three* psychiatrists to testify, in sum and substance, that he responded reasonably to Doe's messages: himself, Dr. Hamilton, and Dr. Meyer.  Conti offers no reason why Doe should be limited to one psychiatrist taking the contrary position.

As explained above with respect to Dr. Appelbaum, *see supra* § I.B, Dr. Cohen's opinions concerning Conti's faulty risk assessment and failure to consult with an experienced forensic colleague and manage countertransference are not "legal conclusions."  *Cf.* Conti Br. 21.

**C.      Dr. Cohen May Properly Testify About What Conti Told Him and Other Facts Relevant to His Opinion**

Conti's criticism of Dr. Cohen for including "factual narratives" in his report, titled "Personal History," "Treatment of John Doe," and "Past Psychiatric History," is perplexing at best.  It is standard practice for psychiatrists to include relevant social history about the person

they are evaluating or treating in notes or reports.  These portions of Dr. Cohen's report provide

relevant context and factual support for his opinions, which appear under "Assessment."  Cohen

Report 20-31.  More important, in criticizing Dr. Cohen for offering a factual account without

"firsthand knowledge," Conti ignores that Dr. Cohen *does* have firsthand knowledge of what

Conti said because he spent almost six hours interviewing Conti.  *Id.* at 2.  It is plainly proper for

Dr. Cohen to testify to what Conti said during his interview.  *See* Fed. R. Evid. 703 ("An expert

may base an opinion on facts or data in the case that the expert . . . personally observed.").

Conti's amorphous request that the Court preclude Dr. Cohen from "editorializing" is

better resolved by objections to specific questions and answers at trial than by a pretrial order

forbidding "spin."  But even Conti's cherry-picked list of five sentence fragments that he does

not like includes scant "editorialization[]."  Conti Br. 22.  For example, that Conti perceived "no

*direct* physical threat from John Doe," *id.* (emphasis added), is undisputed, as Conti testified that

the alleged threat was an *indirect* one, in which Doe would purportedly use his wealth and power

to hire someone else to commit violence.  Conti Tr. 287:6-11.  Dr. Cohen's statement that Doe's

emails "express[] the hurt he believed Dr. Conti caused him and explicitly threaten[] a lawsuit" is

also undeniably factual.  *See, e.g.*, FAC (Dkt. #31) Ex. E ("You don't think I sit here and wonder

what ever your piece of shit ass cat[e]gorizes me as, you don't think it still hurts."); *id.* Ex. J

("Get your legal team because I'm getting mine.").  Finally, Dr. Cohen's analysis of the

shortcomings of Dr. Hamilton's diagnosis is proper.  Even taking the narrowest possible view of

his mandate, Dr. Cohen's job as an IME expert is to assess whether the ███████████

diagnoses that Dr. Hamilton gave Conti are correct.  For Dr. Cohen to critique Dr. Hamilton's

conclusion by observing that Dr. Hamilton's diagnosis was neither contemporaneous with the

messages nor based on actually having seen the messages is entirely appropriate.

**CONCLUSION**

The Court should deny in full Conti's unfocused, sweeping motion to preclude the

testimony of Drs. Appelbaum and Cohen.

Dated: April 17, 2020
      New York, New York

                                    EMERY CELLI BRINCKERHOFF
                                    & ABADY LLP


                                    _____/s/_____
                                    Andrew G. Celli, Jr.
                                    Katherine Rosenfeld

                                    600 Fifth Avenue, 10th Floor
                                    New York, New York 10020

                                    (212) 763-5000

                                    *Attorneys for John Doe*