UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DR. PAUL M. CONTI,

                       Plaintiff,

     -against-

JOHN DOE,

                    Defendant.

Case No. 17 Civ. 9268 (VEC)

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

<u>TABLE OF CONTENTS</u>

PAGE NO.

TABLE OF AUTHORITIES ..................................................................................iii-vi

PRELIMINARY STATEMENT ...............................................................................1

UNDISPUTED FACTS .............................................................................................3

PROCEDURAL HISTORY........................................................................................9

LEGAL STANDARD................................................................................................9

ARGUMENT .............................................................................................................10

I.       GIVEN THEIR CONTENT AND CONTEXT, THE STATEMENTS ARE
NOT ACTIONABLE................................................................................10

      A.     To the Extent the Statements Assert Facts, They Are Substantially
True ...........................................................................................10

      B.     The A(3) and A(4) Statements Are *Not* Defamatory As A Matter of
Law ...........................................................................................14

      C.     Most of the Statements Are Non-Actionable Opinion and/or
Hyperbole..................................................................................14

      1.     Defamation Claims Cannot Be Predicated on Opinions or Hyperbole......15

      2.     Any Reasonable Reader Would Understand the Statements as
Opinions and/or Hyperbole........................................................16

           a.     The Context of the Statements Establishes that the A(1)-(4)
and A(6) Statements Are Opinions and/or Hyperbole..................17

           b.     The Category B Statements Express Doe's Non-Actionable
Speculations About Conti's Reasons for Ending Treatment .........19

           c.     The Facts Underlying the Category C Statements Were Known
to the Readers..............................................................................21

           d.     Many of the Non-Factual Statements Contain Vague Words
and Phrases that Are the Hallmark of Opinion and Hyperbole .....22

           e.     The Non-Factual Statements Are Presented in a Rambling,
Incoherent Form.........................................................................23

           f.     Doe's Vulgar Language Makes Clear that the Non-Factual
Statements Are Not Actionable ....................................................25

i

II.     THE SINGLE INSTANCE RULE BARS CONTI'S DEFAMATION
        CLAIM........................................................................................................26

III.    THE STATEMENTS ARE PROTETED BY THE SELF-INTEREST AND
        COMMON INTEREST PRIVILEGES ............................................................27

        A.     The Qualified Self-Interest and Common Interest Privileges Apply.........29

        B.     No Reasonable Juror Could Conclude Doe Acted with Reckless
               Disregard for the Truth or Solely Out of Spite ..........................................31

CONCLUSION.........................................................................................................33

TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................. 10

*Antoine v. New York City Health & Hosps. Corp.*,
    6 Misc. 3d 1013(A), 2005 WL 159612 (Sup. Ct. N.Y. Co. Jan. 24, 2005) ..................... 31

*Armstrong v. Simon & Schuster, Inc.*,
    85 N.Y.2d 373 (1995) ............................................................................... 27

*Aronson v. Wiersma*,
    65 N.Y.2d 592 (1985) ............................................................................... 23

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,
    151 F. Supp. 3d 287 (E.D.N.Y. 2015) ....................................................... 22, 25

*Celle v. Filipino Reporter Enterprises Inc.*,
    209 F.3d 163 (2d Cir. 2000) .................................................................... 16, 27

*Chandok v. Klessig*,
    632 F.3d 803 (2d Cir. 2011) ................................................................ 29, 31, 32

*Cummings v. City of New York*,
    No. 19 Civ. 7723, 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020) ............................ 20, 23

*Dillon v. City of New York*,
    261 A.D.2d 34 (1st Dep't 1999) .................................................................. 15

*Fleckenstein v. Friedman*,
    266 N.Y. 19 (1934) ................................................................................. 11

*Fleming v. Laakso*,
    No. 18 Civ. 1527, 2019 WL 959521 (S.D.N.Y. Feb. 5, 2019) ............................... 30

*Fordham v. Islip Union Free School Dist.*,
    662 F. Supp. 2d 261 (E.D.N.Y. 2009) ........................................................... 21

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
    669 F. Supp. 2d 405 (S.D.N.Y. 2009) ........................................................... 32

*Gadson v. City of New York*,
    156 A.D.3d 685 (2d Dep't 2017) ................................................................. 25

*Ganske v. Mensch*,
    No. 19 Civ. 6943, 2020 WL 4890423 (S.D.N.Y. Aug 20, 2020) .............................. 15, 16

*Garson v. Hendlin*,
    141 A.D.2d 55 (2d Dep't 1988) ...................................................................... 29

*Goetz v. Kunstler*,
    164 Misc. 2d 557 (Sup. Ct. N.Y. Cnty. 1995) ................................................. 20

*Goldstein v. Cogswell*,
    No. 85 Civ. 9256, 1992 WL 131723 (S.D.N.Y. June 1, 1992)........................... 28

*Gonzalez v. Gray*,
    69 F. Supp. 2d 561 (S.D.N.Y. 1999).............................................................. 17

*Gross v. N.Y. Times Co.*,
    82 N.Y.2d 146 (1993) .................................................................................. 15

*Guccione v. Hustler Magazine, Inc.*,
    800 F.2d 298 (2d Cir. 1986)......................................................................... 11

*Hayashi v. Ozawa*,
    No. 17 Civ. 2558, 2019 WL 1409389 (S.D.N.Y. Mar. 28, 2019) ..................... 23

*Immuno AG v. Moor-Jankowski*,
    77 N.Y.2d 235 (1991) ............................................................................ 15, 25

*Jewell v. NYP Holdings, Inc.*,
    23 F. Supp. 2d 348 (S.D.N.Y. 1998)............................................................. 11

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006)......................................................................... 15

*Kirkland v. Cablevision Sys.*,
    760 F.3d 223 (2d Cir. 2014).......................................................................... 9

*Konikoff v. Prudential Ins. Co. of Am.*,
    234 F.3d 92 (2d Cir. 2000)................................................................. 28, 29, 32

*Korkala v. W.W. Norton & Co.*,
    618 F. Supp. 152 (S.D.N.Y. 1985)................................................................ 12

*Larson v. Albany Med. Ctr.*,
    252 A.D.2d 936 (3d Dep't 1998) .................................................................. 26

*Levin v. McPhee*,
    119 F.3d 189 (2d Cir. 1997)......................................................................... 15

*Liberman v. Gelstein,*
 80 N.Y.2d 429 (1992) ................................................................ 27

*Mann v. Abel,*
 10 N.Y.3d 271 (2008) ................................................................ 15

*Marvel Characters, Inc., v. Simon,*
 310 F.3d 280 (2d Cir. 2002) ...................................................... 10

*Melius v. Glacken,*
 94 A.D.3d 959 (2d Dep't 2012) ................................................. 17

*O'Loughlin v. Patrolmen's Benev. Ass'n of City of N.Y., Inc.,*
 178 A.D.2d 117 (1st Dep't 1991) ............................................... 15

*Penn Warranty Corp. v. DiGiovanni,*
 810 N.Y.S.2d 807 (N.Y. Sup. Ct. 2005) .................................... 23

*Printers II, Inc. v. Professionals Pub., Inc.,*
 784 F.2d 141 (2d Cir. 1986) ...................................................... 11

*Qureshi v. St. Barnabas Hosp. Ctr.,*
 430 F. Supp. 2d 279 (S.D.N.Y. 2006) ....................................... 28

*Rappaport v. VV Publ'g Corp.,*
 618 N.Y.S.2d 746 (Sup. Ct. N.Y. Cnty. 1984) .......................... 19

*Rinaldi v. Holt, Reinhart & Winston, Inc.,*
 42 N.Y.2d 369 (1977) ................................................................ 20

*Sabharwal & Finkel, LLC v. Sorrell,*
 117 A.D.3d 437 (1st Dep't 2014) ............................................... 19

*Sandler v. Marconi Circuit Technology Corp.,*
 814 F. Supp. 263 (E.D.N.Y. 1993) ............................................ 23

*Scott v. Thayer,*
 160 A.D.3d 1175 (3d Dep't 2018) .............................................. 28

*Steinhilber v. Alphonse,*
 68 N.Y.2d 283 (1986) ................................................................ 16

*Stepanov v. Dow Jones & Co., Inc.,*
 120 A.D.3d 28 (1st Dep't 2014) ................................................. 11

*Stephens v. Trump Org. LLC,*
 205 F. Supp. 3d 305 (E.D.N.Y. 2016) ....................................... 10

*Stewart v. Florence Nightingale Health Ctr.*,
    No. 97 Civ. 6977, 1999 WL 179373 (S.D.N.Y. Mar. 31, 1999) ...................................... 29

*Stillman v. Ford*,
    22 N.Y.2d 48 (1968) ........................................................................................... 28

*Tanner & Gilbert v. Verno*,
    92 A.D.2d 802 (1st Dep't 1983) .......................................................................... 27

