UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL CONTI,

          Plaintiff / Counterclaim-
          Defendant

      -against-

JOHN DOE,

          Defendant / Counterclaim-
          Plaintiff.

No. 17-CV-9268 (VEC)

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF
JOHN DOE'S MOTION FOR SUMMARY JUDGMENT
<u>AND IN OPPOSITION TO PAUL CONTI'S MOTION FOR SUMMARY JUDGMENT</u>**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ......................................................................................iii-vi

ARGUMENT ......................................................................................................................4

I.      SUMMARY JUDGMENT SHOULD BE GRANTED ON CONTI'S LIBEL
CLAIM....................................................................................................................4

      A.      Given Their Context and the Way in Which They Were Universally
Understood by Their Recipients, the Statements Are Non-Actionable
Opinion .....................................................................................................6

      B.      Undisputed Evidence Proves that the Category A(1), A(2), B, and C
Statements Are Substantially True................................................................10

              1.      The Category A(1) and A(2) Statements .....................................10

              2.      The Category B Statements .........................................................12

              3.      The Category C Statements .........................................................14

      C.      The Category A(3) and A(4) Statements Are Substantially True and
Do Not Tend to Injure Conti's Reputation .................................................14

      D.      The Single Instance Rule Bars Conti's Defamation Claim .......................16

      E.      The Statements Are Protected by the Self-Interest and Common
Interest Privileges.......................................................................................19

              1.      The Self-Interest and Common Interest Privileges Apply.............19

              2.      No Reasonable Juror Could Conclude Doe Acted with
Reckless Disregard for the Truth or Solely Out of Spite.............22

II.     CONTI'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED ..........26

      A.      Doe's Significant Emotional Damages Are Sufficient to Sustain His
Breach of Doctor-Patient Confidentiality Claim .......................................26

      B.      Neither the Litigation Privilege Nor the First Amendment Protects
Conti............................................................................................................30

              1.      New York's Common-Law Litigation Privilege Does Not
Protect Conti's Disclosure of Doe's Medical Information ...........30

              2.      The First Amendment Does Not Protect Conti's Conduct
From Suit .....................................................................................33

i

CONCLUSION ..................................................................................................................36

<u>TABLE OF AUTHORITIES</u>

<u>PAGE NO.</u>

**Cases**

*Aguirre v. Best Care Agency, Inc.*,
   961 F. Supp. 2d 427 (E.D.N.Y. 2013) ............................................................... 32

*Amodei v. N.Y. State Chiropractic Ass'n*,
   160 A.D.2d 279 (1st Dep't 1990) ....................................................................... 24

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................................. 7

*Ansorian v. Zimmerman*,
   215 A.D.2d 614 (2d Dep't 1995) ....................................................................... 24

*Bisogno v. Borsa*,
   101 A.D.3d 780 (2d Dep't 2012) ....................................................................... 30

*Boehner v. Heise*,
   734 F. Supp. 2d 389 (S.D.N.Y. 2010)................................................................ 21

*Borden v. Malone*,
   No. 1190327, -- So. 3d --, 2020 WL 6932738 (Ala. Nov. 25, 2020)................. 32

*Celle v. Filipino Reporter Enterprises Inc.*,
   209 F.3d 163 (2d Cir. 2000).......................................................................*passim*

*Chandok v. Klessig*,
   632 F.3d 803 (2d Cir. 2011)............................................................................... 23

*Chanko v. Am. Broad. Companies Inc.*,
   27 N.Y.3d 46 (2016) ............................................................................... 27, 29, 34

*Crawford-El v. Britton*,
   523 U.S. 574 (1998)......................................................................................... 7, 9

*D'Annunzio v. Ayken, Inc.*,
   876 F. Supp. 2d 211 (E.D.N.Y. 2012) ............................................................... 33

*DiBella v. Hopkins*,
   403 F.3d 102 (2d Cir. 2005)............................................................................... 23

*Dillenbeck v. Hess*,
   73 N.Y.2d 278 (1989) ................................................................................... 31, 33

*Dillon v. City of New York*,
    261 A.D.2d 34 (1st Dep't 1999) ........................................................ 11

*Estape v. Seidman*,
    269 So. 3d 565 (Fla. Dist. Ct. App. 2019) ....................................... 32

*Ezuma v. City Univ. of New York*,
    665 F. Supp. 2d 116 (E.D.N.Y. 2009) .............................................. 9

*Front, Inc. v. Khalil*,
    24 N.Y.3d 713 (2015) ....................................................................... 31

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)........................................................................... 35

*Giuffre v. Maxwell*,
    No. 15 Civ. 7433, 2017 WL 1536009 (S.D.N.Y. Apr. 27, 2017) ................ 12

*Humphers v. First Interstate Bank of Or.*,
    298 Or. 706 (1985)............................................................................ 32

*Konikoff v. Prudential Ins. Co. of Am.*,
    234 F.3d 92 (2d Cir. 2000)................................................................ 19

*Konikoff v. Prudential Ins. Co. of Am.*,
    No. 94 Civ. 6863, 1999 WL 688460 (S.D.N.Y. Sept. 1, 1999) ................ 19

*Korkala v. W.W. Norton & Co.*,
    618 F. Supp. 152 (S.D.N.Y. 1985).................................................... 11

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006).............................................................. 29

*MacDonald v. Clinger*,
    84 A.D.2d 482 (4th Dep't 1982) ....................................................... 27

*Manganiello v. City of New York*,
    612 F.3d 149 (2d Cir. 2010).............................................................. 8

*Mann v. Abel*,
    10 N.Y.3d 271 (2008) ....................................................................... 24

*McAnaney v. Astoria Fin. Corp.*,
    665 F. Supp. 2d 132 (E.D.N.Y. 2009) .............................................. 5

*McCullough v. Wyandanch Union Free Sch. Dist.*,
    187 F.3d 272 (2d Cir. 1999).............................................................. 9

*Mead v. Gordon,*
    583 F. Supp. 2d 1231 (D. Or. 2008) ........................................................................... 34

*Mezibov v. Allen,*
    411 F.3d 712 (6th Cir. 2005) ...................................................................................... 34

*Moran v. Hurst,*
    32 A.D.3d 909 (2d Dep't 2006) .................................................................................. 21

*Moritz v. Town of Warwick,*
    No. 15 Civ. 5424, 2017 WL 4785462 (S.D.N.Y. Oct. 19, 2017) .............................. 5, 7

*Nobel Ins. Co. v. City of New York,*
    No. 00 Civ. 1328, 2006 WL 2848121 (S.D.N.Y. Sept. 29, 2006) .................................. 5

*Officemax Inc. v. Cinotti,*
    966 F. Supp. 2d 74 (E.D.N.Y. 2013) ......................................................................... 30

*Penn Warranty Corp. v. DiGiovanni,*
    810 N.Y.S.2d 807 (Sup. Ct. N.Y. Cnty. 2005) .......................................................... 25

*Printers II, Inc. v. Profs. Publ'g, Inc.,*
    784 F.2d 141 (2d Cir. 1986).......................................................................................... 12

*Rapaport v. Strategic Fin. Sols., LLC,*
    190 A.D.3d 657 (1st Dep't 2021) ............................................................................... 32

*Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist.,*
    178 F. Supp. 3d 118 (S.D.N.Y. 2016)......................................................................... 24

*Renzi v. Morrison,*
    249 Ill. App. 3d 5 (1993) ........................................................................................... 32

*Tanner & Gilbert v. Verno,*
    92 A.D.2d 802 (1st Dep't 1983) ........................................................................... 16, 17

*Thorsen v. Sons of Norway,*
    996 F. Supp. 2d 143 (E.D.N.Y. 2014) ...................................................................... 6, 22

*Tighe v. Ginsberg,*
    146 A.D.2d 268 (4th Dep't 1989).............................................................................. 27

*Twiggar v. Ossining Printing & Publ'g Co.,*
    161 A.D. 718 (2d Dep't 1914)........................................................................ 16, 17, 18

*United States v. Dunnigan,*
    507 U.S. 87 (1993)...................................................................................................... 34

*Williams by Williams v. Roosevelt Hosp.*,
    66 N.Y.2d 391 (1985) ................................................................................................ 31

*Williams v. Williams*,
    23 N.Y.2d 592 (1969) ................................................................................................ 33

*Wynn v. Earin*,
    163 Wash. 2d 361 (2008) .......................................................................................... 32

**Other Authorities**

N.Y. Pattern Jury Instructions § 3.59 ............................................................................ 26

**Statutes & Rules**

CPLR 4504 ............................................................................................................... 31, 34

N.Y. Civ. Rights Law. § 74 ............................................................................................ 32

Paul Conti's opposition to John Doe's motion for summary judgment raises no material issues of fact, and rebuts none of the many reasons that Conti's defamation claim fails as a matter of law.  Conti's meritless cross-motion for summary judgment misconstrues both the law and the facts and should be denied.

