UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL CONTI,

　　　　　Plaintiff / Counterclaim-
　　　　　Defendant

　　　-against-

JOHN DOE,

　　　　　Defendant / Counterclaim-
　　　　　Plaintiff.

No. 17-CV-9268 (VEC)

**JOHN DOE'S RESPONSE TO PAUL CONTI'S**
**RULE 56.1(b) COUNTER-STATEMENT OF MATERIAL FACTS**

112.　　Doe was aware that Conti traveled in connection with his practice before he agreed to submit to treatment at PPG in Portland, because they first met when Conti was traveling in NY on business. Ex. 2 at 200.

**Response:**　　Undisputed.

113.　　While in treatment with PPG in Portland, Defendant left Portland for Reno, Nevada, Ex. 3 at 136-37, although he has a well-documented gambling addiction, *id.*, at 169.

**Response:**　　Undisputed that Doe traveled to Nevada while he was in treatment with PPG in Portland.  Disputed that the cited evidence supports that Doe went from Portland to Reno, Nevada in connection with gambling.  At his deposition, Doe testified that he traveled from Portland to Lake Tahoe to Los Angeles.  Ex. KK at 282:5:8 ("because it wasn't from Portland, that was from Lake Tahoe that I went to Los Angeles . . .").  Undisputed that Doe had a gambling addiction.

114.　　Instead of returning to Portland from Reno, as per the agreed-upon treatment plan, Doe relocated to Los Angeles.  Dkt. No. 31-4; Ex. 3 at 135.  The relocation was Doe's choice. Ex. 3 at 137.

**Response:**     Undisputed that Doe traveled from Portland to Nevada to Los Angeles. Undisputed that it was Doe's choice to move from Portland to Los Angeles.  Disputed that there was an "agreed upon treatment plan" that required Doe to live in Portland in order to remain a PPG patient.  Ex. UU at 219:3-12 (patients of PPG regularly live outside Portland and are successfully treated by PPG treaters), 300:22-25 (PPG offered Doe several treatment options that would accommodate Doe continuing to stay in Los Angeles), 215:25–217:7 (PPG therapist Mark Schorr believed it was therapeutic for Doe to work and engage with his business, even if in Los Angeles); Ex. EEE at 136:14-16 ("Mark Schorr said it was a fine place for him to do it, that he was very happy with what he was doing.").

115.     Defendant's move to Los Angeles was made without agreement or input from Dr. Conti. Ex. 2 at 281-82; *see also* Dkt. No. 31-4 (termination email).

**Response:**     Undisputed that Doe did not consult with Dr. Conti before he relocated to Los Angeles.  Disputed that Dr. Conti had no "input" into Doe's move to Los Angeles: Dr. Conti prescribed medicine to Doe while Doe was in Los Angeles, as evidenced by the entire "CVS incident."  Dr. Conti's PPG colleague Mark Schorr flew to Los Angeles to provide treatment to Doe there in his role as a member of Doe's treatment team, Ex. UU at 219:15-19, and Doe's PPG treatment team (which included Dr. Conti) communicated about treatment plans for Doe that included options for Doe to remain based in Los Angeles and continue treatment with PPG treatment providers.  Ex. AAA.

116.     By moving to Los Angeles, Defendant ensured that Dr. Conti, who lives in Portland, Oregon, would be required to monitor his Xanax titration remotely.  Ex. 3 at 135-36.

**Response:**     Undisputed that Dr. Conti monitored Doe's Xanax titration remotely when Doe lived in Los Angeles and remained a PPG patient.  Disputed that it was Doe's move to Los

Angeles that "required" Dr. Conti to monitor Doe's Xanax titration remotely.  During the time period of Doe's treatment, Dr. Conti traveled frequently and spent approximately half of his time away from Portland, Ex. QQ at 77:8–78:6; Ex. RR at 101:9-14, and thus Dr. Conti was monitoring Doe's treatment remotely even when Doe lived in Portland.  In any event, Dr. Conti believed that it was possible for him to continue to treat Doe after Doe moved to LA.  Ex. AAA ("Given all of the above, while I am happy to continue care if we can agree upon and stick to a plan, I am also happy to transition care to another physician if you feel more comfortable, in Los Angeles or Portland, or in any other place if you choose.").

117.    Defendant chronically missed appointments and failed to communicate with PPG affiliated personnel.  Ex. 1 at 213; Ex. 2 at 220; Ex. 3 at 180-82; Ex. 4 at 151, 317; Ex. 6 at 28, 232; Ex. 7 at 6, 30; Ex. 8, Def. Ex. 1006.

**Response:**    Undisputed.

118.    While in treatment at PPG, Doe used more Xanax than was prescribed by Dr. Conti, and it is undisputed that Doe has supplemented his prescribed Xanax by purchasing it illegally.  Ex. 11, Def. Ex. 1047; Ex. 7 at 30; Ex. 8, Def. Ex. 1006; Ex. 2 at 65-66, 74.

**Response:**    Undisputed that while Doe was in treatment at PPG, there were periods of time that Doe used more Xanax than was prescribed by Dr. Conti and that he did not obtain the additional Xanax from Dr. Conti.

