UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- X
```

DR. PAUL M. CONTI,                                         :
                                                          :
          Plaintiff and Counterclaim Defendant,           :
                                                          :
          -against-                                       :
                                                          :
JOHN DOE,                                                 :
                                                          :
          Defendant and Counterclaim Plaintiff.           :

```
-------------------------------------------------------- X
```

┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____        │
│ DATE FILED: 4/22/2021               │
└─────────────────────────────────────┘

17-CV-9268 (VEC)

<u>OPINION</u>

VALERIE CAPRONI, United States District Judge:

John Doe and Paul Conti are the players in a patient-psychiatrist relationship that imploded dramatically. The patient, Doe, responded to the termination of the relationship with a series of insulting and profane messages to his former psychiatrist, Dr. Paul Conti. Dr. Conti responded, in turn, with a lawsuit for defamation based on the messages.[1] Am. Compl., Dkt. 31. Doe counterclaimed for breach of fiduciary duty. Answer, Dkt. 59. Both parties have now moved for summary judgment. Dkts. 232, 246. For the following reasons, both motions for summary judgment are DENIED.

---

[1] The Court previously dismissed Dr. Conti's claims for intentional infliction of emotional distress, slander, and violations of various state criminal statutes. *See* Dkts. 57, 61.

## BACKGROUND[2]

Dr. Conti, a psychiatrist, began treating John Doe in May 2016 for drug addiction and erratic, threatening, and destructive behavior. *See* Def. 56.1 Stmt. ¶¶ 1, 5-12. Doe has a history of psychiatric conditions, including depression, anxiety, obsessive compulsive disorder, borderline personality disorder, and pathological gambling. *Id*. ¶¶ 6-10, 15-18. Doe is also addicted to Xanax. *Id.* ¶ 11, 18. In June 2016, at Dr. Conti's urging, Doe moved from New York to Portland, Oregon to start in person treatment with Dr. Conti and other members of Dr. Conti's practice, Pacific Premier Group ("PPG"), including counselor Mark Schorr and family therapist Sonali Patel. *Id.* ¶¶ 3, 13-14.

Over the course of Doe's treatment, Dr. Conti prescribed to Doe Librium and Xanax, in an attempt to wean Doe off of Xanax. *Id.* ¶ 38. Doe supplemented his prescribed Xanax with Xanax obtained from unknown sources and used more Xanax than Dr. Conti prescribed. Pl. Counter 56.1 Stmt. ¶ 118. Doe also repeatedly missed appointments with Dr. Conti, failed to communicate with PPG staff, and ultimately moved to Los Angeles without consulting Dr. Conti. *Id*. ¶¶ 115, 117.

On April 6, 2017, Dr. Conti terminated his treatment of Doe; Dr. Conti explained to Doe and his parents, James and Jane Doe ("the Does"), that his "primary reason for discontinuing care" was that "the treatment of the moment, which consists of medication transition, cannot be

---

[2]     All facts described herein are undisputed unless otherwise stated. The Court will refer to the relevant submissions as follows: Doe's memorandum of law in support of his motion for summary judgment, Dkt. 233 as "Doe Mem. of Law"; Dr. Conti's memorandum in opposition to Doe's motion for summary judgment and in support of his cross-motion for summary judgment, Dkt. 249 as "Conti Opp."; Doe's memorandum of law in further support of his motion for summary judgment and in opposition to Dr. Conti's motion for summary judgment, Dkt. 274 as "Doe Reply"; Dr. Conti's memorandum of law in further support of his motion for summary judgment, Dkt. 279, as "Conti Reply"; Doe's Local Civil Rule 56.1 Statement of Undisputed Facts, Dkt. 234, as "Def. 56.1 Stmt."; Dr. Conti's Response to Doe's 56.1 Statement of Undisputed Facts, Dkt. 251 as "Pl. Counter 56.1 Stmt." Any citations to alphabetical exhibits (e.g. Ex. A) refer to the exhibits attached to the Declarations of Andrew Celli, Dkts. 235, 236, 277. Any citations to numerical exhibits (e.g. Ex. 1) refer to the exhibits attached to the Declaration of Peter Schalk, Dkt. 247.

conducted safely." Ex. D.  Dr. Conti also noted that he could not continue to treat Doe because Doe was continuing to abuse drugs, refusing to comply with Dr. Conti's treatment program, and sending Dr. Conti hostile text messages.[3]  *Id.*  Dr. Conti indicated that he was "happy to assist with transition to another physician, and/or to provide a list of detoxification and treatment facilities in Los Angeles or elsewhere in the country." *Id.*

Following Dr. Conti's termination of treatment, over the next eight months, Doe sent Dr. Conti a series of profane messages.  *See* Exs. B-O.  Doe included numerous third parties on his emails to Dr. Conti, including: his parents; Alan Dershowitz, an attorney on faculty at Harvard Law School; Dr. Michael Jenike, a psychiatrist who treated Doe before and after Dr. Conti treated Doe; Dr. Robin Lippert, a psychologist who treated Doe before and after Dr. Conti treated Doe; Dovi Meyer, Doe's assistant; various members of PPG; and Jeff Barry, Doe's friend and business associate.  *See id.*  In several of the emails, Doe accused Dr. Conti of, *inter alia*, abandoning him during both treatment and the titration process.[4]  *See e.g., id.*, Ex. B ("You're a fucking fraud that abandoned me in treatment . . . your fraudulent mother fucmjng [*sic*] ass was not there."); Ex. F ("You were never there . . . You were no where [*sic*] to be found . . . You abandoned me when I could have gotten out. . . . You abandoned your patient when he got himself from 5 mgs to 1.5 mgs. And your [*sic*] fucking right I freaked out, I didn't have a dr [*sic*] and I beyond relapsed . . .  SHAME ON you for abandoning a vulnerable person in misery"); Ex. N ("Settle I will kill myself because of the titration you abandoned me on . . .  You could have

---

[3]      Prior to the termination but also on April 6, 2017, Doe sent Dr. Conti a message, stating: "Let me say one thing to first start.  Your [*sic*] one big fucking fraud.  Your [*sic*] a fucking con.  That's it. A fucking fraud.  What [*sic*] the narrative you put on me about being a gambler???  Addicted to xanax??  You dumb fuck Steve wonder could see that from a fucking mile you little fucking faggot."  Ex. D.  Dr. Conti terminated treatment later that day. *Id.*

[4]      "Titration" is the process of slowly reducing a patient's use of a drug in order to allow the patient to safely withdraw entirely from use of the drug.

backed out at any minute or time.  Instead you abandoned me."); Ex. O ("You take away a

persons [*sic*] sense of self and abandon them during titration that's criminal.").

Doe also accused Dr. Conti of lying about his reasons for terminating his therapeutic

relationship with Doe.  Specifically, Doe stated that Dr. Conti terminated their relationship

because Doe's parents had caught Dr. Conti engaging in misconduct, not because Doe failed to

adhere to the titration regiment.  *See e.g. id.* Ex. F ("the only reason you terminated treatment

was because my parents caught you on your bullshit . . . had my parents not seen your pure

negligence you mother fucker I would probably be under the care of your incompetent ass."); Ex.

H ("You got caugggt [*sic*] MALPRACTICE . . . you wrote the reason for ending treatment was I

wasn't following the titration process, another fucking poor attempt of deflection . . . the real

reason was because [] you didn't want to continue treatment . . . get your fucking story straight

another poor attempt of deflection MALPRACTICE."); Ex. I ("WE all know with the greatest

certainty you got red handed caught."); Ex. J ("You flat out lied about the titration . . . I still ask

myself why when I wrote the letter did you end treatment?? . . . ITS YOU GOT CAUGHT  . . .

You were caught red handed.").