*Twiggar v. Ossining Print. & Publ'g Co.*,
    161 A.D. 718 (2d Dep't 1914) ...................................................................... 26, 27

*Versaci v. Richie*,
    30 A.D.3d 648 (3rd Dep't 2006) .......................................................................... 24

*Wahrendorf v. City of Oswego*,
    72 A.D.3d 1604 (4th Dep't 2010) ......................................................................... 25

*Wanamaker v. VHA, Inc.*,
    19 A.D.3d 1011 (4th Dep't 2005) ......................................................................... 25

*Weintraub v. Phillips, Nizer, Benjamin, Krim & Ballon*,
    172 A.D.2d 254 (1st Dep't 1991) ......................................................................... 10

*Zerman v. Sullivan & Cromwell*,
    677 F. Supp. 1316 (S.D.N.Y. 1988) .................................................................... 19

## Other Authorities

Restatement (Second) of Torts § 594 ........................................................................ 28, 30

## Rules

Fed. R. Civ. P. 56 ........................................................................................................... 9

**PRELIMINARY STATEMENT**

After three years of litigation, all that remains of Plaintiff's case is a single, aberrant cause of action for defamation.  The facts revealed in discovery lead to one, common-sense conclusion: a sick patient's messages to his former psychiatrist, sent as an emotionally chaotic response to their therapeutic break-up, do not amount to "defamation," simply because the patient copies his parents, lawyer, and incoming doctors on the messages.

The prototypical defamation case centers around statements that are made *about* an individual, *to* members of the public—people who have no personal knowledge or individual connection to the matter being discussed.  Against this backdrop, courts parse the limited number of words at issue, consider them in their context, and decide whether a "reasonable reader" would view them as defamatory.  This case is fundamentally different.  This case involves statements directed to the Plaintiff but *copied* to a small group of Defendant's intimates who were well aware of the context and Defendant's mental health issues.  Psychiatrist Dr. Paul Conti has sued his former patient, John Doe, based on text messages and emails that Doe sent to Conti after Conti abruptly terminated Doe's treatment.  Doe copied his parents, his doctors, his lawyer, and his personal concierge on his communications.  The messages are the ramblings of an unwell man in the midst of a mental-health crisis.  They are long, vitriolic, and largely incoherent.

At the outset of this case, Conti asserted, in shotgun style, that Doe's profane and nonsensical messages should be treated as a single, sweeping defamation claim, never bothering to specify precisely which words *within* these messages he viewed as defamatory.  Instead, he left that task to this Court, which narrowed the claim, at the pleading stage, by identifying three broad categories of statements in suit: (a) "statements that Plaintiff abandoned Defendant," (b) statements "that Plaintiff lied about the reasons for terminating his treatment of Defendant," and (c) statements "that Plaintiff was caught committing misconduct."  Dkt. 57 at 7–12.

With discovery complete, a close review of the *precise* words that ground this lawsuit, and the *specific* context in which they appear, is required.  That analysis reveals that, for a variety of reasons, the statements at the heart of this case are *not* false statements of fact likely to hold Plaintiff up to obloquy and ridicule—*i.e.*, that they are *not* defamatory.

*First*, Doe's statements do not give rise to a defamation claim because they are substantially true, they are not defamatory as a matter of law, and/or they are non-actionable statements of opinion and/or hyperbole.  While the Court addressed some of these arguments at the pleading stage, a factual record has now been established—and the full context and the universal reactions of the statements' recipients compel the conclusion that Doe is entitled to summary judgment as to each of the statements in suit.  *See* Section I, *infra*.

*Second*, New York's "single instance rule" bars Conti's defamation claims *in toto*. It is settled law that allegations of professional incompetence during a single professional engagement are not actionable in defamation.  Here, the statements at issue all concern just one instance of allegedly unprofessional or substandard conduct—namely, Conti's treatment of his patient, John Doe.  They are thus protected by the single instance rule.  *See* Section II, *infra*.

*Third*, Doe's statements are protected by the qualified self-interest and common interest privileges.  These privileges apply because Doe published the statements to only a small group of Doe's intimates, all of whom shared a common concern about Doe's mental well-being and provided support and comfort to Doe in different ways.  Conti cannot overcome either qualified privilege because Doe had no reason to believe his statements were false (they were not) and because Doe was motivated, a least in part, by a legitimate interest in informing those close to him of his damaged emotional state in the wake of Conti's decision to end treatment. *See* Section III, *infra*.

Doe is therefore entitled to summary judgment on Conti's defamation claim.

## UNDISPUTED FACTS

### *John Doe*

John Doe is a 35-year old man with a history of psychiatric conditions that first emerged in childhood. 56.1 Statement ¶¶ 4, 6.[1]  Doe has long suffered from an extreme form of Obsessive-Compulsive Disorder. *Id*. ¶ 7.  Doe's OCD was so severe that he did not complete college. *Id*. ¶ 9.  Doe also suffers from depression and anxiety. *Id*. ¶ 10.  Doe has also been addicted to and abused Xanax, an anxiety and sleep medication. *Id*. ¶ 11.

### *Doe's Treatment with Conti and Conti's Frequent Absences*

Doe was introduced to Dr. Paul Conti in or around late May 2016. *Id.* ¶¶ 5, 12. Conti is a psychiatrist whose practice, Pacific Premier Group ("PPG"), is based in Portland, Oregon. *Id*. ¶ 1–2.  Conti practices at PPG with several other mental health practitioners, including counselor Mark Schorr and family therapist Sonali Patel, who also treat Conti's patients. *Id*. ¶ 3.  Following their initial meeting in New York, Doe agreed to move to Portland so he could be treated in person by Conti at PPG. *Id*. ¶ 13–14.

Doe formally began treatment with Conti and PPG in Portland in June 2016. *Id.* ¶ 14.  At his initial intake with PPG, Doe reported thirty-two symptoms consistent with anxiety, depression, trauma, possible personality disorder, benzodiazepine (Xanax) addiction for nine years, and pathological gambling. *Id*. ¶ 16–17.  Over the course of his treatment at PPG, Doe typically met in person in Portland with Mr. Schorr or Ms. Patel, *id*. ¶ 22, and less frequently

---

[1]      Citations to "56.1 Statement" refer to Defendant's Statement of Undisputed Material Facts, submitted with the instant motion.  Citations to "Ex. __" refer to the exhibits attached to the Declaration of Andrew G. Celli, Jr., dated December 18, 2020 ("Celli Decl.").

with Conti, with whom by December 2016 Doe was only scheduled to see on an "as-needed" basis, *id*. ¶ 21.

By January 2017, Doe had become frustrated that Conti was frequently unavailable to meet in person. *See id*. ¶¶ 28–35.  In a January 24, 2017 progress note in Doe's medical chart, Schorr recorded: "[Doe] expresses his desire to have a regularly [s]cheduled appointment with Dr. Conti." *Id*. ¶ 28.  On January 25, 2017, Schorr recorded Doe's feelings again: "It's fucking bullshit that there's a double standard.  I moved to Portland and have to have a phone contact with my doctor." *Id*. ¶ 29; *see also id*. ¶ 33 (Patel's March 23, 2017 text message to Schorr: Doe was "super pissed at [Conti] for 'not being around much anymore'").

Conti's frequent absences caused Doe stress and anxiety.  Doe told Schorr, for example, that his repeated requests to meet in person with Conti left him feeling like a "needy patient." *Id*. ¶ 30.  Schorr even noted in February 2017 that Doe had been showing "evidence of strong/attachment abandonment concerns from the earliest sessions." *Id*. ¶ 31.  Doe expressed his fear to Schorr about starting treatment with Conti "when he knew it would end." *Id.*

While Conti would later blame Doe for the death of face-to-face sessions, and while Doe did travel away from Portland from time to time, what is undisputed is that, during the period that Doe was in treatment with Conti, Conti spent approximately half of each month in Portland and the other half traveling. *Id*. ¶ 23.  Conti's absences from Portland increased over time. *Id*. ¶ 24.  On at least one occasion, Conti conducted a treatment session with Doe while Conti was in a car in transit somewhere. *Id*. ¶ 27.  Schorr himself has had difficulty reaching Conti when Conti is not in Portland, and Schorr is aware of other PPG patients having difficulties reaching Conti as well. *Id*. ¶¶ 25–26.  None of this is disputed.

***Conti's Absence Compounds Doe's Struggles with Titration***

In Doe's view, Conti's absences made it particularly difficult for Doe to reduce his dependence on Xanax. *Id*. ¶ 36. Doe was still taking Xanax in March 2017, but, under Conti's medical supervision, he was reducing his dosage and trying to reduce it further. *Id*. ¶ 37–38. This process—called titration—is difficult for most patients, and it was particularly difficult for Doe. Conti was prescribing Doe Librium in addition to Xanax as a way to wean Doe off of the Xanax. *Id*. ¶ 38.