## DOE'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED

Conti's libel claim is fatally flawed, as discovery—and, thus, the facts—have now conclusively demonstrated.  It is undisputed that *not a single person* who received Doe's allegedly defamatory statements (the "Statements")[1] understood them to be conveying facts, much less credited them in ways that would injure Conti's reputation.  Each of the recipients viewed the Statements for what they were: rambling, incoherent rants from a mentally ill patient to his former psychiatrist.  Conti offers no evidence to the contrary.

Plaintiff's response to the facts he cannot deny is like that of a three-card monte hustler who refuses to turn over all of the cards at once: he shifts the focus from one (unfortunate) phrase to another and back again, but he refuses to confront the Statements in their entirety, or to place them in their context—although that is precisely what the law requires.  To be sure, much of the language in these messages is vulgar, and all of it is regrettable.  *See e.g.*, FAC ¶ 5 ("I will fuckong [sic] destroy you."); ¶ 6 ("You little fuck.").  But, plainly, when taken in context, the language in suit is *not* defamatory.

It is notable that, whereas Doe carefully combed through the rambling communications to identify the Statements that remain in suit and catalogue them in an Appendix, *see* Appendix, Dkt.232, Conti makes no comparable effort.  As if to leave himself infinite "wiggle room," Conti, in his 56.1 Statement,  refuses even to admit or deny that the

---

[1]　　　The Statements at issue in this case are cataloged in the Appendix to Doe's opening brief.  *See* Dkt. 232.

Appendix sets forth the Statements on which his claim is based.  *See* Pl.'s Resp. 56.1 Stmt. ¶ 111.  Rather than engaging with the mountain of evidence gathered in discovery that establishes that the Statements were all viewed as hyperbolic, incoherent vitriol not to be credited as factual, Conti acts as if discovery is ahead of us, not behind us.

But sleights of hand do not create disputed issues of material fact.  Conti's characterizations of the Statements, and his allegations in the Amended Complaint—all of which were considered under Rule 12—are no substitute for *evidence* painstakingly gathered, and not refuted, as Rule 56 requires.  At this stage of litigation, Conti must produce *evidence* that the Statements, in context, are factual (rather than opinion), false, defamatory, non-privileged, and related to something other than Conti's single treatment relationship with Doe.  Conti offers none of this.

To the extent the Statements contain assertions of fact at all, there is no dispute that those facts are substantially true.  Conti ended Doe's treatment while Doe was attempting to titrate.  Conti was unavailable to Doe's father, during the titration process, when Doe's father needed help filling a prescription for Doe.  Conti terminated Doe as a patient because the treatment relationship was damaged.  Conti traveled frequently and thus was often not available to meet his patient in person.  These are the facts underlying each of the Statements, and, as Conti concedes, they are all true.  *See* Sections I(A)–(C) *infra*.

Conti's libel claim also fails under the single instance rule and the self-interest and common law privileges.  Conti's inapposite case law does undermine the reality that the Statements all concern a single situation, the treatment relationship between Doe and Conti.  The single instance rule therefore applies.  *See* Sections I(D) *infra*.  The family and close friends to whom Doe sent the Statements all shared a common interest in Doe's well-being, and Conti cites

2

no evidence from which a jury could conclude that Doe knew or believed those Statements—to the extent they communicated facts at all—to be false; they were not.  *See* Sections I(E) *infra*

### CONTI'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED

Of course, this case involves more than just Conti's meritless libel claim.  When he filed his Complaint, Conti intentionally disclosed pages' worth of Doe's exceedingly private confidential medical information that Conti only learned by virtue of the fact that he was Doe's treating psychiatrist.  It is a breach literally unprecedented in the law—we know of no other case where a mental health professional intentionally disclosed and effectively weaponized a patient's private medical information in furtherance of a lawsuit for money against the patient.  That disclosure gives rise to Doe's counterclaim against Conti for breach of fiduciary duty.  Conti's primary argument in support of summary judgment on the counterclaim rests on the assertion that Doe is not able specifically to name the entire universe of people who reviewed his confidential information in Conti's Complaint.

Conti's cross-motion is meritless.  Doe is entitled to recover for the significant emotional distress that Conti's unauthorized disclosure caused him, regardless of whether he can identify by name the people to whom his confidential medical information was disclosed.  It is undisputed that court personnel reviewed Doe's confidential information.  That fact alone caused Doe substantial distress.  Doe also was and remains deeply concerned that this disclosure could lead to further disclosures—either because of the public's fundamental right to access judicial proceedings and documents, or because the information would be leaked.  As the Court knows, this has already occurred: in September 2019, an article was published in the *New York Post* attaching Doe's real last name and a photograph of his father to the deeply personal information Conti included in his Complaint.  Given Conti's decision to seed his Complaint with the lurid

3

details of a wealthy man in the throes of a mental health crisis, disclosure to the broader public was not only foreseeable from Day One—it was in fact *foreseen*, or so a jury could find.

Neither the litigation privilege—which applies to defamation claims only—nor the First Amendment protects Conti's unauthorized disclosure.  The common law litigation privilege does not override Conti's duty of confidentiality, nor does it protect the irrelevant, salacious allegations that Conti maliciously included in the Complaint with the intent to harm, embarrass, and shame Doe.  And the First Amendment does not authorize a psychiatrist to disclose a patient's confidences simply by commencing a meritless lawsuit.  Having chosen to "speak" through his lawsuit in derogation of his common-law (and ethical) duties to his patient, Conti must be held to account for the damage he has caused Doe.  *See* Section II *infra*.

Doe's motion for summary judgment should therefore be granted, and Conti's motion for summary judgment should be denied.

## ARGUMENT

## I.   SUMMARY JUDGMENT SHOULD BE GRANTED ON CONTI'S LIBEL CLAIM

Discovery has made clear that the Statements are not actionable because they are opinion or hyperbole rather than statement of fact; they are substantially true; and/or they do not tend to injure Conti in his reputation.

Conti fails to engage seriously with Doe's arguments on summary judgment. Instead, he asserts that the Court's opinion on Doe's pre-answer motion to dismiss somehow forecloses Doe from arguing, factually, what that the voluminous record developed in discovery reveled.  That is not the law.  It is well-settled that the "law of the case" doctrine does not mean that a denial of a motion to dismiss under Rule 12 precludes the granting of summary judgment under Rule 56.  To the contrary, the vastly different standards of review and the existence of a fully-developed evidentiary record require the Court to view the facts and the law afresh at the

dispositive motion stage. *See McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 142 (E.D.N.Y. 2009) ("[B]ecause of the divergent standard of review applicable to motions to dismiss and motions for summary judgment, the law of the case doctrine is inapposite to the Court's analysis of whether, after the close of discovery, genuine issues of fact have been raised which survive summary judgment"); *Nobel Ins. Co. v. City of New York*, No. 00 Civ. 1328, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) (collecting cases and noting that "[t]he law of the case doctrine . . . does not preclude [a] Court from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss.").

Conti's heavy reliance on the Court's motion to dismiss opinion is particularly misplaced in the context of this case, where the discovery record is pivotal.  Conti had the opportunity to depose every single person who received Doe's emails, and he did depose all but one of them.  At this point, the Court need not speculate about how these recipients understood Doe's Statements—they have each *testified* about it.  Each has now sworn that they were well aware of Doe's mental health issues when they received Doe's message to Conti, and that they took the Statements for what they were: expressions of Doe's anguish and pain, not factual assertions about the doctor.

To successfully contest summary judgment, Conti is required to submit "affidavits, depositions, [and] other documentation . . . setting forth specific facts that show that there is a genuine issue of material fact to be tried."  *Moritz v. Town of Warwick*, No. 15 Civ. 5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (citation omitted).  He has not done so. Conti has not put forth a single piece of evidence to suggest that anyone who received Doe's Statements understood them to be anything other than the non-factual ramblings of a man in the

midst of a mental-health crisis.  Whatever presumptions and inferences Conti was due under

Rule 12 do not apply here.  Summary judgment should be granted in favor of the defendant.

### A.     Given Their Context and the Way in Which They Were Universally Understood by Their Recipients, the Statements Are Non-Actionable Opinion

Conti fails to proffer evidence that anyone who received the Statements took them

literally or understood them to be stating facts about Conti—because no such evidence exists.

Faced with this reality, Conti attempts to manufacture a fact dispute by arguing that there is

"conflicting testimony" in the record concerning whether some witnesses perceived some

unspecified communications from Doe as threatening.  *See* Conti Br. at 13–14.  While such facts

may have been relevant to Conti's long-dismissed harassment claims, *see* Order, Dkt. 57

(granting in part Defendant's motion to dismiss), they are *ir*relevant to the question whether the

Statements are actionable in defamation.

For example, Conti notes that his wife testified that Conti received frightening

emails from Doe, and that Conti was "preoccup[ied] with safety" and felt he needed to "protect

[him]self" as a result.  Conti Br. at 14.  Conti also cites his psychiatrist, Dr. Hamilton, who

testified that, when he saw some of Doe's messages for the first time at his deposition, he

thought they were "worse than [he] had anticipated."  *Id.* at 13.  The Statements, Conti argues,

could not have been read as "harmless ramblings" because they were "woefully scary" and

"forced [Conti] to consider how to protect his family."  *Id.* at 15.