119.    Doe lies about his Xanax use to his current treaters, Drs. Jenike and Lippert, Ex. 2 at 68-69, his parents, *id.* at 85, and his personal assistant, *id.* at 99-100.

**Response:**    Disputed that Doe currently "lies" about his use of Xanax.  Undisputed that Doe testified that he had lied to these individuals about whether he was continuing to use Xanax after he left McLean Hospital in 2018 for substance abuse treatment.  Ex. KK at 100:11-

3

15 ("The pressure of addiction and the shame of it, I couldn't hold on to it anymore.  Addiction's a very tough thing to deal with and I need to consult with somebody.  Q. What did you say to Mr. Meyer and what did he say to you?  A. Something along the line of I'm sorry for letting you down. I'm back on Xanax. I've been on it for quite some time.").

120.    With respect to the event where Doe's father was waiting on March 28, 2017 in a CVS to have a prescription filled (the "CVS Incident"), Dr. Conti had called in the prescription and the delay was caused by the pharmacy.  Ex. 9 at 202-03; Ex. 10, Def. Ex. 1059, at PC 1328.

**Response:**    Disputed.  The delay was caused by Conti.  Conti had forgotten to call Doe's prescription into the pharmacy.  Ex. TT at 103:6-10; Ex. D at 2; Ex. FF.  Conti admitted to Doe's parents that he had been unreachable for four hours during the incident at the CVS pharmacy.  Ex. D at 2.  The situation was only resolved when Mark Schorr was able to get ahold of Conti.  Ex. QQ at 272:21–273:5; Ex. FF at 2.  After several hours, Conti's office called in the prescription and the medication was made available to Doe.  Ex. KK at 260:3-15; Ex. LL at 287:2-23; Ex. JJ at 248:7-10; Ex. D at 2; Ex. FF at 2.

121.    Once Sonali Patel found the note in Doe's file confirming that Dr. Conti had in fact called in the prescription, the matter was resolved with the pharmacy and Doe received his prescription.  Ex. 9 at 202-03.

**Response:**    Disputed.  Amber Carr Blum, Dr. Conti's assistant, called in the prescription that day to the pharmacy, which resolved the situation.  Ex. TT at 103:6-10, 108:6-9; Ex. VV.

122.    Dr. Conti believed erroneously that he actually had forgotten to call in the prescription and apologized to the Does for an error that he later learned he did not make.  Ex. 15 at 221.

4

**Response:**     Undisputed that Dr. Conti apologized to Doe's parents for the incident at the CVS pharmacy.  Disputed that Dr. Conti did not make an error.  Conti had forgotten to call Doe's prescription into the pharmacy.  Ex. TT at 103:6-10; Ex. D at 2; Ex. FF.

123.    Doe testified that after the CVS incident, his father James Doe asked him to stay in treatment with Dr. Conti: "[m]y father asked me – we were going to dinner that night and he asked me please, [Doe], you are very close, stick with it and I said okay."  Ex. 2 at 355.

**Response:**     Undisputed that Doe testified as quoted.

124.    At this dinner, James Doe did not tell John Doe that he needed a new psychiatrist because Dr. Conti had abandoned him in treatment, engaged in misconduct, or that the Does had caught Dr. Conti engaging in misconduct: he told him to "stick with it."  Ex. 2 at 355.

**Response:**     Undisputed that Doe testified that his father told him to "stick with" Dr. Conti in treatment.  Disputed that the cited evidence supports the remainder of the paragraph.

125.    After this conversation where his father urged him to stay in treatment with Dr. Conti, Doe and Dr. Conti spoke on the telephone.  Ex. 2 at 355-56.

**Response:**     Undisputed.

126.    Doe claimed that he felt "shamed" during this call with Dr. Conti.  Ex. 2 at 355-57.

**Response:**     Undisputed.

127.    Following the call with Dr. Conti in which Doe claimed to have felt shamed, he sent Dr. Conti a text that concluded: "Your a fraud.  A Coward.  Scum of the fuc*ing earth.  I wouldn't piss on you if you were on fire.  Other than that Have a great Easter holiday fu*k face." Dkt. No. 31-4 at 5 (the "FU*K Face Text").

**Response:**     Undisputed.

128.     When shown the FU*K Face Text at his deposition, Dr. Jenike was asked whether after receiving a text like that, any treatment alliance that Dr. Conti had with Doe was tenable, and Dr. Jenike responded "Probably not." Ex. 1 at 153.

**Response:**     Undisputed.

129.     After receiving the FU*K Face Text, Conti sent an email addressed to Doe's Parents and Doe (the "Discontinuing Care Email").  Dkt. No. 31-3.  At the end of the Discontinuing Care Email, Conti cut and pasted in the FU*K Face Text.

**Response:**     Undisputed.

130.     At a time when she had no motive to lie, Doe's mother replied to the Discontinuing Care Email, which included the FU*K Face Text, that "[James Doe] and I feel that you have described [Doe] and you know him.  What we disagree with you is that [Doe] has separated you from us.  That could not be further from the truth."  Ex. 12, Pl. Ex. 6.