Finally, Doe sent Dr. Conti messages threatening to "ruin [his] name," and to bring legal

action against him.  *See, e.g.*, *id.* Ex. A ("I will own you in a Courtroom"); Ex. H ("I'm advising

you get a legel [*sic*] team because I'm coming with everything I can . . . ."); Ex. J ("Get your

legel [*sic*] team because I'm getting mine. . . . I'm going to ruin your fucking name."); Ex. O

("I'm going to do everything in the power of the law to destroy [you]").  Doe warned that he

would "drain [Dr. Conti] of all of [his] resources," that he would "bury [his] ass alive," that he

was "coming for [Dr. Conti]," and that Dr. Conti should "fucking fear [Doe]" because he was

"going to destroy [Dr. Conti's] ass."  *See id.* Exs. H, K, L.

4

Dr. Conti brought this action for defamation, seeking both monetary and injunctive relief. Dkt. 31. Doe counterclaimed for breach of fiduciary duty, arguing that Dr. Conti breached his duty of confidentiality by "unnecessarily disclosing – indeed, weaponizing – Doe's confidential medical information for personal financial gain." *See* Dkt. 59 ¶¶ 94-106.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris,* 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). To defeat summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). A party may not "rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). On a motion for summary judgment, courts "construe the facts in the light most favorable to the non-moving party and [] resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (internal citation and quotation marks omitted).

## I.      Defendant's Motion for Summary Judgment is Denied

Doe moves for summary judgment on Plaintiff's defamation claim.  Doe argues, *inter alia*, that his statements are not defamatory as a matter of law because they are statements of opinion or hyperbole.  Doe Mem. of Law at 14-25.  Moreover, even if the statements are reasonably susceptible of a defamatory meaning, Doe argues that they are not actionable because they are substantially true.  *Id.* at 10-14.  Finally, Doe argues that Dr. Conti's defamation claim is barred by the single instance rule and that Doe's statements are protected by the qualified self-interest and common interest privileges.  *Id.* at 26-31.  The Court will address each of these arguments in turn.

### A.  Doe's Statements Are Reasonably Susceptible of a Defamatory Meaning

#### i.     Applicable Law

A plaintiff must allege five elements to state a claim for libel under New York law: "(1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability."  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  The first element has four parts: "there must be (A) a writing, it must be (B) defamatory, it must be (C) factual—that is, not opinion— and it must be (D) about the plaintiff, not just a general statement."  *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014).

"Whether particular words are defamatory presents a legal question to be resolved by the court[] in the first instance."  *Celle*, 209 F.3d at 177 (quoting *Aronson v. Wiersma*, 65 N.Y.2d 592, 593 (1985)).  The Court must determine "whether the contested statements are reasonably susceptible of a defamatory connotation."  *Davis v. Boeheim*, 24 N.Y.3d 262, 268 (2014)

(quoting *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380 (1995)).  "If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory."  *Purgess v. Sharrock*, 33 F.3d 134, 140 (2d Cir. 1994); *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) ("On a motion to dismiss or for summary judgment, the issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction."); *Zeevi v. Union Bank of Switzerland*, No. 89-CV-4637, 1993 WL 148871, at *4 (S.D.N.Y. Apr. 30, 1993) ("The plaintiff in a libel action can defeat a motion for summary judgment on the question of whether a statement is libelous *per se* if the court determines that the defendant's statements are reasonably susceptible of a defamatory connotation.") (internal quotation marks omitted).  If a statement is reasonably susceptible of multiple meanings, some of which are not defamatory, it is "for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood."  *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985); *see also Davis v. Costa-Gavras*, 619 F. Supp. 1372, 1376 (S.D.N.Y. 1985) ("The standard is not whether the statements are exclusively susceptible of the meaning alleged by the plaintiffs, but whether such an understanding is a reasonable one.").

A statement is "defamatory" if it exposes an individual "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society."  *Celle*, 209 F.3d at 177 (quoting *Kimmerle v. New York Evening Journal*, 262 N.Y. 99 (1933)).

A statement can only be defamatory if it is a statement of fact; "pure opinion" cannot be defamatory.  *See Davis*, 24 N.Y.3d at 268–69 (quoting *Gross v. New York Times Co.*, 82 N.Y.2d

146, 153 (1993)); *see also Chau*, 771 F.3d at 129; *Purgess*, 33 F.3d at 140.  New York courts

apply a three-factor test to determine whether a reasonable person would consider a statement to

be a "fact" or a nonactionable "opinion":

> (1) whether the specific language in issue has a precise meaning which is readily
> understood; (2) whether the statements are capable of being proven true or false;
> and (3) whether either the full context of the communication in which the
> statement appears or the broader social context and surrounding circumstances are
> such as to signal . . . [to] readers or listeners that what is being read or heard is
> likely to be opinion, not fact.

*Davis*, 24 N.Y.3d at 270 (quoting *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008)); *see also Gross*, 82

N.Y.2d at 153.  In applying this test, "the court must give the disputed language a fair reading in

the context of the publication as a whole."  *Armstrong*, 85 N.Y.2d at 380; *see also Celle*, 209

F.3d at 177; *Davis*, 24 N.Y.3d at 270.

New York courts also distinguish between statements of "pure opinion" and statements of

"mixed opinion."  *Davis*, 24 N.Y.3d at 269.  A statement of "pure opinion" is an opinion that

either "does not imply that it is based upon undisclosed facts" or is "accompanied by a recitation

of the facts upon which it is based."  *Id.*; *see also Chau*, 771 F.3d at 129; *Gross*, 82 N.Y.2d at

154–55; *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289–90 (1986).  Statements of "pure opinion"

are protected from liability under New York's constitution and, therefore, cannot support a

defamation claim.  *See Celle*, 209 F.3d at 178; *Davis*, 24 N.Y.3d at 269; *Steinhilber*, 68 N.Y.2d

at 289–90.  Statements of mixed opinion, however, can support a defamation claim.  *Celle*, 209

F.3d at 178.  A statement of mixed opinion is one that "may be reasonably understood as

implying the assertion of undisclosed facts justifying the opinion."  *Id.* (quoting *Steinhilber*, 68

N.Y.2d at 289); *see also Davis*, 24 N.Y.3d at 269 (A statement of "mixed opinion" is one that

"implies that it is based upon facts which justify the opinion but are unknown to those reading or

hearing it.").

In this case, many of Doe's statements are reasonably susceptible of a defamatory meaning. Specifically, as this Court previously held in its Opinion on Defendant's motion to dismiss, Dkt. 57, Doe's messages contain three categories of actionable defamatory statements: (i) statements that Dr. Conti abandoned Doe in treatment and during titration; (ii) statements that Dr. Conti lied about the reasons for terminating Doe's treatment; and (iii) statements that Doe's parents caught Dr. Conti engaging in misconduct. The Court will address each category of statements in turn.[5]

### ii.    Doe's Statements that Dr. Conti Abandoned Him

Doe's statements that Dr. Conti abandoned him during treatment and the titration process and that this abandonment caused him to "relapse" are susceptible of a defamatory meaning. *See e.g.,* Ex. B ("You're a fucking fraud that abandoned me in treatment . . . your fraudulent mother fucming [*sic*] ass was not there."); Ex. F ("You were never there . . . You were no where [*sic*] to be found. . . . You abandoned me when I could have gotten out . . . You abandoned your patient when he got himself from 5 mgs to 1.5 mgs. And your [*sic*] fucking right I freaked out, I didn't have a dr [*sic*] and I beyond relapsed . . . you knew by not having a caring dr [*sic*] I would relapse . . . you knew in that situation I didn't have a dr [*sic*] and you set me up for one thing only and that's failure . . . you abandoned me . . . SHAME ON you for abandoning a vulnerable person in misery."); Ex. H ("I was told you would be there but you weren't"); Ex. I ("You know when you stopped the treatment it killed me."); Ex. N ("Settle I will kill myself because of the

---

[5]    The actionable defamatory statements are all included in Defendant's appendix of allegedly defamatory statements and Plaintiff's response to Defendant's appendix. Dkts. 233-1; 284. Dr. Conti's argument that the Court should not attempt to specify Doe's defamatory statements is nonsensical. *See* Dkt. 284. To prevail on a claim of defamation, Plaintiff must prove, *inter alia,* "a written defamatory statement of fact concerning the plaintiff." *Celle*, 209 F.3d at 176. In other words, although the entirety of Doe's messages may provide necessary context, and presumably will be introduced into evidence should this case proceed to trial, the Court must first determine which specific statements within Doe's many lengthy messages are reasonably susceptible of a defamatory connotation and therefore can serve as the basis of Plaintiff's defamation claim.