On March 28, 2017, Doe's father, James Doe, was with Doe in Los Angeles when Doe needed a refill of the Xanax and Librium he was using for titration. *Id*. ¶¶ 39–40. James Doe and Dovi Meyer, John Doe's personal concierge, tried to reach Conti to obtain a refill, which Conti had forgotten to call into the pharmacy. *Id*. ¶¶ 41–42. Conti was unreachable. *Id*. ¶¶ 41, 51. Doe's father ultimately contacted Schorr and Patel, and Schorr was eventually able to reach Conti. *Id*. ¶ 47–48. Finally, a refill prescription was called in to CVS by Conti's office. *Id*. ¶ 49. All told, Doe's father spent approximately four hours waiting in CVS, not knowing whether his son would be able to obtain his medication. *Id*. ¶ 45, 49. James Doe described it as a "nerve-racking experience." *Id*. ¶ 50. Conti later acknowledged in an email that he had been unreachable, and he apologized to the Doe parents. *Id*. ¶ 51–52.

***Conti Terminates His Treatment Relationship with Doe***

Conti and Doe had a final treatment session on April 6, 2017. *Id*. ¶ 53. During the session, they discussed the CVS incident. *Id*. ¶ 54. That night, Doe sent a long, profanity-filled message to Conti, stating in part: "when I found out that your ass was half the time not in Portland I realized it wouldn't work. I asked [Schorr] for a new [doctor] [j]ust because it won't

work." *Id*. ¶ 55–56.  Doe's April 6 message to Conti was precipitated by their conversation earlier that day regarding the CVS incident.  *Id*. ¶ 56.

Late in the evening on April 6, 2017, Conti fired Doe as his patient in an email addressed to Doe and Doe's parents.  *Id*. ¶ 58.  In the email, Conti explained that he had terminated Doe's treatment because he did not have a working therapeutic relationship with Doe. *Id*. ¶ 61.  Conti cited and attached Doe's April 6, 2017 message to his email as evidence, *id*. ¶ 59, and copied Schorr and Patel on the email, *id*. ¶ 60.  "The reason for discontinuing care," Conti wrote,  "is that I do not believe [Doe] is engaging with me in any reasonable manner, as evidenced by many interactions I and other caregivers have had with him, and by the text that I have copied in below."  Ex. D at 1.  Conti explained his belief that "the treatment of the moment, which consists of medication transition, cannot be conducted safely" because he and Doe "have no treatment alliance."  *Id.*

***Conti's Termination Decision Takes an Enormous Toll on Doe***

Conti's decision to terminate his treatment relationship with Doe triggered a mental and emotional crisis for Doe.  Doe was in the midst of the titration process when Conti terminated him, leaving Doe without a doctor to prescribe the Librium he was using to reduce his reliance on Xanax, a drug that Doe still needed.  56.1 Statement ¶ 63.  This left Doe physically and emotionally vulnerable.[2]  Conti's abrupt termination of Doe's treatment—by email, and without warning, to Doe's parents—validated Doe's feelings of anxiety about being a "needy patient," his fears that Conti would abandon him, and his fears that he was beyond help.  *Id.* ¶¶ 30–31

---

[2]        Abruptly withdrawing from Xanax after so many years of reliance put Doe at severe risk.

When Conti ended Doe's treatment, there was no plan in place to transition Doe's care to another psychiatrist, *id.*, and Doe and his family were left scrambling to find a new psychiatrist, *id.* ¶ 63.  Doe ultimately turned to two mental health professionals with whom he had previously had a treatment relationship: Dr. Michael Jenike and Dr. Robin Lippert.  *Id.* ¶¶ 68–70, 80, 88.  Dr. Jenike had been Doe's psychiatrist approximately 20 years earlier.  *Id.* ¶ 82.  Dr. Lippert had also been Doe's psychologist for several years between 2007 and 2012.  *Id.* ¶ 90.  Doe turned back to these trusted mental health professionals to help him cope with his feelings about Conti's termination of Doe as a patient.  *Id.* ¶¶ 84, 92.  Doe also reached out to his lawyer and longtime family friend and advisor, Alan Dershowitz, who knew about Doe's mental health issues.  *Id.* ¶ 68–70, 77–78.

### Doe's Messages to Conti

Between April and November 2017, Doe sent Conti multiple emails and a thread of text messages, which together amount to approximately 475 lines of text.  *See* Ex. A, B, E–O. These messages, which are the subject of Conti's defamation claim, are addressed and directed to Conti.  *Id.*  Several of them also copy a small group of Doe's intimates, including (1) his lawyer, Alan Dershowitz, (2) his psychiatrist, Dr. Michael Jenike, (3) his therapist, Dr. Robin Lippert, (4) Doe's parents James and Jane Doe, and (5) Doe's personal concierge Dovi Meyer.  *Id*. ¶ 68. While Conti's PPG colleagues were copied on several emails as well, Conti is the one who added them to the email chain.  *Id.* ¶ 71; *see also* Ex. Z at 1 (copying Mark Schorr, Sonali Patel, Carmen Hempner, and Amber Carr Blum on Conti's reply to Doe's April 7, 2017 email, which did not include them as recipients).

The individuals who Doe copied on his emails to Conti knew Doe well, *id.* ¶ 73, knew about Doe's history of mental illness, *id.* ¶ 75, knew that he had sought treatment from

Conti, *id.* ¶ 74, and knew that Doe sometimes behaved in irrational, inappropriate, and emotional ways that reflected his mental illness, *id.* ¶ 76.  Doe copied them on the emails because, as he stated, he "wanted the people who were close to [him]—the people who were helping [him] work to improve [his] mental health—to see [his] messages because they were the clearest way [he] had at the time of expressing [his] mental state.  [He] wanted these people on whom [he] relied—[his] parents, [his] treating mental health professionals, [his] lawyer—to understand the pain [he] was going through so they could help [him]."  Ex. U ¶ 8.

The individuals who received Doe's repetitive, disjointed, and profane messages saw them for what they were: a reflection of Doe's pain and mental health problems.  Dr. Jenike, for example, testified that Doe's messages "reflected [his] mental illness."  Ex. NN at 290:8–11. Dr. Jenike explained that Doe's "Borderline Personality Disorder and impulsiveness and the anger that he had" caused him to "act[] out" through the messages.  *Id.* at 290:12–291:13.  Dr. Lippert similarly testified that Doe's "actions have been consistent all along with his illnesses." Ex. OO at 261:10–19.  Mr. Dershowitz stated that he "understood the anger in [Doe's] emails to be the product of his illness, and simply that."  Ex. V ¶ 7.  Mr. Meyer testified that the messages reflected the fact that Doe was "frustrated," "isn't well," and was "battling with mental illness" and "suffering from depression."  Ex. SS at 219:3–21.   Jane Doe read the messages "as expressions of [Doe's] frustration and disappointment with Dr. Conti and where [Doe] was emotionally during this time."  Ex. II ¶ 7.

Conti himself acknowledged that Doe's messages reflected Doe's mental illness. In one email, Conti wrote, "I believe with all of my heart, training, and experience, [Doe's behavior] arises from the distress inside of him that we have talked about on so many occasions."

Ex. C at 1.  Nonetheless, Conti commenced this suit against Doe, asserting, *inter alia*, a defamation claim based on Doe's messages.

## PROCEDURAL HISTORY

On March 23, 2018, Doe moved to dismiss all of the claims asserted in Conti's then-extant First Amended Complaint.  *See* Dkt. 41.  In an Opinion dated February 27, 2019, the Court granted Doe's motion in part and denied Doe's motion in part.  The Court dismissed Conti's claims sounding in harassment based on Ohio statutes and Conti's intentional infliction of emotional distress claim.  The Court also dismissed aspects of the defamation claim that it held rested on statements that were not actionable.  The Court declined to dismiss the defamation claim insofar as it was based on three interrelated categories of statements: (a) "statements that Plaintiff abandoned Defendant," (b) statements "that Plaintiff lied about the reasons for terminating his treatment of Defendant," and (c) statements "that Plaintiff was caught committing misconduct."  Dkt. 57 at 7–12.

The Appendix to this brief lists the statements identified in Conti's First Amended Complaint that fall into these three categories and states why, as set forth in detail in the Argument section below, each is nonactionable.  Collectively, the statements set forth in the Appendix are referred to herein as the "Statements," and the categories and numbers set forth in the chart are referenced in the Argument section below.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014).  The proper inquiry is whether there are any material factual issues that properly can be resolved only at a trial because they may reasonably be resolved in favor of either party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250 (1986).  In determining whether a genuine issue of material fact exists, the court must

examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-

movant.  *See Marvel Characters, Inc., v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## ARGUMENT

**I.     GIVEN THEIR CONTENT AND CONTEXT, THE STATEMENTS ARE NOT ACTIONABLE**

            The Statements are not actionable, as the undisputed facts make clear.  Doe sent

heated messages to his psychiatrist, Conti, and he copied his family and close personal advisors

on them.  (Conti himself included the other recipients of the messages in the conversations, and

therefore any publication to them is not actionable under longstanding New York precedent.[3])

Any reasonable reader who understood the context of the messages, as the recipients all did,

would recognize that the Statements were (a) substantially true, (b) not defamatory as a matter of

law, and/or (c) non-actionable opinions and/or hyperbole.