This is a libel case.  Here, the core issues are whether the statements in suit (i)

were factual in nature, and (ii) held the plaintiff up to obloquy or ridicule in the minds of the

people to whom the statements were published.  *See Thorsen v. Sons of Norway*, 996 F. Supp. 2d

143, 163 (E.D.N.Y. 2014).  The testimony of Conti's wife and treating psychiatrist—neither of

whom are among the people to whom Doe published the Statements —is irrelevant to Conti's

6

libel claim as a matter of law.  Certainly, their testimony has nothing to do with how the actual recipients of the messages—Dr. Jenike, Dr.  Lippert, Mr. Dershowitz, Doe's parents, Mr. Meyer, ███████, and Conti's colleagues at PPG—viewed the Statements, namely as overheated, non-factual manifestations of Doe's mental illness, rather than statements of fact about Conti.

A material issue of fact arises only if it "might affect the outcome of the suit under the *governing law*"—in this case, the law of defamation, not harassment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added).  Whether Doe's messages were or were not viewed as "scary" by Conti and his intimates has nothing to do with whether, in the specific context presented here, the Statements could be reasonably understood, by their actual third-party recipients, as stating facts about Conti's skill as a psychiatrist.  Here, it is the undisputed testimony of every recipient of the Statements that they did view them as factual in nature.  *See* 56.1 Statement ¶¶ 79 (Mr. Dershowitz), 86 (Dr. Jenike), 94 (Dr. Lippert), 99 (Mr. Meyer), 109 (James and Jane Doe); Ex. XX ¶ 3.

Conti's attacks on the recipient-witnesses' credibility cannot create a genuine fact dispute where one otherwise does not exist.  It is well settled that a plaintiff cannot defeat a motion for summary judgment "with general attacks upon [a witness's] credibility[;] rather, [the plaintiff] must identify affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof."  *Moritz*, 2017 WL 4785462, at *8 (internal quotation marks and citation omitted).[2]  Conti has failed to do so here.  To hold otherwise would violate the rule that, on a motion for summary judgment, the Court "may not make credibility

---

[2]      *See also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("[S]ummary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial.  At that stage, if the defendant[] has made a properly supported motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive").

determinations or weigh the evidence." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks and citation omitted).  Conti's papers invite this Court to do precisely that.

Far from being "affirmative evidence from which a jury could find" that Conti carried his burden of proof on the critical elements of a libel claim, what proof Conti does point to amounts to nothing more than classic bias/prejudice material suitable for cross-examination of individuals he derides as "friendly witnesses."  Conti Br. at 13.  For example, in response to Dr. Lippert's testimony that she did not view Doe's messages as stating facts, Ex. OO at 261:10–19, and that it appeared that Doe was simply "ranting," *id.* at 97:4–6, Conti suggests that Dr. Lippert cannot be believed because she has billed Doe for missed appointments, Conti Br. at 15. Similarly, in response to Dr. Jenike's testimony that he understood Doe's statements as a "reflect[ion] [of Doe's] mental illness," Ex. NN at 290:8–11, and that Doe's messages have a "rambling and incoherent tone to them," *id.* at 292:9–11, Conti argues that Dr. Jenike may be lying by pointing out, among other things, how much Doe pays Dr. Jenike for therapy sessions. Conti Br. at 15–16. While it is true that the nature of Dr. Lippert's and Dr. Jenike's relationships with Doe would be fair game for cross-examination, their possible biases are not "affirmative evidence" that they understood Doe's Statements to be factual in nature and held Conti in contempt as a result.  If "fair game" cross examination materials were enough to defeat summary judgment, courts could never grant a motion under Rule 56.

Conti also offers nothing to dispute Mr. Dershowitz's or Mr. Meyer's  testimony about how they viewed the Statements.  Mr. Dershowitz testified that he "understood the anger in [Doe's] emails to be the product of his illness, and simply that;" Ex. V ¶ 7.  Conti's response is that Mr. Dershowitz is not credible because he billed Doe a six-figure sum for his legal

services.  Conti Br. at 15.  In the same vein, Conti argues that Mr. Meyer's testimony that he viewed Doe's statements as manifestations of Doe's "battling with mental illness," Ex. SS at 219:3–21,[3] is countered by the proposition that "a reasonable juror could view Mr. Meyer's testimony through the lens of someone who is completely dependent upon Doe for his financial well-being and immigration status," Conti Br. at 16–17.[4]

   This is not enough.  Unlike a criminal defendant whose entire case can be built around "raising questions" through skillful cross- examination, Conti is a plaintiff here; he bears the burden of proof on his claim of libel.  More than three years into this lawsuit, Conti has failed to produce *any* evidence that the recipients of the Statements viewed them as factual and thus harmful to Conti's reputation.

   "Plaintiff had a full opportunity for discovery and has produced no . . . evidence to challenge [these witnesses] assertion[s]."  *Ezuma v. City Univ. of New York*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) (rejecting plaintiff's attempt to attack witness's credibility on summary judgment).  Conti deposed Dr. Lippert, Dr. Jenike, Mr. Dershowitz, and Mr. Meyer, yet he cites no contradictory evidence from the record and instead resorts solely to assertions of bias and attempted character assassination.  Conti "cannot defeat summary judgment . . . merely by impugning [a witness's] honesty."  *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999).

---

[3] Mr. Meyer also testified that he understood that the Statements reflected that Doe was "frustrated," "isn't well," and was "suffering from depression."  *Id.*

[4] In a Declaration filed in opposition to Defendant's motion for summary judgment, Conti states, without support, that "[i]t would not make logical sense to presume that, simply because communication escalates and becomes inappropriate, it is no longer communicating true statements."  Conti Decl. at ¶ 6.  Of course, Conti is entirely incapable of testifying about how Dr. Lippert, Dr. Jenike, Mr. Dershowitz, and Mr. Meyer understood Doe's Statements.  As the Court noted at the recent conference, Conti is "trying to provide an expert opinion on whether someone else would have taken Doe's rants as statement of fact."  Ex. DDD at 24:18–24.

The facts are not in dispute: the recipients of Doe's Statements simply did not understand them to be stating facts concerning Conti's fitness as a psychiatrist, and there is no affirmative evidence to the contrary. There being no evidentiary basis for a jury to find that the Statements were factual in nature and had a defamatory impact, Doe is entitled to summary judgment on Conti's defamation claim.

**B.      Undisputed Evidence Proves that the Category A(1), A(2), B, and C Statements Are Substantially True**

The Category A(1) and (2), B, and C Statements, to the extent that they can be interpreted to assert facts at all, concern Conti's "abandonment" of Doe (Categories A(1) and (2)), the falsity of Conti's stated motivation for terminating treatment (Category B), and that Conti was "caught" committing misconduct (Category C).  *See* Statements A(1)(a)–(g); A(2)(a)–(e); B(1)(a)–(d); C(1)(a)–(g).  The undisputed facts prove that these specific Statements are, in context, substantially true.

**1.      The Category A(1) and A(2) Statements**

Assuming that they are deemed to assert facts at all, the Statements in Category A(1) and A(2) are, respectively, assertions that Conti "abandoned" his patient, Doe,[5] and that he did so while Doe was in the midst of titrating from Xanax.[6]  The term "abandon," as used in the Statements, reflects Doe's own subjective characterization of a central *undisputed* fact in this case: that Conti terminated Doe's treatment at a time when Doe would have otherwise continued to treat with PPG.  *See* Def's 56.1 Statement ¶ 58; Def's Br. at 11–12.  It was precisely this "abandonment" that triggered the messages in the first place.  Taken in their context, as they

---

[5]      *See, e.g.*, Statement A(1)(a) ("You're a fucking fraud who that abandoned me in treatment so who the fuck do you think you are."); A(1)(e) ("You could have backed out any minute or time.  Instead you abandoned me.").

[6]      *See, e.g.*, Statement A(2)(b) ("Settle I will kill myself because of the titration you abandoned me on before I ever settle."); A(2)(d) ("You take away a persons sense of self and abandon them during titration that's criminal.").

must be, the Category A(1) and A(2) Statements are substantially true and thus cannot serve as a basis for a claim of defamation.

Conti admits, as he must, that it was his decision to terminate Doe's treatment. *See* Pl's 56.1 Resp. ¶ 58 (admitting that Conti terminated his treatment of Doe via an email to Doe's parents on April 7, 2017). There being no fact dispute over *that* issue, Conti argues that there is one over whether the Conti terminated Doe's care "appropriately.*"* Conti Br. at 7 (emphasis added); *see also id.* at 9 (arguing that Conti "appropriately terminated care" of Doe). This is a straw man and an effort to strain defamatory meaning: Doe never stated that Conti terminated his treatment without justification. The word "abandon" means simply to withdraw support or help from something.[7] That is exactly what the Category (A)(1) Statements assert and what Conti did, by firing Does as a patient—via email no less—16 months into treatment.