**Response:**     Undisputed that Jane Doe sent the email as excerpted.  Disputed to the extent that this paragraph implies that Ms. Doe has had a "motive to lie" at any time.

131.     Jane Doe sent this reply to the Discontinuing Care Email after the CVS Incident had occurred back in March 2017.  *Compare* Ex. GG to Celli Decl. *with* Ex. 12, Pl. Ex. 6.

**Response:**     Undisputed.

132.     Jane Doe did not respond to the Discontinuing Care Email by claiming that Dr. Conti had abandoned Doe during treatment, engaged in misconduct, or been caught engaging in misconduct.  Ex. 12, Pl. Ex. 6.  Instead, she wrote that Dr. Conti "knew" Doe, and that Doe had failed to separate his parents from Dr. Conti. *Id.*

**Response:**     Undisputed that Jane Doe sent the email as excerpted.  Disputed that the cited evidence supports the remainder of the paragraph.

133.     The Discontinuing Care Email provided generalized grounds for terminating treatment, including: (a) "[t]he reason for discontinuing care is that I do not believe [Doe] is engaging with me in any reasonable manner, as evidenced by many interactions I and other caregivers have had with him, and by the [FU*K Face Text] that I have copied in below." Dkt. No. 31-3.

**Response:**     Undisputed that the email includes the quoted statement and that Dr. Conti offered the statement therein as a justification for terminating his care of Doe.

134.     The Discontinuing Care Email gave multiple examples as to why Dr. Conti had to discontinue care: "I have been left with the following situation: A patient who moved to another city without talking to me, who assails my motivations and competence, and who has made many commitments that he does not keep, and about which he then lies.  He is not engaging in treatment." *Id.*, at p. 2, ¶ 5.

**Response:**     Undisputed that the email contains the quoted statements.  Disputed that Dr. Conti "had to discontinue care."  Dr. Conti chose to discontinue care after he received an angry text message from Doe, and without reviewing the written treatment record. Ex. JJ at 241:12-20; Ex. WW at 283:12-120.

135.     The Discontinuing Care Email confirmed that Dr. Conti had more than one reason for discontinuing care, because it provided a primary reason, not an exclusive reason, for terminating care: "[m]y primary reason for discontinuing care at this point is that I believe the treatment of the moment, which consists of medication transition, cannot be conducted safely." *Id.* at 1 (emphasis supplied).

**Response:**     Undisputed that the document contains this statement.  Disputed that the cited evidence supports the remainder of the paragraph.

136.    When Dr. Conti's psychiatrist, Dr. N. Gregory Hamilton, was shown certain of Doe's message for the first time during his deposition, he testified that "I think they're worse than I had anticipated."  Ex. 13 at 187.

**Response:**    Undisputed.

137.    When Dr. Conti's assistant Amber Blum was asked what she understood Doe to be saying in one of the defamatory messages, she testified that he was "making accusations." Ex. 14 at 127-28.

**Response:**    Disputed.  When Amber Blum was asked what she understood Doe to be saying, Ms. Blum first responded: "I understand that [Doe's] expressing a lot of anger."  She then testified: "And making accusations."  She then added: "He's getting out some frustrations." When asked how she understood Doe's email when she first received it, Ms. Blum testified that she understood Doe "to be expressing anger" and that she could not remember understanding anything else at the time she read the email.  Ex. BBB at 128:2-129:2.

138.    Dr. Conti testified that he checked with his co-workers who had received one of Doe's emails because he wanted to make sure that they "understood everything that was true and not true."  Ex. 15 at 327-28.  As per the Court's prior rulings, the email in question is reasonably susceptible to a defamatory connotation.  *Conti v. Doe*, No. 17-CV-9268 (VEC), 2019 US Dist. LEXIS 31408, at *6-7 (S.D.N.Y. Feb. 27, 2019).

**Response:**    Undisputed that Conti testified as quoted.  Disputed with respect to the remainder of the paragraph, which purports to characterize a legal conclusion made by the Court at the motion to dismiss stage of these proceedings.

139.     Dr. Conti testified that he included people at PPG on a response to Doe because Doe had

made "a very serious allegation that one would be doing something clinical in circumstances in

which it is inappropriate to do something clinical." Ex. 15 at 82-83.

     **Response:**     Undisputed that Conti testified as quoted.

140.     Dr. Conti's wife, Dr. Brooke Maylie, gave the following testimony about her

observations of Plaintiff when she first learned that he was receiving disturbing emails from Doe:

> [M]y husband was sitting on the bed and he had his computer open and he said, "I
> think I need to make you aware of the fact that I'm receiving some very
> disturbing," – as I described before, "woefully scary e-mails from" – "from this
> kid." And he said, "I am" – and it became clear to me that that's the root of what
> I had started to see, which was this preoccupation with safety, a sense of worry
> about the future, and now at least I had an answer for where that was coming
> from.
>
> And, at that time, he said, "I don't know how best to protect myself and get some
> help and I may need to consider some legal advice to figure out how I protect
> myself, because this is scary."

Ex. 16 at 21.

     **Response:**     Undisputed that Dr. Conti's wife, Brooke Maylie, testified as quoted.

141.     Dr. Conti has submitted a sworn statement which takes into account his medical

expertise and experience with Doe, averring that:



Dr. Conti's January 22, 2021 Decl. at ¶ 5.