titration you abandoned me on before I ever settle . . . You could have backed out any minute or time. Instead you abandoned me."); Ex. O ("You take away a persons [*sic*] sense of self and abandon them during titration that's criminal"). These statements are clear statements of fact; they refer to specific instances of Dr. Conti's conduct, have a precise meaning, and are readily capable of being proven true or false. They are, therefore, reasonably susceptible of a defamatory meaning.[6] *See, e.g.*, *Albert v. Loksen*, 239 F.3d 256, 267–68 (2d Cir. 2001) (accusations that a hospital worker "compromised the welfare" of a patient and was "dishonest" about safety violations were actionable defamatory statements because the "accusations are more than statements of opinion about [the plaintiff's] work performance; they are specific statements of fact—statements capable of objective proof—about what [he] did and did not do."); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 722 (S.D.N.Y. 2014) ("When the criticism takes the form of accusations of criminal or unethical conduct, or derogation of professional integrity in terms subject to factual verification, the borderline between fact and opinion has been crossed.").

### iii. Doe's Statements that Dr. Conti Lied About his Reasons for Terminating Treatment

Similarly, Doe's accusation that Dr. Conti lied to Doe's parents about the reasons for terminating Doe's treatment are capable of defamatory meaning. According to Doe, Dr. Conti told Doe's parents that he terminated Doe's treatment because Doe "wasn't following the titration process." Ex. H. In his messages, Doe asserted that this explanation was false and a "poor attempt of deflection." *Id.*; *see also* Ex. J ("You flat out lied about the titration.").

---

[6]     With the exception of the statements discussed *infra,* Doe does not argue that the statements that Dr. Conti abandoned him, lied about the reasons for terminating treatment, and was caught engaging in misconduct do not expose Dr. Conti to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce an evil opinion of one in the minds of right-thinking persons." *Celle*, 209 F.3d at 177. Accordingly, the Court will limit its discussion to whether the statements are assertions of fact such that they are capable of defamatory meaning.

Because these statements have a "precise meaning" and are capable of being proven true or false, they can reasonably be viewed as statements of fact.[7]

### iv.   Doe's Statements that Dr. Conti was Caught Engaging in Misconduct

Finally, Doe's statements that his parents caught Dr. Conti engaging in misconduct are also actionable defamatory statements.  Although Doe repeatedly asserted that his parents caught Dr. Conti "red handed" engaging in misconduct, he never disclosed *what* his parents caught Dr. Conti doing.  *See e.g.,* Ex. F ("[H]ad my parents not seen your pure negligence you mother fucker I would probably be under the care of your incompetent ass . . . the only reason you terminated treatment was because my parents caught you on your bullshit. . . ."); Ex. H ("Your plan went wrong when my parents saw your bitch ass absent . . . You got caugggt [*sic*] MALPRACTICE . . . get your fucking story straight another poor attempt of deflection MALPRACTICE"); Ex. I ("WE all know with the greatest certainty you got red handed caught."); Ex. J ("I still ask myself why . . . did you end treatment??  Was it because it was disrespectful?  Was it you were spending to [*sic*] much time on my case shaming me[?]  NO ITS YOU GOT CAUGHT  . . . You were caught red handed.").  As such, these are actionable statements of "mixed opinion" because they imply undisclosed facts upon which the opinion is purportedly based.[8]  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 462 (S.D.N.Y. 2012) (statement

---

[7]     Defendant renews his argument that Doe's statements about Dr. Conti's motivation for terminating treatment are non-actionable because they are speculative.  Def. Mem. of Law at 19.  Like many of Defendant's arguments, the Court previously rejected this argument in its Opinion denying Defendant's motion to dismiss.  *See* Dkt. 57.  As previously held, Defendant did more than speculate as to Dr. Conti's motivation for terminating treatment; he accused him of lying about it and of doing so in order to cover up misconduct.

[8]     Doe argues that he did disclose the facts on which his opinion was based, namely that Doe's parents "caught" Dr. Conti being unreachable for four hours while they waited for a prescription to be filled at a CVS ("the CVS incident").  *See* Doe Mem. of Law at 21.  The Court disagrees.  Setting aside the issue of whether failing to call in a prescription for four hours constitutes "misconduct," many of Doe's messages accusing Dr. Conti of misconduct do not reference the CVS incident.  *See* Exs. I, J.  Moreover, even in the messages that do reference the CVS incident, there is a question of fact whether Doe was referring to that incident when he accused Dr. Conti of misconduct.  *See, e.g.,* Ex. F (Doe's statement that "the only reason you terminated treatment was because my parents caught you on your bullshit" is approximately ten lines after discussion of the CVS incident); Ex. H (Doe's

that the plaintiff had been "[caught] in different lies" implied undisclosed facts about the plaintiff's conduct and, therefore, was an actionable defamatory statement).

Doe argues that none of his statements is reasonably susceptible of a defamatory meaning because the recipients of the messages understood them as "statements of opinion and/or hyperbole that express Doe's *subjective feelings* regarding Conti's treatment."  Def. Mem. of Law at 18 (emphasis in original).  This argument is unavailing.  At the outset, the threshold issue before the Court is whether Doe's statements are "capable of a defamatory meaning."  *Albert*, 239 F.3d at 267.  If *any* defamatory construction is possible, "it is a question of fact for the jury whether the statements were *understood* as defamatory."  *Purgess*, 33 F.3d at 140 (emphasis added); *Davis*, 619 F. Supp. at 1377 ("The fact, moreover, that a reasonable viewer might interpret the film [not to be defamatory] is irrelevant with respect to the threshold issue of whether the film is reasonably susceptible of the defamatory meaning ascribed to it by plaintiffs.").[9]

---

statement that "You got caugggt [sic] MALPRACTICE" is approximately two paragraphs after his discussion of the CVS incident).

Finally, even assuming that (i) some of Doe's statements accusing Dr. Conti of misconduct were based on disclosed statements of fact, namely the CVS incident, and (ii) failing to call in a prescription would constitute misconduct, there is a factual dispute whether Dr. Conti actually failed to call in the prescription.  As will be discussed *infra*, Dr. Conti claims that he called the prescription in and that the four-hour delay was caused by the pharmacy.  Ex. JJ at 243:17-246:8.  In other words, because there is a factual dispute concerning the truth of the purportedly disclosed statements of fact underlying Doe's claim that his parents caught Dr. Conti engaging in misconduct, Doe's statements are actionable.  *See H & R Indus., Inc. v. Kirshner*, 899 F. Supp. 995, 1010–11 (E.D.N.Y. 1995) (denying defendant's motion for summary judgment where there were material issues of fact concerning the falsity of the disclosed statements of fact upon which the opinions were based).

[9]      The Court, once again, rejects Defendant's renewed arguments that Doe's statements are not capable of defamatory meaning because they are filled with profane language and are presented in a rambling, incoherent form.  *See* Dkt. 57 at 9-10.  The Court agrees that rhetorical hyperbole, vulgar name-calling, and generalized insults are not, without more, actionable under the defamation laws.  *See Treppel v. Biovail Corp.*, No. 03-CV-3002, 2004 WL 2339759, at *12 (S.D.N.Y. Oct. 15, 2004) (collecting cases).  Here, however, the Court finds that, setting aside Doe's crude language, Doe's messages are actionable defamatory statements.  Moreover,  although the messages are indisputably difficult to follow, the Court finds that a reasonable reader could discount the form and tone of the messages and view them as stating facts.