**A.     To the Extent the Statements Assert Facts, They Are Substantially True**

            An assertion of fact (as distinct from a statement of opinion and mere rhetorical

hyperbole) that is substantially true is not actionable.  The undisputed facts establish that

Statements in Categories A-C are substantially true.  Conti *was* absent from Portland during

Doe's treatment at least 50% of the time, and he *did* terminate care with Doe as a patient—*i.e.*,

"abandon" him—during the titration process.  *See* Category A Statements.  Conti also *did* lie to

Doe's family about his reasons for terminating treatment, and he *was* "caught" in that lie.  *See*

Category B & C Statements.

---

[3]        *See Weintraub v. Phillips, Nizer, Benjamin, Krim & Ballon*, 172 A.D.2d 254, 255 (1st Dep't 1991) (New York law does not allow "a claim for defamation where the plaintiff himself voluntarily republishes the alleged defamatory words"); *Stephens v. Trump Org. LLC*, 205 F. Supp. 3d 305, 311 (E.D.N.Y. 2016) ("Stated simply, words voluntarily disseminated to the world by the party alleged to be aggrieved cannot by definition be found defamatory under New York law.").

"It is fundamental that truth is an absolute, unqualified defense to a civil defamation action, and 'substantial truth' suffices to defeat a charge of libel." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) (internal quotation marks and citations omitted). If an allegedly defamatory statement is "substantially true," a claim of libel is "legally insufficient and . . . should [be] dismissed." *Id.*; *see also Stepanov v. Dow Jones & Co., Inc.*, 120 A.D.3d 28, 34 (1st Dep't 2014).

"A statement is substantially true if the statement would not 'have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (quoting *Fleckenstein v. Friedman*, 266 N.Y. 19, 23 (1934)). "[I]t is not necessary to demonstrate complete accuracy to defeat a charge of libel. It is only necessary that the gist or substance of the challenged statements be true." *Printers II, Inc. v. Professionals Pub., Inc.*, 784 F.2d 141, 146 (2d Cir. 1986).

With respect to the Category A Statements, Doe used over-the-top, hyperbolic language to suggest that Conti abandoned him during treatment and during the titration process.[4] Those statements, to the extent they are factual in nature, are substantially true. Doe moved to Portland in May 2016 so Conti could treat him. But Conti was unavailable for in-person sessions with Doe in Portland because he spent only approximately two weeks per month in Portland. The majority of Doe's face-to-face sessions were with Schorr or Patel, rather than Conti. Doe's schedule reflects very few meetings with Conti compared to Patel or Schorr. 56.1 Statement

---

[4]       *See, e.g.* Statement A(1)(b) ("I followed the titration process. I white knuckled nights. And let's talk what we were trying to do. GET OFF THE XANAX. GET OFF THE XANAX. And your fraudulent mother fucking ass was not there."); Statement A(1)(d) ("You looked me in the eye and told me you were the quarterback. . . . You were no where to be found."); Statement A(2)(c) ("You take away a persons sense of self and abandon them during titration that's criminal.").

¶ 22.  Conti's colleague, Mark Schorr, confirmed that Conti was frequently absent from Portland and acknowledged that patients had experienced difficulty reaching Conti when he is not in Portland.

Putting aside the overwrought and offensive language Doe used to communicate these ideas, these undisputed *facts* establish the substantial truth of Doe's Statements that Conti was often absent from Portland, where Doe had moved for treatment —*i.e.*, that Conti had "abandoned" him.[5]

Doe's Statements about Conti's unavailability at specific times were also true. The Statements refer to an incident on March 28, 2017, when Conti was not available to call in a prescription for Doe to a CVS pharmacy in Los Angeles.[6]  That incident in fact occurred.  Doe's father and Mr. Meyer attempted to contact Conti, but he was unreachable.  56.1 Statement ¶ 51  Conti apologized to the Doe family for being unreachable.  *Id.* ¶ 52.  Any "slight inaccuracies" in Doe's retelling of this event are "immaterial" because the underlying charge "is true in substance."  *Korkala v. W.W. Norton & Co.*, 618 F. Supp. 152, 155 (S.D.N.Y. 1985) (internal quotation marks and citation omitted).

Doe's claim that he relapsed on Xanax after Conti ended treatment is true as well.[7]  Doe's mother explained at her deposition: after Dr. Conti terminated his treatment of Doe, "[Doe] went right back up on the Xanax."  Ex. MM at 112:23–24.

---

[5]     *See Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/abandon (last visited Dec. 18, 2020) (defining the verb "abandon" as, "to withdraw protection, support, or help from").

[6]     *See, e.g.*, Statement A(3)(a) ("Where was your ass when Dovi was trying to get ahold of the medications from your dumbass.  And let's get one thing straight I NEVER WAITED 4-5 hours. WE COULDN'T GET A HOLD OF YOUR FUCKING ASS FOR THAT WHOLE TIME."); Statement A(3)(b) ("[W]hen my parents were in town when we couldn't even get a hold of you. . . . YOU WERE UNREACHABLE YOU PIECE OF SHIT.").

[7]     *See* Statement A(2)(e) ("You abandoned your patient when he got himself from 5mgs to 1.5mgs.  And your fucking right I freaked out, I didn't have a dr and I beyond relapsed.").

The remaining Category A Statements concern Doe's repeated, if generic, claim that Conti "abandoned" him.  Statements A(1)–(2).  In addition to being hyperbolic and opinion statements, *see* Section I(C), *infra*, these statements are substantially true because, as Conti concedes, he abruptly terminated his treatment relationship with Doe—"withdraw[ing]" his "support" and "help," *see supra* note 5, while Doe was still struggling with titration and before Doe had a new psychiatrist in place.  56.1 Statement ¶¶ 37, 63–64.

With respect to the Category B Statements, to the extent that Doe's speculation about Conti's "real reason" for terminating care is deemed factual in nature, they are also substantially true.  Doe said that Conti's stated "reason for ending treatment"—that Doe "wasn't following the titration process"—was untrue.  Statement B(1)(a).  And Doe was *right*.

Conti admits that he decided to terminate Doe because he "could no longer safely or ethically take care of" Doe.  Ex. JJ at 241:11.  Conti came to that realization after receiving Doe's April 7 email.  *Id.* at 214:13–25.  Conti's April 7, 2017 email terminating his treatment of Doe even states that Conti's "reason for discontinuing care" was that Doe was not "engaging with [Conti] in any reasonable manner."  Ex. D at 1.  In other words, it was the *deterioration of the treatment relationship*, as evidenced by Doe's vulgar communications to Conti, that led to the termination.  It was not that Doe had failed to adhere to the titration regimen.

With respect to the Category C Statements, they are substantially true (again, to the extent they assert facts at all) because Doe's parents *did* observe ("catch") Conti being unavailable to Doe.  The only *fact* that a reasonable reader could glean from the Category C Statements is that Doe's parents "caught" Conti failing to attend to their son.  And that fact is true: Doe's parents saw that Conti was unavailable when their son desperately needed him in the throes of titration, when a prescription refill was essential.

13

Thus, because any facts expressed in the Statements are substantially true, Conti's defamation claim should be dismissed.

**B.      The A(3) and A(4) Statements Are *Not* Defamatory As A Matter of Law**

Even if there was some dispute over the substantial truth of Statements A(3) and (4)—which concern Doe's inability to reach Conti on one occasion and Conti's frequent out-of-town travel, respectively—they still are non-actionable because they do not hold Conti up to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace."  *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000).  They are not defamatory as a matter of law.

Conti's practice has offices in Portland, Oregon and New York City.  56.1 Statement ¶ 2.  Conti treats patients in Portland, New York, and California, and also performs "consultation work" in the United Kingdom.  *Id*.  *Conti's own website* boasts that his practice is able to "service clients in multiple locations, easily."[8]  Conti, with his bi-coastal clinical practice and international consulting work, would be expected to travel regularly or be unreachable via telephone for some portion of the day.  Given the way Conti openly conducts his practice, nothing about Doe's assertions that Conti traveled and was occasionally unreachable is likely to cause a reader in the position of the recipients here to hold Conti in contempt.

**C.      Most of the Statements Are Non-Actionable Opinion and/or Hyperbole**

The Statements in Categories A(1)–(4), B, and C (collectively, the "Non-Factual Statements") are expressions of opinion and/or hyperbole, which do not give rise to a defamation claim.