Doe was upset that his treating psychiatrist ended the treatment relationship with him abruptly; of that there is no doubt. But courts should not "strain to find defamation where none exists." *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999) (internal quotation marks and citation omitted). Here, "the substance—the 'gist'" of the Category A(1) Statements is "admitted to be true," and Conti's effort to avoid summary judgment by mischaracterizing what appears on the printed page or focusing on "peripheral and immaterial matters" cannot change that. *Korkala v. W.W. Norton & Co.*, 618 F. Supp. 152, 155 (S.D.N.Y. 1985). The Category A(1) Statements are silent as to the "propriety" or specific circumstances surrounding Conti's firing Doe; as such, they are true as written.

---

[7]     *See Abandon,* Merriam-Webster Dictionary (11th ed. 2003), http://www merriam-webster.com/dictionary/abandon (last visited Feb. 19, 2021) (defining the verb "abandon" as, "to withdraw protection, support, or help from").

The Category A(2) statements concerning Conti's firing of Doe *during titration* are also substantially true.  Here again, Conti does not dispute the core factual statement he seeks to sue on:  that Doe was in the midst of the titration process when his doctor terminated treatment.  *See* Pl's 56.1 Resp. ¶ 36 (noting that Doe reduced his Xanax use from "five to two milligrams" during the titration process); ¶ 38 (admitting that Conti prescribed Librium to Doe as "a way to wean Doe off of Xanax"—*i.e.*, titration); ¶ 116 (noting that Conti was "required to monitor Doe's Xanax titration remotely" when Doe moved to Los Angeles).  This ends the matter; the statement is true,

Conti's effort to create a fact dispute by questioning whether and to what degree Doe was properly *adhering* to the titration regimen changes nothing.  *See* Conti Br. at 7.  To the extent that they state any facts at all, the Category A(2) Statements assert that Conti "abandon[ed] [Doe] during the titration"—period, full stop.  And this is true.  Precisely how closely, or not, Doe was adhering to the titration protocol is neither "the substance" nor the "gist" of the Category A(2) Statements.  *Giuffre v. Maxwell*, No. 15 Civ. 7433, 2017 WL 1536009, at *4 (S.D.N.Y. Apr. 27, 2017) (quoting *Printers II, Inc. v. Profs. Publ'g, Inc.*, 784 F.2d 141, 146 (2d Cir. 1986)).  The critical point—which is, again, undisputed—is that Conti was administering and supposedly overseeing the titration process and, in the midst of that process, he terminated Doe's treatment.  Whether Doe was titrating successfully, stumbling along the way (as one would expect of a patient suffering from addiction), or failing miserably, is quite irrelevant to the gist of the Category A(2) Statements, which correctly place Conti's decision to terminate care in a specific temporal moment: "during titration."

## 2.    The Category B Statements

In the Category B Statements, Doe wrote that Conti's professed *reason* for terminating his treatment of Doe—that Doe "wasn't following the titration process"—was false.

Statement B(1)(a).  This statement too is substantially true.  In the April 7, 2017 email where he announced his decision to discontinue Doe's care, Conti states unambiguously the reason he discontinued Doe's care, and that is that the therapeutic relationship between doctor and patient had collapsed.  *See* Ex. D at 1 (Conti notes in the April 7, 2017 termination email that his "reason for discontinuing care" was that Doe was not "engaging with [Conti] in any reasonable matter" and because he and Doe "have no treatment alliance").

Conti argues that there remains a disputed issue of fact for trial as to Category B Statements because "the basis for termination of care given by Dr. Conti was quite broad," Conti Br. at 8.  But Conti proffers *no evidence* that his true reason for terminating Doe's care was that Doe was not properly following the Xanax titration process.[8]  Rather, he simply states the basis for his termination of Doe's treatment with one sentence: "[Doe] [was] not engaging in treatment."  *See* Conti Br. at 8; Pl. Ct. 56.1 ¶ 134.  In other words, Conti's and Doe's explanation for the true reason for Conti's decision to terminate Doe's treatment are the same: Conti fired Doe as a patient because the treatment relationship had soured.

Whether there were *other* reasons Conti may have had for terminating treatment is beside the point.  *Contra* Conti Br. at 9.  What matters is that Doe's purported failure to follow the titration process was not *a* reason for the termination, let alone *the* reason, for terminating care.  The undisputed evidence proves that the Category B Statements are substantially true.

---

[8]     In an email, Conti did write that another reason for his termination of Doe's treatment was that Conti "believe[d] the treatment of the moment, which consists of medication transition, cannot be conducted safely" because Doe was living in Los Angeles, rather than Portland.  Pl. Ct. 56.1 ¶ 135.  This, of course, is not even remotely the same as saying that Conti terminated treatment because Doe had failed to follow the titration process. It is simply an assertion that Conti found the titration process difficult to manage and supervise "safely" from a distance.

### 3.    The Category C Statements

The Category C Statements imply that Conti was "caught" when Doe's parents saw that Conti was "absent" in his treatment of Doe.  Statement C(1)(f).  These statements are also substantially true: Doe's parents *did* "catch" Conti being unavailable to Doe during titration—specifically when Conti was unreachable, for hours, while Doe's father waited at a CVS pharmacy in Los Angeles, unable to fill Doe's prescription for Xanax.  Conti admits that he *was* unavailable that day—and this end the inquiry.  Pl.'s Br. at 6 (admitting that Conti was "not immediately available" the day Doe's father was at the pharmacy).  Conti, yet again, has failed to dispute the substantial truth of Doe's statements.

### C.    The Category A(3) and A(4) Statements Are Substantially True and Do Not Tend to Injure Conti's Reputation

The Category A(3) and A(4) Statements concern Doe's inability to reach Conti on one occasion and Conti's frequent travel away from Portland.[9]  These statements are not only true, they are non-actionable as a matter of law because they do not tend to injure Conti's reputation by holding him up to obloquy, contempt, or ridicule, as required by New York law. *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (citation omitted) ("The gravamen of an action alleging defamation is an injury to reputation.").

The Category A(3) Statements assert that Conti was "unreachable" and that Doe and his family "couldn't get ahold of" Conti on one occasion while Doe's father waited for hours at a CVS pharmacy for Doe's Xanax prescription.  *See* Statements A(3)(a) and (b).  On that occasion, Doe's father and Mr. Meyer tried to call Conti at his office, but Conti was unreachable. 56.1 Statement ¶ 51.  Although Conti blames the delay on the pharmacy, *see* Pl. Ct. 56.1 ¶ 121,

---

[9]      *See, e.g.*, Statement A(3)(b) ("[W]hen my parents were in town when we couldn't even get a hold of you. . . . YOU WERE UNREACHABLE YOU PIECE OF SHIT."); Statement A(4)(a) ("The fact is you were out of town at least 2 weeks of the month.").

he admits he was "*not immediately available* once the pharmacy's error came to light" and emphasizes that "it is *common knowledge* that [Conti] is a busy psychiatrist who travels," Conti Br. at 6 (emphasis added).  In other words, by Conti's own account, it is true that Doe's father "couldn't even get a hold [sic] of [Conti]" that day from the pharmacy.  Statement A(3)(b).

More to the point, the fact that Conti was on one occasion unavailable to Doe does not injure his reputation as a psychiatrist.  Conti himself explains that he "is a busy psychiatrist who travels, and moreover, he had already done what he was supposed to do by calling in the prescription."  Conti Br. at 6.  As a busy psychiatrist with a multi-state practice, Conti does not view his unavailability for some number of hours, on one occasion, as a stain on his professional reputation—and he is right about that.

As for the Category A(4) Statements concerning Conti's routine absences from Portland, Conti once again admits that "[t]here is *no dispute* that Dr. Conti has a multi-state practice based in Portland, Oregon, which requires that he travel frequently."  Conti Br. at 4 (emphasis added).  Conti does not address, let alone explain, how Defendant's statements that Conti was "out of town at least 2 weeks of the month" and "not there in Portland most of the time" hold injure Conti in his reputation.  *See* Statements A(4)(a) and (b).  They do not.  In light of Conti's own admissions that his "multi-state practice" requires him to travel frequently and that "it is common knowledge that he is a busy psychiatrist who travels," it is inconceivable that Doe's specific Statements to the same effect would "induce[] an evil opinion of [Conti] in the minds of right-thinking persons." *Celle*, 209 F.3d at 177 (internal quotation marks and citation omitted).

Conti's admissions make clear that the Category A(3) and A(4) Statements are substantially true and do not tend to injure Conti's reputation.  They are not defamatory as a matter of law.

**D.      The Single Instance Rule Bars Conti's Defamation Claim**

As Conti correctly notes, New York *is* among the jurisdictions that have adopted the single instance rule in defamation cases.  The rule has been on the books in New York for over a century.  *See, e.g.*, *Twiggar v. Ossining Printing & Publ'g Co.*, 161 A.D. 718 (2d Dep't 1914).  It applies in the circumstance presented here, where the Statements all refer to a single ongoing course of conduct, namely, Conti's treatment of one patient, Doe.