     **Response:**     Undisputed that Dr. Conti submitted this Declaration to the Court.

Disputed that Dr. Conti's Declaration "takes into account his medical expertise and experience

with Doe." The Declaration is the statement of an interested party. The Declaration provides another example of how Dr. Conti's filing of this action has led to the substantial disclosure of confidential information derived from the doctor-patient relationship. Dr. Conti seeks to opine about his former patient Doe, with whom he is enmeshed in litigation, without taking into account his own biases and lack of objectivity, which necessarily infect his current opinions of Doe and render them unreliable and irrelevant. The Declaration further fails to "take into account" Dr. Conti's "experience with Doe" because Dr. Conti did not contemporaneously record these purported observations of Doe but instead manufactured them years after the treatment for self-serving purposes in a litigation.

142.   Dr. Conti has submitted a sworn statement which takes into account his medical expertise and experience with Doe, averring that:



Dr. Conti's January 22, 2021 Decl. at ¶ 5.

**Response:**   Please see Defendant's Response to No. 141.

143.   Dr. Conti has submitted a sworn statement which takes into account his medical expertise and experience with Doe, averring that:



[REDACTED]

Dr. Conti's January 22, 2021 Decl. at ¶ 6.

**Response:**     Please see Defendant's Response to No. 141.

144.    Dr. Conti has submitted a sworn statement which takes into account his medical expertise and experience with Doe, averring that: [REDACTED]

[REDACTED] Dr. Conti's January 22, 2021 Decl. at 7.

**Response:**     Please see Defendant's Response to No. 141.

145.    Dr. Conti has submitted a sworn statement which takes into account his medical expertise and experience with Doe, averring that:



Dr. Conti's January 22, 2021 Decl. at ¶ 8.

**Response:**     Please see Defendant's Response to No. 141.

146.    Doe wrote Dr. Conti emails with copies to other individuals stating that "I will qwn you in a courtroom"; "Your ass belongs in mother fu\*king jail"; "Every fu\*king billboard I'm working to put your fu\*king woody wood pecker faggot ass face to get you. Your notriety – "; "I'm going to fucking destroy u and put your ass behind bars your fraudulent fu\*k," *see* Dkt.

No. 31-1; "For months and months I have always thought you have been a fu*king fraud;" "I will never let you do this to anyone. Never."; "You're a sick person," *see* Dkt. No. 31-5.

**Response:**     Undisputed that Doe sent emails to Dr. Conti containing these statements, on which other people were copied.  All of the individuals who Doe copied on his emails to Conti knew Doe personally, knew Conti was Doe's psychiatrist, knew Doe suffered from mental illness, and knew Doe sometimes behaved in irrational, inappropriate, and emotional ways that reflected his mental illness.  *See* Def.'s Statement of Undisputed Facts Nos.73-76.  Disputed that any of these statements are defamatory.

147.     On November 9 and 27, 2017, Doe sent various individuals emails that accused Dr. Conti of abandoning him during titration.  *See* Ex. 22, 23.  Among the persons copied on those emails was ███████, who has a ████████ email domain.  *See id.*  ███████ is a clothing apparel company, and Doe is its Chief Executive Officer.  Ex. 2 at 124-25.

**Response:**     Undisputed that John Doe copied an individual named ████████ on several emails he sent to Dr. Conti.  ███████ is an attorney who has known John Doe since Doe was approximately fourteen years old, and he has a longstanding friendship with John Doe and his family.  Ex. XX; *Id.* ¶ 1.  From approximately October 2011 through approximately May 2018, ███████ served as the Vice President, Secretary, and Treasurer of ███████, while Mr. Doe was the CEO.  *Id.*  ███████ is deeply familiar with John Doe's mental health issues and has often spoken to John Doe and his parents about Doe's mental health and well-being.  *Id.* ¶ 2. ███████ did not understand any statements in the emails to be asserting facts about Dr. Conti, nor did he form any opinion of Dr. Conti based on what was written in John Doe's emails.  *Id.* ¶ 3.

148.    On April 7, 2017, Doe sent various individuals an email that accuses Dr. Conti of abandoning him during treatment.  Dkt. No. 31-5.  Doe copied the following individuals affiliated with PPG on this email: Mark Schorr, Sonali Patel, Carmen Hepner, and Amber Carr. *See id.*

**Response**:        Undisputed that Doe sent an email to Dr. Conti on April 7, 2017 and that the individuals from PPG were copied on it.  At his deposition, Dr. Conti agreed that he originally added these four individuals to the email chain—to which John Doe replied—because he "wanted them to see what [John Doe] had said about [him] and [his] response."  Ex. JJ at 76:13-19.  The email in full states as follows:

> Now we are throwing 911 in there. Buddy you just classified has one of the most horrible human beings with no hope. Leave my parents out of this one. You don't think reading that assessment it doesn't scare the the shit out of me that I have no hope? You don't think I sit here and wonder what ever your piece of shit ass catorgizes me as, you don't think it still hurts. It actually hurts more from someone who I actually 3 months ago saw this coming. Buddy was severely depressed in Portland those first few months. It's funny because down to 2 mgs of xanax and engaged in- this is the best I have felt in 5 months. That's not saying a lot because I'm still very depressed. Dumb fuck. Do you think I need an email for what you just assesesd. I'm living it every day. My whole family is in israel for Passover. You don't think that kills me inside. You don't think I want to be there. But I know I'm no fucming good. So in some way I guess your email your correct I'm just no fucking good but I will never let your piece of shit ass define who I'm. Never tell that cancer patient I helped him because I'm narasasstic. Your a fraud that's it. Nothing in that email you wrote has not been something I have been aware. My parents like you. Why? Your good at what you do. Your a con? Your supposed to like the con men. That's how they get in. Because they are con men. They do a good Jon wiggling there way in. My whole life I have always have had good intuition on people. THAT DOESNT MEAN YOU FAGGOTT I HAVE ALWAYS MADE THE RIGHT CHOICE. But my intuition has been right on people. For months and months I have always thought you have been a fucking fraud. Now I'm going to advise you one thing. I'm working to bring you down on malpractice. That's my goal. That's it. I will never let you do this to anyone. Never. You don't think it's suffocating to hear that news you wrote. You think you mother fucker this is a fucking game to me. I'm fighting for my fucking life. And do have you write the narrative. A mother fucking piece of shit that wrote the narrative on me who was never present doing it feels good. It does not? There's only so much I can take. And what you think you beat me to the punch to end

13

treatment your con ass. I have been trying since December. Is this what you do now you have been called out. It's funny now you are worried about the Xanax titration.????? Where was your ass when Dovi was trying to get ahold of the medications from your dumbass. And let's get one thing straight I NEVER WAITED 4-5 hours. WE COULDNT GET A HOLD OF YOUR FUCKING ASS FOR THAT WHOLE TIME. AND ONE THING YOUR ASS CANT GETAWAY WITH WAS I HAVE ONE WITNESS THAT WAS ALWAYS ON YOUR OFFCIE AND THAT WAS DOVI. AND NOT ANFUCKING PEEP UNTIL MY FATHER GOT IMVOL VED. CONTI YOU CAN HAVE A DEGREE FROM HARVARD AND STANFORD EVEN THOUGH I HAVE PEOPLE CHECKING EVEN IF THAT'S THE CASE. But instead you decided to throw all the blame on me. I'm not suicidal you fuck. I want to live more than anything to prove your piece of shit ass wrong. Your a sick person. Because for me to say I have no issues. Yea that would be wrong. I do. I'm very frustrated. But let's get one thing straight your ass was never there in fact we had to beg and plead with your assistant you get ahold you. So don't worry I'm not suicdal but be aware of the malpractice suit coming on. You really think you could get away with this. You don't think with all the pain I have in me I'm going to let a little faggott like you tell me who I'm. You will never defme who I'm. You couldn't last two mins in my world you little bitch. And for my whole life people have told me I can't do this I can't do that. It's about god darnm time I start proving them wrong and if that sounds narrastic it is. I believe I'm here in this world for one thing and one thing only. Help people. See you don't know I feel others pain. And that's my strength. I understand people. To be honest if I had your pulpit I would be a lot more efficent. Y oy known me for 9 months. I don't give you that much credit. But def have weakened me but I will get back up and shove my success down your fucking face. Fuck off. Your scum

Dkt. 31-5.

149.    Dr. Conti had terminated his treatment relationship with Doe before Doe sent this

email. Dkt. No. 31-4.

**Response:**    Undisputed.

150.    Doe's April 7, 2017 email was a reply to an email from Dr. Conti on which he

had copied Mark Schorr, Sonali Patel, Carmen Hepner, and Amber Carr. *See id.* Doe did not

remove these individuals from the email chain before replying to Dr. Conti, thereby ensuring that

they received it. Dkt. No. 31-5.

**Response:**     Undisputed that Dr. Conti added the individuals listed to the email he sent

to Doe and that Doe then replied to Conti's email including all the added recipients.

151.     On June 13, 2017, Doe sent various individuals an email that accuses Dr. Conti of

abandoning him during treatment and of getting caught by his parents committing misconduct.

Dkt. No. 31-6.  Doe copied Mark Schorr of PPG on this email.  *Id.*

**Response:**     Undisputed that Doe sent an email to Dr. Conti on June 13, 2017 and that

Mr. Schorr was copied on it. The email states as follows:

> Your nothing but a coward. Simply put your a false prophet. You know it's easy
> to write a narrative on me.Very easy. And your entitled to your opinion. I have a
> gambling problem????? Really Mr Conti? Like I said I didn't need to go to
> Portland to get that assessment. I have a XANAX problem??? Really?? I didn't
> need to go to Portland to get that assessment. You are beyond brilliant Mr Conti,
> your diagrams that my 8 year old nephew can do better than that. WHAT DID
> YOU TELL ME ABOUT MYSELF THAT I HADN'T ALREADY KNOWN.
> It's amazing to me how a Dr, a person who should have ethics did what you did.
> You always pushed me so did my family to get off the xanax. I was always told
> the danger of the drug especially with someone of a impulsive personality like
> myself. These are your words. You don't have the best clarity or none at all when
> you are on this drug. This was all told to me by you. You picked and choosed how
> you wanted to narrarate the story. You said I didn't suffer from depression. I
> struggled more than anything with that. AND I LOOKED AT SOME OF
> EFFECTS OF XANAX. What's one of them and a very common one.
> Depression, mood swings. So you can talk your dr talk and talk as eloquently as
> you want as pass me off as the patient which I'm. But I will never understand.
> Never understand, your narrative. You were never there. On one Friday mark told
> my parents- is doing wonderful only than to hear on Monday 2 days later that **"llis**
> this- is that" come on your such a fraud. The part which will never be understood
> for how much you spoke about the dangers of xanax and getting off of it, I was
> doing the hardest work I had ever done. I went from 5 mg down to 1.5 mgs, every
> week being on edge and adding more to my anxiety wondering if I was ever going
> to get the meds. You looked me in the eye and told me you were the quarterback.
> The anxiety of getting OF THE xanax was harder than hell. Every
> fucking week why did we had to add more anxiety to even if I was going to be
> able to get the script to continue this titration. You were no where to be found.
> Dovi couldn't never get ahold of amber. You always deflected blame on someone
> else, Amber Dovi myself. G-D works in mysterious ways and had my parents not
> seen your pure negligence you mother fucker I would probably be under the care
> of your incompetent ass. It's funny no one told you to take me on. I asked actually
> for a new dr because I knew you were a fraud. But it was all under one umbrella

group. Had I not called your ass out when I thought you were going to apologize when my parents were in town when we couldn't even get a hold of you. You were running this titration process which I was doing the work by myself. I have dignity. I don't need to beg like an animal for a drug so wicked like this one tovget off. You word for word said "so what if you have to wait in the cvs pharmacy for 4-5 hours" I thought to myself first off we didn't wait. YOU WERE UNREACHABLE YOU PIECE OF SHIT. Let me ask you something You fraud. Would you want your wife, kids, mother father aunt uncle loved one, waiting in a cvs for 4-5 hours during this BEYOND difficult titration. So like I said no one said take me on. You were playing a mind game with me and you work at brighams women's hospital I hear you didn't the most bang up job. Or the one most amazing paper you wrote on orange juice induced hyperkalemia in schizophrenia. ~ ~ ~ ~

You abandoned me when I could have gotten out. You piece of shit. You abandoned your patient when he got himself from 5mgs to 1.5mgs. And your fucking right I freaked out, I didn't have a dr and I beyond relapsed. Your a coward. That's it. You're a fucking coward. Shame on you. SHAME SHAME FUCKING SHAME ON YOU. Thanks for your great work because you knew by not having a caring dr I would relapse. If your that smart which you think you are, if you take the situation you knew in that situation I didn't have a dr and you set me up for one thing and one thing only and that's failure. Your a scared little fucking coward. Fuck you you piece of shit. I'm in the hell of all hells and the only reason you terminated treatment was because my parents caught you on your bullshit. Now I know you will go back to he's a gambler he s impulsive. We all know that. And now I'm fighting for my life more hopeless than ever and I do put the fucking square blame on you. I get enough shit. This one is on you. You abandoned me. I was following all the orders from a dr who charged full rate but couldn't even give me .0001 percent of your time. Our phone appointments consisted of you being driven to the airport instead of giving me the god damm full hour u billed me for. So shouldn't I have your full undivided attention. Do patients not have any rights. Fuck you. You put me in so much pain and feeling hopeless, I wouldn't wish it upon anyone. Your a coward and a fraud. SHAME ON you for abandoning a vulnerable person in misery. You knew for how much you loved to hear the sound of your voice I would be forced to find another ave. SHAME SHAME SHAME ON YOU

Dkt. 31-6.

152.    At his deposition, Doe admitted that he was not in treatment with Mark Schorr as of June 13, 2017, and that he did not know why he copied him on the June 13, 2017 email.  Ex. 2 at 347.

**Response:**     Undisputed that Mr. Doe testified as excerpted from the deposition transcript.

153.     On June 13, 2017 and June 15, 2017, Doe copied Alan Dershowitz, Esq. on messages that the Court concluded are reasonably susceptible of a defamatory meaning.  Dkt. Nos. 31-6, 31-2 (the June 13 and June 15 messages respectively).

**Response:**     Undisputed that Mr. Doe copied Mr. Dershowitz on these emails. Disputed with respect to the remainder of the paragraph, which purports to characterize a legal conclusion made by the Court at the motion to dismiss stage of these proceedings.

154.     Mark Schorr was also copied on the June 13, 2017 email to Mr. Dershowitz. Dkt. No. 31-6.

**Response:**     Undisputed.

155.     Mr. Dershowitz did not enter into a written retainer agreement with Doe until he sent an email retainer contract on November 17, 2017, which was months after he received Defendant's June 2017 emails.  *Compare* Ex. 18 at DERSH 0001 *with* Dkt. Nos. 31-2, 31-3.