Moreover, contrary to Doe's characterization of the evidence, there is a question of fact whether the recipients of Doe's messages understood them to be statements of opinion or hyperbole.  For example, Ms. Carr, Dr. Conti's assistant, testified that she understood Doe's messages to be "making accusations," rather than simply stating opinions. Ex. 14 at 128:6. Similarly, Dr. Jenike testified that he did not know whether Dr. Conti had "actually abandoned [Doe]," but that Doe "said he did," suggesting that Dr. Jenike did not simply dismiss Doe's statements as nonsensical opinion or hyperbole and may have understood them to be assertions of fact.  Ex. NN at 290:15-16.  Additionally, on January 28, 2018, Dr. Jenike expressed concern that Doe was "so worked up" that Dr. Jenike was afraid he might go see Dr. Conti; Dr. Jenike further stated that Doe "is so crazy now he could attack Conti … This seems dangerous."  Ex. 19 at 12:11; Ex. 20.  Although this occurred two months after Doe's last allegedly defamatory statement, a jury could conclude that it is evidence that Dr. Jenike did not write off Doe's ranting as mere hyperbole but took his statements about Dr. Conti seriously.[10]

Finally, Doe's contention that the recipients could not have understood the messages to be assertions of fact because they viewed them to be a product of Doe's mental illness is unpersuasive.  Doe Mem. of Law at 17-18.  Although Doe's mental illness may provide context for the messages' vulgar language and incoherent tone, it does not foreclose the possibility that a reasonable reader could understand the messages to be assertions of fact.  In other words, a

---

[10]     In the same conversation, Dr. Jenike stated that he had a legal obligation to tell Dr. Conti about Doe's behavior and statements, further evidence that he understood Doe's statements to be more than mere hyperbole.  Ex. 20.  Although Dr. Jenike testified that he could not recall what incident sparked this exchange, he confirmed that he was "being truthful" when he made the statements to Mr. Meyer.   Dkt. 19 at 8:7, 10:24-11:2; 11:14-24; 11:25-12:7.

reasonable reader could read the messages as consistent with, or even caused by, Doe's various

mental illnesses and still understand them to be statements of fact.[11]

In sum, Doe's statements that: (i) Dr. Conti abandoned him in treatment and during

titration; (ii) Dr. Conti lied about the reasons for terminating treatment; and (iii) Dr. Conti was

caught engaging in misconduct are actionable defamatory statements.[12]  Whether the statements

were in fact understood as defamatory is a question for the jury.  *Purgess*, 33 F.3d at 140 ("If any

defamatory construction is possible, it is a question of fact for the jury whether the statements

were understood as defamatory.").

---

[11]    Doe himself testified that he sent the messages because he was "trying to call out [Dr. Conti's] error," suggesting that Doe intended his messages to be understood as assertions of fact rather than expressions of opinion. Ex. 2 at 273:19-24.

[12]    The Court agrees with Doe that certain of his statements are not actionable.  For example, Doe's statements that Dr. Conti was "out of town at least 2 weeks of the month" and that he was "not there in Portland most of the time" are not defamatory.  *See* Ex. H.  These statements do not expose Dr. Conti to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce an evil opinion of one in the minds of right-thinking persons." *Celle*, 209 F.3d at 177.  Moreover, these statements are substantially true.  Dr. Conti admits that he travels both domestically and internationally for work, Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Counter Stmt. ¶ 112, and Mr. Schorr and Ms. Patel confirmed as much.  *See* Ex. QQ at 77:8-77:14 (Mr. Schorr testified that Conti spent "50 percent of the time" in the Portland office); Ex. RR at 101:9-14 (Ms. Patel testified that Conti travelled "often.").

Similarly, Doe's statements: "Where was your ass when Dovi was trying to call out the medications from your dumbass. . . . WE COULDN'T GET A HOLD OF YOUR FUCKING ASS FOR THAT WHOLE TIME" and "[W]hen my parents were in town when we couldn't even get a hold of you. . . . YOU WERE UNREACHABLE YOU PIECE OF SHIT," are not defamatory.  Exs. E, F.  Accusations, even in all capital letters, that Dr. Conti was unreachable for four hours do not injure his reputation as a psychiatrist or expose him to "contempt" or "ridicule."  *Celle*, 209 F.3d at 177 ("The gravamen of an action alleging defamation is an injury to reputation.").  As noted *supra*, Dr. Conti travels frequently and describes himself as a "busy psychiatrist."  Conti Opp. at 6.  Moreover, the statements are substantially true.  Dr. Conti admits that: (i) he was not "immediately available once the pharmacy's error came to light"; (ii) James Doe waited at CVS for the prescription to be filled for four hours; and (iii) Mr. Schorr was only able to get ahold of Dr. Conti after several hours.  *See* Doe 56.1 Stmt. ¶¶ 46-48; Conti Opp. at 6.

14

### B. Substantial Truth of Doe's Statements

#### i. Applicable Law

"It is fundamental that truth is an absolute, unqualified defense to a civil defamation action, and 'substantial truth' suffices to defeat a charge of libel." *Guccione v. Hustler Magazine, Inc.* 800 F.2d 298, 301 (2d Cir. 1986) (internal citations and quotation marks omitted). A statement is "substantially true" if the statement "would not 'have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Jewell v. NYP Holdings, Inc.,* 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (quoting *Fleckenstein v. Friedman*, 266 N.Y. 19, 23 (1934)).

#### ii. Doe's Statements that Dr. Conti Abandoned Him

Doe argues that his statements that Dr. Conti abandoned him during treatment and titration are substantially true because Dr. Conti was frequently absent from Portland during Doe's treatment and because he terminated Doe's care during the titration process. Doe Mem. of Law at 10. The Court disagrees. Doe's statement that Dr. Conti "abandoned" him during treatment suggests that Dr. Conti and his staff deserted Doe without notice and left him with no medical support. Doe's treatment plans and records, however, confirm that Doe met with Dr. Conti, Mr. Schorr, and Ms. Patel, albeit at different frequencies, from mid-2016 to early-2017. Def. 56.1 Stmt. ¶¶ 19-21. Moreover, although Dr. Conti did travel frequently, a fact Doe knew before he started treatment with Dr. Conti, there is a question of fact whether that travel adds up to abandonment.[13] Put differently, accusing a psychiatrist of abandoning a patient in treatment could have an entirely "different effect on the mind of [a] reader" than an accusation that Dr.

---

[13]     Dr. Conti argues that it is Doe who "abandoned" treatment, or at the very least, made treatment impossibly difficult by continually missing appointments, failing to communicate with PPG staff, using more Xanax than Dr. Conti prescribed, and moving to Los Angeles without consulting Dr. Conti, facts that Doe does not dispute. Pl. Counter 56.1 ¶¶ 115, 117; Def. Resp. to Conti's Counter 56.1 Stmt., Dkt. 276 ¶¶ 115, 117-118.

Conti traveled frequently.  *Jewell,* 23 F. Supp. 2d at 366.  Accordingly, a reasonable juror could conclude that Doe's statements that Dr. Conti "abandoned" him in treatment are not substantially true.  *See id.* (explaining that a statement is "substantially true" only if the statement "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.").

Similarly, there is a factual dispute whether Doe's statement that Dr. Conti "abandoned" him during titration is substantially true.  Dr. Conti's email terminating Doe's care explained, *inter alia,* that his "primary reason for discontinuing care" was that "the treatment of the moment, which consists of medication transition, cannot be conducted safely."  Ex. D.  In that same email, Dr. Conti offered to "assist with transition to another physician, and/or to provide a list of detoxification and treatment facilities in Los Angeles or elsewhere in the country."  *Id.* Two months after terminating treatment, in response to one of Doe's profane and allegedly defamatory messages, Dr. Conti again offered to assist Doe's parents in "getting him the help he needs" from a drug rehabilitation facility.  Ex. C.  In short, there is a question of fact whether Doe's statements that Dr. Conti "abandoned" him during the titration process are substantially true.