---

[8]      Pacific Premier Group, *About Us*, http://www.pacificpremiergroup.com/about-us/ (last visited Dec. 18, 2020) ("We have offices in Portland, OR and New York City, NY.  Our offices allow us to service clients in multiple locations, easily.").

1.     **Defamation Claims Cannot Be Predicated on Opinions or Hyperbole**

"Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, it follows that *only statements alleging facts can properly be the subject of a defamation action*."  *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152-153 (1993) (emphasis added) (quotation marks omitted).  Because there is "no such thing as a false idea, courts are tasked with distinguishing between statements of fact, which may be defamatory, and expressions of opinion, which are not defamatory; instead, they receive absolute protection under the New York Constitution."  *Ganske v. Mensch*, No. 19 Civ. 6943, 2020 WL 4890423, at *4 (S.D.N.Y. Aug 20, 2020) (quotation marks and citations omitted); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) ("New York law absolutely protects statements of pure opinion, such that they can never be defamatory.").

That a defendant's particular statement of opinion is unsavory or crude is of no consequence: expressions of opinion are not defamatory, "no matter how vituperative or unreasonable [they] may be."  *O'Loughlin v. Patrolmen's Benev. Ass'n of City of N.Y., Inc.*, 178 A.D.2d 117, 117 (1st Dep't 1991); *see also Mann v. Abel*, 10 N.Y.3d 271, 276 (2008) (opinions, "no matter how offensive," are not actionable).  Similarly, "[l]oose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable."  *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999) (citing *Gross*, 82 N.Y.2d at 152–53).

Under New York law, "resolution of the fact/opinion issue is a matter for the court."  *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (citing *Gross*, 82 N.Y.2 at 154).  Courts must view statements "in their context . . . to determine whether a reasonable person would view them as expressing or implying *any* facts."  *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991).  "[C]ourts must consider 'what the average person hearing or reading the communication would take it to mean' and 'the context of the entire communication and of

15

the circumstances in which they were spoken or written.'"  *Ganske*, 2020 WL 4890423, at *4

(quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986)).  Courts look to four non-

exhaustive factors to distinguish statements of fact from mere opinion:

> (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous;
>
> (2) a determination of whether the statement is capable of being objectively characterized as true or false;
>
> (3) an examination of the full context of the communication in which the statement appears; and
>
> (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Celle*, 209 F.3d at 178–79 (citation omitted).  These factors, however, do not set forth a bright-

line rule.  Common sense and flexibility are required.  Indeed, the Second Circuit has

emphasized that courts should "eschew any attempt . . . to reduce the problem of distinguishing

fact from opinion to a rigid set of criteria which can be universally applied."  *Id.* at 179 (citation

and quotation marks omitted).

### 2.   Any Reasonable Reader Would Understand the Statements as Opinions and/or Hyperbole

Discovery has established that a reasonable reader would understand the Non-

Factual Statements as opinions and hyperbole.  The context here is critical: these were comments

addressed to and at *the plaintiff*; other recipients were only copied on the "cc" line.  Those

recipients could only understand the messages as communications from an unwell psychiatric

patient to his former psychiatrist, and as opinionated, if unfortunate, manifestations of Doe's

frustration with Plaintiff, and his illness.  No reasonable recipient could see them as statements of verifiable fact.

>    a.    **The Context of the Statements Establishes that the A(1)-(4) and A(6) Statements Are Opinions and/or Hyperbole**

*First*, the context of the Statements signals that the A(1)-(4) and A(6) Statements are not statements of fact.  The individuals Doe copied on the messages knew Doe personally and were aware that he had a long history of mental health problems.  56.1 Statement ¶ 73, 75. They knew that Doe, being ill, sometimes lashed out in irrational, inappropriate, and emotional ways.  *Id.* ¶ 76.  And they knew that Conti was Doe's psychiatrist and that Conti had recently terminated Doe as a patient.  *Id.* ¶ 74.

Any reasonable reader aware of the underlying circumstances at play here—as all the recipients were—would understand these Statements as the opinions and hyperbole of a distraught, mentally ill individual expressing strong emotions toward his former psychiatrist.  *See Gonzalez v. Gray*, 69 F. Supp. 2d 561, 567 (S.D.N.Y. 1999) ("A reasonable viewer would understand [defendant's] statements are not statements of fact, but represent the opinion of a distraught widower who recently lost his wife to a terrible illness.").  As such, the reasonable reader would view the statements with "an appropriate amount of skepticism, with the expectation that they are, in all probability, going to hear opinion, and with a reluctance to conclude—absent clear clues to the contrary from the words or context—that the statements made are to be heard as objective fact."  *Melius v. Glacken*, 94 A.D.3d 959, 960 (2d Dep't 2012) (internal quotation marks and citations omitted).

Indeed, the A(1)-(4) Statements—all of which broadly concern Conti's "abandonment" of Doe and his absence during Doe's treatment—were understood by the recipients—and would be understood by any reasonable reader who knew their context—as

17

statements of opinion and/or hyperbole that express Doe's *subjective feelings* regarding Conti's treatment.  The messages came on the heels of Conti's decision to terminate Doe as his patient, and any reasonable reader would understand them as the subjective views of a jilted, unwell patient who felt powerless except to hurl insults at his former doctor.

Testimony from the recipients bears this out.  For example, recipient Dr. Jenike, Doe's longtime psychiatrist, did not understand the Statements to be expressing facts.  56.1 Statement ¶ 86.  Dr. Jenike saw the Statements as a "reflect[ion] [of Doe's] mental illness."  Ex. NN at 290:8–11.  Dr. Jenike even believed it was likely that Doe sent the Statements because of his "Borderline Personality Disorder and impulsiveness and the anger that [he] had."  *Id.* at 290:21–291:19.  "Rather than deal with [these issues] in a therapeutic setting," Dr. Jenike explained, Doe would "blast these [emails] out."  *Id.*  When asked if Doe's messages caused him to change his opinion of Conti in any way, Dr. Jenike testified: "No.  *I figured it was [Doe's] mental illness*."  *Id.* at 295:14–17 (emphasis added).

Dr. Lippert testified that she did not take Doe's messages literally and that "[Doe's] actions have been consistent all along with his illnesses."  Ex. OO at 261:10–19.  Likewise, Doe's attorney, Mr. Dershowitz, stated that he "understood the anger in [Doe's] emails to be *the product of his illness, and simply that*."  Ex. V ¶ 7 (emphasis added).  Mr. Meyer testified that he viewed the messages as manifestations of Doe "battling with mental illness."  Ex. SS at 219:3–21.[9]

*Conti himself*, on more than one occasion, stated that he viewed Doe's unhinged communications as manifestations of Doe's mental illness.  In his April 7, 2017 email, Conti

---

[9]      Even Conti's PPG colleagues saw the messages for what they were.  For instance, Sonali Patel testified that when she read Doe's emails, she did not draw any conclusions about what Doe meant, and instead concluded "[o]nly that [Doe] was expressing frustration and anger with Conti."  Ex. RR at 174:11–17.

wrote: "I am also copying in the text I received today, which I believe is illustrative. [Doe], while it is hard not to find it offensive, *I see in it primarily your suffering*, and it moves me to even greater hope that you will at some point engage in real treatment." Ex. D at 2 (emphasis added). On June 14, 2017, Conti wrote, "I believe with all of my heart, training, and experience, [Doe's vitriol-filled email to Conti including the phrases "I knew you were a fraud" and "Your [sic] a scared little fucking coward. Fuck you you piece of shit"] *arises from the distress inside of him that we have talked about on so many occasions*." Ex. C at 1 (emphasis added).

> **b.    The Category B Statements Express Doe's Non-Actionable Speculations About Conti's Reasons for Ending Treatment**

*Second*, the Category B Statements in which Doe speculates about Conti's motivation for terminating their treatment relationship are non-actionable statements of opinion (if they are not substantially true, *see supra* Section I(A)).

Statements about a person's motives are, as matter of law, protected opinion. "Because statements concerning state of mind, such as hypotheses as to motivation, are not readily verifiable as true or false, courts of this State have consistently found them to be protected." *Rappaport v. VV Publ'g Corp.*, 618 N.Y.S.2d 746, 751 (Sup. Ct. N.Y. Cnty. 1984), *aff'd*, 637 N.Y.S.2d 109 (1st Dep't 1986); *see also Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) ("speculation about [plaintiffs'] motivations . . . does not support a claim for libel"); *Sabharwal & Finkel, LLC v. Sorrell*, 117 A.D.3d 437, 437–38 (1st Dep't 2014) (statement about plaintiff's motivation for bringing lawsuit was non-actionable).

Chief Judge McMahon's recent ruling in *Cummings v. City of New York* is instructive. In *Cummings*, a teacher sued a radio host for asserting that the teacher "'wanted to break [the children's] spirits' and 'give them an inferiority complex'" by having them reenact the Middle Passage as part of classroom exercise. *See Cummings v. City of New York*, No. 19 Civ.