As in every defamation case, context is critical.  Doe, a mentally ill man, went to Conti for psychiatric treatment.  The medication management and therapy treatment that Conti agreed to provide was expected to and did occur for more than a year.  The success or failure of this treatment—a combination of medication management and talk therapy—could only be and would only be measured over the course of an extended period during which Conti provided care.  Unlike the surgeon who is hired to remove an appendix and ends up leaving a pair of scissors in the patient's body—a "single instance" of professional misconduct—a psychiatrist's conduct, which involves complex and subtle issues of professional judgment, can only be understood in the context of the full course of treatment, much like the conduct of a lawyer retained to assist a client with a multi-faceted transaction or long-term litigation.

*Tanner & Gilbert v. Verno*, 92 A.D.2d 802 (1st Dep't 1983) presents just such a case.  *Tanner & Gilbert* was a defamation suit brought by a law firm against its former clients, a group of tenants of an Upper West Side co-op.  After a series of mishaps involving the drafting and approval of the tenants' building's co-op plan, the law firm sent the tenants a bill for $2.4 million in fees.  *Id.* at 803.  A bitter fight ensued and, eventually, some of the firm's former

clients "made defamatory remarks" "to other tenants in the building," stating that the fees the law firm had charged were "'illegal and unethical'" and that a member of the law firm had violated the former clients' privacy rights.  *Id.*

The Appellate Division, First Department, held that the "statements by [the former clients] were expressions of opinion having a sufficient factual basis which were comments *only upon the particular acts of [the law firm]*."  *Id.* (emphasis added).  Critically, the First Department viewed the law firm's overall representation of the tenants—the issue for which they were retained and against which they would be judged—as a "single instance" protected by the New York rule.  The court held that the former clients' statements that the law firm had committed "illegal and unethical" acts, including allegedly charging astronomical fees for a job poorly done and violating the former clients' privacy, were "not actionable under the 'single instance rule.'"  *Id.* (citing *Twiggar*, 161 A.D. 718).

This case is similar.  Like *Tanner & Gilbert*, this case also involves a professional hired to perform a complex task—psychiatric treatment—over a period of time.  Here, as in *Tanner & Gilbert*, the professional sued his former client (here, a patient) for defamation stemming from statements the former client made to a limited audience that was intimately familiar with the underlying professional relationship between the defendant and plaintiff.  And finally, the statements at issue here, like those in *Tanner & Gilbert*, concern the professional's "particular acts" during the course of a single professional relationship—in *Tanner & Gilbert*, it was a single attorney-client representation for a single legal issue; here, a single therapist-patient relationship for the treatment of Doe's (and only Doe's) mental health issues.

The single instance rule exists to bar claims precisely like those in *Tanner & Gilbert* and here, where "a charge of ignorance or want of skill of a lawyer [or psychiatrist] *in a*

17

*particular case* [is] not actionable, in the absence of pleading and of proving special damages."
*Twiggar*, 161 A.D. at 719 (emphasis added).  The single instance rule thus bars Conti's
defamation claim.

   *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000),
upon which Conti places heavy reliance, is easily distinguishable.  In *Celle*, the Second Circuit
declined to apply the single instance rule to a defamation claim arising out of two newspaper
articles, appearing in two different editions of the paper, alleging "different mistake[s] or
error[s]" allegedly committed by the plaintiff.  209 F.3d at 185.  In that specific context, the
Court of Appeals held that "an average reader probably would . . . consider them together to
conclude that plaintiff Celle had repeatedly indulged in unprofessional conduct."  *Id.*

   This case could hardly be more different from *Celle*.  Each of the two articles in
*Celle*—which were published to the public at large—concerned a different event in or facet of
the plaintiff's professional life, including that a judge had found him "negligent" for spreading
false information, the he had made false accusations about a debt owed to a non-party, and that
his business was not financially viable.  *Id.* at 187.  Accordingly,  the Circuit was justified in
holding that the "average reader" would regard the different events as examples of "repeated[]
unprofessional conduct."  Here, Doe's Statements—published to a small group of intimates, each
of whom was steeped in Doe's history of mental illness—all revolve around the ending of a
single professional relationship between Doe and Conti.  Conti does not assert that the
Statements impugn his treatment of other patients or his other professional engagements—they
do not.  The Statements are a critique of Conti's treatment of one patient only: John Doe.

### E.  The Statements Are Protected by the Self-Interest and Common Interest Privileges

Doe is also entitled to summary judgment because the Statements are protected by both the self-interest and common interest privileges.  Conti does not even address the self-interest privilege in his opposition papers.  His meritless arguments about the common interest privilege are based on strained, inaccurate characterizations of the relationship between Doe and the Statements' recipients.  And Conti offers *no* evidence—none—from which a jury could determine that Doe acted with reckless disregard for the truth or solely out of ill will or spite.

#### 1.  The Self-Interest and Common Interest Privileges Apply

The Statements are protected by the self-interest and common interest privileges, both of which are recognized under New York law.  The self-interest privilege applies to communications that are "designed to protect the speaker's own legitimate interests."  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000); *see also* Doe Br. at 28-30.  Here, it applies because the Statements concerned a matter of great importance to Doe (his mental health) and they were made to the very people from whom Doe sought assistance in protecting and improving his mental health: his parents, his mental health treaters, his lawyer, and his close friends.  Conti's papers never specifically address the self-interest privilege, and he does not deny that the Statements concerned Doe's mental health or that the recipients were in a position to help Doe with his mental health.  His silence is an admission on these points and, on those grounds alone, summary judgment for the defendant is warranted.[10]

---

[10]     *See Konikoff v. Prudential Ins. Co. of Am.*, No. 94 Civ. 6863, 1999 WL 688460, at *22, *33 (S.D.N.Y. Sept. 1, 1999) (granting defendant's motion for summary judgment on plaintiff's defamation claim solely on the basis that "the challenged statements by or on behalf of defendant were subject to conditional privileges for self-interest and common interest").

On the common interest privilege, Conti does not dispute that Doe's parents, his treating doctors (Dr. Lippert and Dr. Jenike), and Mr. Meyer (Doe's personal assistant) all had a common interest in Doe's mental health.  Rather, he seeks to refocuses his claim—again—by pointing to communications that went to ███████ Alan Dershowitz, and the PPG treatment team.[11]  Conti's assertions notwithstanding, all of those recipients had a common interest in Doe's mental health.

First, ███████ has been close friends with Doe and his family for decades, and served for a time as a lawyer for Doe's business.  Ex. XX ¶ 1.  He is intimately familiar with Doe's mental health conditions and has communicated extensively with Doe and Doe's parents about them.  *Id.* ¶ 2.  Doe did not address ███████ in his opening brief because ███████ was copied on only two of Doe's emails—Exhibits N & O—neither of which contain defamatory statements.  While Conti argues that the emails mention Conti's abandonment of Doe during the titration process, in fact, neither email includes statements that refer to "specific instances of Plaintiff's conduct and, thus, have a precise meaning and are readily capable of being proven true or false." Feb. 27, 2019 Op., Dkt. 57, at 8.  They are, thus, not defamatory for that reason.  Conti's focus on them now only highlights his desperation to find something—*anything*—to hang his hat on.  In any event, ███████ close and long-standing personal relationship with Doe and Doe's family, including his history of communicating with Doe's parents about Doe's condition, all place statements to him squarely within the protection of the common interest privilege.

Second, Alan Dershowitz—a Doe family friend, confidant, and lawyer—was also within the common-interest relationship.  Mr. Dershowitz has known Doe and his family for ten

---

[11]   Doe's April 7, 2017 12:15PM (Ex. E), June 18, 2017 (Ex. G), and September 7, 2017 (Ex. L) emails copy none of these people.  Conti therefore concedes that these three emails are protected by the qualified privileges.

to fifteen years.  Dershowitz Decl., Ex. V at ¶ 1.  In the ten years prior to 2017, Mr. Dershowitz

had provided Doe with "pro bono legal services and advice on an as needed basis"; he "did so

out of professional consideration, and also out of friendship to Doe and his family."  *Id.* ¶ 4.

Conti himself knew that Doe and Mr. Dershowitz were close.  In a June 14, 2017 email, Conti

acknowledged that Doe had "spoken about [Mr. Dershowitz] as caring for him."  Ex. C at 1.

When Doe sent Mr. Dershowitz the Statements, Mr. Dershowitz received them in

the "capacity of Doe's attorney" and he "considered Doe as [his] client."  Ex. V at ¶ 7.  It is

immaterial that Mr. Dershowitz and Doe did not sign a formal retainer agreement until

November 2017 or that Doe was not paying Mr. Dershowitz a fee during this time.  *Moran v.*

*Hurst*, 32 A.D.3d 909, 911 (2d Dep't 2006) ("[A]n attorney-client relationship does not depend

on the existence of a formal retainer agreement or upon payment of a fee.").  Doe had been

seeking Mr. Dershowitz's legal advice and he understood Mr. Dershowitz to be his lawyer.  *See*

Ex. ZZ at 346:4-16.  He wanted Mr. Dershowitz to be aware of Conti's impact on his mental

health.

And, regardless of whether he had an attorney-client relationship with Doe, Mr.

Dershowitz is within the common interest.  To invoke the common interest privilege, the shared

interest between the parties to the communication "need not be of a legal nature, as it can also be

of a moral or social character."  *Boehner v. Heise*, 734 F. Supp. 2d 389, 399 (S.D.N.Y. 2010).