**Response:**     Undisputed.

156.     Mr. Dershowitz's November 17, 2017 email retainer states that "[i]t was good spending time with you this morning. I learned a great deal from our conversation."  *Id.*

**Response:**     Undisputed.

157.     Mr. Dershowitz's telephone records for the period of April 1, 2017 through the end of November 2017 reflect that Mr. Dershowitz and Doe only spoke one time prior to November 2017, on June 18, 2017. Ex. 18 at DERSH 0003-0009.

**Response:**     Undisputed that the records reflect there was one phone call between the unredacted phone numbers in this document.  Disputed to the extent that the cited evidence does

not support the statement that Mr. Dershowitz and Doe "only spoke one time prior to November 2017."

158.    As of the date of this June 18, 2017 call, Mr. Dershowitz had already been copied on Doe's messages from June 13 and 15, 2017.  *Compare* Ex. 18 at DERSH 0003 and *passim with* Dkt. Nos. 31-2, 31-3.

**Response:**    Undisputed.

159.    On September 7, 2017, Doe sent Dr. Conti an email and copied his parents, Drs. Jenike and Lippert, Mr. Dershowitz, and Dovi Meyer.  Ex. 24 at Pl's Ex. 43.

**Response:**    Undisputed.

160.    Doe started off his September 7, 2017 email as follows: "At the advice of everyone on this email not to write it, Fu*k it."  *Id.*

**Response:**    Undisputed.

161.    This September 7, 2017 email states in part that "the one thing you never took into account was my parents caught you red handed."  *Id.*

**Response**:    Undisputed that the excerpted language is from a full sentence that states "You knew I would fuck up but the one thing you never took into account was my parents caught you red handed."

162.    At Doe's deposition, when asked whether he said something to Dr. Conti that he had no factual basis for in an effort to shame him, Doe's response was that "I wanted to shame him the way he shamed me."  Ex. 2 at 306, 308.

**Response:**    Undisputed that John Doe testified "I said it to shame him the way he shamed me."  Disputed that it was in response to the question above; the question posed to Doe was "So you said it to shame him; correct?"  Pl.'s Ex. 2 at 306:17-19.

163.    When asked at his deposition the effect that one of his inappropriate statements would have on Dr. Conti, Doe responded: "The same effect how he hurt me."  Ex. 2 at 273.

**Response:**    Undisputed that Doe testified, "The same effect as he hurt me."  Disputed as to the question posed to Doe: "What effect did you think it would have upon Dr. Conti?"  Pl.'s Ex. 2 at 273:5-24.

164.    Dr. Jenike travels globally on a private jet paid for by Doe in connection with their treatment sessions.  Ex. 1 at 17.

**Response:**    Disputed.  Dr. Jenike testified that he had traveled to Israel on two occasions with Doe, and that "[s]ometimes I have gone on a private jet and sometimes just fly commercial."  Pl.'s Ex. 1 at 17:1-8.

165.    Jenike charges Doe $10,000 a day or $1,000 an hour because Defendant is a "billionaire."  Ex. 1 at 15.

**Response:**    Undisputed that Dr. Jenike testified "I don't have a set rate I charge different people different amounts . . . Billionaires I charge about a thousand dollars an hour."  Pl.'s Ex. 1 at 15:14-18.  Disputed that Dr. Jenike charges "10,000 a day."  Dr. Jenike testified: "I charge $10,000 a day when I'm gone overnight."  *Id.* at 15:22-33.

166.    Dr. Jenike has joked with Doe about whether Dr. Conti is flexible enough to "fu*k himself."  Ex. 1 at 261.

**Response:**    Undisputed that Dr. Jenike testified that Doe and he "joke around."  Pl.'s Ex. 1 at 262:13.  Disputed with respect to the nature of the joke.  Dr. Jenike testified: "I am not sure that it is saying that you say it is."  *Id.* at 261:24; Ex. YY at 262:1.

167.    Dr. Jenike met in person in New York with litigation counsel in this case.  Ex. 1 at 32.

**Response:**   Undisputed that, at Doe's request, Dr. Jenike accompanied Doe to a meeting in New York with Doe's lawyers, in a "supportive" role.  Pl.'s Ex. 1 at 32:14-16.

168.   Following an incident when Doe was so "worked up" that Dr. Jenike feared that he would get on a plane to see Dr. Conti, Ex. 19 at 9, Dr. Jenike texted Doe's personal assistant, Dovi Meyer, that "[h]e is so crazy now he could attack Conti.  I think I may have to hospitalize him against his will.  This seems dangerous."  *See* Ex. 20, Pl. Ex. 59, at Jenike 00053.

**Response:**   Undisputed.

169.   Dr. Jenike did not warn Dr. Conti about his fear that Doe would attack him and that he may need to be involuntarily hospitalized, but instead asked Dovi Meyer for the "weekend phone number" of Andrew G. Celli, Jr., Esq., Defendant's principal litigation counsel in this case.  *See* Ex. 20 at Jenike 00054.

**Response:**   Disputed that Dr. Jenike requested Mr. Celli's phone number "instead" of contacting Dr. Conti.  The cited evidence does not support this statement.  Dr. Jenike evaluated Doe and found the situation to be resolved.  Ex. FFF.