### iii.    Doe's Statements that Dr. Conti Lied About his Reasons for Terminating Treatment

Dr. Conti also argues that Doe's statements that Dr. Conti only terminated treatment because Doe's parents caught him engaging in misconduct are not substantially true.  As noted *supra,* Dr. Conti gave numerous reasons for terminating Doe's treatment.  *See* Ex. D.  Dr. Conti explained that: Doe was not engaging in treatment; Doe had moved to another city without telling him; Doe assailed his motivations and competence; and Doe makes but does not keep commitments and then lies about them.  *Id.*  As a result, Dr. Conti explained, the treatment

16

relationship had deteriorated, and Doe's titration could not be conducted safely.  *Id.*  If a jury credits Dr. Conti's explanation for his decision-making, it could conclude that Doe's statements that Dr. Conti only terminated treatment because he was caught engaging in misconduct are not substantially true.

### iv.   Doe's Statements that Dr. Conti was Caught Engaging in Misconduct

Finally, there is a question of fact whether Doe's parents "caught" Dr. Conti engaging in misconduct.  At the outset, as discussed in note 8, *supra*, it is not entirely clear what misconduct Doe was alluding to when he asserted that Dr. Conti got "caught."  To the extent that Doe was referring to the CVS incident, there is a significant factual dispute whether the CVS incident was Dr. Conti's fault.[14]  Dr. Conti testified that although he initially took responsibility for the error and apologized to the Does, he later realized that he had called the prescription into CVS and that the delay was caused by the pharmacy.  Ex. JJ at 243:17-246:8 (testifying that at the point at which Dr. Conti apologized, he "thought [he] had not called in a prescription" and that he would have "apologize[d] either way because it is not clinically helpful to figure out it was the pharmacy's fault and tell [the Does] that.").  Testimony from PPG staff supports Dr. Conti's explanation; Ms. Patel testified that she "read in the note [in Doe's chart] that the prescription had already been called in by the doctor," Ex. 9 at 202:22-25, and Ms. Carr testified that "Dr. Conti [had] already called in" the prescription before the Does tried to pick it up but that Dr. Conti instructed her to call it in again, Ex. TT at 107:21-23.[15]

---

[14]    The Court also notes that a reasonable juror could conclude that even if Dr. Conti did fail to call in a Xanax prescription for four hours, such an oversight does not constitute misconduct in the first instance.

[15]    The note in Doe's chart that purportedly indicates that Dr. Conti called the prescription in is illegible.  *See* Ex. 10.  The Court also notes that, while the Does were waiting at CVS, Mr. Schorr texted Ms. Patel that "Conti did forget" to call in the prescription and that Dr. Conti had instructed Ms. Carr to call it in.  Ex. FF.  A reasonable juror could conclude, however, that Mr. Schorr's statement that "Conti did forget" reflected Dr. Conti's *initial* belief that he had forgotten to call in the prescription.

Doe offers no other instances of alleged misconduct by Dr. Conti.  When asked if his parents ever told Doe that they had "caught" Dr. Conti "on his bullshit," Doe answered, "not via-email" and that he "[didn't] recall" if they had ever said as much in person.  Ex. 2 at 358:17-25. Accordingly, a reasonable juror could conclude that Doe's statements that Dr. Conti was "caught" engaging in misconduct are not substantially true.

### C.  The Single Instance Rule

#### i.  Applicable Law

The single instance rule is a "narrow exception to the principle that a statement tending to disparage a person in his or her office, profession or trade is defamatory per se."  *Celle,* 209 F.3d at 180.  The rule "applies where a publication charges a professional person with a *single error* in judgment, which the law presumes not to injure reputation." *Armstrong,* 85 N.Y.2d at 379 n.5 (emphasis added) (internal citations omitted).  As the name implies, the rule does not apply "where a publication or article charges a plaintiff with multiple wrongful acts or lapses in judgment."  *Celle*, 209 F.3d at 181; *Udell v. New York News, Inc.,* 507 N.Y.S.2d 904, 906 (1986) (holding that the single instance rule was inapplicable because "the articles charged the plaintiff with committing a series of incompetent and unethical acts.").  Moreover, the single instance rule does not apply "where a statement or publication that refers to a single instance imputes a general unfitness or unskillfulness, suggesting more than mere human error."  *Celle,* 209 F.3d at 181; *see, e.g., Armstrong,* 85 N.Y.2d at 379 n.5 (statement that attorney suborned perjury goes beyond alleging mere human error and implies unethical character); *Cabin v. Community Newspapers, Inc.,* 275 N.Y.S.2d 396 (2d Dep't 1966) (statement alleging grade tampering by member of the Board of Education for the benefit of his son did not fall under the single instance rule because it suggested a lack of integrity); *Rutman v. Giedel,* 411 N.Y.S.2d 960 (2d Dep't

1979) (statement that police officer was drunk while on duty goes beyond alleging human error and suggests a "lack of character as would render him unfit for his position").

### ii.     The Single Instance Rule Does Not Apply

The single instance rule does not apply to Doe's statements.  Doe's argument that his statements constitute a "single instance" because they "refer to a single ongoing course of conduct, namely Conti's treatment of one patient, Doe," is unconvincing.  Doe Reply at 16.  At issue in this case are fifteen different messages sent over a period of seven months.[16]  The messages repeatedly accuse Dr. Conti of "multiple wrongful acts or lapses in judgment," including abandoning Doe during treatment and during titration, lying about the reasons for terminating treatment, and committing other unspecified acts of misconduct.  *See Celle,* 209 F. 3d at 181.  In other words, Doe's statements accuse Dr. Conti of far more than a "single error in judgment" on a single occasion.  *Armstrong,* 85 N.Y.2d at 379 n.5.  Moreover, Doe's statements accuse Dr. Conti of acts that "impute[] a general unfitness or unskillfulness" as a psychiatrist – allegations that go well beyond "mere human error."  *Celle,* 209 F. 3d at 181.  Accordingly, the single instance rule is wholly inapplicable.  *See e.g., Jean-Joseph v. Walgreens, Inc.,* No. CV-10-4635, 2011 WL 5025266, at *4 (E.D.N.Y. Oct. 21, 2011) (holding that the single instance rule did not apply because defendant accused plaintiff of fraudulent conduct and repeated the statement "multiple times to multiple people."); *Joyce v. Thompson Wigdor & Gilly LLP*, No. 06-CV-15315, 2008 WL 2329227, at *13 (S.D.N.Y. June 3, 2008) (declining to apply the single instance rule to protect defendant's accusation that plaintiff had committed fraud); *Armstrong,* 85 N.Y.2d at 379 n.5 (holding that defendant's accusation that plaintiff suborned perjury "transcends [the] narrow doctrine" of the single instance rule); *Udell,* 507 N.Y.S.2d at 906

---

[16]        According to Doe, his messages totaled approximately 475 lines of text.  Doe Mem. of Law at 7.

(holding that the single instance rule did not apply because the articles "charged the plaintiff with committing a series of incompetent and unethical acts, and these charges of multiple instances of alleged professional misconduct effectively accused the plaintiff of general incompetence and dishonesty in his profession.") (internal citation omitted); *Sadowy v. Sony Corp. of Am.,* 496 F. Supp. 1071, 1078 (S.D.N.Y. 1980) (declining to apply the single instance rule to protect statements that "smack[] more of reporting a characteristic of the plaintiff, i.e., that he is professionally unreliable or irresponsible, than of reporting one single act or omission which in some way reflects badly on his professional competence.").

### D.  Qualified Self-Interest and Common Interest Privileges

In addition to the defense of truth, New York law recognizes various qualified privileges, including the self-interest and common interest privileges, that may immunize a declarant from liability for a defamatory statement, unless the declarant has abused the privilege.  *Foster v. Churchill,* 87 N.Y.2d 744, 751–52 (1996); *Liberman v. Gelstein,* 80 N.Y.2d 429, 437 (1992); *Gostanian v. Bendel,* 1997 WL 214966, at *9-10 (S.D.N.Y. Apr. 25, 1997).  A defendant abuses the privilege if he "act[s] beyond the scope of the privilege, act[s] with common law malice, or act[s] 'with knowledge that the statement was false or with a reckless disregard as to its truth.'"  *Meloff v. New York Life Ins. Co.,* 240 F.3d 138, 146 (2d Cir. 2001) (quoting *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 62, 65 (2d Cir. 1993)).  The defendant bears the burden to demonstrate the facts upon which each privilege depends.  *Konikoff v. Prudential Ins. Co. of Am.*, No. 94-CV-6863, 1999 WL 688460, at *13 (S.D.N.Y. Sept. 1, 1999), *aff'd,*  234 F.3d 92 (2d Cir. 2000).