19

7723, 2020 WL 882335, at *3, 8, 22 (S.D.N.Y. Feb. 24, 2020).  Chief Judge McMahon found

that those statements "reflect inherently subjective evaluations of intent and state of mind, which

are matters not readily verifiable and [are] intrinsically unsuitable as a foundation for

defamation."  *Id.* (citations omitted).  Because "[a] person's internal thoughts are hardly capable

of being proven false, and anyone is entitled to speculate about a person's motives from known

facts of his behavior," the statements were non-actionable opinion.  *Id.*

Also instructive is *Goetz v. Kunstler*, where Bernhard Goetz sued attorney

William Kunstler for asserting that Goetz shot four black teenage boys on a crowded subway

because "[Goetz] is paranoid and has venomous feelings against black people."  164 Misc. 2d

557, 559 (Sup. Ct. N.Y. Cnty. 1995).  The New York County Supreme Court granted summary

judgment in Kunstler's favor, explaining that the statements were written "from a subjective,

rather obvious, point of view and do not purport to be anything else.  Furthermore, speculations

as to Goetz' motives for doing what he did are not readily verifiable and are therefore

intrinsically unsuited as a foundation for defamation."  *Id.* at 565–64 (citing *Rinaldi v. Holt,

Reinhart & Winston, Inc.,* 42 N.Y.2d 369, 382 (1977).

Similarly, in this case, each of the five Statements in Category B is written from

"a subjective, rather obvious, point of view," *id.* at 564—the jilted patient—and describes Doe's

personal beliefs or speculations about Conti's motivation for terminating his treatment of Doe.

*See* Statements B(1)(a)–(d).  After stripping away the epithets and angry, irrelevant commentary

(*e.g.*, "You dumb shit get your fucking story straight"), the Category B Statements are nothing

more than Doe's assertions about Conti's "real reason" for terminating care.  They are thus

"intrinsically unsuited as a foundation for defamation."  *Goetz,* 164 Misc. 2d at 382.

20

c.      **The Facts Underlying the Category C Statements Were Known to the Readers**

*Third*, the Category C Statements disclose the facts upon which Doe based his claims that he and his family "caught" Conti "red handed."  They are therefore non-actionable opinion.

"If a statement of opinion implies that it is based on facts that support the opinion, but [these facts] are unknown to persons reading or hearing it, the statement is an actionable mixed opinion.  However, a statement of opinion made after a recitation of facts disclosed to the reader or listener, or not based on the facts unknown to the reader or listener, is not actionable." *Fordham v. Islip Union Free School Dist.*, 662 F. Supp. 2d 261, 275 (E.D.N.Y. 2009) (citation omitted).  "The essential task is to decide whether the words complained of, considered *in the context of the entire communication and of the circumstances in which they were spoken or written*, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion."  *Id.* (emphasis added) (citation omitted).

When Doe stated Conti was "caught . . . on [his] bullshit," Statement C(1)(a); "got caugggt [sic]," Statement C(1)(b); was "red handed caught," Statement C(1)(d); and "caught red handed," Statement C(1)(e), Doe provided the facts underlying his claims *in each of the same messages*.  Specifically, Doe noted that Conti had been "caught" by Doe and Doe's parents on two occasions: (1) when Conti was unreachable (the CVS incident on March 28, 2017), and (2) Conti's "false" reason for terminating treatment with Doe on April 7, 2017.[10]

---

[10]     *See* Statement C(1)(a) ("You were no where to be found. . . . had my parents not seen your pure negligence you mother fucker I would probably be under the care of your incompetent ass. . . .  I'm in the hell of all hells and the only reason you terminated treatment was because my parents caught you on your bullshit."); C(1)(b) ("You got caugggt [sic] . . . Now you wrote the reason for ending treatment was I wasn't following the titration process . . . and now I found out this week the real reason was . . . you didn't want to continue treatment."); Statement C(1)(d) ("WE all know with the greatest certainty you got red handed caught.  Had I not written that email I would still be under your care."); Statement C(1)(e) ("You flat out lied about the titration.  And you had my family going that I was this and I was that. . . .  And you got caught.  Those are facts.").

Any reasonable reader—and particularly Doe's intimates who received the messages and knew the history of Doe's relationship with Conti—would be able to see the facts underlying Doe's opinions in the Category C Statements, rendering them non-actionable.

### d. Many of the Non-Factual Statements Contain Vague Words and Phrases that Are the Hallmark of Opinion and Hyperbole

*Fourth*, words such as "fraud," "negligence," "malpractice," "abandon," and the vague phrase "caught red handed," as they were used by Doe in several of the Non-Factual Statements, could only be understood as expressions of opinion or hyperbole, especially in the context of communications from an ill patient to his former psychiatrist.  New York courts have routinely found that words like "fraud" or "fraudulent," are nonactionable opinion when, in context, they are used as an exaggerated epithet.  *See Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 293-94 (E.D.N.Y. 2015) (collecting New York cases and finding that use of the word "fraudulent" was not actionable where "the surrounding circumstances" made clear that the word conveyed defendant's opinion).

The Non-Factual Statements that include words like "fraud" do so in the context of expletive-laden, nonsensical, run-on sentences expressing Doe's frustrations and dissatisfaction with his psychiatrist's treatment.[11]  This context makes it clear that Doe's words state opinions, not facts.

Even the word "abandon," when used in this context, is classic opinion, a metaphor for Doe's feelings or, at worst a colorful characterization of the circumstances of

---

[11] *See* Statements A(1)(a) ("You're a fucking fraud who that abandoned me in treatment so who the fuck do you think you are."); A(1)(b) ¶ 33 ("And your fraudulent mother fucming [sic] ass was not there."); B(1)(a) ("You dumb shit get your fucking story straight another poor attempt of deflection."); C(1)(a) ("Your [sic] a fraud.  A Coward.  Scum of the fucking earth.  I wouldn't piss on you if you were on fire."); C(1)(b)–(c) ("You got caugggt [sic] MALPRACTICE. . . . You dumb shit get your fucking story straight another poor attempt of deflection MALPRACTICE."); C(1)(d) ("WE all know with the greatest certainty you got red handed caught."); C(1)(e) ("NO ITS YOU GOT CAUGHT . . . You got caught red handed."); C(2)(a) ("[H]ad my parents not seen your pure negligence you mother fucker I would probably be under the care of your incompetent ass.").

22

Conti's termination of care.  Conti undisputedly terminated Doe's treatment as a patient.  Doe characterizes this "abandonment" because that subjective characterization reflects how Conti's termination made Doe feel—a fact supported  by the undisputed evidence of Doe's pathological "fear of abandonment" (a symptom of Doe's mental disease) and Doe's pre-termination complaints about Conti's unavailability for sessions in Portland.  No reasonable reader would take the phrase "abandonment" as a literal statement—*i.e.*, suggesting that Conti had left Doe stranded on a roadside at night.  *Cf. Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985) (statements that employee is "neglectful" and "isn't doing their job" held not defamatory).

Doe's use of these vague words and phrases unmoors his Statements from anything that could reasonably be understood as a factual accusation.  Rather, Doe's hyperbolic Statements are akin to a "disgruntled consumer" whose "statements reflect his personal opinion based upon his personal dealing with plaintiff." *Penn Warranty Corp. v. DiGiovanni*, 810 N.Y.S.2d 807, 815 (N.Y. Sup. Ct. 2005) (statements that plaintiff had committed "fraud," "has been committing fraud on a grand scale," was "running scams," was "crooked," and had been "ripping off its contract holders for quite a while" were nonactionable subjective expressions of dissatisfaction with plaintiff's services).[12]

### e.    The Non-Factual Statements Are Presented in a Rambling, Incoherent Form

*Fifth*, the ranting, incoherent form of Doe's messages clearly signaled to the recipients that what they were reading was opinion, not fact.  "[S]tatements that are rambling, heated, or speculative are more likely to be understood as opinion." *Hayashi v. Ozawa*, No. 17 Civ. 2558, 2019 WL 1409389, at \*5 (S.D.N.Y. Mar. 28, 2019); *see also Cummings*, 2020 WL

---

[12] *Accord Sandler v. Marconi Circuit Technology Corp.*, 814 F. Supp. 263, 268 (E.D.N.Y. 1993) ("A mere expression of dissatisfaction with a person's professional performance is not defamatory *per se*.").

882335, at *22; *Versaci v. Richie*, 30 A.D.3d 648, 648–49 (3rd Dep't 2006) (finding that a

reasonable reader would give little credence to defendant's "rambling commentary").