Mr. Dershowitz undisputedly had a moral and social interest in Doe's well-being, based on the

years of friendship and legal advice he had provided to Doe and his family.  *See* Ex. KK at

339:23 (Doe's testified that Mr. Dershowitz was "[a] friend of [his].")

Third, Conti's claim that the common interest privilege is somehow vitiated by

*his* decision to voluntarily add his colleagues and staff to an email discussion with Doe and his

parents is puzzling and legally without merit.  The common interest privilege belongs to Doe, not Conti, and Conti cites nothing to suggest that he can pierce that privilege by voluntarily adding people to the conversation.

More to the point, the PPG team that Conti added—Mark Schorr, Sonali Patel, Amber Carr, and Carmen Hepner—in fact did share an interest in Doe's well-being, as they had treated and interacted with Doe for over a year.  These psychiatric professionals had a duty to assist with the transfer of Doe's treatment, and they had the capacity to provide relevant information to further Doe's continuing mental health treatment.[12]  Notably, Schorr, a psychotherapist, repeatedly offered to meet with Doe *after* Conti had terminated Doe's care with PPG.  The reason for that is obvious: Schorr, as a responsible mental health professional, wanted to see Doe heal and was willing to extend himself to assist Doe in doing so.  Conti's litigation-oriented claim that his PPG colleagues had no interest in Doe's mental health just because he, Conti, had dismissed him as a patient is as appalling as it is meritless.[13]

### 2. No Reasonable Juror Could Conclude Doe Acted with Reckless Disregard for the Truth or Solely Out of Spite

The self-interest and common interest privileges can be overcome only by a showing that the speaker acted either solely out of common law malice—*i.e.*, because of spite or ill will—or with "actual malice"—that is, with knowing or reckless disregard for the truth.  The plaintiff bears the burden of proof on these issues, and here, Conti has offered no evidence that Doe acted with either actual or common law malice.  *See Chandok v. Klessig*, 632 F.3d 803, 813

---

[12]   This is, of course, particularly true for Schorr, the only PPG team member who Doe himself copied on an email.

[13]   Conti's own receipt of the Statements does not vitiate the common interest privilege.  Doe's publication of the Statements to Conti himself cannot give rise to a claim of defamation because it does not constitute publication "*to a third party*," as the tort requires.  *Thorsen*, 996 F. Supp. 2d at 163 (emphasis added).

(2d Cir. 2011) (plaintiff has the burden of establishing actual and common law malice to defeat qualified privilege).

To begin, Conti does not argue that Doe's Statements were motivated "solely" by spite or ill-will (common law malice)—and in any event, the standard is exceedingly high. Under New York law, "common-law malice will defeat such a privilege only if it was the one and only cause for the publication." *See Chandok*, 632 F.3d at 815 (quotation marks and citations omitted). Conti's silence on this point is a concession that he cannot satisfy it.

While Conti does assert that Doe acted with actual malice—a state of mind that may be "infer[red] [] from . . . . objective facts," *Celle*, 209 F.3d at 183—he provides no such facts, and there are none to provide. That is because the specific Statements upon which Conti bases his libel claim are substantially true, or, alternatively, any defamatory inference that arises from those facts constitutes Doe's opinion.

The facts, if any, underlying the Statements are these: Conti terminated Doe as a patient while Doe was attempting to titrate, and Doe viewed that termination as an abandonment and characterized it as such. While Conti may dispute that *characterization*, the *facts* on which Doe's Statements are based are true—and Conti certainly cannot dispute that Doe believed them to be true.[14] Conti's say-so, in summary judgment, does not change that. "Any conclusion that [Doe] must have known that his [Statements were] false on the grounds that [they were] (arguably) untrue would be an exercise in conjecture, which is insufficient to establish constitutional malice." *Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist.*,

---

[14]     For this reason, *DiBella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005), is inapposite. There, the Second Circuit affirmed the denial of a post-verdict motion for judgment as a matter of law, concluding that there was evidence to support the jury's finding that the defendant acted with actual malice because witnesses testified that the defendant "was aware of the true facts when he made his" defamatory statements. *Id.* at 117. Here, no witnesses can testify and no document will show that Doe knew or believed the facts to be anything other than what appears in the Statements.

178 F. Supp. 3d 118, 167 (S.D.N.Y. 2016) (applying common interest privilege and finding no evidence to establish actual malice to defeat the privilege).

Conti's steadfast refusal to state with clarity what it is he is suing over plagues this case.  In as much as Conti is now suggesting that the libel here is the implied statement that he acted inappropriately or unprofessionally by terminating care, and/or by not being available during the CVS incident, and/or, more generally, because of his travel outside of Portland, the defamatory thrust is one of opinion based on disclosed facts.  As such, it is not actionable.  *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008) (opinions, "no matter how offensive, cannot be the subject of an action for defamation").

The gauzy—indeed, weightless—nature of Conti's libel claim becomes clear when one considers what, exactly, Conti's "proof of falsity" would look like in Conti's case in chief, were this case to go to trial.  Conti would no doubt spend his time pointing the finger of blame at his former patient for the "breakdown in the therapeutic relationship."  But he would have no *evidence* to offer to refute the assertion that it was he, the doctor, who terminated care in the midst of the titration process; or that he, the doctor, was unavailable during the CVS incident; or that he, the doctor, was frequently away from Portland while Doe was in treatment.  Any "dispute" will not be over facts; it will be over how the parties *characterize* facts that are undisputed.  Conti will say that his conduct was professional, normal, expected, and justified; Doe will say that it constitutes "abandonment."  The evidence will be the same either way.

Such a "dispute" is the stuff of opinion, not actual malice.[15]  Thus, when Conti argues that the jury should be allowed to make "credibility determinations" in order to decide

---

[15]    *See, e.g.*, *Amodei v. N.Y. State Chiropractic Ass'n*, 160 A.D.2d 279, 281 (1st Dep't 1990) (accusation of chiropractor's "unprofessional conduct" was a protected statement of opinion); *Ansorian v. Zimmerman*, 215 A.D.2d 614, 614 (2d Dep't 1995) (statements that teacher was incompetent were protected opinion); *Penn Warranty Corp.*

whether defamation has been proven, the Court should ask:  determinations about *what*?  Which

facts are in dispute?  The answer, of course, is none.

Out-of-context statements by Doe's mother'—to which Conti points in his brief,

Conti Br. at 35, as a basis to defeat summary judgment—change nothing about this calculus.

Jane Doe's anguished email to Conti stating that Conti "described" Doe and "know[s]" Doe

speak to her belief about Conti's understanding of her son's mental illness, not Doe's knowledge

whether  the facts underlying the Statements are true or false.  Her reflections have no bearing on

whether Doe acted with reckless disregard for the truth—except perhaps to support an inference

that Conti, like everyone else who received the messages, understood them to be nothing more

than a manifestation of his illness.

And, Doe's testimony about a dinner he had with his father after Conti failed to

timely call in Doe's prescription supports the inference that Doe's belief in the truth of that

statement was well founded.  As Doe explained, he learned from his father that he had "spoke[n]

to Paul Conti" following the incident at the pharmacy and that Conti had told Doe's father that

he "would like to apologize" to Doe.  Ex. KK at 355:8-18.  This testimony establishes the truth

of Doe's Statements that his parents "caught" Conti.  At the very least, it forecloses any claim

that Doe knew his Statements about Conti getting "caught" by his parents to be untrue.

All that leaves of Conti's "actual malice" argument is Doe's testimony about his

desire to "shame" Conti.  Such testimony is not enough.  The Court of Appeals could not be

more clear:  standing alone, "evidence of ill will is not sufficient to establish actual malice."

*Celle*, 209 F.3d at 183.

---

*v. DiGiovanni*, 810 N.Y.S.2d 807, 815 (Sup. Ct. N.Y. Cnty. 2005) (statements that plaintiff was "running scams," "crooked," and had been "ripping off" customers were nonactionable opinion).

Because Conti has failed to establish that Doe acted with malice—actual or common law—the self-interest and common interest privileges apply.

## II.   CONTI'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED

Conti's summary judgment motion is based on a false premise—that Doe can maintain a breach of confidentiality claim only if he is able to specifically identify the people to whom his information was disclosed, and show that that group is comprised of a certain threshold (unstated) number of individuals.  That is not the law.  The damages element of Doe's breach of doctor-patient confidentiality claim is satisfied by the significant mental anguish and distress Conti's disclosure of confidential medical information caused Doe, regardless of exactly to whom or how many people such information was disclosed.  Neither the litigation privilege nor the First Amendment authorizes such disclosure, or immunizes Conti liability for the damage he has inflicted on Doe.