170.   In regard to this Court's decision on Doe's motion to dismiss for failure to state a claim, Dr. Jenike inquired whether it was "good news."  Ex. 21.

**Response:**   Undisputed that Dr. Jenike sent an email with the excerpted language.

171.   Dovi Meyer testified that he runs a concierge service through the entity DM Services, but all of its income originates with Doe.  Ex. 3 at 22-23.

**Response:**   Undisputed that Mr. Meyer testified that in 2018, the only source of income to DM Services was Doe.  Pl.'s Ex. 3 at 22:1-5.

172.   DM Services' accountant was obtained through the Doe Family, *id.*, and they pay its accounting fees, Ex. 3 at 24.

**Response:**     Undisputed.

173.    Mr. Meyer's duties as the principal of DM Services consist of handling Doe's schedule, booking his private planes and hotels, Ex. 3 at 41, and caring for his dog, *id.* at 44.

**Response:**     Undisputed that Mr. Meyer testified that his duties included these items, as well as "arranging meetings for [Doe], taking care of some business aspects for him," and additional tasks.  Pl.'s Ex. 3 at 43:4-6.

174.    Mr. Meyer funded DM Services start-up operations with a $180,000 loan from Doe, none of which has been repaid.  Ex. 3 at 15-16.

**Response:**     Undisputed.

175.    Mr. Meyer's ████████████████████████████████████████ ██████████████████████████████████████████████████ Ex. 3 at 152.

**Response:**     Disputed that Mr. Meyer's investment in DM Services is an "alleged" investment.  Mr. Meyer testified that he took out a loan for which there is a promissory note so that he could open DM services.  Pl.'s Ex. 3 at 16:17-24.

176.    Mr. Meyer paid his immigration attorney with funds provided by the Doe Family. Ex. 3 at 16.

**Response:**     Undisputed that Mr. Meyer paid his immigration attorney with funds that he had borrowed pursuant to a loan from the Doe family.

177.    The Doe Family staff assisted Mr. Meyer ██████████████ Ex. 3 at 176.

**Response:**     Undisputed.

178.    The only clients DM Services has ever had are Doe and his former girlfriend.  Ex. 3 at 153-54.

**Response:**     Undisputed.

179.    Drs. Jenike and Lippert understood Mr. Meyer to be Doe's assistant, not an international investor.  Ex. 1 at 18; Ex. 6 at 130.

**Response:**    Undisputed that Drs. Jenike and Lippert understood Mr. Meyer was Doe's assistant.  Disputed that Dr. Lippert had any understanding of whether he was or was not an international investor.  Pl.'s Ex. 6 at 130:20.

180.    When Doe misses appointments, Dr. Lippert normally bills him anyway.  Ex. 6 at 29-30.

**Response:**    Disputed.  Dr. Lippert testified that she billed Doe "most of the time" when he missed appointments. Pl.'s Ex. 6 at 29:6.

181.    Dr. Lippert has charged Defendant more than any other patient since she began seeing him.  Ex. 6 at 29-30.

**Response:**    Disputed.  Dr. Lippert testified that she had billed Doe more in fees than any other patient for the time period of January 1, 2016 to July 31, 2019 (the date of her testimony).  Schalk Decl. Ex. 6 at 29-30.

182.    Mr. Dershowitz entered into a $150,000 non-refundable retainer agreement with Doe on November 17, 2017. Ex. 18 at DERSH 0001.

**Response:**    Disputed that Mr. Dershowitz "entered into" a retainer agreement with Doe on November 17, 2017.  The document states: "This letter will constitute a formal retainer for the time I have previously spent advising and consulting with you regarding Dr. Conti and the time I anticipate spending in the future."  Ex. 18.  Disputed that the "standard retainer" referenced in this document was $150,000.  Undisputed that the document at Exhibit 18 states it is a "formal retainer" between Doe and Mr. Dershowitz and that it also states that the "initial retainer" is not refundable.

183.    Despite the large non-refundable retainer, the lone "billing record" that Mr. Dershowitz could produce consisted of an email from March 20, 2018, asking for an additional retainer of $165,000 based on the undocumented claim that he had worked 99.75 hours.  Ex. 18 at DERSH 0002.

**Response:**    Undisputed that Mr. Dershowitz produced documents in this case to Conti, as contained in Exhibit 18, and that one such document is an email regarding "an additional retainer" and stating that he worked 99.75 hours.

184.    Mr. Dershowitz's telephone records reflect that he spoke with Doe for less than an hour and a half over the entire 8-month period when Defendant was sending Dr. Conti the defamatory messages.  Ex. 18 at DERSH 0003-09.

**Response:**    Undisputed that the telephone records produced by Mr. Dershowitz reflect calls of the stated duration between the unredacted phone numbers in this document.  Disputed to the extent that the cited evidence does not support the statement that Mr. Dershowitz and Doe "spoke for less than an hour and a half over the entire 8-month period."

Dated: February 19, 2021
        New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        ABADY WARD & MAAZEL LLP


                                        _____/s/_____
                                        Andrew G. Celli, Jr.
                                        Katherine Rosenfeld
                                        Samuel Shapiro
                                        Nick Bourland

                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for John Doe*

23