### i.    The Self-Interest Privilege

The qualified self-interest privilege applies to a "speaker's communications designed to protect the speaker's own legitimate interests." *Konikoff*, 234 F.3d at 98.  Put differently, the self-interest privilege shields the speaker from liability for defamation if the speaker reasonably believes "(a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest." *Goldstein v. Cogswell,* No. 85-CV-9256, 1992 WL 131723, at *22 (S.D.N.Y. June 1, 1992).

Doe argues that the qualified self-interest privilege applies because the statements at issue "concerned a matter of great important to Doe (his mental health)" and were made to people "who had a strong interest in assisting Doe during his mental health crisis and who each had the ability to do so by different means and techniques."  Doe Mem. of Law at 29-30.  The Court disagrees.  Doe offers no evidence that publishing his profane, ranting, and allegedly defamatory statements would "be of service in the lawful protection" of Doe's mental health.  *Goldstein,* 1992 WL 131723, at *22.  Quite the contrary, Doe testified that he sent the messages to Dr. Conti and the various other recipients because he wanted to "call out Conti's error" and hurt him the same way "he hurt [Doe]."[17]  Ex. 2 at 270:12-273:24.  In other words, there is no indication that Doe included his parents, Dr. Jenike, Dr. Lippert, Mr. Meyer, Mr. Dershowitz, PPG staff, and

---

[17]    Doe's exact testimony, in response to what effect he thought his messages would have on Dr. Conti was: "The same effect how he hurt me."  Ex. 2 at 273:13-18.  Moreover, when asked why Doe sent certain messages about Dr. Conti's purported infidelity without any factual basis for the statements, Doe stated, "I said it to shame him the way he shamed me."  *Id.* at 308:4-8.  Although statements about Dr. Conti's alleged infidelity are not defamatory, the Court notes that Doe's response was consistent with his prior testimony that he sent the defamatory messages to "hurt" Dr. Conti.  *Id.* at 273:17-18.  Doe never testified that he made the statements to protect his own mental health.  Although Doe stated in his affidavit that he included these people because he wanted them "to understand the pain I was going through so they could help me," Ex. U ¶ 8, this statement is not supported by his testimony.

Mr. Barry on his messages for the purpose of protecting his own mental health.  Accordingly, the qualified self-interest privilege does not apply.

### ii.    The Common Interest Privilege

The qualified common interest privilege "extends to a communication made by one person to another upon a subject in which both have an interest."  *Liberman*, 80 N.Y.2d at 437 ("the rationale [of the common interest privilege] is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded.") (internal citation omitted); *see also Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) (noting that the common interest privilege "encompasses a defamatory communication on any subject matter in which the party communicating has an interest . . . made to a person having a corresponding interest.") (internal citation omitted); *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 409–10 (2d Cir. 2000) ("[G]ood faith communications of a party having an interest in the subject, or a moral or societal duty to speak, are protected by a qualified privilege if made to a party having a corresponding interest or duty.").  The common interest privilege is typically applied to statements that are "published to an extremely limited, clearly defined group of private persons with an immediate relationship to the speaker, such as a family member or an employer's own employees."[18]  *Konikoff*, 234 F.3d at 99.  "To invoke the privilege, the parties

---

[18]     The common interest privilege most commonly arises in the context of workplace communications.  *See e.g., Meloff,* 240 F.3d at 146  ("This 'common interest' privilege has been applied to communications within a firm concerning the actions of its employees") (citing *Liberman,* 80 N.Y.2d at 437); *Albert,* 239 F.3d at 272 ("Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege"); *Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364, 372 (W.D.N.Y. 2012) (holding that defendants who worked together "clearly shared a common interest in the subject matter of [one of the defendant's] statements about [one of the plaintiffs]"); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009) (finding that a memorandum distributed to employees about a co-worker's employment-related misconduct was protected by the common interest privilege).  The qualified common interest privilege is also sometimes applied when allegedly defamatory statements are published only among members of an organization.  *See Phelan v. Huntington Tri-Village Little League, Inc.*, 868 N.Y.S.2d 737, 738 (2d Dep't 2008) (finding that a letter from a little league umpire to the director of the Department of Parks and Recreation concerning a little league coach's "unacceptable and despicable language and behavior" was shielded by

need only have such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Scott v. Thayer*, 75 N.Y.S.3d 603 (3d Dep't 2018) (common interest privilege applied to statements made by decedent's guardian to decedent's doctor) (internal citation and quotation marks omitted).

Here, Doe argues that the qualified common interest privilege applies because Doe's statements concern his mental health and were made to people who "share a common interest in Doe's health and well-being." Doe Mem. of Law at 30. At the outset, the Court rejects Doe's underlying premise that Doe's allegedly defamatory statements all concern Doe's mental health. For example, Doe's statements that Dr. Conti lied about the reasons for terminating treatment and was caught engaging in misconduct are not about Doe's mental health or well-being at all. Instead the statements are profane rants that question Dr. Conti's motivations and assail his professional ethics. The fact that the statements were made to Doe's psychiatrist and may have been an outgrowth of Doe's mental health problems does not mean that the statements are *about* Doe's mental health. Put differently, Doe's statements that Dr. Conti only terminated treatment because he was caught engaging in misconduct are not "bona fide communication[s] upon a subject in which [the recipients have a common] interest." *Santavicca v. City of Yonkers*, 518 N.Y.S.2d 29, 31 (2d Dep't 1987). Accordingly, the common interest privilege does not apply to statements regarding the reasons Dr. Conti terminated treatment.

Some of Doe's statements that Dr. Conti abandoned him and caused him to "relapse" do pertain to Doe's mental health. *See e.g.* Ex. F ("You were no where [*sic*] to be found . . . You abandoned your patient when he got himself from 5 mgs to 1.5 mgs. And your [*sic*] fucking

---

the common-interest privilege); *Kalika v. Stern,* 911 F. Supp. 594, 604 (E.D.N.Y. 1995) (noting that the common interest privilege may apply "where members of an organization discuss among themselves matters of concern to the organization.").

right I freaked out, I didn't have a dr [*sic*] and I beyond relapsed. . . . You put me in so much pain and feeling hopeless . . . SHAME ON you for abandoning a vulnerable person in misery . . . "); Ex. I ("You know when you stopped the treatment it killed me."); Ex. N ("This is mental pain you caused a human being under your watch.  You could have backed out at any minute or time.  Instead you abandoned me.  And now I'm stuck with pain.").  Nevertheless, Doe has failed to meet his burden to establish that all of the recipients of these messages share a common interest in Doe's mental health such that the common interest privilege applies.[19]

Doe argues that Mr. Dershowitz was "within the common-interest relationship" because Mr. Dershowitz has "known Doe and his family for ten to fifteen years" and was acting as Doe's attorney.  Doe Reply at 20-21.  Although Mr. Dershowitz attested that he received the messages in his capacity as Doe's attorney "to protect [Doe's] interests," Ex. V ¶ 7, Doe and Mr. Dershowitz did not execute a written retainer agreement until November 7, 2017, five months after Doe first included Mr. Dershowitz on an allegedly defamatory email. Ex. 18.  Moreover, on November 7, 2017, the day the retainer was signed, Mr. Dershowitz sent Doe an email stating: "It was good spending time with you this morning.  I learned a great deal from our conversation," suggesting that the meeting was a preliminary conversation regarding Doe's relationship with Dr. Conti.  *Id*.  Finally, Mr. Dershowitz's telephone records from April 1, 2017

---

[19]     Dr. Conti does not dispute, and the Court agrees, that Doe's parents, Dr. Jenike, Dr. Lippert, and Mr. Meyer all share a common interest in Doe's mental health.  *See Konikoff*, 234 F.3d at 99 (noting that the common interest privilege typically applies to statements made to a group of "private persons with an immediate relationship to the speaker, such as a family member or an employer's own employees"); Restatement (Second) of Torts 594, cmt. d (1977) ("[T]he interest of a parent in the social and moral welfare of his child . . . is sufficient to support a conditional privilege on the part of the parent); *Fleming v. Laakso*, No. 18-CV-1527, 2019 WL 959521, at *10 (S.D.N.Y. Feb. 5, 2019) (doctor's communications to hospital concerning plaintiff's mental health "fall comfortably within the common interest privilege"); *Boehner v. Heise*, 734 F. Supp. 2d 389, 399 (S.D.N.Y. 2010) (noting that the shared interest between the parties to a communication "need not be of a legal nature, as it can also be of a moral or social character.").  Nevertheless, as will be discussed *infra*, even as to recipients who share a common interest in Doe's mental health, there is a question of fact whether Dr. Conti has overcome the qualified privilege by showing that Doe acted with either actual or common law malice.