      The Statements were all conveyed in lengthy, often incomprehensible email and

text message rants.  For example, Doe's email rant dated April 7, 2017 included 40 lines of run-

on text written by Doe on his iPhone.  *See* Ex. E.  The following is an excerpt from that email:

> My whole family is in israel for Passover.  You don't think that kills
> me inside.  You don't think I want to be there.  But I know I'm no
> fucming good.  So in some way I guess your email your correct I'm
> just not fucking good but I will never let your piece of shit ass define
> who I'm.  Never tell the cancer patient I helped him because I'm
> narasasstic.  Your a fraud that's it.  Nothing in that email you wrote
> has not been something I have been aware.  My parents like you.
> Why? Your good at what you do.  Your a con?  Your supposed to
> like the con men.  That's how they get in.  Because they are con men.
> They do a good Jon wiggling there way in.  My whole life I have
> always have had good intuition on people.  THAT DOESNT MEAN
> YOU  FAGGOT  I  HAVE  ALWAYS  MADE  THE  RIGHT
> CHOICE. . . .  I'm very frustrated.  But let's get one thing straight
> your ass was never there in fact we had to beg and plead with your
> assistant you get ahold you.  So don't worry I'm not suicdal but be
> aware of the malpractice suit coming on.

Ex. E (all spelling and punctuation mistakes in original).  The following similar excerpt is from

Doe's equally lengthy and confusing June 13, 2017 email:

> You are beyond brilliant Mr Conti, your diagrams that my 8 year old
> nephew can do better than that.  WHAT DID YOU TELL ME
> ABOUT MYSELF THAT I HADN'T ALREADY KNOWN. It's
> amazing to me how a Dr, a person who should have ethics did what
> you did. . . .  SO you can talk you dr talk and talk as eloquently as
> you want as pass me off as the patient which I'm.  But I will never
> understand. Never understand, your narrative.  You were never
> there.  On one Friday mark told my parents [redacted] is doing
> wonderful only than to hear on Monday 2 days later that "[redacted]
> is this [redacted] is that" come on your such a fraud. . . .  The anxiety
> of getting OF THE Xanax was harder than hell. Every fucking week
> why did we had to add more anxiety to even if I was going to be able
> to get the script to continue this titration.  You were no where to be
> found.

Ex. F (all spelling and punctuation mistakes in original).

Every single Statement in this case was communicated in a rambling, disjointed, message like these, without exception.  These rants are difficult to read, and impossible to accept as stating verifiable facts, precisely because they reflect the troubled thoughts and opinions of a man who is not well.  No reasonable reader would conclude otherwise.  *See* Ex. NN at 292:9–11 (Jenike Dep.) (Dr. Jenike testified that the messages have a "rambling and incoherent tone to them"); Ex. OO at 97:4–6 (Dr. Lippert testified that Doe was "ranting").

### f.   Doe's Vulgar Language Makes Clear that the Non-Factual Statements Are Not Actionable

*Sixth*, the excessively foul language peppered throughout the Non-Factual Statements (and indeed all of the Statements) would lead any reasonable reader to understand that Doe's emotional tirade expressed feelings and opinions, not facts.  There are "certain specific characteristics that distinguish fact from opinion," one of which is cursing or obscenity ("excessive language").  *Bellavia*, 151 F. Supp. 3d at 294.  A reasonable reader of a statement with "such excessive language" cannot "fairly conclude" that the statement "has any basis in fact" because excessive language is a hallmark of "the type of speech often characterized as rhetorical hyperbole, parody, loose, or figurative."  *Id.* at 294 (internal quotation marks and citation omitted).  Such "rhetorical hyperbole [and] vigorous epithets" should "signal the reasonable observer that no actual facts were being conveyed about an individual."  *Immuno AG*, 77 N.Y.2d at 24.[13]

---

[13]      *See also Gadson v. City of New York*, 156 A.D.3d 685, 686–87 (2d Dep't 2017) (use of the expletives "retarded" and "bitch" in the presence of others expressed statements of opinion); *Wahrendorf v. City of Oswego*, 72 A.D.3d 1604, 1605 (4th Dep't 2010) (characterization of plaintiffs as "slumlords" and "sociopaths" was non-actionable hyperbolic name-calling); *Wanamaker v. VHA, Inc.*, 19 A.D.3d 1011, 1012 (4th Dep't 2005) (referring to someone as a "Nazi" is a non-actionable expression of opinion and rhetorical hyperbole).

Here, every message Doe addressed to Conti was riddled with expletives.[14]  Many include angry obscenities in all-caps, perforated with spelling and punctuation errors.  *See, e.g.*, Ex. E at 1; Ex. F at 1.  This characteristic—which is endemic to the Statements—strongly signals to any reader that the Statements are overwrought, emotional and distinctly *non*-factual.  An opinion, even when expressed using foul language, is still a protected opinion.

Doe's offensive messages to Conti expressed nothing more than Doe's opinions of Conti's treatment of him.  They cannot give rise to a defamation claim as a matter of law.

## II.      THE SINGLE INSTANCE RULE BARS CONTI'S DEFAMATION CLAIM

Conti's defamation claim is also barred in its entirety by New York's "single instance" rule.  For over a century, New York courts have applied the single instance rule to dismiss claims based on the allegation that a skilled professional, like a medical doctor, mishandled the treatment of a single patient (a "single instance").  *See, e.g.*, *Twiggar v. Ossining Print. & Publ'g Co.*, 161 A.D. 718, 719–20 (2d Dep't 1914) (single instance rule barred dentist's libel claim based on report that a malpractice action had been commenced against the dentist because of the "unskillful and negligent way in which dental work was done"); *Larson v. Albany Med. Ctr.*, 252 A.D.2d 936, 939 (3d Dep't 1998) (supervising doctor's statement that nurses were insubordinate or engaged in unprofessional conduct while treating single patient was subject to the single instance exception because such charges did not suggest that the nurses were otherwise incompetent).  The rule is an "exception to the principle that a statement tending to disparage a person in his or her office, profession or trade is defamatory per se.  It applies where a publication charges a professional persons with a *single error in judgment*, which the law

---

14      *See, e.g.*, Statements A(3)(a) ("Where was your ass when Dovi was trying to get ahold of the medications from your dumbass."); A(2)(a) ("You abandoned me when I could have gotten out.  You piece of shit."); B(1)(a) ("You dumb shit get your story straight . . . ."); C(2)(a) ("[H]ad my parents not seen your pure negligence you mother fucker . . . .").

presumes not to injure reputation." *Celle*, 209 F.3d at 180 (quoting *Armstrong v. Simon &*

*Schuster, Inc.*, 85 N.Y.2d 373, 379 n.5 (1995)).

In applying the single instance rule, New York courts have long treated a single

professional engagement as a single "instance." *See Twiggar*, 161 A.D. at 719 (surveying New

York and English common law cases and noting that, under the single instance rule, "a charge of

ignorance or want of skill of a lawyer *in a particular case* [is] not actionable, in the absence of

pleading and of proving special damages" (emphasis added)); *Tanner & Gilbert v. Verno*, 92

A.D.2d 802, 802–03 (1st Dep't 1983).

Here, the Statements that remain in the case all relate to a single professional

engagement: Conti's treatment of Doe.  None of the Statements suggest that Conti mistreated

*other* patients.  None concern Conti's treatment of other patients or his overall practice at all.

*See* Appendix.  Instead, each Statement relates only to Conti's treatment of Doe.

While Doe occasionally uses words that have a potentially broad meaning—e.g.,

"fraud" or "malpractice"—read in context, these words relate solely to Conti's treatment of Doe.

*See Tanner & Gilbert*, 92 A.D.2d 802-03 (statements that plaintiff law firm charged "illegal and

unethical" legal fees were "not actionable under the 'single instance' rule").

The Statements are therefore not actionable under the single instance rule.

## III.    THE STATEMENTS ARE PROTETED BY THE SELF-INTEREST AND COMMON INTEREST PRIVILEGES

Conti's defamation claim also fails because the Statements are protected by

qualified privileges that Conti cannot overcome.  "Courts have long recognized that the

public interest is served by shielding certain communications, though possibly defamatory, from

litigation, rather than risk stifling them altogether." *Liberman v. Gelstein*, 80 N.Y.2d 429, 437

(1992).

27

The qualified self-interest privilege protects a "speaker's communications designed to protect the speaker's own legitimate interests." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000).  It applies when the declarant correctly or reasonably believes "(a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection, of the interest." *Goldstein v. Cogswell*, No. 85 Civ. 9256, 1992 WL 131723, at *22 (S.D.N.Y. June 1, 1992) (citing Restatement (Second) of Torts § 594).

The qualified common interest privilege extends to "communication[s] made by one person to another upon a subject in which both have an interest." *Stillman v. Ford,* 22 N.Y.2d 48, 53 (1968).  These communications "are protected for the common convenience and welfare of society, that is, the recognition that on certain occasions the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability outweighs the harm that may be done to the reputation of others." *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 291 (S.D.N.Y. 2006) (internal quotation marks and alterations omitted).  "To invoke the qualified privilege, the parties need only have such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Scott v. Thayer*, 160 A.D.3d 1175, 1176 (3d Dep't 2018) (common interest privilege applied to decedent's guardian's statements to decedent's doctor because both "had a common interest by reason of the duty that each owed to decedent for her health care").