### A.   Doe's Significant Emotional Damages Are Sufficient to Sustain His Breach of Doctor-Patient Confidentiality Claim

"To prove an actionable breach of doctor-patient confidentiality under New York law, Doe must prove that: (i) he had a doctor-patient relationship with Dr. Conti; (ii) Dr. Conti acquired information about Doe's treatment or diagnosis; (iii) Dr. Conti disclosed that information to a person unconnected with treatment in a manner that allowed Doe to be identified; (iv) Doe did not consent to the disclosure of the information; and (v) Doe suffered damages."  Oct. 21, 2020 Op., Dkt. 211, at 11 (citing N.Y. Pattern Jury Instructions § 3.59).

Doe will offer overwhelming proof on each of these elements at trial—including cognizable damages, which, in this case, take the form of the emotional distress caused by the unauthorized disclosures. *See Chanko v. Am. Broad. Companies Inc.*, 27 N.Y.3d 46, 56 (2016).[16]

*Chanko* is instructive in this regard.  In *Chanko*, the New York Court of Appeals sustained a breach of doctor-patient confidentiality claim brought by the estate of a decedent who died less than an hour after the breach had occurred.  Rejecting the defendant's argument that the claim must be dismissed because of a failure to allege "specific damages," the court explained that damages could be ascertained based on evidence showing the impact of the disclosure on the decedent during the last minutes of his life.  27 N.Y.3d at 56 ("evidence could very well reveal the level of decedent's awareness that others were present while he was being treated, and any reaction he may have had to their presence").  The *Chanko* court upheld the claim even though emotional damages were the *only* damages that were provable, as the decedent did not live long enough after the disclosure to suffer any additional consequences.[17]

Here, there is ample evidence that Conti's unauthorized disclosure of Doe's private medical information in the Complaint and the Amended Complaint caused Doe emotional distress.  Doe testified that the disclosures left him deeply concerned that people who he knew "maybe could connect one dot to another" to find out about his "medical history with Paul Conti." Ex. KK at 361:17-21.  When asked how these concerns affected him, Doe testified to what are known as genuine emotional damages (albeit of the garden variety):

---

[16]    *See also Tighe v. Ginsberg*, 146 A.D.2d 268, 272 (4th Dep't 1989) (finding "no merit" to argument that breach of doctor-patient confidentiality claim "should be dismissed because it seeks recovery only for psychological and emotional damage but not for physical harm, lost earnings or special damages").

[17]    Notably, early on, emotional damages were seen as a basis for recognizing breach of doctor-patient confidentiality as a tort.  Analyzing whether a psychiatrist's disclosure of confidential patient information should be considered a breach of contract or a breach of fiduciary duty, one court concluded that the latter, tort theory of liability is more appropriate because, if the plaintiff were limited to an action for breach of contract, "he would generally be limited to economic loss flowing directly from the breach and would thus be precluded from recovering for mental distress . . . ." *MacDonald v. Clinger*, 84 A.D.2d 482, 486 (4th Dep't 1982) (internal citation omitted).

"[e]mbarrassment, shame, really being in a depressed place, rarely leaving [the] apartment, not being able to have energy, not handing [sic] to see family members because you hate yourself, not wanting to be around the office because there were certain people that you fell [sic] knew about your mental condition."  Ex. ZZ 362:3-10.

Doe's treating doctors testified to the existence and precise nature of these damages.  Dr. Lippert testified that disclosures "increased a lot of vulnerable issues" in Doe, "made it harder [for Doe] to trust," and increased "the fear that he is worth nothing but money." Ex. OO at 262:5-13.  Dr. Jenike testified that they had a "devastating" impact on Doe's psychological conditions.  Ex. YY at 146:15-19.  Describing Doe's mental state since the Complaint was filed, Dr. Jenike testified: "His psychiatric symptoms have been markedly wors[e].  He is much more withdrawn than he used to be.  He is more anxious.  He's more depressed.  He has more panic attacks.  His insomnia is wors[e].  It is not all due to the lawsuit but things have markedly gotten wors[e]."  Ex. YY at 283:1-17; *see also* Ex YY at 284:16-20 (Doe "talks about the lawsuit constantly.  'I can't move on.  I can't get off Xanax until the lawsuit is over.'  It is on his mind all the time.  He really feels terrible shame that his family is being dragged through this.").

Conti suggests that the Court ignore Doe's emotional damages and hold as a matter of law that Doe has not sustained any damages because he purportedly "could not identify anyone to whom Dr. Conti or anyone working on Dr. Conti's behalf disclosed the Complaint or his confidential information."  Conti Br. at 36.  But, in a context where it is undisputed that Conti did disclose Doe's confidential medical information, at the very least, to court personnel, whether Doe can give the names of such persons is quite irrelevant to the fact that he has suffered emotional damages.  Conti cites nothing to suggest otherwise.  Doe's inability to name

28

the court personnel, law clerks, legal assistants, court reporters, and others to whom his confidential information was disclosed does not diminish the harm he has suffered from knowing that people *he does not know* have access to intimate secrets he revealed in confidence to his psychiatrist.  *See* Ex. CCC.

Indeed, as the case has progressed, Doe's confidential medical information has been more widely disseminated, as additional people have gained access to the suit's details, including court reporters, experts, lawyers, court personnel, and others.  And Doe's information was leaked more broadly to the media, as Conti knew or should have foreseen would occur.   As the Court is aware, in September 2019, Doe *was in fact* identified as a son of his father, a noted businessman, by the *New York Post* and other news outlets (*The Daily Mail* and Fox Business) that reported on Conti's Complaint.  The coverage attached Doe's real last name and his father's photograph to Conti's most sensitive (and, in some cases, flatly untrue) allegations.

This level of disclosure, coupled with the distress that it caused, is more than sufficient to sustain Doe's claim.  *See Chanko*, 27 N.Y.3d at 55.  In *Chanko*, the decedent's estate stated a breach of doctor-patient confidentiality claim based on the hospital's decision to allow the decedent's treatment to be filmed and then televised.  The Court explained that the claim was cognizable *regardless of whether* the decedent was even recognizable in the televised program because the estate alleged an "improper disclosure of medical information to the ABC employees who filmed and edited the recording."  *Id.* at 55.  That unauthorized disclosure to only a handful ABC employees was sufficient to state a claim.  So too here.

Doe's distress also stems from the reality that Conti's allegations will not remain anonymized and sealed indefinitely.  *See generally Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (recognizing common law and constitutional right of public access

to judicial proceedings and judicial documents).  By filing this lawsuit and including irrelevant,

sensitive, and confidential information about Doe in the Complaint, Conti set off a chain of

events that will lead to the dissemination of Doe's medical information far beyond the confines

of the courthouse.  The mere prospect of that occurring has taken an enormous emotional toll on

Doe, for which he is entitled to recover.  *See* Ex. CCC ¶ 2.

> **B.  Neither the Litigation Privilege Nor the First Amendment Protects Conti**

Conti's decision to disclose his patient's private medical information is not

protected by the litigation privilege or by the First Amendment.

> **1.  New York's Common-Law Litigation Privilege Does Not Protect Conti's Disclosure of Doe's Medical Information**

New York courts have long recognized the existence of a "litigation privilege,"

meaning that statements made in pleadings, court testimony, or the course of ongoing litigation

generally, may not serve as the basis for a claim in defamation.  *See Officemax Inc. v. Cinotti*,

966 F. Supp. 2d 74, 79 (E.D.N.Y. 2013) (citing *Bisogno v. Borsa*, 101 A.D.3d 780, 781 (2d

Dep't 2012)). [18]  Conti seeks to interpose the litigation privilege as a defense to Doe's

counterclaim for breach of fiduciary duty.  But the privilege exists as a defense to claims of

defamation specifically, *not* as a free-floating right of doctors or others entrusted with highly

sensitive and confidential information to disclose such information in court papers under the

"protection" of a court caption.

Conti cites not a single case in which the "litigation privilege" is applied outside

of the defamation context—and we are aware of none, for good reason.  The privilege exists to

---

[18]     The scope and application of this common-law privilege has been widely discussed and debated. *See, e.g.*, Louise Lark Hill, *The Litigation Privilege: Its Place in Contemporary Jurisprudence*, 44 Hofstra L. Rev. 401 (2015); *Defamation and Disparagement*, 27 Bus. Torts Rep. 121 (2015); David L. Hudson Jr., *Heeding the Words: Client's Termination Letters to Attorney Are Protected from Defamation Suit, Court Says*, ABA J., (Apr. 2014).

keep every swearing contest in court from turning into subsequent claims for defamation.  *See*

*Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (2015).  This rationale has no application to cases

alleging breaches of fiduciary duty and confidentiality.  Indeed, to import this narrow defamation

defense into the realm of confidentiality-breach law would be fundamentally re-write New York

common law.

Indeed, it would be to *un-write* and *override* New York statutory law—

specifically CPLR 4504(a), which codifies the doctor-patient privilege itself.  CPLR 4504(a)

prohibits doctors from disclosing a patient's confidential medical information "[u]nless the

patient waives the privilege."  CPLR 4504(a) ("Unless the patient waives the privilege, a person

authorized to practice medicine . . . shall not be allowed to disclose any information which he

acquired in attending a patient in a professional capacity, and which was necessary to enable him

to act in that capacity.").  CPLR 4504(a) was codified in  "the belief that fear of embarrassment

or disgrace flowing from disclosure of communications made to a physician would deter people

from seeking medical help and securing adequate diagnosis and treatment."  *Williams by*

*Williams v. Roosevelt Hosp.*, 66 N.Y.2d 391, 395 (1985).  Its purpose was to encourage patients

to be transparent with their doctors, and it was passed because "[t]he disclosure by a physician . .