to November 30, 2017 reflect only one call with Doe prior to November 2017.  That call was on June 18, 2017, one week *after* Doe first included Mr. Dershowitz on an allegedly defamatory email.  *Id.*  Accordingly, a reasonable juror could conclude that Mr. Dershowitz was not acting in his capacity as Doe's attorney when he received Doe's allegedly defamatory messages and, accordingly, those statements are not protected by the common interest privilege.

Doe has also failed to establish that Mr. Barry or any employee of PPG, including Mr. Schorr, Ms. Patel, Ms. Carr, and Ms. Hepner, share a common interest in Doe's mental health. Doe's argument that Mr. Barry necessarily shares a corresponding interest in Doe's mental health simply because he is friends with Doe and is "deeply familiar with [his] mental health issues" is unpersuasive.[20]  Ex. XX ¶ 2.  Moreover, Doe's argument that he included Mr. Schorr on certain messages because Mr. Schorr has "an interest in Doe's well-being," Doe Reply at 22, is belied by Doe's own testimony.  When asked why Doe included Mr. Schorr on his email to Dr. Conti on June 13, 2017, more than two months after their therapeutic relationship had ended, Doe responded, "I don't know."[21]  Ex. 2 at 347:12-16.  Finally, the Court rejects Doe's arguments that Ms. Patel, Ms. Carr, and Ms. Hepner shared a common interest in Doe's mental health simply because they "treated and interacted with Doe for over a year."  Doe Reply at 22. Ms. Carr and Ms. Hepner's periodic interaction with Doe in their administrative roles at PPG

---

[20]     Doe did not argue that Mr. Barry fell within the common interest privilege until his reply brief.  Doe claims that he "did not address Mr. Barry in his opening brief because Mr. Barry was copied on only two of Doe's emails—Exhibits N & O—neither of which contain defamatory statements."  Doe Reply at 20.  The Court disagrees.  Doe accuses Dr. Conti of abandoning him during titration in both of the messages sent to Mr. Barry.  *See* Ex. N ("Settle I will kill myself because of the titration you abandoned me on before I ever settle . . . You could have backed out at any minute or time. Instead you abandoned me."); Ex. O (You take away a persons [*sic*] sense of self and abandon them during titration that's criminal.").  As noted *supra*, these statements are actionable defamatory statements.

[21]     Doe confirmed that he was no longer in treatment with Mr. Schorr when Doe included him on a June 13, 2017 email to Dr. Conti.  Ex. 2 at 347:9-11.

does not, without more, indicate that they inevitably shared an interest in Doe's mental health after the termination of a doctor-patient relationship between Dr. Conti and Doe.

In sum, the qualified common interest privilege does not apply to Doe's statements that Dr. Conti lied about the reasons for terminating treatment and was caught engaging in misconduct because they are not statements about Doe's own mental health. Further, the common interest privilege does not apply to any statements made to Mr. Barry, Mr. Schorr, Ms. Patel, Ms. Carr, or Ms. Hepner because Doe has failed to establish that those recipients have a common interest in Doe's mental health. Finally, there is a question of fact whether Mr. Dershowitz was acting in his capacity as Doe's attorney when he received the allegedly defamatory messages, putting him within the common interest.[22]

### iii.  Malice

A qualified privilege may be overcome by a showing of either actual or common law malice. *Chandok*, 632 F.3d at 815; *Liberman*, 80 N.Y.2d at 437-38; *Rosenberg v. MetLife, Inc.,* 8 N.Y.3d 359, 365 (2007). To show actual malice, a plaintiff must prove that the defendant either knew his statements were false or acted with reckless disregard as to whether they were false. *Chandok*, 632 F.3d at 815. A person acts with reckless disregard when he publishes the statement at issue entertaining serious doubts as to the truth of the statement or having a high degree of awareness that the statement is probably false. *Harte–Hanks Commc'ns v. Connaughton,* 491 U.S. 657, 667 (1989). "Although actual malice is subjective, a 'court typically will infer actual malice from objective facts.'" *Celle,* 209 F.3d at 183 (quoting *Bose*

---

[22]      Putting aside the statements that included Mr. Dershowitz, as to which there is a question of fact, the only other statements as to which Doe has established he might have a common interest privilege are statements regarding the impact of Dr. Conti's termination of treatment on Doe's mental health that were made only to Doe's parents, Dr. Jenike, Dr. Lippert, and Mr. Meyer. The only messages sent just to those five people are the messages sent on June 18, 2017 and September 7, 2017. *See* Exs. G, L. Because those messages are not about the impact of Dr. Conti's termination of treatment on Doe's mental health, the common interest privilege does not apply.

*Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189, 196 (1st Cir. 1982)).  To show

common law malice, a plaintiff must prove that the defendant was motivated "only" by "spite or

ill will."  *Liberman*, 80 N.Y.2d at 437-38.   The "critical difference" between actual and common

law malice is that actual malice focuses on the "defendant's attitude toward the truth," whereas

common law malice "focuses on the defendant's attitude toward the plaintiff."  *Konikoff,* 234

F.3d at 99.

    A question of fact exists whether Doe made the allegedly defamatory statements with

either actual or common law malice.  Doe repeatedly testified that he wrote the messages out of

shame, anger, and hurt.  Ex. 2 at 270:12-15; 272:21-24; 273:5-10.  Similarly, when asked what

effect he thought the messages would have on Dr. Conti, Doe responded "the same effect how he

hurt me."  *Id.* at 273:13-18.  A reasonable juror could conclude from that testimony that Doe sent

the allegedly defamatory messages out of "spite or ill will" only to hurt Dr. Conti.  *See*

*Liberman*, 80 N.Y.2d at 437.  Moreover, when asked whether he made certain statements to

shame Dr. Conti even though he had no factual basis for the statements, Doe responded that he

had.  *Id*. at 308:4-5 (Doe: "I wanted to shame him the way he shamed me.").  Although this

testimony was in response to questions about non-actionable statements regarding Dr. Conti's

purported infidelity, a reasonable juror could conclude that Doe's response suggests that he also

made his allegedly defamatory statements merely to shame Dr. Conti and without any factual

basis or with reckless disregard as to their falsity.  *See Goldwater v. Ginzburg,* 414 F.2d 324,

342 (2d Cir. 1969) ("There is no doubt that evidence of negligence, of motive and of intent may

be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact

of a defendant's recklessness or of his knowledge of falsity.").

In sum, there are questions of fact that a jury must resolve to determine whether Dr. Conti has defeated the common interest privilege, to the extent it is applicable, by showing that Doe made the allegedly privileged defamatory statements with actual or common law malice.

## II.    Dr. Conti's Motion for Summary Judgment is Denied

Dr. Conti moves for summary judgment on Doe's counterclaim for breach of confidentiality.  To prevail on a claim for breach of doctor-patient confidentiality, Doe must prove: (i) he had a doctor-patient relationship with Dr. Conti; (ii) Dr. Conti acquired information about Doe's treatment/diagnosis; (iii) Dr. Conti disclosed that information to a person unconnected with treatment in a manner that allowed Doe to be identified; (iv) Doe did not consent to the disclosure; and (v) Doe suffered damages.  *See Chanko v. Am. Broad. Cos. Inc.,* 27 N.Y.3d 46, 53-54 (2016).  Dr. Conti's motion focuses exclusively on the fifth element.