Courts sharply limit the circumstances where statements that are protected by a qualified privilege are allowed to go to the jury.  "A qualified privilege may be overcome by a showing either of 'actual' malice (*i.e.*, knowledge of the statement's falsity or reckless disregard as to whether it was false) or of common-law malice." *Chandok v. Klessig*, 632 F.3d 803, 815

(2d Cir. 2011).  "Common-law malice means spite or ill will." *Id.* (internal quotation marks and alterations omitted).  "[A]s to common-law malice, only if a jury could reasonably conclude that spite or ill will was *the one and only cause* for the publication is a triable issue raised."  *Id.* (internal quotation marks and alterations omitted) (emphasis added).

The Court rejected Doe's common interest privilege argument in his motion to dismiss because the "pleadings [did] not contain factual allegations to support it."  Dkt. 57 at 18. Now, the record establishes that both the self-interest and common interest privileges apply, and that Doe did not act with actual malice or solely out of spite.

## A.    The Qualified Self-Interest and Common Interest Privileges Apply

*First*, the Statements are protected by the self-interest and common interest privileges.

Both the self-interest and common interest privileges "have traditionally been" applied to statements that are "published to an extremely limited, clearly defined group of private persons with an immediate relationship to the speaker, such as a family member or an employer's own employees."  *Konikoff*, 234 F.3d at 99; *see also Garson v. Hendlin*, 141 A.D.2d 55, 62 (2d Dep't 1988) ("it has been generally agreed that a qualified privilege attaches to communications relative to family matters, made in good faith to the proper parties, by members of a family, intimate friends, and third persons under a duty to speak").  Under New York law, the "decision as to whether, under the circumstances, a privilege exists, is for the court and not the jury."  *Stewart v. Florence Nightingale Health Ctr.*, No. 97 Civ. 6977, 1999 WL 179373, at *11 (S.D.N.Y. Mar. 31, 1999).

The self-interest privilege applies here because the Statements concerned a matter of great importance to Doe (his mental health) and were made to people—his parents, his lawyer, his concierge and confidante, and his mental health providers—who had a strong interest in

assisting Doe during his mental health crisis and who each had the ability to do so by different means and techniques.  Relatedly, the common interest privilege applies because all of these people share a common interest in Doe's health and well-being.  *See Fleming v. Laakso*, No. 18 Civ. 1527, 2019 WL 959521, at *10 (S.D.N.Y. Feb. 5, 2019), *report and recommendation adopted*, 2019 WL 952349 (S.D.N.Y. Feb. 26, 2019) (doctor's communications to hospital and insurance company concerning plaintiff's mental health "fall comfortably within the common interest privilege"); Restatement (Second) of Torts § 594, comment d (1977) ("[T]he interest of a parent in the social and moral welfare of his child . . . is sufficient to support a conditional privilege on the part of the parent to publish defamatory matter concerning another for the purpose of protecting or advancing the child's well-being.").

The Statements express Doe's anxiety and depression in the wake of Conti's decision to end the treatment relationship.  Throughout his treatment with Conti, Doe expressed concerns about his attachment to Conti.  56.1 Statement ¶¶ 28–35.  The Statements, though directed to Conti, were also sent to Doe's intimates so they could understand Doe's mental state, and so they could help him.  Doe wanted those close to him to know that Conti was unavailable to Doe, emotionally and literally, when Doe needed him and the effect that Conti's absence had on Doe and his treatment relationship with Conti.  *See* Ex. U ¶ 6.  Doe's parents and providers all understood Doe's protestations for what they were—manifestations of the impact of Conti's abandonment and Doe's illness, and a cry for help.[15]

---

[15]       *See* Ex. II ¶ (Jane Doe: the Statements "reflected [Doe's] downward emotional spiral"); Ex. NN at 290:21–291:19 (Dr. Jenike: the Statements were Doe's way of "acting out" in response to Conti's termination of treatment); Ex. SS at 219:3–21 (Meyer: the Statements do not "change my view on [Doe] as a person and where his heart's at. He's frustrated, he isn't well."); Ex. OO at 261:10–19 (Dr. Lippert: Doe's "actions have been consistent all along with his illnesses."); Ex. V ¶ 7 (Dershowitz: "I understood the anger in his emails to be the product of his illness, and simply that.").

Conti's (false) justification for abandoning Doe—that Doe was not committed to titration—hurt Doe as well.  Doe had tried to adhere to the titration process and he felt like he was "working his ass off."  56.1 Statement ¶ 34.  But Conti claimed Doe's lack of progress was the reason he ended treatment.  The Statements lay bare to those who had "legal and societal interests" in Doe's well-being the pain that Conti's assertions had caused Doe.  *See Antoine v. New York City Health & Hosps. Corp.*, 6 Misc. 3d 1013(A), 2005 WL 159612, at *4 (Sup. Ct. N.Y. Cnty. Jan. 24, 2005) (police officers and psychiatrists shared "legal and societal interests" in discussing plaintiff's mental state with persons of "corresponding interests" at time of plaintiff's involuntary hospital admission).

Both the self-interest and common interest privileges protect Doe's right to communicate his feelings about Conti to his parents, his mental health providers, and other professionals who were responsible for his well-being.  That Doe elected to communicate through vitriolic messages directed to Conti is of no moment.  He included those who were close to him on his messages so they would understand what he was feeling.  The law shields such communications from defamation claims.

## B.   No Reasonable Juror Could Conclude Doe Acted with Reckless Disregard for the Truth or Solely Out of Spite

*Second*, Conti cannot overcome either the self-interest or common interest privileges because nothing suggests that Doe acted with actual malice or solely out of spite.  On a motion for summary judgment, the *plaintiff* has the burden of overcoming these privileges by showing, by a preponderance of the evidence, that defendant acted with malice.  *Chandok*, 632 F.3d at 813 (granting summary judgment where plaintiff failed to make a "showing—by a preponderance of the evidence—of either 'actual' malice or common-law malice").  Conti cannot meet this burden here.

31

"The critical difference between common-law malice and constitutional [*i.e.*, actual] malice is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth." *Konikoff*, 234 F.3d at 99.  "Mere conclusory allegations, or charges based upon surmise, conjecture, and suspicion are insufficient to defeat the qualified privilege." *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009).

"As for what is needed to prove 'actual' malice, there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." *Chandok*, 632 F.3d at 815 (internal quotation marks omitted).  No evidence suggests Doe was "highly aware" that the Statements were false (in fact, they were *not* false).  The Statements were assertions of Doe's feelings, and a manifestation of Doe's anxiety about Conti's decision to end their relationship. Doe's messages were a reaction to his fears of being abandoned by Conti coming true.  Doe certainly *believed* the Statements to be true, and they *were* substantially true (to the extent they stated facts at all).  *See supra*.  At the very least, there is no evidence to suggest that Doe knew they were false.

Nor is there any evidence that Doe acted solely out of ill will or spite.  Regardless of whether the Statements were motivated in part by anger, nothing suggests that ill will or spite was "the one and only cause for the publication." *Fuji*, 669 F. Supp. 2d at 412 (common law malice (*i.e.*, ill will or spite) can overcome a qualified privilege only if it is "the one and only cause for the publication").  Doe copied his parents, his mental health providers, his lawyer, and his confidante and concierge—those closest to him—on the messages to show them "how [he] was impacted by Dr. Conti's decision to end [the] treatment relationship."  Ex. U ¶ 8.  Doe

"wanted the people who were close to [him]—the people who were helping [him] work to improve [his] mental health—to see [his] messages because they were the clearest way [he] had at the time of expressing [his] mental state."  *Id.*

Conti admitted that the Statements were caused by Doe's emotional distress, not any ill will.  In an April 7, 2017 email, he described Doe's messages as reflection "primarily" of Doe's "suffering."  Ex. D at 2.

On this record, no reasonable juror could conclude that Doe acted with reckless disregard for the truth or solely out of spite.  Plaintiff cannot meet his burden to establish by a preponderance of the evidence that Doe acted with malice.  The self-interest and common interest privileges therefore defeat Conti's defamation claim.

## CONCLUSION

For all the foregoing reasons, the Court should grant Defendant summary judgment on Conti's defamation claim.

Dated:  December 18, 2020
       New York, New York

 

                             EMERY CELLI BRINCKERHOFF
                             ABADY WARD & MAAZEL LLP

                                 /s/
                             Andrew G. Celli, Jr.
                             Katherine Rosenfeld
                             Samuel Shapiro
                             Nick Bourland

                             600 Fifth Avenue, 10th Floor
                             New York, New York 10020
                             (212) 763-5000

                             *Attorneys for Defendant John Doe*