. of the secrets acquired . . . while attending upon a patient in his professional capacity, naturally

shocks our sense of decency and propriety."  *Dillenbeck v. Hess*, 73 N.Y.2d 278, 285 (1989)

(quotation marks and citation omitted) (alteration in original).  The statute allows no exceptions

for disclosure in court filings or testimony, and it makes no mention of the "litigation privilege"

as an exception or defense.[19]

---

[19]     Notably, CPLR 4504 affirmatively precludes the disclosure of a patient's confidences absent patient
waiver, even when disclosure is necessary to an ongoing litigation.  *See Dillenbeck*, 73 N.Y.2d at 287 ("Once the
privilege is validly asserted, it must be recognized and the sought-after information may not be disclosed unless it is

Against this backdrop, Conti's invocation of the "litigation privilege" as a defense to a breach of fiduciary duty claim borders on the frivolous.  As recently as last month, the Appellate Division, First Department, squarely held that the litigation privilege was *not* a defense to an alleged violation of a *contractual* confidentiality clause.  The "privilege exists in the context of defamation claims," the court explained, and no authority suggests "that it immunizes breaches of contractual confidentiality provisions" that occur in court papers.  *Rapaport v. Strategic Fin. Sols., LLC*, 190 A.D.3d 657, 657 (1st Dep't 2021).  If the litigation privilege cannot override a *contractual* confidentiality obligation, it certainly can override a *statutory* confidentiality obligation like the one that applies to Conti as a doctor.  Indeed, in other jurisdictions—including Oregon, where Conti practices—courts have expressly held that common-law privileges do not override statutory guarantees of confidentiality.[20]

Nothing in the statutory scheme suggests that the Legislature intended to allow doctors to circumvent the confidentiality CPLR 4504 requires by filing a complaint and asserting the litigation privilege. [21]  And, of course, Conti cites no case in which a court has held that the litigation privilege applies to a claim for breach of doctor-patient confidentiality.  His argument,

---

demonstrated that the privilege has been waived.")  Put another way, New York statutory law *prohibits* Conti, a physician, from disclosing Doe's medical information in this litigation, or any other, even if he is subpoenaed for it.

[20]    *See Borden v. Malone*, No. 1190327, -- So. 3d --, 2020 WL 6932738, at *11 (Ala. Nov. 25, 2020) ("[T]he common-law litigation privilege must give way to the statutory right of confidentiality.  In other words, the litigation privilege cannot insulate [defendant] and the clinic from a private action based on an unauthorized disclosure of patient confidentiality."); *Estape v. Seidman*, 269 So. 3d 565, 569 (Fla. Dist. Ct. App. 2019) (common-law witness immunity did not shield disclosures in violation of doctor-patient confidentiality statute); *Wynn v. Earin*, 163 Wash. 2d 361 (2008);  (witness immunity does not apply to information disclosed in violation of health care privacy statute); *Renzi v. Morrison*, 249 Ill. App. 3d 5, 6 (1993) (common law witness immunity did not protect psychiatrist who voluntarily disclosed medical information that was protected by Illinois statute at a court proceeding); *Humphers v. First Interstate Bank of Or.*, 298 Or. 706, 720 (1985) (because the duty of confidentiality arises from a statute, "the defenses of privilege or justification" must also have a statutory foundation).

[21]    Section 74 of the New York Civil Rights Law governs only out-of-court "fair reports" of statements made in litigation; the common law litigation privilege applies to statements made *during and in the conduct* judicial proceedings, such as the disclosures in Conti's Complaint.  *See Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 456 (E.D.N.Y. 2013) (distinguishing between "common law" litigation privilege, which covers statements made during judicial proceedings, and N.Y. Civ. Rights Law. § 74, which covers out-of-court statements).

if adopted, would eviscerate New York's public policy of promoting candor between doctor and patient, *see Dillenbeck*, 73 N.Y.2d at 286 (doctor-patient confidentiality "remains rooted in both the statutory law and public policy of New York State"), and must therefore be rejected.

Moreover, even if New York's common-law litigation privilege somehow did apply here, by its terms, it would not protect statements made in judicial proceedings that are "maliciously institute[d]" with the intent to harm or defame the defendant. *Williams v. Williams*, 23 N.Y.2d 592, 599 (1969). This is precisely such a malicious filing, peppered as it is with salacious details about Doe's alleged life of luxury, his childhood fears and losses, his family dynamics, to say nothing of the as out-and-out lies that he abused cocaine and patronized prostitutes, none of which has anything to do with Conti's claim of libel. A jury could reasonably conclude, based on the numerous gratuitous allegations Conti included in the Complaint, that Conti acted maliciously with the intent to harm, embarrass, and shame Doe. Summary judgment is not available to Conti on these facts.

Finally, and relatedly, the litigation privilege only protects statements that are "material and pertinent to the litigation." *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 216 (E.D.N.Y. 2012). The confidential medical information Conti disclosed about Doe is neither material nor pertinent to his claims against Doe. At the very least, the materiality of Conti's disclosures is a question of fact to be decided at trial.

### 2.    The First Amendment Does Not Protect Conti's Conduct From Suit

The First Amendment does not protect Conti either. Conti's purported First Amendment right to "access the courts," Conti Br. at 38, in no way forecloses Doe's claim for damages arising from Conti's disclosure of Doe's confidential medical information.

To begin, the First Amendment's right to free speech and to petition government are, in the main, rights against prior restraints imposed by government. No prior restraint is at

issue here.  Indeed, there are many circumstances where people are fully permitted to speak in court, but face consequences for things that they say: court sanctions for obstreperous speech, civil liability for lies told to stimulate baseless criminal prosecutions (malicious prosecutions), and criminal liability for perjury are just a few of many examples.  The First Amendment is offended by none of these.[22]  Consequences such as these may be imposed on any member of the public at large, regardless of what occupation s/he chose to pursue.

Doctors, like lawyers and others whose occupations place them in positions of trust and confidence with clients/patients, *agree to* substantial restrictions on their speech and petitioning rights as a condition of their professions.  At the very least, they accept that the exercise of such rights might expose them to financial and other adverse consequences that would not arise but for their decision to engage in a learned profession.  In New York, a psychiatrist's First Amendment rights are restricted by statute.  *See* CPLR 4504(a).  Psychiatrists freely accept such restrictions as a condition of the ethical practice of medicine—and the restrictions are amply justified by the compelling public policy interest in encouraging people who are ill to seek treatment for sensitive problems.

Newsgathering by a television film crew is at least as constitutionally protected as the filing of a damages lawsuit about a private matter, if not more so—yet it can still give rise to liability for disclosing patient confidences without consent.  *See Chanko*, 27 N.Y.3d at 55.  That confidentiality does, should, and must limit doctors' otherwise-protected First Amendment activity is especially true of *psychiatrists* like Conti who treat addiction, mental disorder, and

---

[22]     *See, e.g., United States v. Dunnigan*, 507 U.S. 87, 97 (1993) (observing that "the constitutionality of perjury statutes is unquestioned"); *Mezibov v. Allen*, 411 F.3d 712, 718 (6th Cir. 2005) ("The courtroom is a nonpublic forum where the First Amendment rights of everyone (attorneys included) are at their constitutional nadir."); *Mead v. Gordon*, 583 F. Supp. 2d 1231, 1240 (D. Or. 2008) (court order barring plaintiff from courthouse for one year after she yelled at a judge did not violate plaintiff's First Amendment rights).

family dysfunction.  The prevailing standards of the psychiatric profession impose significant

limits on expression that do not apply to citizens at large.  *See* Ex. EEE at 107:14-108:16

(discussing the "Goldwater Rule" governing psychiatrists, which restricts diagnosis of public

figures).  And there is nothing untoward, or even unusual, about that; it is a requirement for the

ethical practice of psychiatry.  Just as the speech rights of public employees are cabined by

important countervailing considerations attendant to their jobs, *see Garcetti v. Ceballos*, 547

U.S. 410 (2006)—an FBI agent does not have a constitutional right to speak to *The New York

Times* about a sensitive criminal investigation—a psychiatrist cannot violate his ethical

obligations to his patients without consequence, all in the name of his right to petition the courts.

In any event, Doe's claim is not about Conti's right to "access the courts."  Doe

does not dispute that Conti has the right to file a lawsuit against him.  Conti could have sued Doe

*without* violating confidentiality—he just chose to do otherwise.

**CONCLUSION**

For all the foregoing reasons, the Court should grant Doe summary judgment on

Conti's defamation claim and deny Conti's motion for summary judgment.

Dated: February 19, 2021
       New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        ABADY WARD & MAAZEL LLP


                                        _____/s/_____
                                        Andrew G. Celli, Jr.
                                        Katherine Rosenfeld
                                        Samuel Shapiro
                                        Nick Bourland

                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for John Doe*