### i.    Emotional Damages

Dr. Conti argues that Doe "cannot prove that he suffered any damages" as a result of the disclosures in the amended complaint.  Conti Opp. at 36.  The Court disagrees.  Doe testified that Dr. Conti's disclosures of his personal information caused him to experience, *inter alia*, "embarrassment, shame, really being in a depressed place, rarely leaving [the] apartment, not being able to have energy, not handing [*sic*] to see family members because you hate yourself, not wanting to be around the office because there were certain people that you felt knew about your mental condition."  Ex. ZZ at 362:3-10.  Dr. Jenike testified that Doe became more anxious, depressed, withdrawn, and panicked after this case was commenced.  Ex. YY at 283:13-284:20.  Similarly, Dr. Lippert testified that Dr. Conti's disclosures "increased a lot of vulnerable issues" and made it harder for Doe to trust people.  Ex. OO at 262:5-23.  A reasonable juror could conclude from this evidence that Doe suffered emotional damage as a result of Dr. Conti's

disclosures. *See Chanko,* 27 N.Y.3d at 56 (holding that decedent's estate could pursue a claim

for breach of doctor-patient confidentiality after hospital allowed a news crew to film decedent

before he died without his consent because "evidence could very well reveal the level of

decedent's awareness that others were present while he was being treated, and any reaction he

may have had to their presence."); *Tighe v. Ginsberg,* 540 N.Y.S.2d 99, 101 (4th Dep't 1989)

(finding "no merit" to the argument that a claim for breach of doctor-patient confidentiality

"should be dismissed because it seeks recovery only for psychological and emotional damage but

not for physical harm, lost earnings or special damages.").

### ii.   Litigation Privilege

Dr. Conti also argues that Doe cannot prove that he suffered any cognizable damage

because Dr. Conti's disclosures are protected under the litigation privilege.  Conti Opp. at 37

("[b]ecause all of the complained-of statements were made in the context of litigation, they are

protected by New York's absolute litigation privilege.").  The Court disagrees.

"Under New York law, 'statements made by parties, attorneys, and witnesses in the

course of a judicial or quasi-judicial proceeding are absolutely privileged, notwithstanding the

motive with which they are made, so long as they are material and pertinent to the issue to be

resolved in the proceeding.'" *Lipin v. Hunt*, No. 14-CV-1081, 2015 WL 1344406, at *8

(S.D.N.Y. Mar. 20, 2015) (quoting *Kilkenny v. Law Office of Cushner & Garvey, LLP*,  905

N.Y.S.2d 661, 662 (2d Dep't 2010)).  New York courts have long recognized the litigation

privilege as a defense to defamation claims.  *Grayson v. Ressler & Ressler*, No. 15-CV-8740,

2018 WL 3611951, at *7 (S.D.N.Y. July 27, 2018) ("The law of New York for well over one

hundred years has provided 'absolute immunity from liability for defamation' for written

statements made by attorneys in connection with a court proceeding, when those statements are

'pertinent to the questions involved.'") (quoting *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (2015)).

Here, Dr. Conti provides no legal authority from the Second Circuit, and the Court is aware of none, to suggest that the litigation privilege can or should be extended to preclude a claim for breach of confidentiality.[23] *See e.g. Rapaport v. Strategic Fin. Sols., LLC*, 140 N.Y.S.3d 508, 509 (1st Dep't 2021) (holding that defendant's counterclaim for plaintiff's breach of the confidentiality provision of his employment agreement was *not* precluded by the litigation privilege); *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2,* 419 F. Supp. 3d 668, 692 (S.D.N.Y. 2019) (holding that the litigation privilege did not protect defendant, which had allegedly orchestrated a fraud scheme to obtain default judgments for unprovable debts, from being sued under the Fair Debt Collection Practices Act, the N.Y. General Business Law, or the N.Y. Judiciary Law); *Full Circle United, LLC v. Skee-Ball, Inc.,* No. 11-CV-5476, 2014 WL 12829195, at *7 (E.D.N.Y. May 13, 2014) (holding that litigation privilege did not apply to preclude a claim for breach of contract); *Sykes v. Mel Harris & Assocs., LLC,* 757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010) ("Because plaintiffs have not claimed defamation, the [litigation] privilege is wholly inapplicable").  More important, the litigation privilege only protects statements that are "material and pertinent to the issue to be resolved in the proceeding." *Lipin,*

---

[23]     Dr. Conti cites *Kutnick v. Fischer*, No. 81851, 2004 WL 2251799 (Ohio Ct. App. Oct. 7, 2004), in support of his argument that the litigation privilege bars Doe's counterclaim.  Doe does not address Dr. Conti's reliance on *Kutnick,* and inaccurately states that Dr. Conti "cites not a single case in which the 'litigation privilege' is applied outside of the defamation context." Doe Reply at 30.   In *Kutnick,* plaintiff sued her former psychiatrist for breach of doctor-patient confidentiality after he disclosed plaintiff's medical information to initiate a guardianship proceeding against her.  *Id.* at *2-3.  The court in *Kutnick* held that the litigation privilege applied to defendant's disclosures because they were "made in and *relevant to* the guardianship proceedings." *Id.* at *6 (emphasis added).  In other words, although the *Kutnick* court extended the litigation privilege to preclude a breach of confidentiality claim, it explained that it applied only because the defendant's disclosures were directly relevant to the guardianship proceedings.  Here, a reasonable juror could conclude that at least some of Dr. Conti's disclosures were not directly relevant to his defamation claim.

2015 WL 1344406, at *8.  Here, a reasonable juror could conclude that Dr. Conti exceeded the scope of the litigation privilege by disclosing information regarding Doe's mental illness, drug addiction, childhood, family dynamics, and lifestyle, that was not "material and pertinent" to his defamation claim.[24]

In sum, questions of fact remain as to whether Doe suffered damages as a result of Dr. Conti's disclosures.  Accordingly, Plaintiff's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, both parties' motions for summary judgment are DENIED.

In light of the denial of summary judgment, the next step is a trial in this case.  No later than **May 24, 2021**, Doe must show cause why, in light of the imminent trial, he should be permitted to remain anonymous.  Any response by Plaintiff must be filed on or before **May 28, 2021.**

The parties should be prepared to begin trial as soon as the third quarter of 2021.  The Court will inform the parties as soon as it receives a firm trial date; at that time a date will be set for a final pretrial conference.  The parties will receive at least one month's notice of their trial date.

Motions *in limine* are due **June 1, 2021**; oppositions are due **June 14, 2021**.  The parties' joint pretrial order, requests to charge, and proposed *voir dire* questions[25] are due **June 30, 2021**.

---

[24]     Dr. Conti also argues that he cannot be liable to Doe merely because he availed himself of his right to "access the courts" and asserts that he took "every possible precaution with Doe's confidential medical information by choosing to commence his lawsuit under seal." Conti Opp. at 38; Conti Reply at 7.  Doe does not dispute that Dr. Conti had the right to file a lawsuit against him but argues only that the extent of the disclosures violated doctor-patient confidentiality.  Doe Reply at 35 ("Conti could have sued Doe *without* violating confidentiality—he just chose to do otherwise.").  The Court agrees.  There is no dispute that Dr. Conti has a right to "access the courts." Nevertheless, a reasonable juror could conclude that Dr. Conti disclosed more information in his amended complaint than was necessary or pertinent to state a claim for defamation.

[25]     The parties' *voir dire* questions should be focused on questions that are unique to the facts of this case or to the circumstances under which the trial will be conducted (if COVID precautions are still in effect).

The Clerk of Court is respectfully directed to close the open motions at docket entries 232 and 246.


**SO ORDERED.**

**Date:  April 22, 2021**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**